ORIGINAL

IN THE UNITED STATES COURT OF FEDERAL CLAIMS

FILED
FEB 1 2008
U.S. COURT OF FEDERAL CLAIMS

| | |
|---|---|
| HOOPA VALLEY TRIBE, on its own behalf, and in its capacity as *parens patriae* on behalf of its members; Oscar Billings; Benjamin Branham, Jr.; William F. Carpenter, Jr.; Margaret Mattz Dickson; Freedom Jackson; William J. Jarnaghan, Sr.; Joseph LeMieux; Clifford Lyle Marshall, | Case No. ____________ |
| Plaintiff, | COMPLAINT |
| v. | 08-72 L |
| UNITED STATES OF AMERICA, | |
| Defendant. | |

## NATURE OF ACTION

1. Plaintiffs, Oscar Billings; Benjamin Branham, Jr.; William F. Carpenter, Jr.; Margaret Mattz Dickson; Freedom Jackson; William J. Jarnaghan, Sr.; Joseph LeMieux; Clifford Lyle Marshall, and the Hoopa Valley Tribe, in its own capacity and *as parens patriae* on behalf of its members ("Hoopa Valley Tribe" or "Tribe"), by and thorough undersigned counsel of record, seek money damages from Defendant United States of America for breach trust through discriminatory distributions of the proceeds of timber sales and other Reservation income of the former Hoopa Valley Indian Reservation, the "Joint Reservation."

## PARTIES

2. Plaintiff Hoopa Valley Tribe is a sovereign and federally recognized Indian tribe, possessing all legal rights and responsibilities afforded to federally recognized Indian tribes. The Tribe is organized under a Constitution and Bylaws ratified by Congress in 1988. The Tribe occupies the Hoopa Valley Indian Reservation (the "Reservation" or the "Square"), located in northwestern California, and is the beneficial owner of land and natural resources within the Reservation, title to which is held in trust by the United States for the benefit of the Tribe. The



ORIGINAL

Hoopa Valley Tribe is a named beneficiary of the Hoopa-Yurok Settlement Act ("HYSA" or "Settlement Act"), Pub. L. 100-580, *codified in part at* 25 U.S.C. § 1300i, *et seq*. The Tribe sues in its own capacity and in its capacity as *parens patriae* on behalf of its members.

3. Plaintiffs Oscar Billings; Benjamin Branham, Jr.; William F. Carpenter, Jr.; Margaret Mattz Dickson; Freedom Jackson; William J. Jarnaghan, Sr.; Joseph LeMieux; Clifford Lyle Marshall are enrolled members of the Hoopa Valley Tribe.

4. Defendant United States, through the Secretary of the Interior, Special Trustee for the Office of Special Trustee for American Indians, and the Secretary of the Treasury, as a matter of constitutional, statutory, regulatory, and federal common law, is trustee and a fiduciary to the Tribe and is charged with carrying out trust duties and responsibilities with regard to the management and administration of the Hoopa-Yurok Settlement Fund.

## JURISDICTION

5. This Court has jurisdiction over the subject matter of this action under 28 U.S.C. §§ 1505 (the Indian Tucker Act) and 1491 (the Tucker Act), as this action involves a claim against the United States for money damages brought by an Indian tribe arising under the Constitution, laws, treaties, or regulations of the United States, or Executive Orders of the President, including, but not limited to:

a. Hoopa-Yurok Settlement Act ("HYSA" or "Settlement Act"), Pub. L. 100-580, *codified in part at* 25 U.S.C. § 1300i, *et seq.*; and

b. The Act of October 25, 1994 (American Indian Trust Fund Management Reform Act of 1994), Pub. L. No. 103-412, codified at 25 U.S.C. §§ 161a, 162a, and 4001–4061 (1997), which imposes various accounting, auditing, fund management, reconciliation and reporting obligations on the United States; and

c. Act of June 24, 1938, ch. 648, 52 Stat. 1037 (*codified as amended at* 25 U.S.C. § 162a (2000)).

6. The United States has waived its sovereign immunity under 28 U.S.C. §§ 1491 and 1505. *United States v. Mitchell*, 469 U.S. 206, 228 (1983).

**ALLEGATIONS COMMON TO ALL CLAIMS FOR RELIEF**

7. Congress has charged the Secretary of the Interior with the duty to collect income derived from tribal trust assets and to deposit such income in the United States Treasury and other depository institutions for the benefit of the Tribe. Pursuant to the duties and authority delegated by Congress, the Secretary of Interior exercises comprehensive control over the trust funds that were or are in the Hoopa-Yurok Settlement Fund.

8. Under longstanding constitutional, statutory, and federal common law, and based upon the historic relationship between the United States and Indian tribes, the United States assumed the obligations and duties of a trustee by establishing and maintaining comprehensive regulatory control of funds derived from tribal trust lands and resources. The United States owes a trust duty to the Tribe with regard to the Hoopa-Yurok Settlement Fund. In the exercise of that trust duty, the United States is held to the most exacting fiduciary standards.

9. The United States has failed to administer the Settlement Fund consistent with federal law and has permitted and/or authorized the disbursement of the Settlement Fund in violation of statutory, regulatory, and common law trust duties owed to the Tribe.

**History Leading to the Hoopa-Yurok Settlement Act**

10. The Hoopa Valley Reservation, as it existed from 1891–1988,[1] consisted of three parcels, of which the "Square" was the largest. The first parcel, the Klamath River Reservation was reserved by Executive Order in 1855. In 1864, Congress passed a statute authorizing four reservations for Indians in California and later that year the Hoopa Square became one of them. An Executive Order in 1876 formally defined the boundaries of the Square. Although the Tribe did not know it at the time, the third parcel, a thirty-five mile strip between the two reservations, gained reservation status in 1891 by an Executive Order that joined the Klamath River and Hoopa parcels. Thus after 1891 the three parcels were enclosed within one continuous boundary.

