**Electronically Filed April 2, 2008**

IN THE UNITED STATES COURT OF FEDERAL CLAIMS

| | |
|---|---|
| HOOPA VALLEY TRIBE, on its own behalf, and in its capacity as *parens patriae* on behalf of its members; Elton Baldy; Oscar Billings; Benjamin Branham, Jr.; Lila Carpenter; William F. Carpenter, Jr.; Margaret Mattz Dickson; Freedom Jackson; William J. Jarnaghan, Sr.; Joseph LeMieux; Clifford Lyle Marshall; Leonard Masten, Jr.; Danielle Vigil-Masten,<br><br>Plaintiff,<br><br>v.<br><br>UNITED STATES OF AMERICA,<br><br>Defendant. | Case No. 08-72 L<br>Judge Lawrence S. Margolis<br><br>**PLAINTIFFS' PROPOSED FINDINGS OF UNCONTROVERTED FACT** |

In accordance with Rule 56(h)(1) of the Rules of the United States Court of Federal Claims, Plaintiffs the Hoopa Valley Tribe et al. ("Hoopa Plaintiffs") respectfully submit the following Proposed Findings of Uncontroverted Fact in support of their motion for partial summary judgment.

1. "Under the Act of April 8, 1864, authorizing the President to set apart and locate not more than four reservations in California . . . for the accommodation of the Indians of California, without specification of the tribes to be so accommodated, the President had discretion to authorize any Indian tribes of California to reside upon such reservations as he set apart." *Short v. United States*, 202 Ct. Cl. 870, 974 (1973) (*Short I*).

2. "No Indian tribe resident upon a reservation created under the act [of April 8, 1864] could obtain vested rights to the exclusion of another group or tribe of Indians thereafter authorized by the President to share in the benefits of the reservation." *Id.*

3. "In 1876 a 12-mile square tract of land in Northern California, on the last reach of the Trinity River before it joins the Klamath River, was set aside by order of President Grant as the Hoopa Valley Indian Reservation." *Id.* at 873.

4. The Reservation was initially "established in 1864 pursuant to the Act of April 8, 1864, 12 Stat. 39 . . . ." *Id.* at 874.

5. "Most but not all of the Indians of the tract, called the Square, were and have been Hoopa Indians." *Id.* at 873.

6. "In 1891 President Harrison made an order extending the boundaries of the reservation to include an adjoining 1-mile wide strip of land on each side of the Klamath River, from the confluence of the two rivers to the ocean about 45 miles away . . . ." *Id.*

7. "Most of the Indians of the added tract, called the Addition, were and have been Yurok Indians, also known as Klamaths." *Id.*

8. "[T]he plain and natural consequence of the [1891] order was the creation of an enlarged, single reservation incorporating without distinction its added and original tracts upon which the Indians populating the newly-added lands should reside on an equal footing with the Indians theretofore resident upon it." *Id.* at 882.

9. The Hoopa Valley Tribe was organized "and its membership includes most of the ethnological Indian tribes and groups who traditionally occupied the 'Square.'" *Short v. United States*, 12 Ct. Cl. 36, 38 (1987) (*Short IV*).

10. The Hoopa Square is heavily timbered and, since the 1940s, timber on its unalloted trust status lands has produced substantial revenues. Those revenues are administered by the United States as trustee for the Indian beneficiaries. *Short I*, 202 Ct. Cl. at 873-74.

11. "Until 1955, any revenues from both parts of the Hoopa Valley Reservation—the Square and the Addition—were deposited in a single United States Treasury Account . . . entitled 'Proceeds of Labor, Hoopa Valley Indians." *Short I*, 202 Ct. Cl. at 970.

12. Beginning in 1955 and continuing after the *Short I* trial, the Secretary of the Interior, upon requests made by the Hoopa Valley Tribe, had each year disbursed from the "Proceeds of Labor, Hoopa Valley Indians" account and its interest account, "per capita payments to the Indians on the official roll of the Hoopa Valley Tribe organized pursuant to the constitution and bylaws adopted at the election of May 13, 1950 . . . ." *Id.* at 971.

13. Before *Short I* the Secretary of the Interior had refused to "distribute any income derived from the Square portion of the Hoopa Valley Reservation to any Indians of the Hoopa Valley Reservation other than those who are members of the Hoopa Valley Tribe according to its official roll." *Id.* at 973.

