**Electronically Filed April 2, 2008**

IN THE UNITED STATES COURT OF FEDERAL CLAIMS

| | | |
|---|---|---|
| HOOPA VALLEY TRIBE, on its own behalf, and in its capacity as *parens patriae* on behalf of its members; Elton Baldy; Oscar Billings; Benjamin Branham, Jr.; Lila Carpenter; William F. Carpenter, Jr.; Margaret Mattz Dickson; Freedom Jackson; William J. Jarnaghan, Sr.; Joseph LeMieux; Clifford Lyle Marshall; Leonard Masten, Jr.; Danielle Vigil-Masten, | ) | Case No. 08-72 L<br>Judge Lawrence S. Margolis |
| Plaintiffs, | ) | **HOOPA VALLEY TRIBE AND INDIVIDUAL HOOPA TRIBAL MEMBERS' MEMORANDUM IN SUPPORT OF MOTION FOR PARTIAL SUMMARY JUDGMENT ON QUESTION OF BREACH OF TRUST RESPONSIBILITY** |
| v. | ) | |
| UNITED STATES OF AMERICA, | ) | |
| Defendant. | ) | |

# TABLE OF CONTENTS

Page


STATEMENT OF QUESTION PRESENTED ........ 1

STATEMENT OF THE CASE ........ 2

I. INTRODUCTION ........ 2

II. INTEREST OF THE HOOPA PLAINTIFFS ........ 3

III. STATUTORY AND FACTUAL BACKGROUND ........ 6

A. Creation of the Hoopa Valley Reservation and Escrow Funds ........ 6

B. *Short* Litigation ........ 7

C. Hoopa-Yurok Settlement Act ........ 9

1. Hoopa-Yurok Settlement Fund ........ 9

2. The Hoopa-Yurok Settlement Act Waiver Requirement ........ 10

D. Yurok Interim Council's Rejection of the Waiver and Access to the Settlement Fund ........ 11

E. Interior's Consistent Interpretation of the Waiver Requirement (1992-2006) ........ 12

F. Swimmer's Decisions of March 1 and March 21, 2007 Authorizing a Discriminatory Disbursement From the Settlement Fund ........ 16

G. Swimmer Directed Discriminatory Release of the Settlement Fund ........ 17

SUMMARY OF ARGUMENT ........ 17

STANDARD OF REVIEW ........ 18

ARGUMENT ........ 18

I. CONGRESS IMPOSED A FIDUCIARY DUTY UPON THE UNITED STATES TO HOLD AND MANAGE THE SETTLEMENT FUND FOR ALL INDIANS OF THE RESERVATION. ........ 19

A. The Settlement Fund Is an Indian Trust Fund. ........ 20

B. Congress Requires the Secretary to Hold and Manage the Settlement Fund for All of the "Indians of the Reservation." ........ 21

C. The Settlement Fund Remainder Can Be Disbursed Only at Congress' Direction. ........ 22

II. INTERIOR VIOLATED ITS FIDUCIARY DUTIES BY DISBURSING THE SETTLEMENT FUND REMAINDER TO SOME, BUT NOT ALL, INDIANS OF THE RESERVATION. ........ 25

A. The United States Breached Its Trust Duties By Not Following Congress's Clear Direction for Disbursement of the Settlement Fund. ........ 26

1. The Settlement Act Requires That the Yurok Takings Claim Be Waived Before the Settlement Fund Be Disbursed to the Yurok Tribe. ...................... 27

a. The Plain Language of the Act Unambiguously Requires that the Yurok Claim Waiver be Made by the Yurok Interim Council. .......... 29

b. The Legislative History of the Act Supports the Reading of the Act that Requires that the Claim Waiver be Made by the Interim Council. .................................................................................................. 32

2. The Yurok Interim Council Litigated The Claims Congress Intended it to Waive. ........................................................................................................ 33

3. Interior's Disbursement of the Settlement Fund Upon Receipt of an Illusory Waiver From a Different Yurok Entity Violates the United States' Trust Responsibility. ........................................................................................ 34

CONCLUSION ............................................................................................................. 37

**CONTENTS OF**
**APPENDIX OF EXHIBITS**

| **Exhibit No.** | **Document Description** | **Page** |
|---|---|---|
| Exhibit 1 | Finale Memorandum Regarding Hoopa Valley Reservation Trust Funds (June 25, 1974) | 1 |
| Exhibit 2 | Finale letter to Chairman Masten Regarding Set Aside Trust Funds (Mar. 19, 1975) | 4 |
| Exhibit 3 | Assistant Secretary—Indian Affairs Gerard Message to Hoopa and Yurok People (Nov. 20, 1978) | 6 |
| Exhibit 4 | S. 2723, 100th Cong., 2d Sess., A Bill to Partition Certain Reservation Lands between the Hoopa Valley Tribe and Yurok Indians. to Clarify the use of Tribal Timber Proceeds (Aug. 10, 1988) | 9 |
| Exhibit 5 | Memorandum of Congressional Research Service to House Committee Regarding Questions Concerning Hoopa Valley Reservation Settlement as Proposed in H.R. 4469 (Sept. 13, 1988) | 35 |
| Exhibit 6 | Senate Report, S. Rep. 100-564 (Sept. 30, 1988) | 78 |
| Exhibit 7 | Public Law 100-580 (Oct. 31, 1988) | 119 |
| Exhibit 8 | Notice Regarding Hoopa Valley Tribe Claim Waiver, 53 Fed. Reg. 49361 (Dec. 7, 1988) | 133 |

| | | |
|---|---|---|
| Exhibit 9 | Notice of Options for Persons on the Hoopa-Yurok Settlement Roll (Apr. 12, 1991) | 135 |
| Exhibit 10 | Notice of Settlement Option Deadline, 56 Fed. Reg. 22996 (May 17, 1991) | 148 |
| Exhibit 11 | Notice of Statute of Limitation for Certain Claims, 56 Fed. Reg. 22998 (May 17, 1991) | 149 |
| Exhibit 12 | Notice to Convene General Council Meeting of the Yurok Tribe to Nominate the Yurok Interim Tribal Council (Aug. 14, 1991) | 150 |
| Exhibit 13 | Memorandum to Area Director Regarding Distribution of Funds (Aug. 22, 1991) | 152 |
| Exhibit 14 | Memorandum to Superintendent Regarding Issuance of Per Capita Checks (Oct. 24, 1991) | 156 |
| Exhibit 15 | Memorandum of Assistant Solicitor-- to Area Director Regarding Issues Raised at Organizational Meeting of the Yurok Interim Council (Feb. 3, 1992) | 159 |
| Exhibit 16 | Testimony of Richard Haberman, Chairman Interim Council of the Yurok Tribe (Mar. 5, 1992) | 166 |
| Exhibit 17 | *Yurok Indian Tribe v. United States of America* Complaint, No. 92-173 L (Mar. 10, 1992) | 170 |
| Exhibit 18 | Letter of Assistant Secretary - Indian Affairs to Honorable Dale Risling, Sr. (Apr. 13, 1992) | 176 |
| Exhibit 19 | Letter of Assistant Secretary - Indian Affairs to Honorable Richard Haberman (Apr. 15, 1992) | 178 |
| Exhibit 20 | Letter of Susie L. Long, Vice-Chair, Yurok Interim Tribal Council to Honorable Ada Deer (Aug. 20, 1993) | 180 |
| Exhibit 21 | Letter of Assistant Secretary - Indian Affairs to Susie L. Long (Nov. 23, 1993) | 182 |
| Exhibit 22 | Letter of Assistant Secretary - Indian Affairs to Susie L. Long (Apr. 4, 1994) | 183 |
| Exhibit 23 | Letter of Assistant Secretary - Indian Affairs to Susie L. Long (Mar. 14, 1995) | 187 |
| Exhibit 24 | Letter of Assistant Secretary - Indian Affairs to Hon. J. Dennis Hastert Regarding Department's Section 14(c) Report (Mar. 15, 2002) | 189 |

| | | |
|---|---|---|
| Exhibit 25 | Committee on Indian Affairs, United States Senate, Oversight Hearing on Hoopa-Yurok Settlement Act, S. Hrg. 107-648 (Aug. 1, 2002) | 241 |
| Exhibit 26 | Proposed Amendments to the Hoopa Yurok Settlement Act Developed in Formal Mediation (Dec. 3, 2003) | 348 |
| Exhibit 27 | S. 2878, 108th Cong., 2d Sess., A Bill to Amend the Hoopa-Yurok Settlement Act (Sept. 30, 2004) | 353 |
| Exhibit 28 | Letter of Feinstein, Boxer and Thompson to Hon. David L. Bernhardt, Acting Solicitor (Mar. 21, 2006) | 368 |
| Exhibit 29 | Letter of Associate Deputy Secretary of Interior to Clifford Lyle Marshall (July 19, 2006) | 370 |
| Exhibit 30 | Letter of Special Trustee for American Indians to Clifford Lyle Marshall (Mar. 1, 2007) | 372 |
| Exhibit 31 | Letter of Special Trustee for American Indians to Clifford Lyle Marshall (Mar. 21, 2007) | 375 |
| Exhibit 32 | Yurok Tribal Council Resolution 07-037 (Mar. 21, 2007) | 376 |
| Exhibit 33 | Hoopa Petition for Reconsideration, IBIA No. 07-90-A (Apr. 17, 2007) | 378 |
| Exhibit 34 | Resolution of Yurok Tribal Council No. 07-41 Regarding Distribution of Assets Held in Trust (Apr. 19, 2007) | 393 |
| Exhibit 35 | Letter of Deputy Solicitor to Clifford Lyle Marshall (Apr. 20, 2007) | 395 |
| Exhibit 36 | Fax of Cindee McKernan to Donna Erwin Regarding Acceptability of Draft Resolution (Apr. 20, 2007) | 396 |
| Exhibit 37 | Letter of Special Trustee for American Indians to Clifford Lyle Marshall (Apr. 20, 2007) | 399 |
| Exhibit 38 | Letter of Deputy Special Trustee - Trust Services to SEI Private Trust Company Regarding Free-Delivery of Hoopa-Yurok Settlement Account (Apr. 20, 2007) | 400 |
| Exhibit 39 | Letter from Assistant Secretary - Indian Affairs to Clifford Lyle Marshall (June 29, 2007) | 403 |
| Exhibit 40 | Check from Morgan Stanley to Yurok tribal member (Jan. 15, 2008) | 405 |

# TABLE OF AUTHORITIES

**Cases**

*American Petroleum Inst. v. E.P.A.*,
198 F.3d 275 (D.C. Cir. 1999) ........ 32

*Anderson v. Liberty Lobby, Inc.*,
477 U.S. 242 (1986) ........ 18

*Caminetti v. United States*,
242 U. S. 470 (1917) ........ 31

*Central States, Southeast & Southwest Areas Pension Fund v. Central Transport, Inc.*,
472 U.S. 559 (1985) ........ 25

