Congressional Research Service
The Library of Congress

Washington, D.C. 20540

September 13, 1988

TO : House Committee on the Interior and Insular Affairs
Attention: Frank Ducheneaux

FROM : American Law Division

SUBJECT : Questions with Respect to Hoopa Valley Reservation Settlement as Proposed in H.R. 4469

This responds to your request to provide a memorandum concerning the Hoopa Valley Reservation dispute settlement proposed in H.R. 4469 as amended by the substitute, a draft of which you enclosed. What follows is an analysis of three specific questions posed by the Committee; a summary appears on the final pages of the memorandum and on a separate page attached for your convenience.

Before proceeding to the questions we will briefly set forth the major provisions of the proposal:

H.R. 4469 as amended

If Hoopa Valley Tribe adopts a resolution to the effect, the Hoopa Valley Reservation is to be partitioned: the Square to the Hoopa Valley Tribe; the Extension to be established as the Yurok Reservation (including National Forest lands and parts of Yurok Experimental Forest), with $5,000,000 authorized for additions.

The Short v. United States (Ct. Cl. No. 102-63) litigation would not be affected.

Claims would be barred 210 days after partition or 120 days after publication of option election data. Yurok claim could be barred by tribal waiver or by expiration of 180 days after the general council meeting.

"Indians of Reservation" roll is to be established; that, together with Hoopa Valley tribal roll, is to constitute settlement roll. Persons listed on settlement roll are to be accorded right to choose: Hoopa Valley Tribe membership (provided other qualifications are met: 18 years of age, meeting Short Hoopa Valley criteria, and residence or property on the Square); Yurok Tribe membership (with $3,000 cash payment); or lump sum, $20,000, payment. Choice effects renunciation of assets of tribe not chosen or, in the case of choice of lump sum payment, any tribal assets. The settlement fund is to be divided between the tribes on a pro-rata basis. After payment of these sums to individual Yuroks from escrow accounts, remainder (including accumulating interest) (plus $10,000,000 authorized to be appropriated) is to be divided between the tribes equally. These sums are to be held in trust by the United States for the benefit for each tribe, not to be distributed per capita until the expiration of ten years. (There is also a provision authorizing up to $3,500,000 million annual expenditure from the fund to be paid to the Hoopa Tribe for tribal purposes.)

The Settlement Roll is to consist of eligible "Indians of the Reservation" who can qualify under Short, living on the date of enactment, citizens of the United States, who are not enrolled members of the Hoopa Valley Tribe.

Those choosing Yurok Tribal membership are permitted to join in forming tribe, which may be organized under the Indian Reorganization Act. Secretary is to convene a general council of eligible Yurok Tribe members, who are to nominate members of an Interim Council and to vote on waiving any claim against the United States. Interim Council is empowered to appoint a committee to draft tribal constitution and is to expire upon its adoption or at the end of 2 years.

Essentially, this proposal would effect a division of the present Hoopa Valley Reservation into two Indian reservations: one portion, the Square, a timber rich area, to be held in trust for the Hoopa Valley Tribe, who apparently are currently the chief residents of the Square; the other portion, the Extension, to be held in trust for the Yuroks, who are to include the "Indians of the Reservation," the successful plaintiffs in Short v. United States (Claims Court Docket No. 102-63).

You have asked three questions regarding this proposal:

> 1. What is the legal nature of the interest of persons qualifying as "Indians of the Reservation" in the tribal or communal resources of the Hoopa Valley Indian Reservation, prior to any individualization of such resources?
>
> 2. What is the scope of Congressional power over tribal communal property of Indian reservations; membership in Indian tribes; and individual rights to participate in such tribal or communal property?
>
> 3. In view of the plenary power of Congress over Indian affairs and its role as guardian of Indian tribes in view of the responses to questions 1 and 2 above, does Congress have power to deal with the tribal or communal property and assets of the Hoopa Valley Indian Reservation as proposed in H.R. 4469 as amended by the substitute?

We shall attempt to confine our response to those questions and address them in order, avoiding tangential matters, however important their impact upon the proposal. We will, however, supply a brief background, derived from court opinions, in an attempt to set the framework within which your questions and the legislation arise.

