Court of Appeals for the Ninth Circuit denied a request for a stay on August 9, 1988.[62]

The Puzz case, thus, does not involve any findings on the question of whether the Indians of the reservation have any vested rights in the reservation as against Congressional action. It merely has decided that based on the wording of the executive orders and the 1864 statute, the Department of the Interior is under an obligation to administer the reservation for the benefit of all of its Indians, rather than to funnel most of the resources to the Hoopa Valley Tribe.

It, thus, is clear that neither the Short decisions or the Puzz decision squarely address the central question of whether any Indians or tribes have any vested rights in the Hoopa Valley Reservation or its resources. Each case has had before it a specific question of statutory and executive order interpretation. Each has concluded that the reservation was founded for no particular Indian tribe but that it was set aside for the Indians of California and that any Indians settled upon the reservation were entitled to share in the reservation resources equally. To the Short court that meant that per capita distributions of timber revenues could not be denied Indians legitimately connected with the reservation. Using the Short rationale the Puzz court concluded that the statutes and executive orders placed a duty on the Department of the Interior to treat all reservation Indians equally in terms of having input into the management of the reservation. No court has held that any of the Indians of the reservation can compel the individualization of the

---

[62] Puzz v. United States Department of the Interior, (D. N. Cal. No. C-80-2908 TEH, order filed June 20, 1988); Puzz v. United States Department of the Interior (9th Cir. Nos 88-2834, 8802836, 88-2837, order filed August 9, 1988).

assets of the reservation. Indeed, in Short, the court refused to compel the government to pay damages to the individual plaintiffs to make up for the fiscal disbursements to the Hoopa Tribe that had no parallel in payments to the other Indians of the reservation.

**C. How the courts have treated the question in general.** In general, tribal property is held to be communal property, to which individual members have a right to participate in any distribution, but no right to compel individualization as would tenants in common.[63] In The Cherokee Trust Funds[64] case, the Supreme Court stated that although Indian tribal lands are owned communally, "that does not mean that each member had such an interest, as a tenant in common that he could claim a pro rata share of the proceeds of sales made of any part of them." Another description of the interest of individual members in tribal property is as follows:

> In the absence of legislation to the contrary, the individual Indian has no right as against the tribe to any specific part of the tribal property. It is often said that the individual has only a 'prospective right' to future income from tribal property in which he has no present interest. Other terms used to picture this right are 'an inchoate interest,' and a 'float.' These terms aptly characterize the intangible right of the Indian to share in tribal property. Until the property loses its tribal character and becomes individualized, his right can be no more than this, except insofar as federal law, tribal law, or tribal custom may give him a more definite right of occupancy in a particular tract. In the case of tribal funds, he has, ordinarily, no vested right in them until they have been paid over to him or have been set over to his credit, perhaps subject to certain restrictions. In the case of lands, he has no vested right unless the land or some designated interest therein has been set aside for him either severally or as tenants in common.[65]

---

63 Gritts v. Fisher, 224 U.S. 640 (1912).

64 117 U.S. 228, 308 (1886).

65 Felix S. Cohen, Handbook of Federal Indian Law 183-184 (1942).

In addition to the question of whether individuals have rights in tribal or communal property, there is in this instance an issue of whether there is any communal compensable property. The question of whether there are compensable rights in executive order reservations is not completely settled. There are cases holding that such reservations give rise to no compensable rights.[66] Arguments have been made, however, that "Congress has acted in a number of ways to assure that title to many executive order reservations stands on the same footing as title to reservations created by treaty or statute."[67] It is possible that Congress has, thus, barred the executive from disturbing interests in executive order reservations but retains for itself the authority to confirm them or to alter their limits.[68]

A statute exists that could be used to test whether the United States would have to pay damages for a taking in connection with an unconfirmed executive order reservation. Section 1505 of title 28, allows the Claims Court to hear "any claim against the United States accruing after August 13, 1946, in favor of any tribe, band, or other identifiable group of American Indians residing within the territorial limits of the United States or Alaska whenever such claim is one arising under the Constitution, laws or treaties of the

---

[66] Sioux Tribe v. United States, 316 U.S. 331 (1942); Hynes v. Grimes Packing Co., 337 U.S. 86 (1949).

[67] Cohen, Felix S., Handbook of Federal Indian Law 495 (1982 ed.).