11. As connected by the Executive Orders, the 1891 Reservation spanned traditional tribal areas of two tribes, the Hoopas and the Yuroks. The Yurok parcels, valuable redwood timber lands, were largely allotted to individual Indians in the 1890s. Most of the Hoopa Square was reserved from allotment.

12. By 1955, many of the Yurok allottees had sold their land and timber, and little unallotted land remained on the Extension. In 1955, at the request of the Hoopa Valley Tribe, the BIA began to sell timber from the Square. The BIA distributed the proceeds as directed by the constitutionally-established Hoopa Valley Business Council. The Interior Department Solicitor approved the distributions. 65 I.D. 59, 2 Op. Sol. Int. 1814 (1958). Certain nonmembers of the Hoopa Valley Tribe sued the United States in 1963, claiming that, although

[1] The Reservation consisting of the Square, the former Klamath River Reservation, and the Connecting Strip has been referred to variously as the "1891 Reservation," "former Reservation," and "Joint Reservation."

they were not enrolled in any tribe, they too should receive per capita payments. *Jessie Short, et al. v. United States*, No. 102-63 (Ct. Cl.).[2]

13. In 1973, the *Short* court ruled that the Federal Executive Orders made the three reservation parcels a single unified reservation from 1891 onward, and the Bureau had violated statutory trust duties to non-Hoopa "Indians of the Reservation" by its administration of trust funds generated by Joint Reservation resources which should have been used for the benefit of all Indians of the Reservation. The Court set about determining who those excluded Indians of the Reservation were. *Short I*, 202 Ct. Cl. 870 (1973) (per curiam), *cert. denied*, 416 U.S. 961 (1974).

14. On April 24, 1988, the Hoopa-Yurok Settlement Act was introduced as H.R. 4469. Two House and two Senate hearings were held in June and September 1988. The Senate version of the bill, S. 2723, was signed into law on October 31, 1988, as Public Law 100-580, 102 Stat. 2924.

15. Special Trustee Ross O. Swimmer, who was the Assistant Secretary of Interior Indian Affairs in 1988, provided testimony opposing certain provisions in the Senate Bill. In 1988, Mr. Swimmer advocated that the Yurok General Council, not the Yurok Interim Council, act upon the proposed waiver of claims, by the Yurok Tribe. Different language was adopted by Congress. Sections 2(c)(4) and 9(d) of the Act assigned that task to the Yurok Interim Council. 102 Stat. 2926, 2933.

---

[2] *Short v. United States* includes seven reported opinions (202 Ct. Cl. 870 (1973); 661 F.2d 150 (Ct. Cl. 1981); 719 F.2d 1133 (Fed. Cir. 1983); 12 Cl. Ct. 36 (1987); 25 Cl. Ct. 722 (1992); 28 Fed. Cl. 590 (1993); and 50 F.3d 994 (Fed. Cir. 1995)) and hundreds of unreported orders. *Short*, still pending after 44 years, also spawned many related lawsuits. *Short* is a "breach of trust" case against the United States.

**The Hoopa-Yurok Settlement Act**

16. Section 2 of the Settlement Act authorized splitting the 1891 Reservation into the new Hoopa Valley Reservation and the Yurok Reservation, conditioned upon the Hoopa Valley Tribe enacting a resolution waiving certain claims. Yurok reservation land additions and other benefits were similarly conditioned upon a claims waiver by the Yurok Interim Council.

17. Section 4 of the Settlement Act established a Hoopa-Yurok Settlement Fund pooling the Escrow funds—all Hoopa or Yurok trust funds in existence on the date of the Act. Section 4(c) authorized certain distributions from the Settlement Fund.

18. Section 5 directed the Bureau to establish the Hoopa Yurok Settlement Roll using criteria established for "Indians of the Reservation" in the *Short* case. The Settlement Roll was completed and published on March 21, 1991. 56 Fed. Reg. 12,062.

19. Section 6 established three choices that were available to persons on the Settlement Roll: Hoopa tribal membership, Yurok tribal membership, or receipt of a lump sum payment. Nearly 3000 persons, approximately eighty percent (80%) of those on the Settlement Roll, selected the Yurok tribal membership option, together with a $5000 payment ($7500 for persons over age 50). Most of the adults selecting Yurok tribal membership (about 1800 persons) were plaintiffs previously held to be Indians of the Reservation in the *Short* case. In addition to the Settlement Act payments made to those members, as *Short* plaintiffs they each ultimately received damage awards of approximately $25,000, depending upon the distributions of reservation funds from which they had been excluded.

20. Sections 8 and 9 addressed tribal governance problems. Section 8 ratified and confirmed the 1972 Constitution of the Hoopa Valley Tribe. Under Section 9, a 5-member Interim Council of the Yurok Tribe was to be elected to prepare a constitution and perform other

functions, including consideration of opting to obtain certain benefits offered in the Settlement Act by enacting an unconditional claim waiver. Yurok members completed and approved a constitution in 1993.

21. Section 14 directed the Interior Department to report the outcome of litigation to Congress, which would consider amendments to the Settlement Act.

**The Hoopa-Yurok Settlement Fund**

22. The Settlement Fund established by Section 4 of the HYSA, 25 U.S.C. § 1300i-3, combined seven existing trust accounts and $10 million in federal appropriations. The seven trust accounts, known as the "escrow funds," came about because federal laws required the Secretary of the Interior to deposit into U.S. Treasury trust accounts the income from certain BIA regulated activities such as logging on unallotted lands, leases of unallotted lands, and tribal commercial fishing income. For example, in 1991, the total Settlement Fund amounted to about $85 million dollars ($75 million from the escrow accounts, plus $10 million in new federal money).