14. On March 27, 1963, certain nonmembers of the Hoopa Valley Tribe sued the United States in the Court of Claims for money damages; the case was captioned *Jessie Short, et al. v. United States*, No. 102-63. The Plaintiffs were "3,323 Indians, in the main Yuroks of the Addition and their descendants, who [were] ineligible for membership in the Hoopa Valley Tribe and [had] thus been denied a share in the revenues from the Square." *Id.* at 874; *accord Short IV*, 12 Ct. Cl. at 38. Other plaintiffs intervened after *Short I* or filed separate complaints making similar claims.

15. In 1973, the Court of Claims issued the first major decision in the *Short* case and held that "the effect of the executive order of 1891 was that all the Indians of the reservation as thereby extended—Addition and Square—got equal rights in the enlarged reservation and thus that the rights of Indians of the Addition are equal to those of the Indians of the Square, the

Hoopa Valley Tribe or any other Indians of the reservation." *Short I*, 202 Ct. Cl. at 980. *See* App. 1-8.

16. In *Short I* "the Court of Claims decided that the Hoopa Valley Reservation was one reservation all of whose Indian peoples . . . were 'Indians of the Reservation' entitled to equal rights in the division of timber profits (and other income) from the unallotted trust land of the reservation . . . ." *Short v. United States*, 719 F.2d 1133, 1133 (Fed. Cir. 1983) (*Short III*).

17. In *Short III*, the Federal Circuit held that "the Government was under fiduciary obligations with respect to the comparable Indian forest lands involved here, and is liable for breach of fiduciary obligation in failing to distribute the sale proceeds (and other income) to persons entitled to share in those proceeds . . . . [I]f the Secretary decides (as he has) to distribute proceeds under § 407, he must act non-discriminatorily and cannot exclude any of those Indians properly entitled to share in the proceeds." 719 F.2d 1133, 1135, 1137 (Fed. Cir. 1983).

18. "[D]iscriminatory distributions of the proceeds of the timber sales (and other Reservation income) constituted a breach of the government's fiduciary duties with respect to the qualified [*Short*] plaintiffs." *Short IV*, 12 Ct. Cl. at 38.

19. The law of the *Short* case requires "that if the Secretary decides to make per capita distributions of unallotted Reservation income, all persons who fall into the category of an Indian of the Hoopa Valley Reservation, alive at the time of a given distribution, be included." *Id.* at 44.

20. In an effort to resolve difficulties highlighted by the *Short* case and related litigation, a bill was proposed in Congress "to partition the reservation into two reservations, one consisting of the Hoopa Valley Square to be set aside for the use and benefit of the Hoopa Valley

Tribe, and the other consisting of the Hoopa and Klamath Extension, to be set aside for the use and benefit of the Yurok Tribe." S. Rep. 100-564 at 1–2, App. 78-79.

21. The substitute House bill was introduced in the Senate as S. 2723 and, as amended, became the Hoopa-Yurok Settlement Act ("Settlement Act" or "HYSA"); it was signed into law on October 31, 1988. Pub. L. No. 100-580, 102 Stat. 2924 (codified in part as amended at 25 U.S.C. §§ 1300-i to 1300i-11 (2008), App. 119-32.

22. Section 4 of the Settlement Act established the Hoopa-Yurok Settlement Fund ("Settlement Fund") by combining "all the funds in the escrow funds, together with all accrued income thereon . . . ." HYSA § 4(a), App. 122; 25 U.S.C. § 1300i-3(a).

23. The "escrow funds" mentioned in Section 4 of the Settlement Act are defined and identified in Section 1 of the Act as "the moneys derived from the joint reservation which are held in trust by the Secretary" in seven listed accounts. HYSA § 1(b)(1), App. 119; 25 U.S.C. § 1300i(b)(1). *See* App. 1-8.

24. The Senate Select Committee on Indian Affairs indicated in its report, S. Rep. 100-564, that the bill's definition of "escrow funds" was intended to include "the accounts maintained by the Secretary of the Interior into which income from reservation economic activity . . . are deposited." S. Rep. 100-564 at 16, 19, App. 93, 96.

25. In a memorandum dated October 24, 1991, regarding issuance of payments from the Hoopa-Yurok Settlement Act funds, the Bureau of Indian Affairs' Office of Tribal Services analyzed the components of the escrow funds and the Hoopa-Yurok Settlement Fund. This analysis indicated that the funds from the Yurok Reservation areas amounted to 1.26303% of the total amount included in the Settlement Fund and that the remainder came from Hoopa

Reservation area funds, accounts J52-561-7197, J52-561-7236 and a portion of J52-575-7256 (before deposit of the federal appropriations). App. 157, 325.