*Cheyenne Arapaho Tribe v. United States*,
512 F.2d 1390 (Ct. Cl. 1975) ........ 25

*Hall v. Aqua Queen Mfg.*,
93 F.3d 1548 (Fed. Cir. 1996) ........ 18

*Hartford Underwriters Ins. Co. v. Union Planters Bank, N.A.*,
530 U.S. 1 (2000) ........ 29

*Heller, Ehrman, White & MacAuliffe v. Babbitt*,
992 F.2d 360 (D.C. Cir. 1993) ........ 28

*Hoopa Valley Tribe v. Swimmer*,
44 IBIA 247 (2007) ........ 17

*Hornback v. United States*,
405 F.3d 999 (Fed. Cir. 2005) ........ 34

*Karuk Tribe of California v. United States*,
41 Fed. Cl. 468 (1998) ........ 14, 15, 34

*Lamie v. United States Tr.*,
540 U.S. 526 (2004) ........ 29

*Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*,
475 U.S. 574 (1986) ........ 18

*Mountain States Tel. & Tel. v. Santa Ana*,
472 U.S. 237 (1985) ........ 36

*Nat'l Wildlife Fed., et al. v. Bureau of Land Management*,
140 IBLA 85 (1997) ........ 25

*Qi-Zhuo v. Meissner*,
70 F.3d 136 (D.C. Cir. 1995) ........ 31

*Richards v. United States*,
369 U.S. 1 (1962) ........ 24

*Russello v. United States*,
464 U.S. 16 (1983)........ 31

*Seminole Nation v. United States*,
316 U.S. 286 (1942)........ 25

*Short v. United States (I)*,
202 Ct. Cl. 870 (1973), *cert. denied*,
416 U.S. 961 (1974)........ 2, 3, 6, 7

*Short v. United States (II)*,
661 F.2d 150 (1981)........ 8

*Short v. United States (III)*,
719 F.2d 1133 (Fed. Cir. 1983) ........ 2, 3, 4, 6, 8, 18, 20, 21, 22, 23

*Short v. United States (IV)*,
12 Ct. Cl. 36 (1987) ........ 2, 5, 6, 7, 8, 18, 21, 22, 23, 36, 37

*Short v. United States (VII)*,
50 F.3d 994, 1000 (Fed. Cir. 1995) ........ 3, 6, 7, 8

*Shoshone Tribe v. United States*,
299 U.S. 476 (1937)........ 25

*United States v. Alvarez-Sanchez*,
511 U.S. 350 (1994)........ 29

*United States v. Locke*,
471 U.S. 84 (1985)........ 24

*United States v. Mason*,
412 U.S. 391 (1973)........ 25

*United States v. Mitchell*,
463 U.S. 206 (1983)........ 4, 5, 19, 20

*W. Radio Servs. Co. v. Glickman*,
123 F.3d 1189 (9th Cir. 1997) ........ 34

*White Mountain Apache Tribe v. Bracker*,
448 U.S. 136 (1980)........ 4

*Yurok Indian Tribe v. United States*,
No. 92-CV-173 (Fed. Cl.)........ 12, 13, 14, 33

**Statutes**

25 U.S.C. § 123........ 24

25 U.S.C. § 132........ 34

25 U.S.C. § 162a........ 10, 20, 22

25 U.S.C. § 407........ passim

25 U.S.C. §§ 117a ........................................ 23
25 U.S.C. §§ 1300i ........................................ passim

**Other Authorities**

18 JAMES WM. MOORE ET AL., MOORE'S FEDERAL PRACTICE § 131.01 (3d ed. 2005) ................. 34
53 Fed. Reg. 49361 ........................................ 11
Act of April 8, 1864, 13 Stat. 39 ........................................ 1, 2, 4, 19
S. Rep. 100-564 ........................................ 9, 11, 22, 24, 27, 32

## STATEMENT OF QUESTION PRESENTED

Whether the United States of America breached its fiduciary trust obligations to the Indians of the Hoopa Valley Reservation when it discriminatorily distributed the balance of the Hoopa-Yurok Settlement Fund, an Indian trust account held for the benefit of Indians of the Reservation, as a per capita payment to only members of the Yurok Indian Tribe in violation of the Hoopa-Yurok Settlement Act, 25 U.S.C. §§ 1300i, *et seq.*, 25 U.S.C. § 407, and the Act of April 8, 1864, 13 Stat. 39.

## STATEMENT OF THE CASE

### I. INTRODUCTION

The individual Hoopa tribal members and the Hoopa Valley Tribe ("Hoopa Plaintiffs") are entitled to judgment as a matter of law that the United States of America is liable for a breach of its fiduciary trust obligations. The United States has a statutory obligation to hold the Indian trust account known as the Settlement Fund for all "Indians of the Reservation." The United States violated this obligation by making a discriminatory and underinclusive per capita distribution of the account in violation of Federal statutes, including the Hoopa-Yurok Settlement Act, Pub. L. 100-580, *codified in part as amended at* 25 U.S.C. §§ 1300i, *et seq*. ("Settlement Act"),[1] 25 U.S.C. § 407, and the Act of April 8, 1864, 13 Stat. 39 ("1864 Act").

The question presented will be familiar to this Court because, in many respects, the instant litigation mirrors that in *Short, et al. v. United States, et al.*, No. 102-63.[2] The teaching of the *Short* cases with respect to trust funds of the former Hoopa-Yurok Reservation is unmistakable: "if the Secretary decides to make per capita distributions of unallotted Reservation income, all persons who fall into the category of an Indian of the Hoopa Valley Reservation, alive at the time of a given distribution, must be included." *Short IV*, 12 Ct. Cl. at 44. Otherwise, as the Federal Circuit Court found twelve years ago:

> the Secretary's actions in making per capita payments only to Hoopa Valley Tribe members were unauthorized. *See Short III*, 719 F.2d at 1137 (characterizing the Secretary's distributions as "illegal"). The plaintiffs

---

[1] For convenience, sections of the Public Law are generally cited here. The Settlement Act is set forth at App. 119-32.

[2] *Short v. United States* includes seven reported opinions as follows: 202 Ct. Cl. 870 (1973); 661 F.2d 150 (Ct. Cl. 1981); 719 F.2d 1133 (Fed. Cir. 1983); 12 Cl. Ct. 36 (1987); 25 Cl. Ct. 722 (1992); 28 Fed. Cl. 590 (1993); 50 F.3d 994 (Fed. Cir. 1995); and hundreds of unreported orders. App. 21.

> are entitled to the damages awarded by the Court of Federal Claims because the Secretary failed to operate within the framework established by Congress for the administration of reservation revenues.

*Short v. United States (VII)*, 50 F.3d 994, 1000 (Fed. Cir. 1995). Despite 45 years of *Short* litigation, the United States has learned nothing.

Here, the United States violated its fiduciary trust duties by acting contrary to the statutory framework to disburse reservation revenues held in an Indian trust fund for the benefit of all Indians of the Reservation such that the funds were distributed per capita to only Yurok tribal members. This discriminatory and underinclusive disbursement is a breach of the United States' fiduciary duty. *Id.*; *Short III*, 719 F.2d at 1135 (holding that the pervasive statutory scheme in 25 U.S.C. § 407 creates an actionable fiduciary duty when the Secretary wrongfully distributes timber proceeds in a discriminatory fashion).

## II. INTEREST OF THE HOOPA PLAINTIFFS

The Hoopa Plaintiffs seek to enforce their rights created under the 1864 Act and 25 U.S.C. § 407, acknowledged in *Short* and preserved in the Settlement Act, which also provided new authorities for the Secretary of the Interior, the Hoopa Valley and Yurok tribes, and the affected "Indians of the Reservation." 25 U.S.C. § 1300i(b)(5). Members of the Hoopa Valley Tribe are by definition Indians of the Reservation, and they have suffered damages as a result of the United States' wrongful and discriminatory per capita distribution to members of the Yurok Indian Tribe.[3] *Id.*; *see also* App. 4.

---

[3] To be clear, the Hoopa Plaintiffs do not deny that the Hoopa Valley Tribe received the share of the Settlement Fund to which it was entitled under Section 4(c) of the Settlement Act and do not contest the Interior Department's conclusion in 2002 that the Hoopa Valley Tribe is not entitled to further distribution under the Settlement Act. This does not mean, however, that the United States was therefore vested with *carte blanche* authority to make an underinclusive per capita distribution without causing actionable damage to the Hoopa Plaintiffs as eligible Indians of the Reservation. Should partial summary judgment be granted establishing the

The Settlement Act, in conjunction with the United States' fiduciary duty to Indian tribes derived from the 1864 Act and 25 U.S.C. § 407, provides the Hoopa Plaintiffs an actionable breach of trust claim and a substantive right to damages. *United States v. Mitchell*, 463 U.S. 206, 224-26 (1983) ("*Mitchell II*"). Section 407, which prior to its 1988 amendment governed the sale of timber on unallotted lands of the former Joint Hoopa Valley Reservation, and other timber-management statutes "establish the 'comprehensive' responsibilities of the Federal Government in managing the harvesting of Indian timber." *Id*. at 222 (quoting *White Mountain Apache Tribe v. Bracker*, 448 U.S. 136, 145 (1980)). The regulations promulgated under these statutes establish a fiduciary relationship between the United States and the Indians. *Id.* at 224-26. These statutes and regulations "can fairly be interpreted as mandating compensation by the Federal Government for damages sustained" for breach of fiduciary duty. *Id*. at 226; *accord Short III*, 719 F.2d at 1135.

The Hoopa-Yurok Settlement Fund is comprised of the escrow funds collected from the Hoopa Square and placed into Indian trust accounts <u>prior to passage</u> of the Settlement Act, funds that were at issue in *Short*. 25 U.S.C. § 1300i(b)(1); App. 119. Congress directed that the Settlement Fund be invested and held as an Indian trust account subject to disposition as directed by Congress for the benefit of all Indians of the Reservation in much the same way as the escrow funds at issue in *Short* were to be held and treated. *See* 25 U.S.C. §§ 1300i-3(e), 1300i-5(c). More than 98% of the monies in the Settlement Fund were derived from clear-cutting forests on the unallotted trust lands of the Hoopa Plaintiffs' Reservation. Plaintiffs' Proposed Findings of Uncontroverted Facts ¶¶ 22-25 ("Pl. Facts").

---

government's fiduciary duty and the breach thereof, further proceedings would be necessary to determine damages.