Historical and Legal Background. Generally, the situation that exists today on the Hoopa Valley Reservation is a product of the interaction between legal doctrines and historical or political realities. The reservation evolved from two reservations joined because of a legal limitation on the number of

reservations that could be established in California. On this reservation were settled Indians whose traditional organization was either non-existent in the tribal sense or so loose as to fail to make its presence felt in dealings with the federal government. Although there is evidence that the federal government recognized that because the two reservations had been joined members of both units had legal interest in the entire reservation, there is also evidence that the federal government made efforts to segregate the two sections of the reservation. The eventual organization of the Indians on the reservation into a formal tribal government was in some sense federally inspired and it was centered on one part of the reservation, the Square, wherein resided the primary resource of the reservation, its timber. Indians of the Extension, the other part of the reservation, successfully brought suit in the Court of Claims for damages based on the amount of timber proceeds they would have received had the distribution been equitable in their view. These plaintiffs had been excluded from participation in the tribal government of the Square and excluded from federal per capita distributions of timber proceeds. These plaintiffs included both residents and non-residents of the reservation who qualified as "Indians of the Reservation," based on a test analogous to the membership requirements of the organized tribal government of the reservation.

This test was used in the Short[1] case, which currently involves the process of deciding which of the over 3,000 plaintiffs was entitled to receive a per capita share of timber proceeds already distributed.

The specifics of how that situation developed are briefly as follows. The

---

[1] Short v. United States, 486 F. 2d 561, 202 Ct. Cl. 870 (1973), cert. denied, 416 U.S. 961 (1974); Short v. United States, 661 F. 2d 150, 228 Ct. Cl. 535 (1981), cert. denied, 455 U.S. 1034 (1982); Short v. United States, 719 F. 2d 1133 (Fed. Cir. 1983); Short v. United States, ___ F. 2d ___, 12 Ct. Cl. 36 (Fed. Cir. 1987).

Hoopa Valley Reservation as it exists today is shaped like "a square skillet with an extraordinarily long handle."[2] The square section (hereinafter, the Square) derives from the original Hoopa Valley Reservation; the handle or extension (hereinafter the Extension) section derives from a reservation, one mile wide on either bank of the Klamath River, set aside for Indians living on the lower Klamath, primarily the Yuroks, and a connecting strip of land linking it to the Hoopa Valley Reservation. In 1864, by statute the President was authorized to set aside reservations for the Indians of California pursuant to the Act of April 8, 1864, 12 Stat 39, 40, which read, in pertinent part:

> Sec. 2. That there shall be set apart by the President, and at his discretion, not exceeding four tracts of land, within the limits of said state, to be retained by the United States for the purposes of Indian reservations, which shall be of suitable extent for the accommodation of the Indians of said state....And provided, further, That said tracts to be set apart as aforesaid may, or may not, as in the discretion of the President be deemed for the best interests of the Indians to be provided for, include any of the Indian reservations heretofore set apart in said state, and that in case any such reservation is so included, the same may be enlarged to such an extent as in the opinion of the President may be necessary, in order to its complete adaptation to the purposes for which it is intended.

By executive order of June 23, 1876, President Grant set aside the Hoopa Valley reservation as follows:

> It is hereby ordered that [description of metes and bounds follows]...be, and hereby are, declared to be the exterior boundaries of Hoopa Valley Indian Reservation, and the land embraced therein, an area of 89,572.43 acres, be, and hereby is, withdrawn from public sale, and set apart for Indian purposes, as one of the Indian reservations authorized to be set apart, in California, by act of

---

[2] Short v. United States, 202 Ct. Cl. 870, 873; 486 F. 2d 561 (1973), cert. denied, 416 U.S. 961 (1974). For a map of the reservation see Appendix A (attached).

Congress approved April 8, 1864.[3]

That executive order pertained to the square part of the current Hoopa Valley Reservation. It has been described as "a 12-mile square tract of land in Northern California, on the last reach of the Trinity River before it joins the Klamath River."[4] Another reservation had been established by executive order along the Klamath River on November 16, 1855, pursuant to the Act of March 3, 1853, 10 Stat. 226, 238) as amended by the Act of March 3, 1855. 10 Stat. 686, 699. The 1853 legislation, as amended, authorized the President to set aside "five [subsequently seven] military reservations from the public domain in the State of California or the Territories of Utah and New Mexico bordering on said State, for Indian purposes." 10 Stat. 226, 238. By the 1855 executive order President Franklin Pierce ratified the Department of Interior recommendation for a "Klamath Reservation," a "strip of territory commencing at the Pacific Ocean and extending 1 mile in width on each side of the Klamath River."[5]

After the 1864 act restricted the President's authority to establishing no more than four California reservations, no definitive action was taken with respect to the Klamath Reservation[6] akin to the June 23, 1876, executive order pertaining to the Hoopa Valley Reservation. The Department of the Interior,

---

[3] I Kappler, Indian Affairs: Laws and Treaties 815 (1904 ed.) (hereinafter, Kappler).