[68] In Felix S. Cohen, Handbook of Federal Indian Law, 495-406 (1982 ed.), the authors list the kinds of Congressional action that have arguably confirmed all executive order reservations: confirming tribal title to some of them; ratifying them as permanent through appropriations as in Shoshone Tribe v. United States, 299 U.S. 476 (1937); and treating executive order reservations like all other Indian lands in various statutes. This, however, leads them to postulate, "it is probable that Congress has expressly or implicitly 'recognized' the title to all executive order reservations created before 1919. This ratification would appear to preclude revocation of the reservations by executive action not specifically authorized by Congress."

United States, or Executive orders of the President...." Whether that statute gives rise to acknowledgment of a compensable interest in executive order reservations has not been decided.[69]

D. **How the courts might treat the question with respect to the Hoopa Valley Reservation.** The nature of the relationship between the United States and the Indian people has been a government to government relationship, a political relationship, with the Indian tribe, the usual Indian component of the relationship.[70] Generally the rights of Indians to reservation resources prior to individualization are rights as tribal members. It may be that the legal position of Indians of the Hoopa Valley Reservation is not that of members of tribes which have title to property or which are entitled to property held in trust by the United States. It is possible that the courts could find that the Hoopa Valley Reservation is not a tribal reservation. It was not created for a tribe but "for the accommodation of the Indians of said state [California]."[71] The executive orders that set the reservation apart did not mention any particular Indian tribes but ordered that the lands be "set apart for Indian purposes, as one of the Indian reservations authorized to be set apart, in California, by act of Congress approved April 8, 1864. (23 Stats., p. 39)."[72]

The reservation, moreover, was not given to an Indian tribe in exchange

---

69 Since 1946, Congress has not been in the practice of altering reservation boundaries to the detriment of the Indians involved.

70 Morton v. Mancari, 417 U.S. 535 (1974).

71 13 Stat. 40.

72 Executive Order, dated June 23, 1876; Executive Order dated October 16, 1891, I Kappler 815.

for a treaty cession of aboriginal rights.[73] It is possible that no tribe, thus, has clearly recognized title compensable under the Fifth Amendment.[74] No Congressional act designated the area as an Indian reservation for any tribe. What is involved is a reservation created by executive orders pursuant to statute with no specific designation of tribes to which the reservation is dedicated. The courts, moreover, that have looked at the question, in Short and in Puzz, concluded that one tribe, the Hoopa Valley Tribe had no vested interest in the resources of the reservation. It, thus, may be that the courts would have to conduct a review of the history of the reservation to determine if there were indeed tribal rights. If tribal rights were found, then the likelihood would be that the courts would find that no individual members had rights in tribal property before it was individualized. On the other hand, the courts might find that no tribal rights have arisen on the reservation and might then address the question of whether the individual Indians settled there

---

[73] In Short v. United States, 202 Ct. Cl. 870, 891-897, the court discussed a "'treaty'" made by Austin Wiley, Superintendent of Indian Affairs of California, in August 1864. Article I of that document purports to "set aside for reservation purposes for the sole use and benefit of the tribes of Indians herein named, or such tribes as may hereafter avail themselves of the benefit of this treaty, the whole of Hoopa valley, to be held and used for the sole benefit of the Indians whose names are hereunto affixed as the representatives of their tribes." 202 Ct. Cl. 870, 893. That "treaty" was never ratified; it, thus, has no legal power to bind the federal government.

[74] In Tee-Hit Ton v. United States, 348 U.S. 272, 277-279 (1955), the Supreme Court defined the manner in which Indian title to property may be "recognized" or confirmed, giving rise to compensable interest:

> The question of recognition may be disposed of shortly. Where Congress by treaty or other agreement has declared that thereafter Indians were to hold the lands permanently, compensation must be paid for subsequent taking....
>
> ...There is no particular form for congressional recognition of Indian right of permanent occupancy. It may be established in a variety of ways but there must always be definite intention by congressional action or authority to accord legal rights, not merely permissive occupation.

have vested rights.

The Hoopa Valley Reservation's legal status may be distinct from that of most other executive order reservations. Unlike the majority of executive order reservations created in the nineteenth century, the Hoopa Valley executive order was authorized by specific Congressional authorization.[75] Because the 1864 statute empowered the President to establish the Hoopa Valley Reservation, the argument may be made that Congress has confirmed or recognized Indian title to that reservation and that those Indians or Indian tribes who have rights on the reservation would be entitled to Fifth Amendment damages should their interest be taken away by legislation.[76]

This is not a settled question, however. No court has ruled definitively on whether the combination of the 1864 statute and the subsequent executive orders in fact recognized title to the Hoopa Valley Reservation in whatever Indians were located thereon.[77] We could locate no other decided case with parallel facts.