23. The escrow funds included monies from the Yurok Reservation as well as from the Hoopa Reservation, but the funds from the Yurok Reservation were comparatively small. For example, the proceeds of Klamath River Reservation account totaled about $75,000. The proceeds of labor (Lower Klamath) totaled about $17,000. The proceeds of labor (upper Klamath) totaled about $219,000. The Klamath River Fisheries account totaled approximately $459,000. The major escrow accounts were those originating from logging on the Hoopa Square, particularly the "70%" account, and the "Reservation wide" account. These accounts had been set aside by the BIA for the benefit of the "Indians of the Reservation," a group that expressly included the Hoopa Valley Tribe.

24. The BIA Office of Tribal Services prepared an analysis of the components of the Settlement Fund in their Memorandum regarding Issuance of Per Capita Checks from the Hoopa Yurok Settlement Act Funds, dated October 24, 1991. They concluded that 1.263% of the escrow funds came from the Yurok Reservation. Over 98% of the monies in these accounts which became the Settlement Fund were derived from clear-cutting forests on the Hoopa Square.

25. The escrow accounts were the subject of the *Short v. United States* litigation. *Short* held that the Secretary of the Interior has authority over the sale and management of timber and other income of the Joint Reservation because 25 U.S.C. § 407 established a fiduciary relationship with the Hoopa and other Indians of the Reservation with respect to the timber, and can fairly be interpreted as mandating compensation for damages sustained through discriminatory distribution of the funds.

26. *Short* plaintiffs sought to have the court award them the escrow funds in their entirety, but the court refused saying:

> Under [25 U.S.C.] § 407, Congress has stated that the income from the sale of timber on unallotted lands "shall be used for the benefit of the Indians who are members of the tribe or tribes concerned in such manner as [the Secretary] may direct." . . . While the Secretary does exercise discretion over these funds, such discretion is not unlimited. The action must be consistent with the government's overriding fiduciary obligation to Indian tribes and individual Indians in the management of their resources, property, and affairs.
>
> The violation of these duties under the statute would give rise to an action for money damages. . . . The *Short* escrow funds remains subject to the Secretary's discretion and <u>shall be expended as the Secretary determines, for the benefit of the Indians of the Reservation as provided by statute</u>, and in a manner otherwise consistent with this Opinion and previous court decisions.

*Short v. United States*, 12 Cl. Ct. 36, 45 (1987), *aff'd*, 50 F.3d 994 (Fed. Cir. 1995) (emphasis added).

27. The monies in the Fund were only partly distributed under the HYSA. The Act offered portions of the Fund to the Yurok Tribe and its members if the Yurok Interim Council and its members waived their claims against the United States. 25 U.S.C. §§ 1300i-1(c)(4) and -5(c)(4). The individual Yurok members waived their claims and received payments;[3] the Yurok Interim Council, acting on behalf of the tribal government, refused to waive the Tribe's claims.

28. Under the Settlement Act, the Secretary of Interior was required to "invest and administer" . . . "as Indian trust funds pursuant to . . . 25 U.S.C. § 162a" any funds that were not distributed under the Settlement Act.

**Waiver and Payment Provisions of the HYSA**

29. The tribal claim waiver provisions appear in Sections 2 and 9 of the HYSA. Individuals on the Settlement Roll granted waivers pursuant to Section 6 of the Act. The waiver provisions arose from concerns that a taking of property protected by the Fifth Amendment could be found by a court reviewing the Act. Ultimately, the courts found no takings.

30. The Hoopa Valley Tribe was required to enact a waiver within sixty days of the passage of the Act in order to effect the partition of the Reservation and the ratification of the Tribe's Constitution. Due to the process established in the HYSA, the Yurok Tribe had over five years from passage of the Act to consider a proposed waiver through its Interim Council. The Interim Council was granted complete authority to adopt a resolution waiving any claim the Yurok Tribe may have against the United States arising out of the provisions of the Act. Section 9(d)(2).

---

[3] The HYSA authorized certain payments from the Settlement Fund, including over $17 million which was paid to Yurok Tribe members under 25 U.S.C. § 1300i-5(c)(3) and to the Yurok Transitional Team under 25 § U.S.C. 1300i-3(a)(3).

31. The proposed bill initially required that the Yurok waiver issue be decided at the organizational meeting, but that suggestion was scrapped in favor of delegating that decision to the 5-member Yurok Interim Council which had a statutory life span of two years. Section 9(d)(5). The Senate committee adopted an amendment assigning the claims waiver resolution responsibility to the Interim Council instead of the General Council. S. Rep. 100-564 at 26 (1988). The Act expressly distinguished among the Yurok Transition Team, the Yurok Interim Council, and the governing body under the proposed Yurok Constitution.

32. The Senate Report explains that the authority for certain transfers of funds and lands:

> [S]hall not be effective unless the Interim Council of the Yurok Tribe adopts a resolution waiving any claims it might have against the United States under this Act and granting consent as provided in section 9(d)(2). Section 9 of the bill provides for an Interim Council to be elected by the General Council of the tribe.

S. Rep. 100-564 at 18 (1988).

33. The Yurok Tribe's Interim Council had only two years to make a choice: enact a waiver and receive the portion of the Fund which the HYSA awarded (plus certain lands, et cetera), or refuse to grant a waiver and instead conduct takings claims litigation.

**Application of the Waiver Requirement**

34. On December 7, 1988, the Interior Department published a notice that the Hoopa Valley Tribe had adopted a valid resolution which met the requirements of Section 2(a)(2)(A) of the Act. 53 Fed. Reg. 49,361. The approved resolution noted that "the waiver required by the Act does not prevent the Hoopa Valley Tribe from enforcing rights or obligations created by this Act, S. Rep. 100-564 at 17." As a result, the 1891 Reservation was partitioned. The boundaries of the two new reservations are described in the Federal Register and comport with traditional tribal areas. 54 Fed. Reg. 19,465 (May 5, 1989); *see* S. Rep. 100-564 at 17–18.