26. Individual Indians of the Reservation and both the Hoopa Valley Tribe and the Yurok Tribe were offered payments from the Settlement Fund, but certain conditions had to be met to become entitled to a distribution. Each tribe and individual Indian on the Settlement Roll was required to waive any claim they may have had against the United States arising out of the Act. Members of the Hoopa Valley Tribe, however, were not required to waive any claims unless they elected a Settlement Roll option. As a result, Indians of the Reservation whose names were placed on the Settlement Roll signed claim waivers but Hoopa tribal members did not. HYSA §§ 2, 4, 6, 7, App. 120-128.

27. Before passage of the Act, the House Committee on the Interior and Insular Affairs asked the Congressional Research Service of the Library of Congress for its opinion on the House version of the proposed Settlement Act. The Committee asked about the legal nature of the interest of Indians of the Reservation in tribal or communal resources of the Reservation and whether Congress had the power to deal with the tribal or communal property as proposed in the house bill. App. 35, 37. On September 13, 1988, the Congressional Research Service concluded that in light of the unique California Indian situation, courts might find that the Indians of the reservation have "a compensable interest" or that "Indians of the reservation have a vested interest in reservation property." App. 67.

28. The final version of the Act expanded the claim waiver requirements of sections 2(a), 2(c)(4), and 9(d)(2) of the bill. These changes were suggested by the Department of Justice, which was concerned that parties might claim that the Act effected a taking of property in

violation of the Fifth Amendment. The Department recommended "a provision requiring express tribal consent." S. Rep. 100-564 at 40, App. 117.

29. Section 2 of the Settlement Act provides in part that the "apportionment of funds to the Yurok Tribe as provided in sections 4 and 7 [of the Act] . . . shall not be effective unless and until the Interim Council of the Yurok Tribe has adopted a resolution waiving any claim such tribe may have against the United States arising out of the provisions of this Act." HYSA § 2(c)(4), App. 121.

30. The substitute House bill, H.R. 4469, and the initial version of S. 2723, which later became the Settlement Act, required that the Yurok Tribe's claim waiver be made by a 2/3 vote of the General Council of the Yurok Tribe at the organizational meeting conducted by the Secretary of Interior. App. 28. The Senate Select Committee on Indian Affairs changed the bill language so that the Yurok Tribe's waiver had to be made specifically by the Interim Council of the Yurok Tribe. S. Rep. 100-564 at 26, App. 103; *see also id*. at 36, 40, App. 113, 117.

31. On December 7, 1988, the Department of Interior published a notice that the Hoopa Valley Tribe had adopted a valid waiver resolution that met the requirements of section 2(a)(2)(A) of the Act. 53 Fed. Reg. 49361, App. 133-34.

32. The Hoopa Valley Tribe's resolution waiving the claims it had in 1988 against the United States, specified that "the waiver required by the Act does not prevent the Hoopa Valley Tribe 'from enforcing rights or obligations created by this Act' S. Rep. 100-564 at 17." 53 Fed. Reg. 49361, App. 133. As so conditioned, the waiver was approved by the Assistant Secretary—Indian Affairs. *Id*.

33. The Senate Select Committee on Indian Affairs indicated in its report, S. Rep. 100-564, that it did "not intend that the waivers of the tribes, if given, shall present [sic] the tribes from enforcing rights or obligations created by this Act." S. Rep. 100-564 at 17, App. 94.

34. The Department of the Interior prepared and published the Hoopa Yurok Settlement Roll and notified persons whose names were on the Roll of their settlement options and the rights they would be waiving by accepting various options. App. 135-48. The Bureau of Indian Affairs thereafter published notice that the statute of limitation for any person or entity (other than the Hoopa Valley Tribe or the Yurok Tribe) to file suit questioning the constitutionality of the Settlement Act was September 16, 1991. App. 149.

35. On August 14, 1991, the Bureau of Indian Affairs, Northern California Agency, notified adult Yurok tribal members of a meeting of the General Council of the Yurok Tribe to nominate the Yurok Interim Tribal Council. App. 150-51.