The United States is liable to the Hoopa Plaintiffs for the failure of the Special Trustee for American Indians to follow Congress' requirement that the trust funds held in the Settlement Fund may be used only as provided in the Act or other applicable law. The about-face decisions of Interior officials to make a discriminatory per capita distribution to fewer than all of the Indians of the Reservation for whom the Settlement Fund was created do not avoid the United States' trust obligations to the Hoopa Plaintiffs. This Court has held:

> In the present circumstances of per capita distributions already made to fewer than those entitled, it is therefore sensible and equitable to define the group improperly deprived of payments by the same definitions as identified those who received payments, less the factors wrongfully used to exclude the claimants from the distributions.

*Short v. United States*, Ct. Cl. Trial Div., at 28 (Mar. 31, 1982). The Court later adopted this reasoning and highlighted exactly what happened again in 2008, in *Short IV*:

> It is also without consequence that the monies were first distributed by the Secretary to the Hoopa Valley Tribe for subsequent distribution to the Tribe's individual members. Where the Secretary's action or failure to act permits a violation of his fiduciary obligations to occur, the United States is liable for the damages sustained. *United States v. Mitchell*, 463 U.S. 206, 226-28 . . . . <u>The Secretary cannot avoid established trust obligations to qualified plaintiffs by making discriminatory distributions to individual</u> Hoopas through the Hoopa Valley Tribe, <u>when such distributions were otherwise prohibited by the law of this case</u>. . . .
>
> . . .
>
> The action must be consistent with the government's overriding fiduciary obligation to Indian tribes and individual Indians in the management of their resources, property, and affairs.
>
> <u>The violation of these duties under the statute would give rise to an action for money damages</u>. . . .
>
> The *Short* escrow funds remain subject to the Secretary's discretion and shall be expended as the Secretary determines, for the benefit of the Indians of the Reservation as provided by statute, and in a manner otherwise consistent with this opinion and previous court decisions.

*Short IV*, 12 Ct. Cl. at 41, 45 (emphasis added). These words ring as true today as they did twenty-one years ago. The discriminatory per capita payment is a breach of the United States' fiduciary obligations and trust responsibility to the Hoopa Plaintiffs.

## III. STATUTORY AND FACTUAL BACKGROUND

### A. Creation of the Hoopa Valley Reservation and Escrow Funds

In 1864, federal officials, acting under the Act of April 8, 1864, established the "Square" portion of the Hoopa Valley Indian Reservation in Northern California without any specification of the tribes to be accommodated thereon.[4] Pl. Facts ¶¶ 1-5. The Connecting Strip and the Klamath River Reservation (collectively "Addition") were added to the Square by Executive Order in 1891. *Id.* ¶¶ 6-8. After the 1940s, the unallotted trust status lands of the Hoopa Square began to produce substantial revenues because the Square is heavily timbered. The United States administered these revenues as trustee for the Indian beneficiaries. *Id*. ¶ 10.

Until 1955, revenues derived from the Joint Hoopa Valley Reservation — the Square and the Addition — were deposited in a single United States Treasury Account entitled "Proceeds of Labor, Hoopa Valley Indians." *Short I*, 202 Ct. Cl. at 970. The Bureau of Indian Affairs of the Department of the Interior ("BIA") manages trust funds in the names of certain Indian tribes and reservations, and this was one such account holding the proceeds from sales of timber and other resources from unallotted trust lands of the Hoopa Valley Reservation. *Short VII*, 50 F.3d at 996. Beginning in 1955, the United States made per capita payments from the proceeds of the former Joint Hoopa Valley Reservation to members of the Hoopa Valley Tribe. *Short I*, 202 Ct. Cl. at

---

[4] The Act of April 8, 1964, helps "show that the Government had a fiduciary relationship toward qualified plaintiffs with respect to the Hoopa Valley reservation and also to show that the Secretary's action in excluding [certain Indians of the Reservation] from the distribution of the monies was unlawful." *Short III*, 719 F.2d at 1136.

971; Pl. Facts ¶¶ 11-12. The Secretary refused to "distribute any income derived from the Square portion of the Hoopa Valley Reservation to any Indians of the Hoopa Valley Reservation other than those who are members of the Hoopa Valley Tribe according to its official roll." *Short I*, 202 Ct. Cl. at 973; Pl. Facts ¶¶ 12-13. This per capita distribution of the proceeds spawned the *Short* litigation.

**B. *Short* Litigation**

Nonmembers of the Hoopa Valley Tribe sued the United States in 1963 seeking a share of the timber revenues the United States had distributed to Indians on the official roll of the Hoopa Valley Tribe.[5] Pl. Facts ¶ 14. In *Short I*, 202 Ct. Cl. 870 (1973) , the Court of Claims held that the Square and the Addition together constituted a single reservation, and that all the "Indians of the Reservation" were entitled to share in the distributed revenues. Pl. Facts ¶¶ 14-16. The United States, as trustee and administrator of the timber resources, was held liable to excluded Indians of the Reservation for monies that the government withheld from them through the per capita payments. *Short I*, 202 Ct. Cl. at 980–81.

Despite the liability decision, the BIA continued to make payments only to Hoopa Valley tribal members for a few years. "The only difference was that, following the 1973 decision, the BIA held seventy percent of the unallotted Hoopa Valley Reservation income in an escrow fund and made payments only out of the remaining thirty percent of the reservation proceeds." *Short VII*, 50 F.3d at 997. This BIA practice highlighted the establishment of two Indian trust escrow accounts: the "70% account" and the "30% account." App. 3. These accounts continued to receive deposits of Reservation income until February 1, 1979, whereupon a single "Reservation-wide" trust account was established. App. 8.

[5] This memorandum provides a brief synopsis of the facts of the *Short* cases. For a more thorough discussion, *see, e.g., Short v. United States*, 12 Cl.Ct. 36 (1987) ("*Short IV*").

In *Short II*, 661 F.2d 150 (Fed. Cir. 1981), the Court directed the trial judge to fashion standards for determining who were "Indians of the Reservation" by adapting five separate membership standards used by the Hoopa Valley Tribe in preparing its roll in 1949-72. *Short III* upheld the standards defined on remand and ruled that 25 U.S.C. § 407, the general tribal timber statute applicable to all reservations, includes as trust beneficiaries all individual Indians who are "communally concerned with the proceeds." *Short III*, 719 F.2d 1133, 1136 (Fed. Cir. 1983). The Court required that Indians of the Reservation receive "equal rights in the division of timber profits (and other income) from the unallotted trust land of the reservation" and reiterated that the "Government . . . is liable for breach of fiduciary obligation in failing to distribute the sale proceeds (and other income) to all persons entitled to share in those proceeds." *Id.* at 1133, 1135. The Secretary must act "non-discriminatorily" in making the distributions. *Id.* at 1137; *see* Pl. Facts ¶ 17-19.

Subsequently, in a series of orders, the Court held that no tribe or individual had any ownership right in the escrow accounts. In *Short IV*, 12 Ct. Cl. 36 (1987) , the Court decided that the *Short* plaintiffs were not entitled to the escrow accounts because the funds had not yet been individualized. *Short IV*, 12 Ct. Cl. at 44-45 (finding that plaintiffs had no right to the undistributed 'seventy percent fund' until the Secretary of the Interior took some action related to those funds, such as authorizing payments from it); Pl. Facts ¶ 18. Thus, while the *Short* plaintiffs did not have an ownership right in the various escrow accounts, they were entitled to damages for the monies the government withheld from them when the Secretary individualized portions of the trust funds as per capita payments to some, but not all, Indians of the Reservation. A final money judgment in favor of *Short* plaintiffs was entered in 1994, and *Short IV* and *Short VI* were affirmed in *Short VII*, 50 F.3d 994 (Fed. Cir. 1995) .

## C. Hoopa-Yurok Settlement Act

Congress responded to the frustration caused by *Short* and the related litigation with the adoption of the Settlement Act, which was signed into law on October 31, 1988. App. 119. The Settlement Act, *inter alia,* established a method to divide the former Joint Reservation into two reservations, enabled the Yurok Tribe to organize a tribal government so that each tribe could exercise sovereignty over its reservation, created a combined trust fund comprised of the escrow funds held for Indians of the Reservation, and created a specific mechanism for the tribes to access the fund. Pl. Facts ¶¶ 20-26.

### 1. Hoopa-Yurok Settlement Fund

Section 1(b)(1) of the Settlement Act defined the term "Escrow Funds" to mean seven specific accounts "derived from the joint reservation" and "held in trust by the Secretary." App. 119; Pl. Facts ¶¶ 23-24.[6] Prior to the Settlement Act's passage, the United States Senate estimated that the escrow funds in the accounts totaled approximately $65 million. App. 93, 96. Most of the escrow funds originated from logging on the Hoopa Square, particularly funds in the "70% account" and the "Reservation-Wide" account. Funds from the Yurok Reservation amounted to only 1.26303% of the total amount in the Settlement Fund (prior to deposit of the federal appropriations). App. 156-58; 325; Pl. Facts ¶ 25.

Section 4 of the Settlement Act combined these accounts, deposited them in the newly established Hoopa-Yurok Settlement Fund, and specified how distributions could be made from it. 25 U.S.C. § 1300i-3(a); App. 122. Under the Settlement Act, the Secretary of Interior was

[6] When considering the proposed Hoopa-Yurok Settlement Act, the Senate Select Committee on Indian Affairs indicated in its report, S. Rep. 100-564, that the definition of the "escrow funds" was intended to be a comprehensive list of the funds and accounts in federal hands derived from the lands or resources of the Joint Reservation (the Hoopa Square, Connecting Strip, and Klamath River Reservations combined). Pl. Facts ¶ 24.

required to "invest and administer" . . . "as Indian trust funds pursuant to . . . 25 U.S.C. § 162a" any funds that were not distributed under the Settlement Act. 25 U.S.C. § 1300i-3(b). Thus, when Congress pooled these trust monies into the Hoopa-Yurok Settlement Fund it declared how the Settlement Fund could be used, if at all.[7] Until 2007, the monies in the Settlement Fund, almost all of which were derived from the Hoopa Square's resources, were only partially distributed as per the Settlement Act.

**2. The Hoopa-Yurok Settlement Act Waiver Requirement**

The Settlement Act offered monetary awards from the Settlement Fund in exchange for litigation claim waivers by individuals qualified for the Settlement Roll, the Hoopa Valley Tribe, and the Interim Council of the Yurok Tribe. Pl. Facts ¶ 26. Persons qualified for the Hoopa-Yurok Settlement Roll if they had been held to be "Indians of the Reservation" in *Short* or if they met the same standards as applied by the BIA to non-*Short* plaintiffs. Only persons on the Hoopa-Yurok Settlement Roll could elect membership in the Yurok Tribe and vote for the Yurok Interim Council. Thus, the Settlement Fund was used for the benefit of all the "Indians of the Reservation."