[4] Short v. United States, 202 Ct. Cl. 870, 873.

[5] I Kappler 817.

[6] Some definitive action was taken with regard to other California reservations. For example, the Act of July 27, 1868, 15 Stat. 198, 221, 223, provided for the removal of Indians from the Smith's River reservation to Hoopa Valley and Round Valley reservations, to Hoopa Valley and for the restoration of the Mendocino Indian reservation to the public domain.

however, continued to treat the Klamath River Reservation as a legitimate reservation. In 1888 the federal courts ruled that the Klamath Reservation was not Indian country because it had not been set aside pursuant to the 1864 act.[7]

Subsequently, on October 16, 1891, an executive order[8] extended the Hoopa Valley Reservation "so as to include a tract of country one mile in width on each side of the Klamath River, and extending from the present limits of the said Hoopa Valley reservation to the Pacific Ocean." Lands to which other valid rights attached were excluded. The Supreme Court in Donnelly v. United States,[9] a case requiring a decision on whether the former Klamath River Reservation was Indian country for jurisdictional purposes, upheld the extension of Hoopa Valley Reservation to include the Klamath River Reservation as within the power conferred upon the executive by the Act of 1864. In Mattz v. Arnett,[10] the Court indicated its view of the rationale for the 1892 act:

> The reason for incorporating the Klamath River Reservation in the Hoopa Valley Reservation is apparent. The 1864 Act had authorized the President to 'set apart' no more than four tracts for Indian reservations in California. By 1876, and certainly by 1891, four reservations already had been so set apart. These were the Round valley,...the Mission, the Hoopa Valley, and the Tule River....Thus, recognition of a fifth reservation along the Klamath River was not permissible under the 1864 Act. Accordingly, the President turned to his authority under the Act [of 1864] to expand an existing, recognized reservation. He [President Benjamin Harrison] enlarged the Hoopa Valley Reservation to include what had been the Klamath River Reservation as well as an intervening riparian strip connecting the two tracts. The President's continuing authority so to enlarge reservations and,

---

[7] United States v. Forty-eight Pounds of Rising Star Tea, 35 F. 403 (N.D.Cal. 1888), aff'd 30 F. 400 (C.C.N.D. Cal. 1889).

[8] I Kappler 815.

[9] 228 U.S. 243 (1913).

[10] 412 U.S. 481, 493-492 (1973)(footnotes omitted).

> specifically, the legality of the 1891 Executive Order, was affirmed by this Court in Donnelly v. United States....

An Act of June 17, 1892, 27 Stat. 52, permitted opening the former Klamath River Reservation up to settlement with provision for Indian allotments as follows:

> Provided That any Indian now located upon said reservation may, at any time within one year from the passage of this act, apply to the Secretary of the Interior for an allotment of land for himself and, if the head of a family, for the members of his family, under the provisions of the act of February eighth, eighteen hundred and eighty-seven, [the General Allotment Act]...and, if found entitled thereto, shall have the same allotted as provided in said act or any act amendatory thereof.[11]

There was a further provision that the funds realized from the sale of land were to "be used under the direction of the Secretary of the Interior for the maintenance and education of the Indians now residing on said lands and their children."[12]

Surveying had begun on the Square and temporary allotments made on the basis of authority issued on November 29, 1887,[13] under the authority of the General Allotment Act of February 8, 1887, as amended by the Act of February 23, 1891.[14] Allotments on the Connecting Strip were not specifically authorized under the 1892 legislation, but were authorized by the President under authority of the General Allotment Act.[15] Allotments were made to Indians residing on each of the portions of the Hoopa Valley Reservation;

---

11 27 Stat. 52.