In addition to the question of whether an executive order reservation

---

[75] In United States v. Midwest Oil Co., 236 U.S. 459, 469-470 (1915), in which the Supreme Court conducted an extensive examination of the authority of the President to make withdrawals from the public domain, the Court drew a distinction between those withdrawals made by virtue of a specific statutory authorization, citing Donnelly v. United States, and those made without specific statutory authority. How important this distinction would be in deciding whether rights had vested has not been decided.

[76] See Robert N. Clinton, Statement in Opposition to H.R. 4469 Proposing the Nonconsensual Partition of the Hoopa Valley Reservation between the "Hoopa Valley" & "Yurok" Tribes, Hearing before the House Committee on the Interior and Insular Affairs, Washington, D.C. (June 21, 1988), citing Felix S. Cohen, Handbook of Federal Indian Law 477 (1982).

[77] In Mattz v. Arnett, 412 U.S. 481, 494 (1973), in dictum, the Supreme Court used the term "recognized" in conjunction with this reservation, referring to the president's "authority under the Act to expand an existing, recognized reservation." In the case, however, it was not dealing with a question as to whether there was recognized title in the reservation.

involves a compensable interest, there is the further question as to who would be able to maintain an action for compensation when the reservation involved is one such as the Hoopa that has not been set aside for identifiable tribes. If a court were to decide that there was a compensable interest in the Hoopa Valley Reservation property, it would be faced with the question of how to distribute that interest.

Again there does not seem to be a case on point. There is, however, one situation that seems somewhat analogous in the sense that it illustrates how the courts might handle the issue of deciding whether any tribal rights exist on the Hoopa Valley Reservation. In 1958, Congress passed legislation that confirmed an executive order reservation and recognized title in the words of the executive order in the "Hopi Indians and such other Indians, if any, as heretofore have been settled thereon by the Secretary of the Interior pursuant to such Executive Order."[78] The statute also authorized a three-judge district court to hear the conflicting claims of Navajos and Hopis to what had been created in 1882 by executive order as a reservation for the use of Hopi "and such other Indians as the Secretary of the Interior may see fit to settle thereon".[79] In 1963, the court ruled that in the areas that the Navajos had been settled, there was a joint tenancy in which each tribe had identical interests.[80]

The court started from the premise that "...an unconfirmed executive order creating an Indian reservation conveys no right of use or occupancy to the

---

[78] Pub. L. 85-547, 72 Stat. 403.

[79] Kappler, Indian Affairs: Laws and Treaties 805 (1904).

[80] Healing v. Jones, 210 F. Supp 211 (D. Ariz. 1962), aff'd, 373 U.S. 758 (1963).

beneficiaries beyond the pleasure of Congress or the President"[81] and that no rights vested prior to enactment of the 1958 statute. In deciding what Indians had rights on the reservation, the court looked to the history of the executive order settling the Hopis on the reservation. It concluded that the purpose was protecting the Hopis from depredations by nearby whites and Navajos.

It next attempted to construe the "such other Indians" clause, showing it to be customary language in contemporaneous executive orders. It viewed the rights secured to the Hopis by the 1882 executive order in the following terms:

> ...the Hopis gained non-vested rights of use and occupancy in the entire 1882 reservation. These rights were then exclusive in the sense that unless and until the Secretary thereafter settled other Indians in the reservation, the Hopis were the only Indians entitled to use and occupy that area. These rights were non-exclusive in the sense that the Hopis would be required to share the 1882 reservation with any other Indians the Secretary thereafter saw fit to settle in the reservation. Such rights as the Hopis had in the reservation on July 22, 1958 [the date of the jurisdictional act] became vested on that date.[82]

The court established the principle that "Indians other than Hopis acquired rights in the 1882 reservation under the executive order in question if: (1) such Indians used and occupied the reservation in Indian fashion, as their continuing and primary area of residence, and (2) the undertaking of such use and occupancy was authorized by the Secretary, exercising the discretion vested in him by the executive order."[83]

It examined the language of the 1882 executive order, in itself, and in contrast with other executive orders and decided that the Navajos were not

---

81 Healing v. Jones, 210 F. Supp. 125, 138.

82 Healing v. Jones, 210 F. Supp. 125, 170.

83 Healing v. Jones, 210 F. Supp. 125, 144.

given any rights in 1882 primarily because the executive order did not mention them although some Navajo Indians had made the reservation area their residence prior to 1882.