35. In accordance with the HYSA, a roll of eligible Indians was prepared and approximately 3000 persons selected the option of membership in the Yurok Tribe. Under Section 6(c)(4), persons electing Yurok membership waived their individual claims and also granted to members of the Interim Council a proxy directing them to grant necessary tribal consent and approve a proposed resolution waiving any claim arising out of the Act that the Yurok Tribe may have against the United States. Under Section 9(c), the Secretary of the Interior prepared a voter list for adults who elected the Yurok tribal membership option, convened a General Council meeting of the eligible voters, and conducted an election of a five-member Interim Council.

36. The HYSA carefully and specifically defined "Interim Council" in Section 9. The Interim Council replaced the Yurok Transition Team, a federal instrumentality which had been appointed by the Secretary of Interior shortly after passage of the Act. Sections 9(a)(3) and 14(a).[4] As anticipated in the HYSA, during the two-year lifespan of the Yurok Interim Council, the Tribe adopted a constitution and chose a governing body.[5] The Act also anticipated that the Interim Council would waive its takings claims and accept the settlement. The Interim Council did not do so.

37. On March 11, 1992, the Yurok Interim Council filed *Yurok Indian Tribe v. United States*, No. 92-CV-173 (Fed. Cl.). The complaint asserted "claims for just compensation under the Fifth Amendment to the Constitution of the United States for the taking of compensable

---

[4] The last sentence of Section 14(a) was added by Pub. L. 101-301 and codified at 25 U.S.C. § 1300i-11(a) to protect the Yurok Transition Team.

[5] The Yurok Interim Council successfully gained federal recognition of a 9-member Yurok Tribal Council, elected pursuant to the October 22, 1993, Constitution, and received grants and contracts to aid the exercise of future tribal governing authority over the Yurok Reservation.

property and property rights of the Yurok Tribe by the United States under the [HYSA]." This takings claim was among the claims that were to be waived by the Interim Council prior to November 25, 1993. 25 U.S.C. §§ 1300i-1(c)(4) and 1300i-11(a).

38. The Yurok Interim Council refused the offer contained in the HYSA and opted to transform a "protective" suit into a nine-year litigation campaign. The results were dismissal of the Yurok Tribe's claims. *Karuk Tribe of California, et al. v. Ammon*, 41 Fed. Cl. 468 (1998), *aff'd*, 209 F.3d 1366, 1372 (Fed. Cir. 2000), *cert. denied*, 532 U.S. 941 (2001) ("This litigation is the latest attempt by plaintiffs to receive a share of the revenues from timber grown on the square.").[6]

39. The Yurok Interim Council did adopt a resolution regarding the claim waiver near the end of its term, Resolution No. 93-61, but the Interior Department ruled that it did not qualify as a resolution waiving claims the Yurok Tribe had against the United States. The resolution specifically preserved the right to pursue the lawsuit that the Interim Council had filed earlier in March 1992.

**Prior Consistent Positions of the Department of the Interior Rejecting New Waiver**

40. In 1992, The Assistant Secretary – Indian Affairs explained the situation as follows:

> The Hoopa-Yurok Settlement Act, 25 U.S.C. § 1300i-8(d)(2)(i), authorizes the Interim Council to adopt a resolution waiving any claim the Yurok Tribe may have against the United States arising out of the provisions of the Settlement Act. Section 2(c)(4) of the Settlement Act, 25 U.S.C. § 1300i-!(c)(4), spells out the consequences to the Yurok Tribe of refusing to adopt such a resolution. It provides as follows: 'The - (A) apportionment of funds to the Yurok Tribe as provided in sections 1300i-3 and 1300i-6 of this title; (B) the land transfers pursuant to paragraph (2); (C) the land acquisition authorities in paragraph (3); and (D) the

[6] The Hoopa Valley Tribe incurred substantial expense defending against the years of litigation brought by the Yurok Tribe and its members.

> organizational authorities of section 1300i-8 of this title shall not be effective unless and until the Interim Council of the Yurok Tribe has adopted a resolution waiving any claim such tribe may have against the United States arising out of the provisions of this subchapter.' It is clear that the Interim Council's decision to file the above-reference claim in the U.S. Claims Court means that the same consequences follow as if it fails to enact a resolution waiving claims against the United States. Therefore, unless and until the Interim Council waives the Tribe's claims and dismisses its case against the United States, it will neither have access to its portion of the Settlement Fund, . . . .

Letter of Eddie F. Brown, Asst. Secretary-Indian Affairs to Honorable Dale Risling, Sr., Chairman, Hoopa Valley Tribe (Apr. 13, 1992) (emphasis added).

41. The BIA Sacramento Area Director requested an opinion on several issues that arose at the organizational meeting of the Interim Council held on November 25–26, 1991. Duard R. Barnes, Assistant Solicitor, Branch of General Indian Legal Activities, responded with a thorough opinion on February 3, 1992, which concluded:

> (1) The Interim Council of the Yurok Tribe automatically dissolved two years after November 25, 1991;
>
> (2) The Settlement Act permits three separate Interim Council resolutions, if necessary, to address claim waiver, contribution of escrow monies, and receipt of grants and contracts; and
>
> (3) Refusal to pass a resolution waiving claims against the United States and/or filing a claim would prevent the Yurok Tribe from receiving the apportionment of funds, the land transfers, and the land acquisition authorities provided by various sections of the Settlement Act, but would not preclude the Yurok Tribe from organizing a tribal government.

42. On November 23, 1993, Assistant Secretary – Indian Affairs Ada E. Deer wrote to the Vice-Chairman of the Yurok Interim Council expressing willingness to accept the decision of the Yurok Tribe to organize outside the authority offered by the Settlement Act. The Assistant Secretary cautioned that the Yurok Interim Council would, on November 25, 1992, lose the legal powers vested in it by the Settlement Act. The Assistant Secretary said, "the authority vested in the Interim Council by section 2(c)(4) of the Act to waive claims against the

United States will expire on November 25, 1993." The Assistant Secretary pointed out that "[a]ny subsequent waiver of claims by the Tribe will be legally insufficient."[7]

43. On April 4, 1994, Assistant Secretary – Indian Affairs Ada E. Deer wrote to the Chair of the Interim Tribal Council of the Yurok Tribe concerning its Resolution No. 93-61, approved November 24, 1993. That resolution declared that to the extent the Act "is not violative of the rights of the Yurok Tribe . . . under the Constitution . . . or has not effected a taking . . . [then] the Yurok Tribe hereby waives any claim which said Tribe may have against the United States" arising out of the provisions of the Act. The Assistant Secretary determined that the resolution did not meet the requirements of the Act. She stated:

> It is quite clear that Resolution No. 93-61 specifically preserves, rather than waives, the Yurok tribe's taking claim against the United States. Indeed, the Yurok Tribe has filed a claim in the U.S. Court of Federal Claims asserting that the Hoopa-Yurok Settlement Act effected a taking under the Fifth Amendment of the United States Constitution.