36. In a memorandum dated February 3, 1992, Assistant Solicitor Duard R. Barnes informed the Area Director of the Sacramento Area Office of the Bureau of Indian Affairs that "it is clear that the Interim Council's lifespan is two years from the date of its installation on November 25, 1991, unless a tribal governing body is elected before the expiration of the two year period, whereupon the Interim Council would be dissolved following such election." App. 160.

37. In a memorandum dated February 3, 1992, Assistant Solicitor Duard R. Barnes informed the Area Director of the Sacramento Area Office of the Bureau of Indian Affairs that "[i]t is clear that should the Interim Council file a claim in the U.S. Claims Court on behalf of the Yurok Tribe pursuant to 25 U.S.C. § 1300i-11(a), the same consequences would follow as if it fails to enact a resolution waiving claims under 25 U.S.C. § 1300i-1(c)(4)." App. 162.

38. In a memorandum dated February 3, 1992, Assistant Solicitor Duard R. Barnes informed the Area Director of the Sacramento Area Office of the Bureau of Indian Affairs that the Department does not "believe that the Settlement Act precludes the Yurok Tribe from having a government if it refuses to waive claims against the United States. The Yurok Tribe's failure to waive claims only affects its authority to organize under the Indian Reorganization Act." App. 162.

39. In a memorandum dated February 3, 1992, Assistant Solicitor Duard R. Barnes informed the Area Director of the Sacramento Area Office of the Bureau of Indian Affairs that the Settlement Act "simply does not authorize the Interim Council to dispense with the [waiver] resolution requirement in order to be afforded the benefits conferred under specified sections of the Settlement Act for any reason . . . ." App. 163.

40. Section 14(b)(3) of the Settlement Act barred the Yurok Tribe from filing a takings claim more than 180 days "after the general council meeting of the Yurok Tribe as provided in section 9 or such earlier date as may be established by the adoption of a resolution waiving such claims as provided in section 9(d)(2)." HYSA § 14(b)(3), App. 131.

41. On March 5, 1992, Richard Haberman, Chairman, Interim Council of the Yurok Tribe, submitted testimony to the House of Representatives Committee on Appropriations Hearing on the Department of Interior and Related Agencies fiscal year 1993 appropriations bill. Chairman Haberman requested an amendment of the Settlement Act to provide more time before the statute of limitations expired for claims of the Yurok Tribe. He stated: "We either have to waive our rights to any damages claim against the United States or file suit." App. 166. He continued: "The Yurok Tribe is now faced with either providing technical consent to P.L. 100-580 in order to receive the residual balance of the Settlement Fund . . . or suing the United

States in the Court of Claims for damages arising out of the partition. . . . [A] better alternative is for the United States to make a clear commitment to providing an appropriate land and economic base for the Yurok Tribe, and we will execute appropriate consent (called waivers in the Act) and end the litigation." App. 167. He concluded as follows: "We therefore will file a protective law suit in the U.S. Claims Court, a law suit which we will withdraw when a new statute of limitations period is provided." App. 169.

42. To forestall the statute of limitations provided in Section 14(a)(3), on March 11, 1992, the Yurok Interim Council brought a suit in the U.S. Claims Court against the United States. The complaint asserted "claims for just compensation under the Fifth Amendment to the Constitution of the United States for the taking of compensable property and property rights of the Yurok Tribe by the United States under the Hoopa-Yurok Settlement Act of 1988." Complaint in *Yurok Indian Tribe v. United States*, No. 92-CV-173 (Ct. Cl.) ¶ 1, App. 170.

43. In a letter dated April 13, 1992, Assistant Secretary – Indian Affairs Eddie F. Brown informed the Chairman of the Hoopa Valley Tribe that "[i]t is clear that the Interim Council's decision to file [*Yurok Indian Tribe v. United States*] . . . means that the same consequences follow as if it fails to enact a resolution waiving claims against the United States. Therefore, unless and until the Interim Council waives the Tribe's claims and dismisses its case against the United States, it will [not] have access to its portion of the Settlement Fund . . . ." App. 176.

44. In a letter dated April 15, 1992, Acting Assistant Secretary—Indian Affairs William D. Bettenberg acknowledged receipt of several Yurok Interim Council documents, including Chairman Haberman's testimony before the Appropriations Committee and the complaint in *Yurok Tribe v. United States*, and informed the Chairman of the Yurok Interim

Council that "[u]nless and until the Interim Council waives the Tribe's claims and dismisses its case against the United States, it will [not] have access to its portion of the Settlement Fund." App. 178.