The tribal claim waiver provisions appear in Sections 2 and 9 of the Settlement Act. Section 2(c)(4) of the Settlement Act provides in part that the "apportionment of funds to the Yurok Tribe as provided in sections 4 and 7 . . . <u>shall</u> not be effective <u>unless and until</u> the Interim Council of the Yurok Tribe has adopted a resolution waiving any claim such tribe may have against the United States arising out of the provisions of this Act."[8] 25 U.S.C. § 1300i-1(c)(4)

---

[7] An August 22, 1991, Memorandum from the Director, Office of Trust Funds Management, Department of the Interior, describes the partial distribution of the Settlement Fund which occurred effective April 12, 1991. App. 152-55.

[8] The waiver authorization language designed by Congress places an important temporal limitation on the claims waived pursuant to the Settlement Act. Congress required the tribes to

(emphasis added); Pl. Facts ¶ 29. The choice presented by Congress to the tribes was simple — waive the claim that the Settlement Act constituted a taking in exchange for a portion of the Settlement Fund or litigate the takings claim and forgo payment under the Act.[9] On December 7, 1988, the Interior Department published a notice that the Hoopa Valley Tribe had adopted a valid resolution which met the requirements of Section 2(a)(2)(A) of the Settlement Act. Pl. Facts ¶¶ 31-32; App. 133-34. The Hoopa Valley Tribe granted consent to use of Hoopa escrow monies "as provided in the [Act]," but did not consent to any other uses of the funds. App. 134.

**D. Yurok Interim Council's Rejection of the Waiver and Access to the Settlement Fund**

The Senate Report accompanying the Settlement Act explains that the authority for certain transfers of funds to the Yurok Tribe:

> [S]hall not be effective unless the Interim Council of the Yurok Tribe adopts a resolution waiving any claims it might have against the United States under this Act and granting consent as provided in section 9(d)(2). Section 9 of the bill provides for an Interim Council to be elected by the General Council of the tribe.

---

waive the claims they "may have" in the present tense. 25 U.S.C. § 1300i-1(a)(2)(A)(i). Congress did not require, and the Hoopa Valley Tribe did not, waive any future claims. The approved resolution waives such claims as the Tribe had in 1988 but noted that "the waiver required by the Act does not prevent the Hoopa Valley Tribe 'from enforcing rights or obligations created by this Act,' S. Rep. 100-564 at 17." App. 133. Further, the claim waiver was limited to current claims "arising out of the provisions" of this Act dealing with partition of the Joint Reservation. There is no credible argument that the Hoopa Valley Tribe waived future claims against the United States arising from disregard of the Settlement Act and other law. Pl. Facts ¶ 31-33.

[9] The statement of Rodney R. Parker, for the Justice Department, expressed the understanding that waiver language in the Senate bill as introduced already evidenced tribal consent but he requested "a provision requiring express tribal consent [which] could provide a clearer acknowledgment by the tribal government that no taking has occurred." App. 116-17. Clearly the committees that considered the Act were concerned that it might be a taking. App. 90, 107; Pl. Facts ¶ 27.

App. 95. As explained by Duard R. Barnes, Assistant Solicitor, Branch of General Indian Legal Activities, the Yurok Interim Council had a limited time to take the action as directed by Congress to access the Settlement Fund, and the failure to take such action would have consequences:

1. The Interim Council of the Yurok Tribe would automatically dissolve two years after November 25, 1991;
2. The Settlement Act permits three separate Interim Council resolutions, if necessary, to address claim waiver, contribution of escrow monies, and receipt of grants and contracts;
3. Refusal to pass a resolution waiving claims against the United States and/or filing a claim would prevent the Yurok Tribe from receiving the apportionment of funds, the land transfers, and the land acquisition authorities provided by various sections of the Settlement Act, but would not preclude the Yurok Tribe from organizing a tribal government.

App. 162-63; Pl. Facts ¶¶ 36-39. Nevertheless, in contrast to the Hoopa waiver of claims and the admonition from the United States not to file a taking claims, the Yurok Interim Council not only failed to enact a waiver, on March 11, 1992, the Yurok Interim Council filed a takings action, *Yurok Indian Tribe v. United States*, No. 92-CV-173 (Fed. Cl.). App. 170-75; Pl. Facts ¶¶ 41-45. The complaint asserted "claims for just compensation under the Fifth Amendment to the Constitution of the United States for the taking of compensable property and property rights of the Yurok Tribe by the United States under the Hoopa-Yurok Settlement Act of 1988." Pl. Facts ¶ 42.

**E. Interior's Consistent Interpretation of the Waiver Requirement (1992-2006)**

Rather than waive its takings claims as directed by Congress to obtain proceeds from the Settlement Fund, the Yurok Interim Council elected to do the opposite, refusing Congress' offer, and choosing to litigate its takings claims. Pl. Facts ¶¶ 41, 45. This understanding of the situation was confirmed on April 13, 1992. Assistant Secretary—Indian Affairs Eddie F. Brown

wrote to the Chairman of the Hoopa Valley Tribe indicating that the Yurok Interim Council's decision to litigate the claims in *Yurok Tribe v. United States* "means that the same consequences follow as if it fails to enact a resolution waiving claims against the United States." App. 176; Pl. Facts ¶ 43. On April 15, 1992, the Acting Assistant Secretary—Indian Affairs wrote to the Chairman of the Yurok Interim Council saying much the same thing: [u]nless and until the Interim Council waives the Tribe's claims and dismisses its case against the United States it will [not] have access to its portion of the Settlement Fund." App. 178. In other words, the Yurok Tribe's right to an apportionment of the Settlement Fund was lost. Unless the Yurok Interim Council dismissed its case and waived the claims, the Settlement Fund remainder would have to be held as an Indian trust account until such time as Congress directed its disbursement. 25 U.S.C. § 1300i-3(b).

On November 23, 1993, Assistant Secretary—Indian Affairs Ada E. Deer wrote to the Yurok Interim Council cautioning that the Yurok Interim Council would, on November 25, 1993, lose the legal powers vested in it by the Settlement Act: "[a]ny subsequent waiver of claims by the Tribe will be legally insufficient." App. 182; Pl. Facts ¶¶ 46-47.

In a last ditch effort to maintain its suit and also comply with the Settlement Act, the Yurok Interim Council enacted a resolution purporting to waive its claims while simultaneously preserving the Yurok's right to litigate its takings claim. On April 4, 1994, Assistant Secretary Deer wrote to the Chair of the Interim Tribal Council of the Yurok Tribe determining that Interim Council Resolution No. 93-61 (Nov. 24, 1993) did not meet the requirements of the Settlement Act, stating:

> It is quite clear that Resolution No. 93-61 <u>specifically preserves, rather than waives, the Yurok tribe's taking claim against the United States</u>. Indeed, the Yurok Tribe has filed a claim in the U.S. Court of Federal

> Claims asserting that the Hoopa-Yurok Settlement Act effected a taking under the Fifth Amendment of the United States Constitution.

App. 185 (emphasis added); Pl. Facts ¶¶ 48-49. The Assistant Secretary reaffirmed Interior's prior conclusion that maintaining the suit in the Claims Court led to the same results as would the Yurok Interim Council's failure to waive claims under the Settlement Act — the Yurok Tribe would be unable to enjoy the "benefits" of the Settlement Act. *Id.*

On March 14, 1995, Assistant Secretary Deer wrote the Chairperson of the Yurok Tribal Council rejecting the Tribal Council's request for reconsideration of her decision of April 4, 1994. App. 187. The Assistant Secretary explained that the legislative history of the Act confirms that potential taking claims against the United States were precisely the type of claims Congress was most concerned about, which explained why waiver of such claims were essential elements to triggering key provisions of the Settlement Act:

> In our opinion, the Tribe's decision to prosecute its claim in this litigation is inconsistent with the waiver of claims required under the Act. Were there to be a settlement of the lawsuit, it would have to be accomplished before the case has proceeded to a determination on the merits. This is necessary to both save time, energy and money on costly legal proceedings and because a settlement will not be possible if the court has ruled on any portion of the merits.

App. 188; Pl. Facts ¶ 50. The Yurok Tribe was urged to seek a stay of proceedings in *Yurok Tribe v. United States* in order to conduct a referendum and undertake settlement negotiations.[10]

---

[10] A year later, the parties to *Yurok Tribe v. United States* (which had been consolidated with other claims under the heading of *Karuk Tribe of California, et al. v. United States, et al.*, No. 90-CV-3993), filed a joint motion to postpone oral argument on cross-motions for summary judgment on the merits for the purpose of discussing settlement. *See* Pl. Facts ¶ 50-51. During 1995-2001, the Yurok Tribe and the United States engaged in settlement negotiations concerning its claims. Indeed, the March 14, 1995, letter of Assistant Secretary Deer, stated a settlement position advanced by the United States, which was that the Yurok Tribal Council could cure the deficiencies in Resolution No. 93-61 of the Interim Council, even at that late date, if a settlement of the litigation was accomplished before a final determination on the merits. App. 188. The Hoopa Valley Tribe made similar proposals and urged the settlement of the case. No settlement

As a result of the Yurok Interim Council's failure to timely waive its claims and decision to litigate an unsuccessful suit seeking greater compensation, the balance of the Settlement Fund never transferred to the Yurok Tribe under Settlement Act Sections 4 or 7. What to do with the unallotted monies in the Settlement Fund was the subject of the Secretary of the Interior's March 2002 post-litigation summary report to Congress pursuant to Settlement Act Section 14(c). App. 189-240; Pl. Facts ¶ 52.

The report stated Interior's position, *inter alia*, that "the Yurok Tribe did not meet the waiver conditions of the Act and is therefore not entitled to the benefits enumerated within the Act." App. 194; Pl. Facts ¶ 53. Interior recommended, *inter alia*, as follows: the Settlement Fund be retained in trust account status; there be no distribution of Settlement Fund dollars to any tribe or individual; the Settlement Fund continue to be administered for the mutual benefit of both the Hoopa Valley and Yurok Tribes; and Congress should fashion a mechanism for the future administration of the Settlement Fund. App. 194; Pl. Facts ¶ 54. At an August 2002, Senate Committee on Indian Affairs hearing on Interior's report, the Assistant Secretary—Indian Affairs testified that "[i]t is our position that it would be inappropriate for the Department to make any general distribution from the Fund without further instruction from Congress."[11] App. 332; Pl. Facts ¶ 55.