12 Id.

13 Short v. United States, 202 Ct. Cl. 870, 925 (finding 78).

14 24 Stat. 388; 26 Stat. 794.

15 Short v. United States, 202 Ct. Cl. 870, 928 (finding 82).

first, to those on the Extension[16]; then to those on the Connecting Strip; and, finally the process of making allotments to those on the Square began.[17] In 1922, 365 allotments on the Square were approved; by 1932, when a survey indicated that there was relatively little land on the reservation suitable for allotment, i.e., agricultural purposes, there were about 600 Indians on the Square and Connecting Strip who might seek allotments.[18] Some allotments were made in 1933 but at that time, the Commissioner of Indian Affairs gave orders to cease making allotments because of the possibility that "Indians of the Connecting Strip and the Lower Klamath Strip (which he called the 'former Klamath River Reservation') would all be equally entitled to allotment on the Square (which he termed the 'original Hoopa Valley Reservation'), and the available agricultural and grassland would be sufficient for so small a number of those qualified as to work injustice."[19] Overall, the allotments that had been made were made to Hoopas on the Square and Yuroks on the Extension with a few Yuroks on the Square and Hoopas on the Extension, mainly those who had ties by blood or residence.[20] According to the Court of Claims:

> In connection with the allotment program, officials of the Indian Office on a number of occasions ruled that

---

[16] Under the 1892 legislation lands not selected by the Indians for allotments on the former Klamath River Reservation were opened to the public for settlement. The result was that the Indians of the former reservation, i.e., the Extension, who did not choose allotments became scattered. 66 I.D. 59, 64 (February 5, 1958); II Opinions of the Solicitor, Department of the Interior, Indian Affairs 1814, 1816.

[17] Short v. United States, 202 Ct. Cl. 870, 928-933 (findings 80-88).

[18] Short v. United States, 202 Ct. Cl. 870, 934-935(findings 91-92).

[19] Short v. United States, 202 Ct. Cl. 870, 938 (finding 96).

[20] Short v. United States, 202 Ct. Cl. 870, 940 (finding (100).

> Indians of the Addition[21] and the Square--Klamaths and Hoopas and others--were equally entitled to rights in the entire reservation as enlarged and, specifically, in the Square.[22]

The tribal organization of the Indians settled on the Hoopa Valley Reservation was not maintained into the twentieth century[23], prompting the Department of the Interior to convene a council in 1915 for allotment purposes.[24] That council apparently fell out of use for by 1930, no council existed.[25] In 1933 a business council, with purely advisory powers, limited to the Square and to the Hoopas, was established with the approval of the Interior

---

[21] Some sources use the term "Addition" for the area referred to in this paper as the Extension. Others use the terms Addition and Connecting Strip to distinguish the original Klamath River Reservation and the strip of land connecting it to the original Hoopa Valley Reservation.

[22] Short v. United States, 202 Ct. Cl. 970, 938 (finding 101). Findings 101-108 provide specific instances of Indian Department actions or statements over time supporting the contention that no distinction was made in allocating allotments on the reservation.

[23] In 1958, the Deputy Solicitor of the Department of the Interior apprised the Commissioner of Indian Affairs as follows:

> A group of Indians had been politically recognized as a Hoopa tribe by the United States as early as 1851 when a treaty was negotiated with the 'Hoo-pah' or, as they were sometimes otherwise called, the Trinity River Indians. Although this treaty was never ratified, it is convincing evidence of the existence of a Hoopa tribal group. Later this tribal group exercised the rudiments of community government over the Indians of an area comprising the twelve mile square original Hoopa Valley reservation and were thus qualified for political recognition as a tribe occupying the reserved area. We have seen no evidence, or contention, that any other tribal group claimed, at that time any governmental or economic jurisdiction over the twelve mile square area of the original Hoopa Valley Reservation.

65 I.D. 59, 61; II Opinions of the Solicitor, Department of the Interior, Indian Affairs 1814, 1815-1816 (February 5, 1958).

[24] Short v. United States, 202 Ct. Cl. 870, 950-951 (finding 110).

[25] Short v. United States, 202 Ct. Cl. 870, 951.