It then looked to the history of settlement of Navajos on the reservation. Finding no official Department of the Interior document declaring them to be settled on the reservation, it embarked upon a lengthy examination of the course of conduct from 1882 and identified a 1931 Interior Department document approving a recommendation to divide the reservation as implicitly settling all Navajos present on the reservation.[84] Because the department placed no restrictions in terms of number or special qualifications of the Navajos who could settle on the 1882 reservation, the Healing court concluded that the Navajo Tribe, itself, had been settled on the reservation and tribal rights to the reservation were at stake.

Healing is merely analogous to the Hoopa Valley situation. Congress had explicitly confirmed an executive order reservation. The statute and the executive order mentioned one tribe as having vested rights and the court was instructed to decide whether any other tribe had vested rights and the extent of such rights. Hoopa Valley, on the other hand, involves an executive order that does not name tribes, a statute that does not name tribes, and to this date no Act of Congress specifically vesting rights. In the Hoopa Valley

---

[84] Other departmental actions were viewed as buttressing this conclusion. In 1936, the Department had divided the reservation into land management districts, only one of which was exclusively occupied by Hopi and many of which had Navajos. In the 1940's there were departmental efforts to establish a boundary between Hopi lands and Navajo lands on the reservation. The court's examination of the history of departmental treatment of Navajos on the reservation, moreover, led it to conclude that all Navajos who had entered the reservation for purposes of settling there had been settled there by the Department because they were treated no differently than those whom the court had found to be there at dates on which there was implicit departmental recognition of settlement.

situation, moreover, two judicial decisions to date indicate that there is considerable difficulty in distinguishing tribal affiliations of the Indians settled on the Hoopa Valley Reservation.

Despite these distinctions, however, Healing is illustrative of several points: the importance of the historical circumstances surrounding the creation of the reservation, the method for determining if settlement of individual Indians gives rise to tribal rights, and the importance of a detailed examination of the attitude of the Department of the Interior when exercising discretion conferred upon it by executive order.

With the Hoopa Valley situation, the courts have not addressed the question of whether any tribes have been settled on the reservation. Short decided that individual Indians had been settled on the reservation; it refused to substitute a tribe for those individuals, not because there was no possibility of tribal rights arising but because the challenged governmental action involved individual, not tribal, rights. In addition to the Hoopa Valley Tribe, there is the possibility that other tribes may be able successfully to assert tribal rights to the reservation.[85] The Short court recognized this possibility. In deciding how to construct a standard for Indians of the Reservation analogous to one of the criteria used by the Hoopa Tribe for membership, the court had to determine how to define a blood quantum requirement. The Hoopa standard included one-quarter Hoopa blood. The court refused to use this:

---

[85] In Short, 719 F. 2d 1133, 1144, the court allowed blood of the following tribes or bands to be counted as "Reservation blood" for purposes of qualifying Indians of the Reservation: Yurok, Hoopa/Hupa; Grouse Creek; Hunstang/Hoonsotton/Hoonsolton; Miskut/Miscotta/Miscolts; Redwood/Chilula; Saiaz/Nongatl/Siahs; Sermalton; South Fork; Tish-tang-atan; Karok; Tolowa; Sinkyone/Sinkiene; Wailake/Wylacki; Wiyot/Humboldt; Wintun.

> The Hoopa Valley Reservation is not a one-tribe reservation or even a reservation for specific tribes, but was by statute one of several set aside for Indians of California generally. This conclusion went far to establish, in the decision on the nature of the Hoopa Valley Reservation, that no tribe could have exclusive rights to the Reservation. 202 Ct. Cl. at 877-78 (fdg. 175). But it did not follow that all California Indians had rights on the Reservation; the court held, further, that the Hoopa Valley Reservation was established by President Grant in 1876, as was well understood then and throughout the years following, 'for such tribes as might reside or settle there, then or thereafter, with the approval of the President.' 202 Ct. Cl. at 975 (fdg. 181), 877-78, 880-81, 974 (fdg. 175).
>
> ..................................................
>
> What then shall be the required blood? To begin, there is Hoopa blood, now, of course, to be enlarged to include at least Yurok blood. It is moreover conceded that Hoopa blood includes the blood of several tribes or bands who have merged into the Hoopas or are deemed 'affiliated' with the Hoopas. .... the Hunstang, Hupa, Miskut, Redwood, Saiaz, Sermalton and Tish-tang-atan Bands....the South Fork and Grouse Creek....[86]