*Id.* at 2–3. The Assistant Secretary reaffirmed the February 3, 1992, Solicitor's Opinion conclusion that the suit in the Claims Court would produce the same results as would the Interim Council's failure to enact a resolution waiving claims under the Act. She also noted that her conclusion was consistent with the Yurok Interim Council's letter stating that "the Interim Council would not provide any such waiver during its term."[8] *Id.*

44. On March 14, 1995, Assistant Secretary – Indian Affairs Ada E. Deer wrote to the Yurok Tribal Council rejecting the Tribal Council's request for reconsideration of her decision of April 4, 1994. The Assistant Secretary explained that the legislative history of the Act indicates

---

[7] The Yurok Tribe could have challenged the Assistant Secretary's determination that any waiver after November 25, 1993, would be legally insufficient, but failed to do so. Defendant's subsequent decision reversed this determination.

[8] The 1994 decision of the Assistant Secretary also could have been challenged, but was not.

that potential taking claims against the United States were precisely the type of claims Congress was most concerned about, which explained why waivers of claims were essential elements to triggering key provisions of the Act. Because the Yurok Tribe could no longer make a valid waiver, the Assistant Secretary offered the possibility of a settlement before the claim was extinguished by judgment:

> In our opinion, the Tribe's decision to prosecute its claim in this litigation is inconsistent with the waiver of claims required under the Act. Were there to be a settlement of the lawsuit, it would have to be accomplished before the case has proceeded to a determination on the merits. This is necessary to both save time, energy and money on costly legal proceedings and because a settlement will not be possible if the court has ruled on any portion of the merits.

*Id.* at 2.

45. The Assistant Secretary also rejected the contention that the Act's waiver requirements violate the doctrine of unconstitutional conditions, a then-undecided issue in the litigation. She explained that:

> [T]he statutorily required waiver of taking claims against the United States in exchange for valuable property benefits is rationally tied to the Act's purpose to resolve longstanding litigation between the United States and various Indian interests and to promote effective management of the Hoopa Valley and Yurok Indian Reservations by their respective tribal governments.

*Id.* at 1. The Assistant Secretary urged the Yurok Tribe to seek a stay of proceedings in *Yurok Tribe v. United States* in order to conduct a referendum and undertake settlement negotiations.

46. On May 17, 1996, the parties to *Yurok Tribe v. United States* (which had been consolidated with other claims under the heading of *Karuk Tribe of California, et al. v. United States, et al.*, No. 90-CV-3993), filed a joint motion to postpone proceedings and continue settlement talks. Eventually, on August 6, 1998, the court granted summary judgment to the United States and the Hoopa Valley Tribe, and dismissed the complaints. *See Karuk Tribe of*

*California v. United States*, 41 Fed. Cl. 468 (1998), *aff'd*, 209 F.3d 1366 (Fed. Cir. 2000), *cert. denied*, 532 U.S. 941 (2001).

47. In the settlement efforts, the federal defendants were concerned that, unless the Act's benefits could be made available there would be little incentive for the Yurok Tribe to settle. The Assistant Secretary's March 14, 1995, letter proposed a solution. No settlement offer was accepted. The takings litigation was concluded on the merits by the U.S. Supreme Court's Order of March 26, 2001.

**Interior's 2002 Report to Congress**

48. Pursuant to Section 14(c) of the HYSA, in March 2002 the Department submitted a report to Congress after the conclusion of the Yurok's case with its recommendations for amending the Act and addressing the HYSA Fund. Interior concluded that because the Yurok Tribe did not waive its claims arising from the HYSA, Yurok had no rights to the Fund under the Act, stating, "it is the position of the Department that the Yurok Tribe did not meet the waiver conditions of the Act and is therefore not entitled to the benefits enumerated within the Act." Report at 7.

49. The Report also contained the Interior Department's positions that to withhold the funds in their entirety, or to allow any accrued funds to revert to the Treasury, would not be an effective administration of the intent of the Act, and that Congress intended the Act to provide the tribes and their reservations with the means to acquire some financial and economic benefit and independence which would allow each tribe to prosper in the years to come. *Id.* at 6–7.

50. Under the circumstances in 2002, the only authority the Secretary had was to "invest and administer such fund as Indian trust funds." 25 U.S.C. § 1300i-3(b). As a result, the Interior Department recommended in the Report to Congress as follows: (1) the Settlement Fund

be retained in trust account status; (2) there be no general distribution of Settlement Fund dollars to any tribe or individual, but the Fund be "administered for the mutual benefit of both the Hoopa Valley and Yurok tribes"; (3) Congress should fashion a mechanism for the future administration of the Settlement Fund; and (4) Congress should consider new legislation which would authorize two separate permanent funds to benefit the Hoopa and Yurok Tribes in a manner that fulfills the intent of the original Act. *Id.* at 7–8.

51. In August 2002, the Senate Committee on Indian Affairs held a hearing on Interior's Section 14(c) Report. At the hearing, the Assistant Secretary – Indian Affairs testified that "[i]t is our position that it would be inappropriate for the Department to make any general distribution from the Fund without further instruction from Congress." *Id.* at 91 (S. Hrg. 107-648 at 88 (Aug. 1, 2002)). At the hearing's conclusion, Senator Inouye directed the tribes to agree on how to divide the funds and invited the tribes to also address infrastructure and economic development needs.