45. In a letter dated August 20, 1993, Susie L. Long, Vice-Chair, Interim Tribal Council informed Assistant Secretary — Indian Affairs Ada Deer that the Yurok Tribe "have filed a fifth amendment claim in the United States Claims Court, as provided for in the Act, to press our views." She also withdrew a proposed constitution submitted to BIA explaining that "The Settlement Act's IRA provisions are not activated unless and until the Tribe provides "waivers" under the Act. We have not provided such waivers, we will not provide such waivers during our term, and our draft constitution requires a referendum of the Yurok people in order to provide such waivers." App. 180-81.

46. In a letter dated November 23, 1993, Assistant Secretary – Indian Affairs Ada E. Deer informed the Vice-Chair of the Yurok Interim Council that "[u]nder section 9(d) of the Act, the Interim Council created under the authority of the Act will be dissolved on November 25, 1993. In that respect, the authority vested in the Interim Council by section 2(c)(4) of the Act to waive claims against the United States will expire on November 25, 1993." App. 182.

47. In a letter dated November 23, 1993, Assistant Secretary—Indian Affairs Ada E. Deer informed the Vice Chair of the Yurok Interim Council that after the Interim Council is dissolved, "[a]ny subsequent [after November 25, 1993] waiver of claims by the Tribe will be legally insufficient to effectuate the apportionment of funds to the Tribe as provided in sections 4 and 7 of the Act . . . ." App. 182.

48. In a letter dated April 4, 1994, Assistant Secretary – Indian Affairs Ada E. Deer informed the Chair of the Yurok Interim Council that Resolution No. 93-61, which the Interim

Council approved regarding the waiver of claims against the United States, did not meet the requirements of the Act, stating that "[i]t is quite clear that Resolution No. 93-61 specifically preserves, rather than waives, the Yurok tribe's takings claim against the United States." App. 185.

49. In a letter dated April 4, 1994, Assistant Secretary — Indian Affairs Ada E. Deer informed the Chair of the Yurok Interim Council that the Department's "determination that Resolution No. 93-61 fails to meet the requirements of 25 U.S.C. § 1300-1(c)(4) [sic] means that the Yurok Tribe will be unable to enjoy the benefits conferred under Section 2 and 9 of the . . . Settlement Act upon the passage of a legally sufficient waiver of claims, including the Yurok Tribe's share of the Settlement Fund under Sections 4 and 7 of the Act . . . ." App. 185.

50. In a letter dated March 14, 1995, Assistant Secretary – Indian Affairs Ada E. Deer informed the Chair of the Yurok Tribal Council that in the opinion of the Department "the Tribe's decision to prosecute its claim in [*Yurok Indian Tribe v. United States*] is inconsistent with the waiver of claims required under the Act. Were there to be a settlement of the lawsuit, it would have to be accomplished before the case has proceeded to a determination on the merits. This is necessary to both save time, energy and money on costly legal proceedings and because a settlement will not be possible if the court has ruled on any portion of the merits." App. 188.

51. In the consolidated case involving takings claims related to the Settlement Act, including *Yurok Indian Tribe v. United States*, No. 92-CV-173 (Ct. Cl.), the Court of Federal Claims denied plaintiffs' motions for summary judgment, granted the cross-motions of defendants, and directed the clerk to dismiss the complaints. *Karuk Tribe of California v. United States*, 41 Fed. Cl. 468, 477 (1998), *aff'd*, 209 F.3d 1366 (Fed. Cir. 2000), *cert. denied*, 532 U.S. 941 (2001).

52. On March 15, 2002, the Secretary of Interior made a post-litigation summary report to Congress in accordance with Section 14(c) of the Settlement Act ("Section 14(c) Report"). App. 189-240.

53. In its Section 14(c) Report, the Secretary of Interior stated that "the Yurok Tribe did not meet the waiver conditions of the Act and is therefore not entitled to the benefits enumerated within the Act." App. 194.