---

offer was accepted and the litigation was concluded on the merits by the U.S. Supreme Court's Order of March 26, 2001. *Karuk Tribe of California v. United States*, 41 Fed. Cl. 468 (1998), *aff'd*, 209 F.3d 1366 (Fed. Cir. 2000), *cert. denied*, 532 U.S. 941 (2001).

[11] At the hearing's conclusion, Senator Inouye directed the tribes to agree on how to divide the funds and invited the tribes to also address infrastructure and economic development needs. The Hoopa Valley and Yurok Tribal Councils engaged in mediation and the resulting agreement was introduced as S. 2878 in September 2004. App. 348-67; Pl. Facts ¶ 57-58. That bill failed. The mediation agreement included no detailed directions on how to divide and distribute the Settlement Fund, but stated that "No expenditure from the Settlement Fund shall be made prior to submission of the report, and Congressional action upon such report, except as

**F. Swimmer's Decisions of March 1 and March 21, 2007 Authorizing a Discriminatory Disbursement From the Settlement Fund**

On March 1, 2007, the Special Trustee for American Indians Ross O. Swimmer, issued a decision reversing prior Department opinions concerning authority to distribute the Settlement Fund remainder. Swimmer's decision concluded, for the first time in nineteen years, that the Department *ipse dixit* "can distribute [the Hoopa-Yurok Settlement] funds to the Yurok Tribe administratively, consistent with the provisions of the Act, if the Yurok Tribe were to submit a new waiver of claims as required by the Act." App. 372; Pl. Facts ¶ 62. Without citing to or quoting from the Settlement Act, Swimmer stated that roughly $90 million would be distributed "after the Department has received an unconditional waiver from the Yurok Tribe consistent with the Act." *Id.* The March 1, 2007 letter did not acknowledge the prior, longstanding position of the United States that the Yurok Tribe did not, and now cannot, meet the waiver conditions of the Act. The decision merely stated that "[t]he Yurok Tribe proposes now to provide the Department with a new, unconditional waiver of claims" and that, even though "[t]he Act authorized the Yurok Interim Council, an entity that ceased to exist in 1993, to provide the requisite waiver under the Act . . . the current governing body of the Yurok Tribe can submit the waiver required by the Act." App. 373-74.

On March 21, 2007, Swimmer issued a supplemental decision accepting a new waiver from the Yurok Tribe. App. 375; Pl. Facts ¶ 63. The March 21, 2007, letter states that Swimmer received a new waiver from the "Yurok Tribal Council" on that same day. App. 375. Swimmer

---

may be agreed upon by the Hoopa Valley and Yurok Tribes pursuant to their constitutional requirements." *See also* App. 351; Pl. Facts ¶¶ 57-58. That agreement was also embodied in S. 2878, § 2(5)(D)(ii): "No expenditures for any purpose shall be made from the Settlement Fund before the date on which, after receiving the report under clause (i), Congress enacts a law authorizing such expenditures, except as the Hoopa Valley Tribe and the Yurok Tribes may agree pursuant to their respective constitutional requirements." App. 358. Interior breached its trust duties by disregarding the mediation agreement as well.

described the waiver as an "unconditional waiver of claims" and found that "the resolution meets the requirements of the Act." *Id*. Accordingly, Swimmer announced that the Department would administratively distribute the funds to only the Yurok Tribe on April 20, 2007.[12] *Id*; App. 376-77.

### G. Swimmer Directed Discriminatory Release of the Settlement Fund

On April 20, 2007, Special Trustee Swimmer sent a letter stating that "nothing precludes me from taking action consistent with the decision in this matter. As of 10:00 a.m. Eastern Daylight Time today, I have advised the custodian of the account holding the remaining balance of the Hoopa-Yurok Settlement Fund that its ownership has been transferred solely to the Yurok Tribe." App. 399; Pl. Facts ¶ 65; *see also* App. 400-02; Pl. Facts ¶ 66.

In January 2008, the Secretary acquiesced as the Yurok Tribe began distributing per capita payments to only its members over $80 million from the tribal trust funds that were held as part of the Settlement Fund. App. 396-402, 405. Each of approximately 5200 Yurok members received $15,652.89. App. 405; Pl. Facts ¶ 69. The Hoopa Plaintiffs were excluded from this disbursement.

## SUMMARY OF ARGUMENT

The Hoopa Plaintiffs are entitled to judgment as a matter of law that the United States of America is liable for a breach of its fiduciary trust obligations. Unless the Settlement Act

---

[12] The Hoopa Valley Tribe sought to challenge the March 1 and March 21, 2007, Swimmer decisions in the Interior Board of Indian Appeals ("IBIA"). App. 378-92; *see* Pl. Facts ¶ 64. The IBIA docketed and dismissed the challenge on jurisdictional grounds without reaching the merits. Later, the IBIA denied reconsideration. The IBIA noted: "In characterizing the Special Trustee's action as one to administer the Settlement Act by allocating the balance of the Settlement Fund, we express no opinion on the merits of whether or not the action was authorized by the Settlement Act." *Hoopa Valley Tribe v. Swimmer*, 44 IBIA 247, 250, n.4 (2007). The Tribe's efforts to have the Secretary "refer" the matter to the IBIA to cure the alleged jurisdictional problems were rejected by the Solicitor's Office that same day. App. 395.

authorized the payments at issue here, Interior's disbursement of funds was a breach of trust. The United States has a statutory obligation to hold the Settlement Fund as a trust fund for all Indians of the Reservation. It violated this obligation when the Special Trustee made a discriminatory per capita distribution of the Indian trust fund account to only members of the Yurok Indian Tribe. The discriminatory per capita distribution finds no authorization in the Settlement Act's fiduciary standards and limited authorization for use of the Settlement Fund, standards that forbid such a unilateral administrative disbursement of the trust funds. *See* 25 U.S.C. § 1300i-3. The disbursement demonstrates the uncanny ignorance of the Interior Department, despite the *Short* litigation, which makes clear that: when the United States fails to operate within the statutory framework for handling Indian trust accounts from the former Joint Reservation, and makes per capita disbursements to some, but not all, of the Indians of the Reservation, the disbursements are "illegal" and the "plaintiffs are entitled to damages" for breach of trust. *Short III*, 719 F.2d at 1137; *Short IV*, 12 Ct. Cl. at 41, 44-45. Pl. Facts ¶ 19.

**STANDARD OF REVIEW**

Summary judgment is appropriate when there is no genuine issue as to any material fact and the moving party is entitled to judgment as a matter of law. Fed. Cl. R. 56(c); *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 247–52 (1986). "A genuine issue of fact precluding summary judgment is shown to exist only where the nonmovant presents evidence such that, if the trial record were the same as the summary judgment record, a fact finder could reasonably find in the nonmovant's favor." *Hall v. Aqua Queen Mfg.*, 93 F.3d 1548, 1553 n.3 (Fed. Cir. 1996) (citing *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986)).

**ARGUMENT**

To state a claim cognizable for damages for breach of trust under the Indian Tucker Act, and the U.S. Supreme Court's decisions in *United States v. Mitchell*, 445 U.S. 535 (1980)

(*Mitchell I*), and *United States v. Mitchell*, 463 U.S. 206 (1983) (*Mitchell II*), the Hoopa Plaintiffs must (1) identify a substantive source of law that establishes specific fiduciary or other duties and (2) allege that the Government has failed faithfully to perform those duties. *Mitchell II*, 463 U.S. at 216-17, 219. Partial summary judgment on the purely legal question of the United States breach of trust responsibility is appropriate here because there are no genuine issues of material fact in dispute as to the United States' trust responsibility to manage and hold the Settlement Funds as a trust fund for the benefit of all Indians of the Reservation, and there is no set of facts under which the per capita distribution to only members of the Yurok Tribe would have been lawful.

## I. CONGRESS IMPOSED A FIDUCIARY DUTY UPON THE UNITED STATES TO HOLD AND MANAGE THE SETTLEMENT FUND FOR ALL INDIANS OF THE RESERVATION.

The Settlement Act, working in conjunction with the 1864 Act and 25 U.S.C. § 407, creates a specific duty, recognized in *Short*, to hold the Settlement Fund as an Indian trust fund for all Indians of the Reservation. "[T]he 1864 statute authorizing the creation of the reservation imposed a trust responsibility on the U.S. Government extending to all the Indians of the Reservation." App. 111 (S. Rep. 100-564 at 34, testimony of Ross O. Swimmer). The United States' failure to adhere to that duty by disbursing the Settlement Fund as a discriminatory per capita payment to only the Yurok Indian Tribe is a breach of that trust.

As a matter of law, the Settlement Act defines the trust as follows:

> The Secretary <u>shall make distribution from the Settlement Fund as provided in this subchapter and</u>, pending payments under section 1300i-5 of this title [election of payments] and dissolution of the fund as provided in section 1300i-6 of this title [division of fund remainder], <u>shall invest and administer such fund as Indian trust funds pursuant to section 162a of this title</u>.

25 U.S.C. § 1300i-3(b) (emphasis added). The language stating that the Secretary must "administer such fund as Indian trust funds" cannot be more clear. Congress' intent to create a trust duty is buttressed by the Settlement Act's reference to 25 U.S.C. § 162a.

25 U.S.C. § 162a provides for the holding of "community funds of any Indian tribe which are, or may hereafter be, held in trust by the United States . . ." and makes plain that the "trust responsibilities of the United States" in managing such funds include, *inter alia,* "providing adequate controls over . . . disbursements." 25 U.S.C. § 162a(a), (d)(2) (emphasis added). Thus, as a matter of statutory language, the Settlement Act as well as the 1864 Act and 25 U.S.C. § 407 go beyond a bare trust and permit a fair inference that the United States is subject to duties as a trustee and can be liable in damages for breach. *United States v. White Mountain Apache Tribe,* 537 U.S. 465 (2003) (finding breach of trust where, as here, the statutory language expressly defines a fiduciary relationship).

The trust relationship, confirmed here by the Settlement Act and recognized by *Short*, requires the trustee (the Secretary of the Interior) to manage the trust corpus (the Settlement Fund) for the trust beneficiaries (all Indians of the Reservation). Where, as in *Mitchell II*, 463 U.S. at 225, the relevant sources of substantive law create "[a]ll of the necessary elements of a common-law trust," there is no need to look elsewhere for the source of a trust relationship. *Short III*, confirms that this case "is essentially governed by . . . *Mitchell II*." *Short III*, 719 F.2d at 1134.