Department; a similar council for the Indians along the Klamath River was also established with a subordinate role.[26] Since comparable powers were not approved for the Klamath council, it eventually disappeared.[27] The constitution and by-laws of the Hoopa Valley Business Council were approved on November 20, 1933; no indication of the extent of its jurisdiction was indicated.[28] Members were elected from districts in the Square, Indians of Yurok and Karok blood have been elected to the council; and the council treated of matters having reservation wide impact.[29] Enrollment and membership qualifications, however, were related to the Square.[30] When the government distributed proceeds of timber harvested on the Square, it limited the per capita payments to members of the Hoopa Valley Tribe.[31] In 1958, the Deputy Solicitor of the Department of the Interior ruled that "no Indians other than those entitled as members of the Hoopa Tribe of the original 12-mile square reservation and their descendants, have rights of participation in the communal property on that part of the Hoopa Valley Reservation."[32] Speaking of

---

[26] Short v. United States, 202 Ct. Cl. 870, 952 (findings 113-117).

[27] Short v. United States, 202 Ct. Cl. 870, 955 (finding 123).

[28] Short v. United States, 202 Ct. Cl. 870, 956 (finding 125).

[29] Short v. United States, 202 Ct. Cl. 870, 957-958 findings 127-131).

[30] Short v. United States, 202 Ct. Cl. 870, 959-967 (findings 136-156).

[31] Three accounts were created for trust funds held by the United States; one for the lower Klamath River Yurok Indians, one for the upper Klamath River Yuroks, and one for the "Hoopa Valley Indians." Beginning in 1955, upon resolutions of the Hoopa Valley Business Council, the Secretary of the Interior made per capita distributions to the Indians on the official roll of the Hoopa Valley Tribe. Short v. United States, 202 Ct. Cl. 870, 970-980 (findings 166-171).

[32] 65 I.D. 59, 64 (February 5, 1958); II Opinions of the Solicitor, Department of the Interior, Indian Affairs 1814, 1819.

the Indians of the Extension, the Deputy Solicitor said:

> The Klamath River Indians, whose ancestors formerly resided on the Klamath River Reservation, have consistently been regarded as an identifiable tribe by the Federal Government....These Indians are also included in the general term 'Yurok' meaning downstream Indians although a Yurok Tribe, as such was not organized until recent years.[33] The 'Yurok Tribe' has never been recognized as having jurisdiction over any part of the 'Hoopa Extension' because its membership is not confined to reservation Indians.[34]

As part of that ruling the Deputy Solicitor found that the 1876 executive order had vested property rights in the reservation in the Hoopa Valley Indians which could not be disturbed by the incorporation of the Klamath River Reservation and its Yurok Indians into the Hoopa Valley Reservation in 1891. The Department, thus, continued to distribute timber proceeds from the Square to members of the Hoopa Valley Tribe.

Those distributions were challenged by the filing of the Short litigation by plaintiffs representing themselves to be affiliated with the Extension and the Connecting Strip. Eventually, the Court of Claims ruled that the 1864 Act was so worded that no tribe settled on one of the reservations authorized thereby "could obtain vested rights to the exclusion of another group or tribe

---

[33] The Deputy Solicitor seems to be speaking of the Yurok Tribal Organization, which was not a federally recognized tribe, and, thus, may have been merely a social organization. In Short v. United States, 202 Ct. Cl. 870, 958 (finding 132), the Court of Claims described this organization as "a California corporation,...formed in 1949 to represent and promote the interests of all persons of Yurok ancestry, a group described as native to and resident of the Klamath River Basin, an area larger than the Addition." According to the Deputy Solicitor, the organization was "recognized for the purposes for which it was formed namely 'to promote the cultural, social, educational and economical well being of members of the Yurok Tribe.'" 65 I.D. 59, 64, n.3; II Opinions of the Solicitor, Department of the Interior, Indian Affairs 1814, 1817, quoting a Letter from Assistant Commissioner to Mrs. Lowana Brantner, November 26, 1954.