In addition to these tribes, the court confronted the question of whether other assorted bands of California Indians known by various names "were among those residing on the Hoopa Reservation at the time of its creation or settled there by the President."[87] Because anthropological evidence and documents from the Department of Interior archives indicated that the Indians of the area had very loose tribal organization which had all but vanished, the court examined various documentary and historical sources and concluded that Karok, Tolowa, Sinkyone, Wiyot, Wylackie, and Wintun blood could qualify as reservation blood for purposes of the standards set for Indians of the reservation. These

---

[86] Short v. United States (Ct. Cl. No. 102-63, filed March 31, 1982), slip op., at 36-37.

[87] Short v. United States (Ct. Cl. No. 102-63, filed March 31, 1982), slip op., at 38.

findings in no way directly bear on the question of whether any tribes were settled on the reservation. The historical and anthropological data examined, however, indicates the possibility that a full judicial airing of the question of whether any tribes have tribal rights on the reservation would find at least some materials indicating the presence of various tribes on the reservation. The data examined by the court also indicates another problem that any court deciding whether tribal rights arose on the Hoopa Valley Reservation would have to face: fashioning a legal framework for examining tribal rights of the California Indians. The Short court described them as follows:

> The context for the decision is that California tribes were not formally organized, that their names were inexact and usually referred to a place or area of residence, often the river on which their village was situated. Fdg. 4. The Hoopas themselves were also called the Trinity Indians, after the river on which they lived. Id. The anthropological evidence at the trial showed no signs of sharply bounded tribal areas from which Indians of other tribes would be excluded. Yurok villages were to be found, aboriginally, on the Trinity, in what was later called the Square. 202 Ct. Cl. at 880, 887-87 (fdg. 5), 899 (fdg. 22).
>
> The word 'tribes,' used in referring to California Indians means peoples. Geography, lack of tribal organization, mingling of residences of groups and intermarriage operated together to minimize identifiable tribal affiliation. Fdgs. 44, 47. Tribal blood was difficult to verify, and tribal blood as recorded by the Indians themselves was likely to be inaccurate, Fdgs. 37-48. In 1929 the Superintendent of the Reservation wrote that it was meaningless to divide the Indians of the Reservation into Hoopas, Klamath River Indians, Lower Klamath Indians and the other tribes of whom census rolls were prepared annually: 'They have lost tribal affiliation to such an extent that very few of them know what tribe they belong to, and if they name a tribe, it is, in fact not a tribe but a band of Indians named after some local name of a place where they once resided.' Fdg. 44.[88]

---

[88] Short v. United States (Ct. Cl. No. 102-63, filed March 31, 1982), slip op., at 38-39.

From this description, it is possible that a court: (1) could actually find some tribes to have tribal rights in the reservation; (2) could find that no tribes have tribal rights in the reservation; and (3) could find that the California Indian situation is so unique as to require courts to effectuate the purpose of the 1864 act and the executive orders thereunder to devise a method to protect the rights of the Indians settled on the reservation.

To summarize, generally the courts have held that individual Indians have no vested interest in tribal property prior to individualization. In contemporary Hoopa Valley Reservation litigation the courts have ruled that "Indians of the Reservation" have no interest in reservation property that has not been individualized. Because no court has faced the question squarely, however, there is a remote possibility that should the courts be required to adjudicate the interests of the Indians of the Reservation at this date, without further Congressional action, they might find that because the reservation was established by executive order with specific statutory authority there is a compensable interest and that because the reservation was established for non-tribal Indians, Indians of the reservation have a vested interest in reservation property.

2. The Scope of Congressional Power over Tribal Communal Property of Indian Reservations; Membership in Indian tribes; and Individual Rights to Participate in Such Tribal or Communal Property. Communally held Indian property is generally held in trust by the United States for the Indian beneficial owners. As trustee for this property, the United States has considerable but not unlimited authority over it. The Supreme Court, in a series of cases beginning with United States v. Kagama[89] and Lone Wolf v.

---

[89] 118 U.S. 375 (1886).

Hitchcock,[90] down to Delaware Tribal Business Committee v. Weeks,[91] has held that Congressional power with regard to Indian tribes and Indian property is plenary. In Delaware Tribal Business Committee v. Weeks the Court upheld a distribution of judgment funds statute that allocated funds to two groups of Delaware Indians, and not a third on the theory that the decision to include only the two groups could be "tied rationally to the fulfillment of Congress' unique obligation towards Indians," a test that derives from Morton v. Mancari.[92] That rational basis test seems to be the test that would be used to test the validity of a statute that dealt with property held communally by Indians.