52. The tribes engaged in mediation and the resulting agreement was introduced as federal legislation, S. 2878 in September 2004. That bill failed. The agreement included no detailed agreement on how to divide and distribute the Hoopa-Yurok Settlement Fund, but stated that the Secretary of the Interior should prepare a report concerning the Settlement Fund and that "no expenditure from the Settlement Fund shall be made prior to submission of the report, and Congressional action upon such report, except as may be agreed upon by the Hoopa Valley and Yurok Tribes pursuant to their constitutional requirements."[9]

[9] That agreement was also embodied in S. 2878, § 2(5)(D)(ii): "No expenditures for any purpose shall be made from the Settlement Fund before the date on which, after receiving the report under clause (i), Congress enacts a law authorizing such expenditures, except as the Hoopa Valley Tribe and the Yurok Tribes may agree pursuant to their respective constitutional requirements."

**Swimmer's Decisions of March 1 and March 21, 2007, Reversing Previous Policy**

53. On March 1, 2007, the Special Trustee Ross O. Swimmer, issued a decision reversing prior Department opinions concerning the Settlement Fund remainder. Defendant Swimmer's decision concluded that the Department "can distribute [the Hoopa-Yurok Settlement] funds to the Yurok Tribe administratively, consistent with the provisions of the Act, if the Yurok Tribe were to submit a new waiver of claims as required by the Act."

54. Swimmer's decision indicates that the "share set aside in 1991 for the benefit of the Yurok Tribe (roughly $37 million), with interest accrued over the past fifteen years (now totaling roughly $90 million), as well as funds authorized by the Act specifically for the Yurok Tribe (roughly $3.1 million)" would be distributed "after the Department has received an unconditional waiver from the Yurok Tribe consistent with the Act."

55. The March 1, 2007, decision of Special Trustee Swimmer does not cite or quote the HYSA and does not acknowledge the prior consistent position of the United States that the Yurok Tribe did not timely, and now cannot, meet the waiver conditions of the Act and is, therefore, not entitled to certain benefits enumerated within the Act. The decision merely states that "[t]he Yurok Tribe proposes now to provide the Department with a new, unconditional waiver of claims, a concept not proposed at the time of the 2002 hearing."

56. Swimmer's dramatic reversal of the Department's prior positions is based on a flawed reading of the HYSA which enabled him to make the following conclusions: (1) "the Act does not specify a time limitation . . . on the ability to provide a waiver"; (2) "nothing in the Act states that the Yurok Tribe's choosing to litigate its takings claim would cause the Tribe to forfeit the benefits under the Act"; and (3) even though "[t]he Act authorized the Yurok Interim

Council, an entity that ceased to exist in 1993, to provide the requisite waiver under the Act . . . the current governing body of the Yurok Tribe can submit the waiver required by the Act."

57. On March 21, 2007, Special Trustee Swimmer issued a supplemental decision accepting a new waiver from the Yurok Tribe. The March 21, 2007, letter states that Swimmer received a new waiver from the "Yurok Tribal Council" on March 21, 2007.

58. Swimmer described the waiver as an "unconditional waiver of claims" and, without analysis, found that "the resolution meets the requirements of the Act." *Id.* Accordingly, Swimmer announced that the Department would distribute the funds to the Yurok Tribe on April 20, 2007.

59. Special Trustee Swimmer's letters ignored both the Act and the fact that the Yurok Tribe's Constitution, Art. IV Section 5(a) prohibits the 9-member Yurok Tribal Council from enacting a new waiver, requiring a referendum vote of members instead. The supplemental decision states that the "Yurok Tribal Council" enacted the waiver resolution. It would appear that the new waiver violates tribal law, as no referendum vote was held in the days between the two decisions.

**Interior Board of Indian Appeals**

60. On March 22, 2007, the Hoopa Valley Tribe filed an appeal of the March 1 and March 21, 2007, Swimmer decisions with the Interior Board of Indian Appeals ("IBIA").

61. In the IBIA, the Tribe alleged that Mr. Swimmer's decisions are invalid and that the Secretary cannot, as a matter of law, receive and accept a new waiver at this later date from this Yurok body consistent with the HYSA. The Tribe sought to enjoin the release of the Settlement Fund.

62. On March 27, 2007, the IBIA docketed and dismissed the Tribe's Notice of Appeal and Statement of Reasons without reaching the merits, stating that the IBIA lacked jurisdiction.

63. On April 17, 2007, the Tribe sought reconsideration of the IBIA's March 27, 2007, decision. On April 20, 2007, the IBIA denied reconsideration. The IBIA noted: "In characterizing the Special Trustee's action as one to administer the Settlement Act by allocating the balance of the Settlement Fund, we express no opinion on the merits of whether or not the action was authorized by the Settlement Act." 44 IBIA 247, 250, n.4. The Tribe's efforts to have the Secretary "refer" the matter to the IBIA were rejected by the Solicitor's Office that same day.

**Swimmer's Letter of April 20, 2007, Transferring Ownership of the Settlement Fund**

64. Also on April 20, 2007, Special Trustee Swimmer sent a letter stating that "nothing precludes me from taking action consistent with the decision in this matter. As of 10:00 a.m. Eastern Daylight Time today, I have advised the custodian of the account holding the remaining balance of the Hoopa-Yurok Settlement Fund that its ownership has been transferred solely to the Yurok Tribe." Swimmer also transferred the funds to a private Yurok account held by Morgan Stanley.

**Yurok's Per Capita Designs for the Settlement Fund**

65. In January 2008, the Secretary acquiesced as the Yurok Tribe began distributing through per capita payments to only its members over $80 million from the tribal trust funds that were held as part of the Settlement Fund. Each of approximately 5,200 members received $15,652.89.