54. In its Section 14(c) Report, the Secretary of Interior recommended that: (1) the "Settlement Fund would not revert to the general fund of the Treasury, but would be retained in trust account status by the Department pending future development;" (2) "there would be no general 'distribution' of the HYSA Settlement Fund dollars to any particular tribe, tribal entity, or individual. But rather the Fund dollars would be administered for the mutual benefit of both the Hoopa Valley and Yurok tribes;" (3) "that Congress in coordination with the Department, and following consultation with the Hoopa and Yurok Tribes, fashion a mechanism for the future administration of the HYSA Settlement Fund;" and (4) that Congress "give serious consideration to the establishment of one or more new Act(s) that provide the Secretary with all necessary authority to establish two separate permanent Fund(s) with the balance of the current HYSA Fund, for the benefit of the Hoopa and Yurok Tribes in such a manner as to fulfill the intent of the original Act in full measure." App. 194-95.

55. On August 1, 2002, the Senate Committee on Indian Affairs held an oversight hearing on the Department of Interior's Section 14(c) Report. The Assistant Secretary—Indian Affairs testified: "It is our position that it would be inappropriate for the Department to make any general distribution from the Fund without further instruction from Congress." S. Hrg. 107-648 at 88, App. 332.

56. In the August 1, 2002 hearing, Joseph Jarnaghan, Hoopa Tribal Council member testified that: "When the BIA clearcut our forests, which ultimately generated the settlement fund, the BIA was more interested in the volume of timber going to the mill to create the settlement fund account than it was in the environmental state of our reservation." App. 258-59. Mr. Jarnaghan testified that the road construction standards used by the BIA were "deplorable and created ongoing problems that we continue to deal with today." App. 259. Mr. Jarnaghan showed slides depicting damage from clear cutting, and he explained the problem of sediment from road erosion hurting fisheries, water quality and riparian organisms. *Id*.; App. 274, 290-97.

57. Mediation supported by the Interior Department between the Hoopa Valley and Yurok tribes in 2002-03 produced a mediation agreement consisting of proposed amendments to the Hoopa-Yurok Settlement Act, dated December 3, 2003. App. 348-52.

58. The Hoopa-Yurok Mediation Agreement was redrafted into bill form and introduced as S. 2878 in the 108th Cong., 2d Sess. App. 353-52. Like the Mediation Agreement itself, S. 2878 provided that "no expenditures for any purpose shall be made from the Settlement Fund before the date on which, after receiving the report under clause (i), Congress enacts a law authorizing such expenditures, except as the Hoopa Valley Tribe and the Yurok tribes may agree pursuant to their respective constitutional requirements." App. 358.

59. In a letter dated March 21, 2006, three members of Congress wrote to the Acting Solicitor of the Department of the Interior asking: "Is it the Solicitor's opinion that Congressional action is required to establish a distribution process for the Hoopa-Yurok Settlement Fund? Or, under the terms of the Act, does the Secretary continue to have the authority to make a determination on the status of the Fund?" Also: "Is it the Solicitor's opinion

that the waiver provided for in the Hoopa-Yurok Settlement Act of 1988 remains an exercisable option for the Yurok tribe? If so, what is the legal basis for this conclusion?" App. 368-69.

60. In a letter dated July 19, 2006, Associate Deputy Secretary of the Interior James E. Cason wrote to the Chairman of the Hoopa Valley Tribe responding to the Tribe's concern that members of Congress would not address the Hoopa-Yurok Settlement Fund while the Interior Department was analyzing the situation. Mr. Cason stated that "the Department does not intend to submit to Congress a new report or a replacement to the report submitted in March 2002 pursuant to Section 14(c) of the Hoopa-Yurok Settlement Act." App. 370.

61. Except during settlement communications in the consolidated case of *Karuk Tribe of California, et al. v. United States, et al.*, prior to the merits adjudication of that case, the Department of the Interior consistently took the position that portions of the Hoopa-Yurok Settlement Fund could be distributed to the Yurok Tribe only if the Yurok Interim Council adopted a resolution waiving any claim, including takings claims, such tribe may have had arising out of the provisions of the Settlement Act, until 2007. App. 159-95; 247-56; 326-32; 368-69.

62. In a letter dated March 1, 2007, Ross Swimmer, Special Trustee for American Indians, informed the chairmen of the Hoopa Valley and Yurok tribes that "the Department concludes that the Yurok Tribe can tender a new, unconditional waiver and that the Act provides authority to the Department to act administratively to distribute the remaining funds to the Yurok Tribe upon receipt of such a waiver if it otherwise comports with the waiver requirements under the Act." The Special Trustee further stated that "the Act does not specify a time limitation . . . on the ability to provide a waiver." App. 373.