**A. The Settlement Fund Is an Indian Trust Fund.**

The Settlement Fund, to be held in trust, is comprised of previously existing "escrow account" Indian trust funds. Section 1(b)(1) of the Settlement Act defines the term "escrow funds," as "moneys derived from the joint reservation which [were then] held in trust by the Secretary in [certain enumerated] accounts." 25 U.S.C. § 1300i(b)(1) (emphasis added). The

definition of "escrow funds" makes clear that these are the trust funds that are the subject of the *Short* litigation. *See, e.g.*, *Short IV*, 12 Cl. Ct. at 38-39. Section 4 of the Settlement Act created the Settlement Fund by combining the seven accounts consisting of the "escrow funds" which the Secretary held in trust for the "Indians of the Reservation." 25 U.S.C. § 1300i-3(a)(1) & (b)(1); *see also* App. 1-5 (admitting that escrow finds are "held in trust").

The money distributed from the Settlement Fund derived from timber cut from the Hoopa Square in accordance with 25 U.S.C. § 407. 25 U.S.C. § 407 "established a fiduciary relationship . . . Given the existence of a trust relationship, it naturally follows that the Government should be liable in damages for the breach of its fiduciary duties . . . in failing to distribute the sale proceeds (and other income) to persons entitled to share in those proceeds." *Short III*, 719 F.2d at 1135 (internal quotations omitted). The Senate Report indicated that the definition of "escrow funds" was intended to be a comprehensive list of the accounts, in federal hands, derived from the lands or resources of the joint reservation. App. 96-97. Thus, both 25 U.S.C. § 407, which authorized the cutting of timber from the Hoopa Square that led to the proceeds placed in the escrow accounts, and the Settlement Act, which used those escrow account funds to create the Settlement Fund, conclusively establish a trust relationship to manage and invest the trust corpus.

### B. Congress Requires the Secretary to Hold and Manage the Settlement Fund for All of the "Indians of the Reservation."

The Settlement Act (and the Hoopa waiver) permitted the Secretary to make distributions from the Settlement Fund only "as provided in this Act," App. 120, 134; otherwise, Congress required the Secretary to "invest and administer such Fund as Indian trust funds pursuant to the first section of the Act of June 24, 1938 (52 Stat. 1037; 25 U.S.C. § 162a)." 25 U.S.C. § 1300i-3(b). Congress intended the tribes to continue "enforcing rights or obligations created

by this Act." App. 94 (S. Rep. 100-564 at 17). The Settlement Act was thus another constraint on the Secretary's discretion, adding to the duties imposed by the existing fiduciary relationship between the Secretary and the Indians of the Reservation. *Short VI*, 28 Fed. Cl. 590, 595.

Under the law of the *Short* case, if the Secretary chose to make additional payments from resources of the Joint Reservation, all Indians of the Reservation must be benefited by those payments. *See Short IV*, 12 Cl. Ct. at 41-42. "Indians of the Reservation" has been defined with specificity in the *Short* litigation and by statute. 25 U.S.C. § 1300i(b)(5). It is undisputed that, by definition, the Hoopa Plaintiffs are Indians of the Reservation and are, therefore, a trust beneficiary. *Id.; see e.g.*, App. 4. Such Indians of the Reservation are "entitled to equal rights in the division of timber profits (and other income) from the unallotted trust land of the [joint] reservation." *Short III*, 719 F.2d at 1133. Nothing in the Settlement Act cut off the beneficial interests of these Indians of the Reservation in the escrow funds that were combined in the Settlement Fund. *See* 25 U.S.C. § 1300i-2. Thus, the Hoopa Plaintiffs are beneficiaries of the Settlement Fund.

**C. The Settlement Fund Remainder Can Be Disbursed Only at Congress' Direction.**

While the Settlement Act added to the Secretary's discretion to make payments, it did not give the Secretary or, for that matter, the Special Trustee *carte blanche* with respect to use of the Settlement Fund. In fact, as the Secretary maintained (until 2007), Congress cut off the ability of the Secretary or his designee to do administratively what Congress reserved for itself legislatively – direct release of the balance of the Settlement Fund. *See* App. 131, 25 U.S.C. § 1300i-11(c)(2). The limits on the Secretary's authority are illustrated by one of the few cases concerning the monies of the Settlement Fund, *Short VI*.

In *Short VI*, plaintiffs challenged the per capita distribution to Hoopa tribal members authorized by Section 7 of the Settlement Act. The Court ruled:

> The only reasonable construction of section 7 [of the Settlement Act] is that it changes the nature of the government's discretion to make per capita distributions from the escrow fund. Under the law of this case, it is within the Secretary of Interior's discretion to make per capita distributions. *Short IV*, 12 Cl. Ct. at 44. The Secretary's discretion is constrained by statutes including 25 U.S.C. §§ 117a and 407, and by the fiduciary relationship between the Secretary and the Indians. *Short III*, 719 F.2d at 1135–37. The Settlement Act is simply another statute that constrains the Secretary's discretion in new ways.

*Short v. United States*, 28 Fed. Cl. 590, 595 (1993). In other words, the Settlement Act must expressly allow a payment from the Settlement Fund; in the absence of congressional authorization, the United States is constrained by the strict fiduciary obligations established in the *Short* case.[13] *See* 25 U.S.C. § 1300i-2.

Use of the Settlement Fund remainder, created by the failure of the Yurok Interim Council to waive its takings claims against the United States by 1993 as a precondition to obtain a share of the Settlement Fund, is confined by the Settlement Act and the comprehensive timber regulatory scheme provided by 25 U.S.C. § 407 which governs the use of the money credited to the Settlement Fund from the unallotted trust lands of the Hoopa Square. *Short III*, 719 F.2d at 1135; Pl. Facts ¶¶ 26-50. Accordingly, the balance of the Settlement Fund remains subject to the government's "overriding fiduciary obligation to Indian tribes and individual Indians," *Short v. United States*, 12 Cl. Ct. 36, 45 (1987), and Section 4(b) of the Settlement Act, which requires the Secretary of the Interior to "invest and administer such fund as Indian trust funds." 25 U.S.C. § 1300i-3(b).

---

[13] "[I]f the Secretary decides (as he has) to distribute proceeds [derived from] § 407, he must act non-discriminatorily." *Short III*, 719 F.2d at 1137. Where, as here, there is a discriminatory distribution, "the proper beneficiaries can sue under the Tucker Act if those funds illegally leave the Treasury." *Id.*

The Settlement Act did not state what should be done with the unexpended Hoopa-Yurok Settlement Fund if one tribe refused to waive its claims. Instead, the Settlement Act directed the Secretary to report back to Congress at the conclusion of any takings litigation, with recommendations upon "any modifications to the resource and management authorities established by this Act." Section 14(c)(2), 25 U.S.C. § 1300i-11(c)(2). In 2002, Interior made its recommendation: "it would be inappropriate for the Department to make any general distribution from the Fund without further instruction from Congress." App. 332 (S. Hrg. 107-648 at 88). This acknowledgement is critical – the United States understood in 2002 that it could not administratively disburse the Settlement Fund. It forgot this by 2007.

It is particularly important to respect Congress's specific language in the Settlement Act because the Settlement Act directs the Secretary to treat the Settlement Fund as a trust fund.[14] Indian trust funds are protected by 25 U.S.C. § 123, a statute analogous to the federal Anti-Deficiency Act, which provides, with limited exceptions not applicable here, that "No money shall be expended from Indian tribal finds without specific appropriation by Congress." 25 U.S.C. § 123. The requirement that the Secretary treat the Settlement Fund as a trust fund highlights Congress's intention that the Fund be distributed only under the narrowly prescribed provisions in the Settlement Act.

Congress has not authorized any release of the Settlement Fund remainder. Unfortunately in 2007, the Special Trustee unilaterally decided to distribute the funds. The

---

[14] While this result might seem harsh, judicial unwillingness to soften the import of Congress's chosen words, even if the court were to believe the words lead to a harsh outcome, is long-standing. It results from "deference to the supremacy of the Legislature, as well as recognition that Congressmen typically vote on the language of a bill." *See United States v. Locke*, 471 U.S. 84, 95 (1985) (citing *Richards v. United States*, 369 U.S. 1, 9 (1962)). Congress, not the Special Trustee, has the authority to revise the Settlement Act (at which time Congress could, if it determined it was appropriate, provide a distribution to the Yurok Tribe).

Special Trustee's distribution of the Settlement Fund to only the Yurok Tribe and its members, rather than all Indians of the Reservation, was a breach of trust to Hoopa beneficiaries because the distribution was made with full knowledge of the subsequent per capita distribution which would be made (and was made) to Yurok tribal members only. App 385-86, 391, 396-405; Pl. Facts ¶¶ 62-69. Such a disbursement of the Settlement Fund was not authorized by the Settlement Act and flies in the face of the holdings of *Short.*

## II. INTERIOR VIOLATED ITS FIDUCIARY DUTIES BY DISBURSING THE SETTLEMENT FUND REMAINDER TO SOME, BUT NOT ALL, INDIANS OF THE RESERVATION.

When acting as a trustee, the Federal Government is required to deal with Indian tribes according to the "most exacting fiduciary standards." *Seminole Nation v. United States*, 316 U.S. 286, 297 (1942). "One of the fundamental common-law duties of a trustee is to preserve and maintain trust assets," *Central States, Southeast & Southwest Areas Pension Fund v. Central Transport, Inc*., 472 U.S. 559, 572 (1985) (internal citations omitted); *see United States v. Mason*, 412 U.S. 391, 398 (1973) (standard of responsibility is "such care and skill as a man of ordinary prudence would exercise in dealing with his own property"); Restatement (Second) of Trusts § 176 (1957) ("The trustee is under a duty to the beneficiary to use reasonable care and skill to preserve the trust property").

As the trustee for tribal trust funds set aside as the Settlement Fund, the Special Trustee has a fiduciary duty to mange the Settlement Fund in accordance with the law. *Nat'l Wildlife Fed., et al. v. Bureau of Land Management*, 140 IBLA 85, 102 (1997) (finding that the trust relationship and consequent fiduciary duty generally arise from specific directives appearing in a treaty, statute, agreement, or other indication that the United States intended to act as a trustee in its particular dealings with an Indian tribe); *Shoshone Tribe v. United States*, 299 U.S. 476 (1937); *Cheyenne Arapaho Tribe v. United States*, 512 F.2d 1390 (Ct. Cl. 1975). As explained

below, the Special Trustee's unilateral and administrative release of the funds to the Yurok Tribe in 2007 was unlawful under the language of the Settlement Act, resulting in a discriminatory distribution of trust funds to less than all Indians of the Reservation, abrogating Congress's exclusive power to allocate the Settlement Fund, and triggering damages for the Hoopa Plaintiffs.