[34] 65 I.D. 59, 64; II Opinions of the Solicitor, Department of the Interior, Indian Affairs 1814, 1817.

of Indians thereafter authorized by the President to share in the benefits of the reservation."[35] It further ruled that "[t]he Hoopas were not the sole occupants of the Square, either in aboriginal times or thereafter,"[36] and that "the evidence is abundant that the reservation was intended, from the outset, for the accommodation of numbers of tribes of Northern California, including the Klamaths, such as might reside there with Presidential approval...."[37] It also found that:

> President Grant's order of June 23, 1876, establishing the Hoopa Valley Reservation 'as one of the Indian reservations authorized to be set apart in California by act of Congress approved April 8, 1864'...established the reservation not for any specific tribe or tribes, none having been mentioned in the order, but for such tribes as might reside or settle there, then or thereafter, with the approval of the President, and the tribes as were then resident upon it were subject to further exercise of Presidential authority under the act with respect to the reservation.[38]

Finally, the court found that the 1891 executive order created "an enlarged reservation in which the Indians of the original reservation and the Indians of the added tracts would have equal rights in common."[39]

In subsequent proceedings in the Short litigation, the Court of Claims refused to permit the government to substitute the Yurok Tribe for the Short plaintiffs,[40] and held that under the federal Indian timber statutes[41]

---

[35] Short v. United States, 202 Ct. Cl. 780, 974 (finding 175).

[36] Short v. United States, 202 Ct. Cl. 870, 975 (finding 179).

[37] Short v. United States, 202 Ct. Cl. 870, 975 (finding 180).

[38] Short v. United States, 202 Ct. Cl. 870, 975 (finding 181).

[39] Short v. United States, 202 Ct. Cl. 870, 976 (finding 183).

[40] Short v. United States, 228 Ct. Cl. 535, 661 F. 2d 150 (1981), cert. denied, 455 U.S. 1034 (1982).

[41] 25 U.S.C. § 407.

directing use of timber proceeds for Indians "who are members of the tribe or tribes concerned," the individual Short plaintiffs were entitled to distribution since the term "tribe" was not a term denominating a particular Indian organization but a means of designating the Indians who had a communal interest in the timber property,[42] and that the Short plaintiffs had no claim upon the funds distributed to the Hoopa Valley Tribe since they were suing as individuals.[43]

It is important to note that the Short litigation deals with a statutory right under the Indian timber statutes and that it involves individuals suing as individuals not Indian tribes suing as tribes. It is also noteworthy for what it does not test--i.e., whether there is a vested interest in the reservation land, deprivation of which could entail a Fifth Amendment claim for just compensation for a taking. What it has decided, however, is that individuals, mainly associated with the Connecting Strip or the Extension, whose interest in the Hoopa Valley Reservation is analogous to that of members of the Hoopa Valley Tribe whose interest is associated with the Square, are entitled under federal statutes to a distribution of proceeds of timber harvested on the Square on a par with any per capita distribution to members of the Hoopa Valley Tribe.

Having set forth the main provisions of the proposed legislation as well as the basic historical and legal context in which it arises, we proceed to analyzing the specific questions that have been presented with respect to the proposal.

---

[42] Short v. United States, 719 F. 2d 1133 (Fed. Cir. 1983), cert. denied, 467 U.S. 1256 (1984).

[43] Short v. United States, 12 Cl.Ct. 36 (1987).

1. The Legal Nature of the Interest of Persons Qualifying as "Indians of the Reservation" in the Tribal or Communal Resources of the Hoopa Valley Indian Reservation, Prior to Any Individualization of Such Resources. In order to discuss the legal nature of the interest of persons qualifying as "Indians of the Reservation" in the Tribal or Communal Resources of the Hoopa Valley Indian Reservation, prior to any individualization of such resources, it is necessary to: (1) identify "Indians of the Reservation," (2) identify the extent to which the courts in the recent Hoopa Valley litigation have dealt with the question, (3) discuss how the courts have treated this question generally, and (4) predict how the courts would treat the question with regard to the Hoopa Valley situation.

A. **"Indians of the Reservation."** In the 1973 Court of Claims decision in the Short case, the Court of Claims ruled that the Hoopa Valley Reservation constituted a single unit and that Indians of the reservation were entitled to share in any per capita distribution of timber harvested from the Square. Since the United States was found to have acted arbitrarily in restricting the distribution of this property to members of the Hoopa Valley Tribe it was liable in damages to any of the Short plaintiffs who could show that they were "Indians of the Reservation." The term, "Indians of the Reservation," therefore, has two meanings, one applicable generally with respect to the Hoopa Valley Reservation and one applicable to Short plaintiffs.