The test that the courts use in determining whether legislation that deals with Indian property is an exercise of the eminent domain power or an exercise of the power of guardianship over Indian property is the test derived from Three Affiliated Tribes of Fort Berthold Reservation v. United States,[93] known as the Fort Berthold test and adapted by the Supreme Court in United States v. Sioux Nation.[94] The test is formulated in terms of the facts of the case in which the government extinguished Indian title to land and compensated the Indians with money:

> It is obvious that Congress cannot simultaneously (1) act as trustee for the benefit of the Indians, exercising its plenary powers over the Indians and their property, as it thinks is in their best interests, and (2) exercise its sovereign power of eminent domain, taking the Indians'

---

[90] 187 U.S. 553 (1903).

[91] 430 U.S. 73 (1977).

[92] 417 U.S. 535 (1974).

[93] 390 F. 2d 686 (Ct. Cl. 1968).

[94] 448 U.S. 371 (1980).

> property within the meaning of the Fifth Amendment to the Constitution. In any given situation in which Congress has acted with regard to Indian people, it must have acted either in one capacity or the other. Congress can own two hats, but it cannot wear them both at the same time.
>
> ..................................................
>
> Where Congress makes a good faith effort to give the Indians the full value of the land and thus merely transmutes the property from land to money, there is no taking. This is a mere substitution of assets or change of form and is a traditional function of a trustee.[95]

Congress has in the past legislated the breaking up of Indian lands into allotments, with remaining land sold for the benefit of the tribe. It has also authorized rights of way across Indian lands, sale of some lands for railroads or utilities, and use of Indian lands for water projects. The Supreme Court has upheld such legislation.[96] These cases involved tribal land and not the property of individuals.

Recently, the Court, in Hodel v. Irving,[97] held unconstitutional a provision of the Indian Lands Consolidation Act of 1983,[98] that would have cut off the rights of Indian allottees of fractional shares of 2 percent or less of allotments to devise or their heirs to inherit by intestacy such shares if they earned less than $100 in the preceding year. The court viewed the interest at stake, the right to pass on the remainder interest, as a valuable property interest and as a right long recognized by Anglo-American property law and held

---

95 Three Affiliated Tribes of Fort Berthold Reservation v. United States, 390 F. 2d at 691.

96 Lone Wolf v. Hitchcock, 187 U.S. 553 (1903) (disposal of a reservation); Cherokee Nation v. Kansas Railway Co., 135 U.S. 641 (1890)(eminent domain); Missouri, Kansas & Texas Railway Co. v. Roberts, 152 U.S. 114 (1894).

97 ___ U.S. ___, 107 S.Ct. 2076 (1987).

98 Pub. L. 97-459, Tit. II, 96 Stat. 2519.

it to be a compensable right under the Fifth Amendment. The right at stake in Hodel v. Irving, an individual property right, however, is clearly distinguishable from communal property.

To summarize, other than the requirement that the property be communal and not individual, the courts in analyzing Congressional treatment of Indian tribal property require only that the legislative disposition of the property be "an exercise of guardianship," and not "an act of confiscation."[99] The Court has said:

> Our decisions, while recognizing that the government has power to control and manage the property and affairs of its Indian wards in good faith for their welfare, show that this power is subject to constitutional limitations and does not enable the government to give the lands of one tribe or band to another, or to deal with them as its own.[100]

The rights of individual Indians to tribal property is an inchoate right; individualization of the assets may not be compelled.[101] Unless there has been express statutory designation of the property as that of various individuals the courts will permit the United States as trustee to dispose of the property for the benefit of its wards:

> Indians have frequently taken to court the complaint that the tribal property has become vested, by previous act or treaty, in individuals and is no more subject to congressional control than the private property of other individuals. The courts, however, tend to construe such previous acts and treaties, wherever possible, against the vesting of private rights in tribal property.[102]

---

[99] United States v. Creek Nation, 295 U.S. 103, 110 (1935).

[100] Chippewa Indians v. United States, 301 U.S. 358 (1937).

[101] See supra, 21-22.

[102] Felix S. Cohen, Handbook of Federal Indian Law 95, n. 75 (citations omitted)(1942 ed.).