66. This Court has remedied discriminatory distribution via per capita payments from the Hoopa escrow funds before and has held that where Defendant "handled the monies in the fund contrary to law, then plaintiffs could be entitled to damages." *Short VI*, 28 Fed. Cl. at 591.

67. The Hoopa Valley Tribe has and will continue to suffer harm and loss from Defendant's administration of the Settlement Fund in violation of federal law and Defendant's fiduciary obligations to the Tribe by unlawfully distributing the Fund to only the Yurok Tribe for use as a per capita that benefits only Yurok members.

## CLAIMS FOR RELIEF

## FIRST CLAIM FOR RELIEF

### Breach of Trust and Fiduciary Duties: Accepting the Yurok Tribe's Waiver in Contravention of the HYSA

68. Plaintiffs incorporate by reference all proceeding paragraphs.

69. Congress in the HYSA gave only to the 5-member Yurok "Interim Council" the right to agree to or reject a waiver of the Yurok taking claims by 1993. The Interim Council did not enact such a waiver and instead filed a lawsuit, and litigated its takings claims, thereby rebuking Congress's offer.

70. The Interim Council exhausted its takings claims through litigation that ended in a decision on the merits against the Yurok Tribe.

71. For more than thirteen years, until the issuance of the decision on March 1, 2007, Defendant consistently took the position that the Yurok Tribe did not meet the waiver conditions of the Act and had lost the opportunity to obtain the benefits enumerated within the Act prior to amendment of the HYSA.

72. Defendant's March 1 and March 21, 2007, decisions represent a 180-degree change of course that is not supported by the record or the plain statutory language of the HYSA.

73. The Yurok Tribe's takings claim is extinguished and can no longer be "waived."

74. The Yurok Tribe did not meet the waiver requirements under the Act and is, therefore, not entitled to receive the Settlement Fund or other benefits under the Act.

75. Defendant has violated the requirements of the HYSA by: (1) allowing the Yurok Tribe to issue a new unconditional waiver under the HYSA even though this 9-member Council does not have authority to issue such a waiver and the Yurok Tribe already elected not to waive its claims litigating them to a final decision on the merits instead; and (2) accepting the Yurok Tribe's new unconditional waiver that was issued in violation of tribal law.

76. Defendant's maladministration of the Settlement Fund breaches fiduciary trust duties that arise out of statutes, regulations, executive orders, and federal common law described above.

**<u>SECOND CLAIM FOR RELIEF</u>**

<u>Breach of Trust and Fiduciary Duties: Exceeding Statutory Authority</u>

77. Plaintiffs incorporate by reference all proceeding paragraphs.

78. Federal law requires Defendant to manage the Hoopa-Yurok Settlement Fund created by the HYSA as a tribal trust fund. The BIA testified to Congress that the monies must be retained in trust account status rather than generally distributed while Congress fashions further legislation. S. Hrg. 107-648 at 88 (Aug. 1, 2002). The Bureau of Indian Affairs testified that the funds should be used for the benefit of both tribes.

79. Section 4(a)(1) of the HYSA states: "Upon enactment of this Act, the Secretary shall cause all the funds in the escrow funds, together with all accrued income thereon, to be deposited into the Settlement Fund." The HYSA (and the Hoopa waiver) only permitted the Secretary to make distributions from the Settlement Fund "as provided in this Act"; otherwise,

Congress required the Secretary to "invest and administer such Fund as Indian trust funds pursuant to . . . [25 U.S.C. §] 162(a)." Section 4(b), 25 U.S.C. § 1300i-3(b).

80. The HYSA did not end the trust relationship between the United States and members of the Hoopa Valley Indian Tribe with respect to the proceeds of timber sales and other Reservation income arising from the Joint Reservation. Congress's specifications of the Secretary's authority to make distributions under the HYSA was necessary because of the holding that, if the Secretary chose generally to make payments from resources of the Joint Reservation, all "Indians of the Reservation" must be benefited by those payments. *Short IV*, 12 Cl. Ct. at 41–42.

81. Special Trustee Swimmer lacks statutory or properly delegated authority to authorize discriminatory per capita distributions from the Settlement Fund. As a creature of the American Indian Trust Reform Act, the authority and responsibilities of the Special Trustee are defined effective April 21, 2003, by Pt. 109, Chapter 11 of the Departmental Manual. "The Special Trustee exercises Secretarial direction and supervision, pursuant to the 1994 Reform Act, over of the Office of Special Trustee for American Indians."

82. Unlike the Secretary, or certain other Departmental officials, the Special Trustee only has authority to release Indian trust funds pursuant to Section 202 of the Reform Act and the related regulations at 25 C.F.R. pts. 115 and 1200.

83. No Secretarial Order or special delegation of authority to the Special Trustee applies here. Secretarial Order No. 3259, Amendment No. 2 (Mar. 31, 2006) temporarily redelegated all functions of the Assistant Secretary – Indian Affairs to the Associate Deputy Secretary during the time that the Assistant Secretary – Indian Affairs position remained vacant. The Special Trustee's decision dated March 1, 2007, occurred just before Mr. Carl Artman was

confirmed as Assistant Secretary – Indian Affairs on March 5, 2007. The second decision, dated March 21, 2007, came after the Assistant Secretary position was filled.

84. The Special Trustee's duties, which are spelled out in Subchapter III of the American Indian Trust Fund Management Reform Act, are set forth as mandatory duties to "oversee," "monitor," "ensure," and "provide guidance" to the Department, reporting directly to the Secretary. 25 U.S.C. §§ 4041–4043. Nowhere in the Trust Reform Act is the Special Trustee authorized to make decisions, or held accountable for decision-making, regarding the Secretary's substantive duties related to trust funds. *See Cobell v. Babbitt*, 91 F. Supp. 2d 1, 13 (D.D.C. 1999); *Cobell v. Norton*, 240 F.3d 1081, 1091 (D.C. Cir. 2001).

85. The Special Trustee lacked authority to unilaterally release the Indian trust funds in the Settlement Fund to the Yurok Tribe or anyone else.