63. In a letter dated March 21, 2007, Ross Swimmer, Special Trustee for American Indians, informed the chairmen of the Hoopa Valley and Yurok tribes: "I today received a copy of Yurok Tribal Council Resolution 07-037. This resolution provides an unconditional waiver of claims that the Yurok Tribe may have against the United States arising out of the provisions of the 1988 Hoopa-Yurok Settlement Act. Upon review, I find that the resolution meets the requirements of the Act." App. 375. *See* App. 376-77.

64. In proceedings before the Interior Board of Indian Appeals, the Hoopa Valley Tribe noted that the funds from the Hoopa-Yurok Settlement Fund were proposed to be distributed in per capita payments by the Yurok Tribe to Yurok Tribe members. App. 385, 391.

65. In a letter dated April 20, 2007, Ross Swimmer, Special Trustee for American Indians informed the chairmen of the Hoopa Valley and Yurok tribes that "today, I have advised the custodian of the account holding the remaining balance of the Hoopa-Yurok Settlement Fund that its ownership has been transferred solely to the Yurok Tribe." App. 399. On that same day, staff of the Office of the Special Trustee for American Indians authorized SEI Private Trust Company to "free deliver" the assets of the Hoopa/Yurok Settlement-7193 Account to Morgan Stanley, custodian for the Yurok Tribe. App. 400-02.

66. The proposed resolution of the Yurok Tribal Council, ultimately enacted as No. 07-41, regarding distribution of assets, was presented to Ms. Donna Erwin, Department of Interior Office of Trust Funds Management, on or about April 20, 2007, and as amended, was enacted by the Yurok Tribal Council with the date of April 19, 2007. App. 393-94, 396-98.

67. In a letter dated April 20, 2007, Department of the Interior Deputy Solicitor Lawrence Jensen informed the Chairman of the Hoopa Valley Tribe that because the Special

Trustee can render final decision for the Department, "[r]eferral to the IBIA would not be appropriate." App. 395.

68. In a letter dated June 29, 2007, Carl J. Artman, Assistant Secretary — Indian Affairs wrote to the Hoopa Valley Tribe Chairman expressing the view that because "Congress provided in the Act for the equitable division of the Fund between the two Tribes, the Hoopa Valley Tribe consented to the use of escrow funds to be included for this purpose." Mr. Artman further stated that: "The Department provided ample opportunity for the Tribe to challenge these decisions in Federal court, where aggrieved parties usually challenge final agency actions. The Tribe itself chose not to take this approach, based on an interpretation of a Ninth Circuit decision with which the Department does not necessarily agree." He also noted that "The Department already distributed the Fund to the Yurok Tribe in accordance with the expressed intent of the March decisions as well as the April 20, 2007 letter from the Special Trustee." App. 403-04.

69. By checks from Morgan Stanley & Company, Inc., each of approximately 5200 members of the Yurok Tribe received $15,652.89, a total of approximately $80 million. App. 405.

Respectfully submitted this 2nd day of April, 2008.

s/ Thomas P. Schlosser
Thomas P. Schlosser, Attorney of Record
MORISSET, SCHLOSSER, JOZWIAK & McGAW
801 Second Avenue, Suite 1115
Seattle, WA 98104-1509
Tel: (206) 386-5200
Fax: (206) 386-7322
t.schlosser@msaj.com

*Of Counsel:*

Rob Roy Smith, Attorney
ATER WYNNE, LLP
601 Union Street, Suite 1501
Seattle, WA 98101-3981
Tel: (206) 623-4711
Fax: (206) 467-8406
rrs@aterwynne.com

**CERTIFICATE OF SERVICE**

I hereby certify that on April 2, 2008, a copy of the Plaintiffs' Proposed Findings of Uncontroverted Fact was electronically sent via the CM/ECF system by the United States Court of Federal Claims on the following party:

Devon Lehman McCune
Email: devon.mccune@usdoj.gov

s/ Thomas P. Schlosser____________________
Thomas P. Schlosser, Attorney of Record
MORISSET, SCHLOSSER, JOZWIAK & McGAW
801 Second Avenue, Suite 1115
Seattle, WA 98104-1509
Tel: (206) 386-5200
Fax: (206) 386-7322
t.schlosser@msaj.com

T:\WPDOCS\0020\09561\Pleadings\HVTPFUF030708_05.doc
nmc:4/1/08