**A. The United States Breached Its Trust Duties By Not Following Congress's Clear Direction for Disbursement of the Settlement Fund.**

The Special Trustee acting on behalf of the Secretary of the Interior breached the United States trust duties as defined in the Settlement Act by ignoring Congress's direction as to how the Settlement Fund should be held and could be disbursed. It is an undisputed fact that the Special Trustee made a disbursement from the Settlement Fund to only the Yurok Tribe. App. 392-405; Pls. Facts ¶¶ 63-69. The act of making a discriminatory per capita payment from the Settlement Fund to only the Yurok Tribe, without more, is an actionable breach of the United States fiduciary obligations to the Hoopa Plaintiffs as Indians of the Reservation under the Settlement Act and *Short.* Indeed, the Hoopa Plaintiffs need show no more than (1) the existence of the trust duty; (2) the elements of the trust; and (3) the action that breaches that trust in order to be entitled to the requested judgment as a matter of law concerning the breach of trust claim. The wrongful discriminatory payment made by the Special Trustee in contravention of the Settlement Act, and without other Congressional authorization, is what matters for the breach of trust claim. *See* Argument § I.C *supra*.

Nevertheless, the Hoopa Plaintiffs believe the actions leading to the Special Trustee's wrongful discriminatory per capita distribution are worthy of discussion as they illuminate the series of wrongful acts, contrary to the plain language of the Settlement Act, that ultimately culminated in the discriminatory per capita distribution. The per capita disbursement violated

the trust responsibility to the Hoopa Plaintiff beneficiaries of the Settlement Fund because the Special Trustee allowed the "Yurok Tribal Council" to waive claims that (in addition to already having been litigated to a judgment on the merits) were required by Congress to be waived by 1993 by a different legal entity: the "Yurok Interim Council." Furthermore, even assuming *arguendo* that Section 2(c)(4) of the Settlement Act was satisfied in 2007, the immediate per capita distribution of any funds apportioned to the Yurok Tribal Council by the Special Trustee would fly in the face of Section 7(b) of the Settlement Act, which declares that any funds apportioned to the Yurok Tribe "shall not be distributed per capita to any individual before the date which is 10 years before the date on which the division is made under this section." App. 126-27; 25 U.S.C. § 1300i-6(b).

**1. The Settlement Act Requires That the Yurok Takings Claim Be Waived Before the Settlement Fund Be Disbursed to the Yurok Tribe.**

Congress, in the Settlement Act, established a clear mechanism for the Yurok Tribe to receive its share of the Settlement Fund:

> The apportionment of funds to the Yurok Tribe as provided in sections 1300i-3 and 1300i-6 of this title . . . <u>shall not be effective unless and until the Interim Council of the Yurok Tribe has adopted a resolution waiving any claim such tribe may have against the United States arising out of the provisions of this subchapter</u>.

25 U.S.C. § 1300i-1(c)(4) (emphasis added); *see also* App. 95 (S. Rep. 100-564 at 18). This section, providing for a distribution to be made under the Settlement Act after the submission of a specific form of claim waiver, was essentially a pre-litigation settlement offer.[15] The

[15] In 1994, the Department of Interior found that "it is clear" that the Settlement Act's waiver requirement "is a waiver of claims that would challenge the partition of the Joint Reservation or another provision of the Settlement Act as having effected a taking or otherwise having provided inadequate compensation." App. 184 (Letter dated April 4, 1994, from Assistant Secretary Deer at 2). One year later, in 1995, the Department of Interior informed the Chair of the Yurok Tribal Council that "it is our opinion that the statutorily required waiver of

government offered the distribution from the Settlement Fund in exchange for not being sued. As the Court of Appeals for the District of Columbia Circuit recognized:

> to induce acceptance of the new arrangement [created by the Settlement Act], Congress transferred the 70% escrow fund, along with $10 million in federal appropriated funds and some small Yurok trust funds, into a statutory Settlement Trust Account—the "Settlement Fund"—for the purpose of compensating the Indians for their consent to the new distribution of land and resources.

*Heller, Ehrman, White & MacAuliffe v. Babbitt*, 992 F.2d 360, 362 (D.C. Cir. 1993).

To trigger the entitlement to the Settlement Fund, Congress required the "Interim Council of the Yurok Tribe" to adopt a resolution waiving any claim. 25 U.S.C. § 1300i-1(c)(4)(D). To understand how the Special Trustee breached his fiduciary duties under the Settlement Act by disbursing the Settlement Fund in 2007 based on a waiver from the Yurok Tribal Council, it is necessary to explore what Congress had in mind when it stated that the Yurok Tribe's benefits from the Settlement Fund would only be available if "Interim Council of the Yurok Tribe" enacted the unconditional waiver of claims required by the Settlement Act.

---

taking claims against the United States in exchange for valuable property benefits is rationally tied to the Act's purpose to resolve long standing litigation between the United States and various Indian interests . . . ." App. 187 (Letter dated March 14, 1995, from Assistant Secretary Deer at 1).

**a. The Plain Language of the Act Unambiguously Requires that the Yurok Claim Waiver be Made by the Yurok Interim Council.**

The plain, unambiguous language of the Settlement Act permitted only the "Yurok Interim Council" to waive the Yurok Tribe's takings claims to trigger access to the Settlement Fund under the Act. 25 U.S.C. § 1300i-1(c)(4). In interpreting a statute, the inquiry begins, and often ends, "with the plain meaning of the statute's language." *See United States v. Alvarez-Sanchez*, 511 U.S. 350, 356 (1994). "It is well established that when the statute's language is plain, the sole function of the courts—at least where the disposition required by the text is not absurd—is to enforce it according to its terms." *Lamie v. United States Tr.*, 540 U.S. 526, 534 (2004) (quoting *Hartford Underwriters Ins. Co. v. Union Planters Bank, N.A.*, 530 U.S. 1, 6 (2000) (internal quotation marks omitted)).

The "Interim Council" is a specific entity, not a generic or ambiguous term. The Settlement Act carefully distinguished between the authorities and immunities of the Yurok "Transition Team," the Yurok "Interim Council," the Yurok "General Council," and the "tribe governing body elected pursuant to the constitution" making it clear that those are separate entities that have different powers and serve different purposes. 25 U.S.C. § 1300i-8; *see* App. 150 (notice of General Council meeting to nominate Interim Council). For instance, the "Interim Council" replaced the "Yurok Transition Team" which had been appointed by the Secretary of Interior shortly after passage of the Act to "provide counseling, promote communication with potential members of the Yurok Tribe concerning the provisions of this subchapter, and . . . study and investigate programs, resources, and facilities for consideration by the Interim Council." *Id.*. More importantly, the "Interim Council" preceded the creation of the present-day Yurok tribal government.

The "Interim Council" is defined in the Settlement Act as follows:

> There shall be established an Interim Council of the Yurok Tribe to be composed of five members. The Interim Council shall represent the Yurok Tribe in the implementation of provisions of this subchapter, including the organizational provisions of this section, and subject to subsection (d) of this section shall be the governing body of the tribe until such time as a tribal council is elected under a constitution adopted pursuant to subsection (e) of this section.

*Id.*, § 1300i-8(b). The "Interim Council" was a temporary entity; Congress placed an express time limit on when the "Interim Council" could act. The Settlement Act provided that "[t]he Interim Council shall be dissolved effective with the election and installation of the initial tribe governing body elected pursuant to the constitution adopted under subsection (e) of this section or at the end of two years after such installation, whichever occurs first." *Id.*, § 1300i-8(d)(5). In other words, the "Interim Council" would cease to exist when the Yurok tribal government organized into existence.[16] *Id.*, § 1300i-8(e).

Congress also defined "Yurok Tribe," distinguishing what the Yurok Tribe could do under the Settlement Act from the actions authorized for the "Interim Council." Congress defined "Yurok Tribe" to mean "the Indian tribe which is recognized and authorized to be organized pursuant to section 1300i-8 of this title." *Id.*, § 1300i(b)(16). Settlement Act subsection 9(e), entitled "Organization of Yurok Tribe," provided that "[u]pon written request of the Interim Council" the Secretary would conduct an election to adopt the Yurok Tribe's constitution and select "the initial tribal governing body upon the adoption of" the Tribe's new constitution. *Id.* § 1300i-8(e). In other words, the "Yurok Tribe" was organized by an election

---

[16] This understanding of the temporal limitation on the Yurok Interim Council's ability to execute the claim waiver was confirmed by the Department of the Interior in 1993: "Under section 9(d) of the Act, the Interim Council created under the authority of the Act will be dissolved on November 25, 1993. In that respect, the authority invested in the Interim Council by section 2(c)(4) of the Act to waive claims against the United States will expire on November 25, 1993. Any subsequent waiver of claims by the Tribe will be legally insufficient to effectuate the apportionment of funds to the Tribe as provided in sections 4 and 7 of the Act . . . ." App. 182; *see also* App. at 160, 180.

held at the request of the "Interim Council," and that election was a catalyst for the dissolution of the "Interim Council."

In Section 9(d) of the Settlement Act, Congress also expressly defined the powers of the Interim Council. Among the limited powers granted to the "Interim Council" was the "full authority to adopt a resolution—(i) waiving any claim the Yurok Tribe may have against the United States arising out of the provision of this subchapter . . . ." *Id.*, § 1300i-8(d)(2). This is the only provision in the Act granting any entity the power to waive the claims of the Yurok Tribe, and it grants it to only the "Interim Council."

Congress's distinction in terms is purposeful and important. By placing the ability to waive claims within the exclusive authority of the Interim Council, Congress limited that authority to the Interim Council to the exclusion of other Yurok entities. Because statutory language represents the clearest indication of Congressional intent, it should be presumed that Congress meant precisely what it said. *Cf. Russello v. United States,* 464 U.S. 16, 23 (1983) ("Where Congress includes particular language in one section of a statute but omits it in another section of the same Act, it is generally presumed that Congress acts intentionally and purposely."); *Qi-Zhuo v. Meissner*, 70 F.3d 136, 140 (D.C. Cir. 1995) ("Where . . . the plain language of the statute is clear, the court generally will not inquire further into its meaning."); *Caminetti v. United States*, 242 U. S. 470, 485 (1917) (noting that it is well-established that "when the statute's language is plain, the sole function of the courts—at least where the disposition required by the text is not absurd—is to enforce it according to its terms").

Congress unquestionably knew how to allocate responsibilities between the Interim Council and other entities of the Yurok Tribe. If Congress had wanted a different Yurok entity to succeed to the same authority as the Interim Council with respect to the waiver, it would have

said so. It did not. Thus, the plain language of the Settlement Act enables the Interim Council, and only the Interim Council, to effect the necessary waiver of the claims under the Settlement Act required to receive the benefits of the Act.

**b. The Legislative History of the Act Supports the Reading of the Act that Requires that the Claim Waiver be Made by the Interim Council.**

Although it is not necessary to look beyond the unambiguous plain language of the Settlement Act, the legislative history accompanying the Settlement Act confirms that Congress's decision to vest the authority to grant a waiver only in the Interim Council was deliberate.