B. **How the question was treated in recent Hoopa Valley litigation.** The central question before the Court of Claims in Short was whether individual plaintiffs claiming ties to the Hoopa Valley Reservation by virtue of having been settled or descended from settlers on the Extension were entitled to participate in distributions of income from the Square. Since the statute

required that such income be used for the benefit of Indians "who are members of the tribe or tribes concerned,"[44] the Court had to decide what tribes were concerned. It decided that by virtue of the Executive Order of 1891, "all the Indians of the reservation as thereby extended--Addition and Square--got equal rights in the enlarged reservation and thus that the rights of Indians of the Addition are equal to those of the Indians of the Square, the Hoopa Valley Tribe or any other Indians of the Reservation."[45] The term, "Indians of the Reservation," may thus mean any Indian or tribe that has any rights in the reservation. In Short, the term also denotes the "non-Hoopa Indians residing on or connected with the reservation...entitled to equal rights in the division of timber profits (and other income) from the unallotted trust land of the reservation."[46]

It does not appear that any court has decided explicitly what tribes have rights in the reservation. In Short, the United States attempted to substitute the Yurok tribe for the plaintiffs to no avail.[47] The Claims Court has, however, decided that the Short plaintiffs have no right to claim a share of any payments made by the United States to the Hoopa Valley tribe.[48]

---

[44] 25 U.S.C. § 407.

[45] Short v. United States, 202 Ct. Cl. 870, 980 (finding 188).

[46] Short v. United States, 719 F. 2d 1133 (Fed. Cir.1983), cert. denied, 467 U.S. 1256 (1984).

[47] Short v. United States, 661 F. 2d 150, 228 Ct. Cl. 535 (1981), cert. denied, 455 U.S. 1034 (1982). The Assistant Secretary of Interior for Indian Affairs had begun the process of forming a Yurok Tribe in order to qualify it along with the Hoopa Valley Tribe as "Indians of the Reservation," in order to reach a settlement in the Short litigation: "Since no Yurok tribal organization existed and the membership of the Tribe was not established, the Assistant Secretary announced that the Interior Department would initiate organization of a Yurok Tribe." Short v. United States 661 F. 2d 150, 153.

[48] Short v. United States, 12 Cl. Ct. 36 (1987).

During the course of the Short litigation, the Court of Claims and its successor, the Claims Court, have ruled on tangential issues and have detailed the history of the Hoopa Valley Reservation, explicating the meaning of the various pertinent statutes and executive order. The focus in that case, however, was whether the individual plaintiffs as individuals had a legal claim to share in per capita distributions. No attempt was made to decide what tribal rights were involved in the reservation itself or what individual rights were involved in other property of the reservation, other than the timber proceeds to which there was a statutory right.

In related litigation,[49] individual plaintiffs have somewhat successfully challenged the authority of the Hoopa Business Council to manage the resources of the reservation without the participation of other "Indians of the reservation." The situation is described as follows:

> Other Indians of the reservation, such as plaintiffs, are not eligible for membership in the Hoopa tribe and are not represented by the Hoopa Business Council. Most of these Indians live on the reservation's 'Addition' or 'Extension' along the Klamath river, or in other places distant from the Square, and many of them trace their origin to the Yurok tribe or other historic Indian groups. They have no council or governing body, do not view themselves as a separate tribe or tribes, and have resisted the government's efforts to have them organize themselves as a tribe. Plaintiffs are among these Indians of the reservation, but they sue as individuals, not on behalf of the class of all non-Hoopa Indians of the reservation.[50]
>
> ....................................................
>
> Since less than one third of the Indians of the reservation belong to the Hoopa tribe, the interests of the majority of Indians are not represented by any tribal organization. Despite this, the government pursued its

---

[49] Puzz v. United States, No. C-80-2908 (N.D. Cal., order filed April 8, 1988).

[50] Puzz, slip op. at 2.