Delaware Tribal Business Committee v. Weeks may be cited broadly in support of Congressional power to determine membership in tribes for purposes of administering federal law. Tribes, themselves, of course, being separate political entities from the United States, retain a paramount power to determine membership for all tribal purposes.[103] Tribal decisions on tribal membership generally are not reviewable by the federal government.[104] Tribal decisions, however, do not necessarily bind the federal government when administering federal programs. In determining who is entitled to tribal funds, for instance, the Secretary of Interior by statute has broad authority. In 25 U.S.C. § 163, for example, the Secretary is authorized to cause a final membership roll of any tribe (in order to segregate tribal funds) to be composed and given authority to approve such roll. It is, thus, possible that the federal government or Congress could define tribal membership in one way for a specific purpose and the tribe could define its membership in a different way.

3. Whether Congress Has Power to Deal with the Tribal or Communal Property and Assets of the Hoopa Valley Indian Reservation as Proposed by H.R. 4469 as Amended by the Substitute. Generally, the Fort Berthold test would be the applicable test that the courts would use to test the constitutionality of this legislation. At the present time there has been no adjudication to indicate that individual property rights are at stake. Puzz and Short, on the contrary, indicate that no individualized rights are vested. While no court has decided whether tribal rights are vested, the general law on executive

---

[103] Santa Clara Pueblo v. Martinez, 436 U.S. 49 (1978).

[104] Cherokee Intermarriage Cases, 203 U.S. 76 (1906) (upholding a tribe's right to set different standards of membership for different categories of members).

order reservations holds that no rights vest without Congressional confirmation. The 1864 statute raises a certain amount of uncertainty about whether rights have vested. The wording of the statute and the subsequent executive order also raise doubts about the nature of the parties, i.e., tribal or individual Indians, who might have obtained any vested rights should rights have vested. The historical circumstances of settling loosely organized California Indians on the reservation combined with the further disintegration of any formal tribal organization of the Indians settled on the reservation indicate that any judicial adjudication of tribal rights could be even more complex, protracted, and bitter than the 25 year-old Short litigation.

All of those factors could influence a court to view any distribution of reservation assets by Congress as an exercise of guardianship. The substitute gives many indices of a good faith effort by Congress: (1) efforts to divide the reservation in a logical as well as historically defensible way; (2) provision for non-Hoopa Indians who have an interest in the reservation to decide to pool their resources or to withdraw monetary remuneration for their share; (3) and authorizing expansion of the portion of the reservation to be allocated to the Yurok Tribe.

With respect to determining Yurok tribal membership, the substitute makes no pretense of establishing an Indian tribe for all purposes. It simply sets standards for a group who are to be given management authority over the portion of the reservation allocated to the Yuroks. It does not require that they form a tribal government; it merely permits a mechanism for their recognition under the Indian Reorganization Act.

Portions the legislation that might be cited as indicative of a confiscatory intent include: (1) the provision that the partitioning of the

reservation is to be triggered by a vote of the Hoopa Valley Tribe rather than by a vote of all Indians who have an interest in the reservation; (2) the fact that the major assets of the reservation have been allocated to the Hoopa Valley Tribe; and (3) the lack of consideration for any other tribes that might have a tribal interest in the reservation.

Using the Delaware Tribal Business Committee v. Weeks standards, however, it is likely that if Congress in the legislative history of this legislation provides evidence of an intent to deal fairly with all the interests in the reservation, the courts will uphold the legislation. The kinds of concerns that might influence the courts would be: (1) an interest in preventing the hostilities engendered by the Short litigation to continue; (2) an interest in giving both the Hoopas and the non-Hoopas contiguous, not checker-boarded areas to administer; (3) a political determination that the Department of Interior's views as propounded in Short that the Hoopa Valley Reservation and Klamath River Reservations were combined for administrative purposes and have never in actuality functioned as one entity; (4) concern that the Hoopas who, unlike the "Indians of the Reservation,"[105] have tended to live on the reservation continue thereon and be accorded sufficient resources to sustain their habitation; and (5) a political judgment that a functioning tribal government fulfilling the federal policy of tribal self-determination deserves greater federal support than does a group of Indians who have no tribal organization, who have refused tribal organization, and many of whom live off-reservation.

[105] A counterargument might be offered to the effect that federal policies drove the non-Hoopas from the reservation.

To summarize the responses to the committee's questions:

1. What is the legal nature of the interest of persons qualifying as "Indians of the Reservation" in the tribal or communal resources of the Hoopa Valley Indian Reservation, prior to any individualization of such resources?