86. The Hoopa-Yurok Settlement Act reserved exclusively to Congress the authority to further distribute resources such as these. 25 U.S.C. § 1300i-11(c).

87. The Special Trustee exceeded his statutory authority by purporting to issue a final decision that discharges the Settlement Fund based on his own unilateral interpretation of the HYSA.

88. Defendant's mismanagement of the Settlement Fund breaches fiduciary trust duties that arise out of statutes, regulations, executive orders, and federal common law described above.

## THIRD CLAIM FOR RELIEF

Breach of Trust and Fiduciary Duties:
Unlawful Authorization of Release of Funds

89. Plaintiffs incorporate by reference all proceeding paragraphs.

90. Federal law requires Defendant to manage the Hoopa-Yurok Settlement Fund created by the HYSA. Absent the claim waivers required by the Act, the only authority the Secretary of the Interior has is to "invest and administer such fund as Indian trust funds." 25 U.S.C. § 1300i 3(b).

91. The Bureau of Indian Affairs testified to Congress that the monies must be retained in trust account status while Congress fashions further legislation. Senate Hearing 107-648 at 88 (Aug. 1, 2002).

92. The Settlement Fund never belonged to the Yurok Tribe. It was offered to the Yurok Tribe, but the Tribe refused the offer. The Yurok Tribe left the funds and other benefits on the settlement table and opted to litigate the claim to judgment.

93. The final decision allowing a release of funds based upon permitting the Yurok Tribe to cure the Interim Council's failure to waive, thirteen years after the fact, is arbitrary, capricious, an abuse of discretion, and otherwise not in accordance with the law.

94. Defendant's actions in interpreting the HYSA in a manner that stigmatizes Plaintiffs and treats one beneficiary of the HYSA differently from the other beneficiary are arbitrary, capricious, an abuse of discretion, and otherwise not in accordance with the law.

95. Defendant has violated its trust duty to Plaintiff with regard to its management of the tribal trust funds by applying trust funds and transferring title thereto exclusively to the Yurok Tribe in a manner not authorized by law.

## FOURTH CLAIM FOR RELIEF

Breach of Trust and Fiduciary Duties:
Unlawful Use of Joint Reservation Trust Funds as Per Capita Only for Yurok Members

96. Plaintiffs incorporate by reference all proceeding paragraphs.

97. The rulings of *Short v. United States*, particularly *Short III*, 719 F.2d 1133, 1135 (Fed. Cir. 1983) and *Short VI*, 28 Fed. Cl. 590, 595 (1993), *aff'd*, 50 F.3d 994 (Fed. Cir. 1995), provide the standards that must be met for management of Joint Reservation income held in the Settlement Fund to avoid the United States being found liable in damages for breach of trust.

98. In *Short VI*, plaintiffs pointed to a 1991 distribution to members of the Hoopa Valley Tribe in which other Indians of the Reservation did not share. The Court noted that the plain language of Section 7 of the Act, 25 U.S.C. § 1300i-6, permitted that distribution. The Court concluded that a reasonable construction of the Settlement Act is that it changed the nature of the government's discretion to make per capita distributions.

> Under the law of this case, it is within the Secretary of the Interior's discretion to make per capita distributions. *Short IV*, 12 Cl. Ct. at 44. The Secretary's discretion is constrained by statutes including 25 U.S.C. §§ 117a and 407, and by the fiduciary relationship between the Secretary and the Indians. *Short III*, 719 F.2d at 1135-37. The Settlement Act is simply another statute that constrains the Secretary's discretion in new ways.

*Short VI*, 28 Fed. Cl. 590, 594–95.

99. The Settlement Act did not supersede the rulings in *Short v. United States*. *See* 25 U.S.C. § 1300i-2. Those rulings require that all Indians of the Reservation, including the Hoopa Valley Tribe, be benefited by expenditures from these funds unless Congress otherwise provides.

100. The Settlement Act requires that the Secretary use the Settlement Fund for the benefit of all "Indians of the Reservation," unless another provision of the Act expressly allows another use. No provision of the Settlement Act allows this use and the distribution violates the plain language of 25 U.S.C. §§ 1300i-1(c)(4) and 1300i-8(d).

101. The administration's transfer of federal trust monies committed to the benefit of all "Indians of the Reservation" to only Yurok members violates the HYSA and the Defendant's fiduciary relationship to the Hoopa Valley Tribe and its members.

102. Defendant's mismanagement of the Settlement Fund breaches fiduciary trust duties that arise out of statutes, regulations, executive orders, and federal common law described above.

103. Defendant has violated and continues to violate its trust duty to Plaintiff with regard to its management of the tribal trust funds by using and expending the trust funds for purposes not for the exclusive benefit of all "Indians of the Reservation."

104. Defendant has and continues to violate its trust duty to Plaintiff with regard to its management of the Tribe's trust funds by otherwise failing to invest and manage the Tribe's trust funds as a prudent trustee.

105. Plaintiff has been damaged and seeks compensatory damages against Defendant, interest, costs, attorneys' fees, and all other and further relief as this Court deems just and proper.

## **PRAYER FOR RELIEF**

WHEREFORE, Plaintiffs respectfully requests that this Court:

A. Enter judgment in favor of the Plaintiffs Hoopa Valley Tribe and its members and against the Defendant United States of America for compensatory damages in an amount to be determined at trial;

B. Grant Plaintiffs prejudgment interest, costs, and attorneys' fees in this litigation as may be provided by law; and

C. Grant Plaintiffs such further and additional relief as the Court may deem just and proper.

DATED this 31st day of January, 2008.

Respectfully submitted,

MORISSET, SCHLOSSER, JOZWIAK &McGAW

Thomas P. Schlosser, WSBA# 06276
*Attorneys for the Plaintiff Hoopa Valley Tribe, et al.*

T:\WPDOCS\0020\09561\Fed Cl Complaint013008_File.doc
nmc:1/30/08