Senate Report 100-564 is important in two respects. First, it explains that the authority for the transfer of the Settlement Fund was limited and:

> shall not be effective unless the Interim Council of the Yurok Tribe adopts a resolution waiving any claims it might have against the United States under this Act and granting consent as provided in section 9(d)(2). Section 9 of the bill provides for an Interim Council to be elected by the General Council of the tribe.

App. 95. Second, the Senate Report notes that "[t]he Committee substituted the term 'Interim Council' for the term 'General Council'" as the Yurok entity with the authority to waive claims and trigger the release of the Settlement Fund for the Tribe. App. 103; Pl. Facts ¶ 30. In other words, the Senate bill initially required that the waiver be made by a different entity, the Yurok General Council, but Congress chose to grant that authority to a different entity, the Interim Council. *See also* App. 113, 117. This shows that Congress considered the waiver, and determined that it wanted the waiver to be made by a particular entity, the Interim Council, which had a defined lifespan. *See American Petroleum Inst. v. E.P.A.*, 198 F.3d 275, 279 (D.C. Cir. 1999) (finding that courts are to assume that Congress is conscious of what it has done,

especially when it chooses between two available terms that might be included in the provision in question).

The Senate Report affirms that, as the plain language of the Settlement Act lays out, Congress was aware of the differences between the various Yurok entities, that it knew how to distinguish them, that it considered which entity was to authorize the waiver, and that in the end it determined the waiver was to be enacted by no entity other than the Interim Council.

**2. The Yurok Interim Council Litigated The Claims Congress Intended it to Waive.**

It is an uncontested fact that, despite Congress's clear direction, the Yurok Interim Council did not enact the necessary claim waiver before it ceased to exist in 1993. Pl. Facts ¶¶ 41-50; *see* App. 166-88. Not only that, the Yurok Interim Council took the opposite tack, deciding to file a lawsuit asserting a taking claim against the United States. Pl. Facts ¶¶ 42-51; App. 166-88. The Yurok Interim Council announced that it did not intend to enact the claim waiver. Pl. Facts ¶ 45; App. 180-81.

The Yurok Tribe's complaint against the United States, filed in *Yurok Indian Tribe v. United States*, No. 92-CV-173 (Cl. Ct.), asserted "claims for just compensation under the Fifth Amendment to the Constitution of the United States for the taking of compensable property and property rights of the Yurok Tribe by the United States under the [Settlement Act]" and requested the Court to enter "judgment awarding the Yurok Tribe just compensation for the taking of its compensable property rights . . . ." App. 170, 175. This was exactly the claim that was to be waived by the Interim Council before November 25, 1993, in order for there to be a disbursement from the Settlement Fund to the Yurok Tribe. 25 U.S.C. §§ 1300i-1(c)(4) and 1300i-11(a); Pl. Facts ¶ 41.

Congress chose the term "claim" in the Settlement Act purposefully. The term "claim" has a well-recognized legal meaning. The use of the term must be given its purposeful effect, and any "claims" fully litigated by the Yurok Tribe must be deemed extinguished based on principles of res judicata. *W. Radio Servs. Co. v. Glickman*, 123 F.3d 1189, 1192 (9th Cir. 1997) (stating that "[r]es judicata, also known as claim preclusion, bars litigation in a subsequent action of any claims that were raised or could have been raised in the prior action"); *see also* 18 JAMES WM. MOORE ET AL., MOORE'S FEDERAL PRACTICE § 131.01 (3d ed. 2005) (stating that "if the plaintiff loses the litigation, the resultant judgment acts as a bar to any further actions by the plaintiff on the same claim, with limited exceptions"). When claim preclusion applies, a party's claim is extinguished upon final judgment. *Hornback v. United States*, 405 F.3d 999, 1001 (Fed. Cir. 2005). Applying these well-established principles here, it is clear that the Yurok Tribe's takings claims against the United States arising out of the Settlement Act were adjudicated in a final decision on the merits, are extinguished, and can no longer be "waived." *Karuk Tribe of California v. United States*, 209 F.3d 1366, 1372 (Fed. Cir. 2000), *cert. denied*, 532 U.S. 941 (2001).

In sum, no relevant claim waiver that might authorize a Settlement Fund payment was executed by the legal entity designated by Congress nor in the time permitted by Congress. As such, the Secretary was required to "invest and administer such fund as Indian trust funds," 25 U.S.C. § 1300i-3(b), until such time as Congress directed a release of the funds. 25 U.S.C. § 132.

**3. Interior's Disbursement of the Settlement Fund Upon Receipt of an Illusory Waiver From a Different Yurok Entity Violates the United States' Trust Responsibility.**

Special Trustee Swimmer's letter on March 1, 2007, marked a 180-degree change in the Department's interpretation of the Act's waiver requirements. *Compare* App. 176-95 *with* App.

372-74. The Department consistently took the position that the Yurok Tribe did not meet the waiver conditions of the Act and that the Interim Council's failure to waive could not be cured without some amendment of the Settlement Act: "Because the Yurok Tribe litigated its claims against the United States based on the passage of the Act rather than waiving those claims, the Department is of the view that the Yurok Tribe did not meet the conditions precedent to the establishment of section 2(c)(4) of the act for the tribe to receive its share of the settlement fund or other benefits." App. 251; *see also* App. 193; Pl. Facts ¶¶ 50-55.

The plain language of the Settlement Act provides that the Secretary is not authorized to make a distribution from the Settlement Fund to the Yurok Tribe unless the Interim Council, and only the Interim Council, submitted the required claim waiver. As a matter of law, the Yurok Tribe no longer held a takings claim to waive because the Yurok Tribe's takings claim against the United States arising out of the Settlement Act was adjudicated to a final decision on the merits, is extinguished, and is, thus, no longer subject to waiver. There is no way, as a matter of federal law, that the new resolution submitted by the Yurok Tribal Council on March 21, 2007, could have met the requirements of the Settlement Act. App. 375-77. The Special Trustee's actions, ignoring these fatal defects and proceeding to permit an immediate per capita distribution in the face of the statutory language, is a breach of trust.[17]

By allowing the Yurok Tribe to "cure" the Interim Council's 1993 decision not to waive its claims by now issuing a new waiver of the already litigated claims, the Special Trustee has violated the unambiguous requirements of the Settlement Act and taken on the role that Congress

---

[17] In fact, the Special Trustee's one-sentence analysis ("Upon review, I find that the resolution meets the requirements of the Act." App. 375) overlooks an obvious defect in the Yurok Tribal Council's March 21 resolution: like the 1993 resolution of the Yurok Interim Council, the new resolution preserved "the Yurok Tribe's taking claim against the United States" App. 185, because it was enacted after completion of that 9-year litigation campaign.

reserved to itself — to amend the Settlement Act as necessary following the litigation to allow disbursement. *See* Section 14(c); App. 131-32. If Congress had intended to allow a different governing body of the Yurok Tribe to "cure" the Interim Council's failure to enact a valid waiver, it is "difficult to understand why it did not say so in simple language." *See Mountain States Tel. & Tel. v. Santa Ana*, 472 U.S. 237, 251 (1985) (finding that the Pueblo Lands Act of 1924 did not provide for a new administrative application of the Nonintercourse Act to Pueblo lands). The Special Trustee's decisions punish the other trust beneficiaries for following the statutory guidelines but reward Yurok individuals for failing to follow the rules. Such a result is unfair and contrary to both common sense and Congress's intent.

The "apportionment of the funds as provided in 1300i-3 and 1300i-6 of this title" is the only means provided for the Yurok Tribe to receive a distribution from the Settlement Fund. 25 U.S.C. § 1300i-1(c)(4). Because that apportionment was not made, the Special Trustee's decision to take matters into his own hands and distribute the balance of the Settlement Fund to only the Yurok Indian Tribe by means of a per capita payment must be analyzed under the trust responsibility rules established in *Short*. *See also* Section 7(b) (barring certain per capita distributions); App. 126-27. Under *Short*, because the balance of the Settlement Fund was required to be held for the benefit of the Indians of the Reservation as provided by statute, "[t]he Secretary cannot avoid established trust obligations to qualified plaintiffs by making discriminatory distributions to individual Hoopas through the Hoopa Valley Tribe, when such distributions were otherwise prohibited by the law of this case. . . . The violation of these duties under the statute would give rise to an action for money damages. . . . *Short IV*, 12 Ct. Cl. at 41, 45. The law of the *Short* case is that "'Indians of the Reservation' be included in any per capita distributions made . . . the distributions must be made in a non-discriminatory manner." *Id.* at

40, 42. Applying these principles to the undisputed facts of this case, partial summary judgment should be entered in favor of the Hoopa Plaintiffs based on the wrongful and discriminatory distribution of the remainder of the Settlement Fund as a per capita payment to only the Yurok Indian Tribe.

**CONCLUSION**

For the foregoing reasons, the Court should enter partial summary judgment as to liability for breach of trust and fiduciary duties in favor of the Hoopa Plaintiffs.

Respectfully submitted this 2nd day of April, 2008.

s/ Thomas P. Schlosser
Thomas P. Schlosser, Attorney of Record
MORISSET, SCHLOSSER, JOZWIAK & McGAW
801 Second Avenue, Suite 1115
Seattle, WA 98104-1509
Tel: (206) 386-5200
Fax: (206) 386-7322
t.schlosser@msaj.com

*Of Counsel:*

Rob Roy Smith, Attorney
ATER WYNNE, LLP
601 Union Street, Suite 1501
Seattle, WA 98101-3981
Tel: (206) 623-4711
Fax: (206) 467-8406
rrs@aterwynne.com
*Attorneys for the Plaintiff Hoopa Valley Tribe, et al.*

**CERTIFICATE OF SERVICE**

I hereby certify that on April 2, 2008, a copy of the Hoopa Valley Tribe and Individual Tribal Members' Memorandum in Support of Motion for Partial Summary Judgment on Question of Breach of Trust Responsibility was electronically sent via the CM/ECF system by the United States Court of Federal Claims on the following party:

Devon Lehman McCune
Email: devon.mccune@usdoj.gov

s/ Thomas P. Schlosser____________________
Thomas P. Schlosser, Attorney of Record
MORISSET, SCHLOSSER, JOZWIAK & McGAW
801 Second Avenue, Suite 1115
Seattle, WA 98104-1509
Tel: (206) 386-5200
Fax: (206) 386-7322
t.schlosser@msaj.com

T:\WPDOCS\0020\09561\Pleadings\MemSuppMotPtSJ_07.DOC
nmc:4/2/08