> policy of strengthening tribal self-government by working closely with the Hoopa Business Council in administering the reservation. People not represented by the Hoopa Business Council came to believe that the government's administration of the reservation in conjunction with the HBC was unfair. They claimed that the government was allowing the Hoopa tribe to enrich itself, denying non-Hoopa Indians a fair share of income from reservation resources, administering social services in a discriminatory manner, and denying non-Hoopa Indians a voice in reservation government.[51]

In responding to the plaintiffs' claim for a greater voice in the management of the reservation, the defendants, i.e., the United States, the Department of the Interior, and other federal defendants as well as the Hoopa Business Council, advanced the argument that the reservation was owned by tribes. The court interpreted the 1864 act as conferring "continuing executive discretion to locate any tribe or tribes thereon [on any of the reservations established under the act] and to change the boundaries of the reservation,"[52] and as having an "intent to create the reservation for tribes, not exclusively for the Hoopa tribe."[53]

The court acknowledged "that Congress continued to view the reservation, and reservations in general, as tribally enjoyed," and that "executive administration of the reservation from the time of its creation forward is consistent with the tribal premise."[54] The court, however, said, that "plaintiffs are Indians of the reservation, which necessarily means that they

---

51 Puzz, slip op., at 3.

52 Puzz, slip op., at 7.

53 Puzz, slip. op., at 8.

54 Puzz, slip. op., at 9, citing Act of May 19, 1958, 72 Stat. 121; Act of June 25, 1910 (as amended, 25 U.S. C. § 407); Act of March 3, 1883 (as amended, 25 U.S.C. § 155) and Thompson v. United States, 44 Ct. Cl. 359, 366 (1909); and Elser v. Gill Net # 1, 54 Cal. Rptr. 568, 575 (1966).

trace their origins to one or another of the Indian tribes or groups for whose benefit the reservation was created."[55] It found that "the reservation is indeed tribally enjoyed, and plaintiffs can make no claim for individual, severable shares of its land or resources....it does not follow that plaintiffs, as Indians of the reservation, have no standing to claim a right to share in the communal enjoyment of the reservation."[56] Because the plaintiffs were not suing as a tribe or as tribal representative, the court had to rule on their claims as individuals.[57]

In reaching the merits of the plaintiffs' case, the court first ruled that Congress had set a policy of tribal self-government that was furthered by the Department of Interior's according the Hoopa Business Council authority in reservation matters. Moreover, since such broad discretion was conferred upon the Department, the court could not enjoin it from permitting the Hoopa Business Council to continue to exercise management functions. Looking to the Short findings the court also set up four essential principles to guide it:

> 1. The Square and the Addition constitute one unified reservation for the purpose of distributing income from unallotted trust lands of the Reservation to 'Indians of the Reservation';
>
> 2. There are no tribes on the Hoopa Valley Reservation having vested rights to the income from unallotted trust lands on the Reservation;

---

55 Puzz, slip op., at 10.

56 Id.

57 "No legislative or executive act has ever consolidated the tribes on the reservation....Therefore, plaintiffs cannot predicate their standing on membership in some new, reservation-wide tribal community....Their status as Indians of the reservation [sic] necessarily entails ties to one or another of the historic Indian groups for which the reservation was created, and these ties create the right to share in the benefits of the reservation." Puzz, slip op. at 11.

> 3. The Indians of the Reservation hold equal rights to income from unallotted trust lands of the Reservation; and
>
> 4. The United States Department of the Interior, Bureau of Indian Affairs, acted arbitrarily in recognizing only the persons on the official roll of the Hoopa Valley Tribe as the persons entitled to the income from the unallotted trust lands on the Square.[58]

Proceeding from this base, the court concluded that "the government has a duty to allow all Indians of a reservation to benefit from reservation resources and to participate in self-government, on a non-discriminatory basis"[59] and that "the 1864 Act and subsequent legislative and executive actions do impose on federal defendants a duty to administer the reservation for the use and benefit of all Indians of the reservation."[60] Finally, the court ruled:

> The federal defendants may not dispense funds for any projects or services that do not benefit all Indians of the reservation in a nondiscriminatory manner....
>
> Federal defendants must retain supervisory authority over all spending of reservation funds, to assure that they are used for purposes which benefit non-Hoopa as well as Hoopa Indians of the reservation. To fulfill the responsibility, federal defendants must develop and implement a process to receive and take account of the opinions of non-Hoopas on the proper use of reservation funds.[61]

The federal government is, thus, under order in the Puzz case to inaugurate a procedure for participation in reservation management by all Indians of the reservation. A plan was submitted to the court, given "conditional approval," on June 20, 1988, subject to briefing and oral argument. The United States

---

58 Puzz, slip op. at 14-15.

59 Puzz, slip op., at 16.

60 Puzz, slip op., at 17.

61 Puzz, slip op., at 18.