Generally the courts have held that individual Indians have no vested interest in tribal property prior to individualization. In contemporary Hoopa Valley Reservation litigation the courts have ruled that "Indians of the Reservation" have no interest in reservation property that has not been individualized. Because no court has faced the question squarely, however, there is a remote possibility that the case could create a new federal Indian law precedent: i.e., should the courts be required to adjudicate the interests of the Indians of the Reservation at this date, without further Congressional action, they might find that because the reservation was established by executive order with specific statutory authority there is a compensable interest and that because the reservation was established for non-tribal Indians, Indians of the reservation have a vested interest in reservation property.

2. What is the scope of Congressional power over tribal communal property of Indian reservations; membership in Indian tribes; and individual rights to participate in such tribal or communal property?

Other than the requirement that the property be communal and not individual, the courts, in analyzing Congressional treatment of Indian tribal property, require only that the legislative disposition of the property be "an exercise of guardianship," and not "an act of confiscation." The courts have also recognized a broad Congressional power to determine membership in tribes for purposes of administering federal law as well as the power of tribes, themselves, to determine membership for all tribal purposes. It is, thus, possible that Congress could define tribal membership in one way for a

specific purpose and the tribe could define its overall membership in a different way.

3. In view of the plenary power of Congress over Indian affairs and its role as guardian of Indian tribes in view of the responses to questions 1 and 2 above, does Congress have power to deal with the tribal or communal property and assets of the Hoopa Valley Indian Reservation as proposed in H.R. 4469 as amended by the substitute?

Since the courts require that Congress make a good faith effort when transmuting Indian property from one form to another, if the substitute for H.R. 4469 indicates that Congress has conscientiously attempted to act in the best interest of its Indian wards, there is the likelihood that the courts will uphold the legislation as within the power of Congress.

We emphasize that we are in no position to have studied every aspect of this issue as thoroughly as would be required in any litigation. We can, thus, make only general statements. With that caveat, we can say that if Congress documents its intention to deal fairly with all concerned, on the basis of recent precedents and the long line of cases upholding plenary power in Indian affairs, there is a likelihood that the proposed legislation would be upheld.

M. Maureen Murphy
Legislative Attorney

SUMMARY

1. What is the legal nature of the interest of persons qualifying as "Indians of the Reservation" in the tribal or communal resources of the Hoopa Valley Indian Reservation, prior to any individualization of such resources?

Generally the courts have held that individual Indians have no vested interest in tribal property prior to individualization. In contemporary Hoopa Valley Reservation litigation the courts have ruled that "Indians of the Reservation" have no interest in reservation property not individualized. Because no court has faced the question squarely, however, there is a remote possibility that the case could create a new federal Indian law precedent: i.e., should the courts be required to adjudicate the interests of the Indians of the Reservation, without further Congressional action, they might find that because the reservation was established by executive order with specific statutory authority there is a compensable interest and that because the reservation was established for non-tribal Indians, Indians of the reservation have a vested interest in reservation property.

2. What is the scope of Congressional power over tribal communal property of Indian reservations; membership in Indian tribes; and individual rights to participate in such tribal or communal property?

Other than the requirement that the property be communal and not individual, the courts, in analyzing Congressional treatment of Indian tribal property, require only that the legislative disposition of the property be "an exercise of guardianship," and not "an act of confiscation." The courts have also recognized a broad Congressional power to determine membership in tribes for purposes of administering federal law as well as the power of tribes, themselves, to determine membership for all tribal purposes. It is, thus, possible that Congress could define tribal membership in one way for a specific purpose and the tribe could define its membership in a different way.

3. In view of the plenary power of Congress over Indian affairs and its role a guardian of Indian tribes in view of the responses to questions 1 and 2 above, does Congress have power to deal with the tribal or communal property and assets of the Hoopa Valley Reservation as proposed in H.R. 4469 as amended by the substitute?

Since the courts require that Congress make a good faith effort when transmuting Indian property from one form to another, if the substitute for H.R. 4469 indicates that Congress has conscientiously attempted to act in the best interest of its Indian wards, there is a likelihood that the courts will uphold the legislation as within the power of Congress.

APPENDIX – A

# APPENDIX TO OPINION OF THE COURT

## MAP OF HOOPA VALLEY INDIAN RESERVATION, CALIFORNIA*

Scale: 1 inch = 12 miles




LEGEND:

Old Klamath River Reservation.

Connecting Strip.

Original Hoopa Valley Reservation.

*United States Department of Interior, General Land Office 1944.

503-857 O - 75 (Face p. 506)