Calendar No. 1025

100TH CONGRESS
2d Session

SENATE

REPORT
100-564

# PARTITIONING CERTAIN RESERVATION LANDS BETWEEN THE HOOPA VALLEY TRIBE AND THE YUROK INDIANS, TO CLARIFY THE USE OF TRIBAL TIMBER PROCEEDS, AND FOR OTHER PURPOSES

SEPTEMBER 30 (legislative day, SEPTEMBER 26), 1988.—Ordered to be printed

Mr. INOUYE, from the Select Committee on Indian Affairs, submitted the following

## REPORT

[To accompany S. 2723]

The Select Committee on Indian Affairs, to which was referred the bill (S. 2723) to partition certain reservation lands between the Hoopa Valley Tribe and the Yurok Indians, to clarify the use of tribal timber proceeds, and for other purposes, having considered the same, reports favorably thereon with an amendment and recommends that the bill as amended do pass.

The amendment is an amendment in the nature of a substitute.

### PURPOSE

S. 2723, introduced by Senator Cranston on August 10, 1988, is a bill to partition certain reservation lands between two tribes in the northern part of the State of California: the Hoopa Valley Indian Tribe and the Yurok Tribe, and to resolve long standing litigation between the United States, the Hoopa Valley Tribe and a large number of individual Indians, most, but not all of whom are of Yurok descent, who have asserted an individual interest in the communal reservation property. The claims were originally asserted in 1963 in the yet to be finalized case of *Short* v. *United States* filed in the United States Court of Claims, and has led to a number of companion or collateral cases which have made it impossible for the Hoopa Valley Tribe to perform normal tribal governmental functions, including the management of a significant portion of the reservation property.

The legislation will partition the reservation into two reservations, one consisting of the Hoopa Valley Square to be set aside for the use and benefit of the Hoopa Valley Tribe, and the other consisting of the Hoopa or Klamath Extension, to be set aside for the

19-010

use and benefit of the Yurok Tribe. The authority of the Hoopa Valley Tribe to govern the Hoopa Valley Square and its interests in the assets of the Square will be confirmed. The Yurok plaintiffs are authorized to organize and adopt a constitution and the property and governmental rights of the Yurok Tribe in the Extension will be confirmed. A communal escrow account which now exceeds $65 million will be allocated between the Hoopa Tribe and the Yurok or "Short" plaintiffs. Limited per capita payments from the accrued escrow account are authorized for each of the tribes. A third portion is used to provide additional payments to persons who do not wish to become members of the newly organized Yurok Tribe. The remaining dollars are then allocated to the Yurok Tribe for governmental or development purposes.

This legislation will remove the legal impediments to the Hoopa Valley Indian Tribe to governance of the Hoopa Square and establish and confirm its property interest in the Square. The legislation will also establish and confirm the property interests of the Yurok Tribe in the Extension, including its interest in the fishery, and enable the tribe to organize and assume governing authority in the Extension.

This legislation should not be considered in any fashion as a precedent for individualization of tribal communal assets. The solutions fashioned in this legislation spring from a series of judicial decisions that are unique to the Hoopa Valley Indian Reservation that have established certain individual interests that conflict with the general federal policies and laws favoring recognition and protection of tribal property rights and tribal governance of Indian reservations. The intent of this legislation is to bring the Hoopa Valley Tribe and the Yurok Tribe within the mainstream of federal Indian law.

The Yurok Tribe is a federally recognized tribe, but it is not organized and there is no established roll of members. This legislation enables the tribe to organize and to establish its base roll. Persons who are not members of the Hoopa Tribe but who meet certain criteria under the *Short* case are authorized to elect whether or not they wish to become an enrolled member of the Yurok Tribe, with all of the rights and benefits that that entails, including provision of federal services springing from membership in a federally recognized tribe. All minor children meeting the criteria will be deemed to be members of the Yurok Tribe unless they are already enrolled in another federally recognized tribe whose membership criteria forbids dual enrollment in another tribe.

## HISTORY

### ABORIGINAL TRIBES AND LANDS OF NORTHERN CALIFORNIA

The lands of what is now northern California, like most of the Pacific coastal area, were aboriginally inhabited by many small tribes or bands of Indians of numerous linguistic stocks or derivations. Representatives tribes in the general area of dispute included the Hoopa (Hupa), Chilula, Wilkut, and Nongati of Athapascan derivation; the Yurok and Wiyot of Algonkian derivation; the Karok (Karuk), Shasta, and Chimariko of Hokan stock; and the Wintun of the Penutian language.

The original location of these tribes centered upon the drainages of the Klamath and Trinity Rivers and adjacent streams in extreme northwestern California. The Klamath River flows southwesterly out of southern Oregon to its junction with the Trinity River (which flows north and is essentially a branch of the Klamath) and, then, veering sharply to the northwest, continues to the ocean. As noted by the Court of Claims in the *Jessie Short* case, the two rivers from a "Y" whose arms are the Klamath and whose trunk is the Trinity.

The aboriginal lands of the Yurok of Klamath Indians were generally centered on the drainage of the valley of the Klamath River from the Pacific Ocean to its fork with the Trinity River. These lands lay northward from that fork and westward to the Pacific. The lands of the Wiyot, a tribe related to the Yurok, were south of the Yurok lands in a narrow strip along the ocean.

The aboriginal lands of the Hupa or Hoopa Indians were centered on the drainage of the Hoopa Valley of the Trinity River southward from its fork with the Klamath. The lands of the related tribes of the Chilula, Whilkut, and Nongatl lay to the west and south of the Hoopa lands and eastward of the Yurok and Wiyot lands.

The aboriginal lands of the Karok, and the related Shasta and Chimariko tribes, lay to the east of the Hoopa and Yurok lands on the upper drainages of both the Klamath and Trinity Rivers. The Wintun lands were southeast of the Hoopa lands along the upper drainage of the south fork of the Trinity River. Although some scholars disagree, the U.S. Court of Claims noted in the case of *Jessie Short et al.*v. *The United States* (202 Ct. Cl. 870, 886):

> The Indian tribes of Northern California were not organized or large entities; Indians resident on a particular river or fork were a "tribe". Tribal names were often applied inexactly and usually meant only a place of residence. To call an Indian a "Hoopa" or Trinity Indian meant he was an Indian resident in the valley of the Trinity called Hoopa. The names "Yurok" and "Karok" * * * also meant a place of residence.

## IMPACT OF WHITE SETTLEMENT

These small Indian tribes or bands had only minimal contact with non-Indians, primarily Spanish settlers to the south or occasional fur-trading or exploration parties, until the discovery of gold in 1849. With that discovery came the well-known influx of gold seekers and other white settlers and immigrants. As the white population grew and white settlements expanded, the conflicts with local Indian tribes and bands increased in number and intensity. White settlers sought to push the Indians off their lands and demanded that local and Federal governments take steps to remove the Indians to other areas. Backed upon the Pacific Ocean, the tribes had no place else to go and the inevitable hostilities and warfare between Indians and whites began to occur.

The huge influx of whites into the area and the resulting wars had a devastating impact upon the Indian tribes. In 1850, only two years after the United States had acquired the territory from

Mexico, Federal officials recognized that something had to be done quickly for the tribes. Indian Sub-agent Adam Johnston wrote that the white men had taken Indian lands and resources, introduced strange diseases, and provoked violent confrontations.

In other areas, the government had tried to relocate the Indians before the advance of white settlers; but there were already more than 100,000 whites in California, which became a state on September 9, 1850. It was decided that the best policy was to set aside small tracts of land in the new state for the tribes to protect them from the worst effects of settement by separating them from the whites. At the same time, vast tracts of Indian lands would be opened to eager white settlers and miners.

To effectuate this policy, Congress provided for the appointment of treaty commissioners in September of 1850 to secure the cession by the Indians of their lands and to establish reservations for them. By the end of 1851, numerous treaties with many Indian tribes or bands, including those of northern California, had been signed. On June 28, 1852, President Fillmore presented eighteen California treaties to the Senate for ratification. Because of strong white opposition to providing any lands for the Indians, the Senate, in secret session, rejected the treaties on June 28, 1852. With the rejection of these treaties, the conflicts and hostilities between white settlers and Indian tribes resumed.

In northern California, much of the warfare and bloodshed was centered in the valleys of the Klamath and Trinity Rivers which were the traditional homelands of the Yurok and Hoopa Indians and related tribes.

### ESTABLISHMENT OF KLAMATH RIVER RESERVATION

In an early attempt to carry out the policy adopted with respect to California Indian tribes, President Pierce, by Executive Order of November 16, 1855, established the Klamath River Reservation for the benefit of Indian tribes in that general area. The President acted pursuant to the Act of March 3, 1853 (10 Stat. 226, 238), as amended in 1855, authorizing the creation of seven military reservations in California or in the Territories of Utah and New Mexico.

As finally established, the Klamath River Reservation was "a strip of territory commencing at the Pacific Ocean and extending 1 mile of width on each side of the Klamath River" for a distance of approximately 20 miles, containing 25,000 acres. The reservation was within the aboriginal territory of the Yurok and, at the time of its creation, was occupied by about 2,000 Indians of the Yurok tribe, also known as the Klamaths. However, the Hoopa and other inland tribes refused to move onto this reservation and armed conflict in those areas continued.

### ESTABLISHMENT OF THE HOOPA VALLEY RESERVATION

In 1864, in a further effort to bring about peace in California, Congress enacted legislation (Act of April 8, 1864, 13 Stat. 39) reorganizing the Indian Department in California by providing for the appointment of one superintendent of Indian Affairs and authorizing the President to establish four reservations in the State. On

May 26, 1864, the President appointed Austin Wiley as Superintendent.

On August 12, 1864, at Fort Gaston, Wiley negotiated an agreement with the Hoopa Indians along the Trinity River entitled "Treaty of peace and friendship between the United States government and the Hoopa, South Fork, Redwood, and Grouse Creek Indians." Section 1 of the agreement provided that—

> The United States * * * by these presents doth agree and obligate itself to set aside for reservation purposes for the sole use and benefit of the tribes of Indians herein named, or such tribes as may hereafter avail themselves of the benefit of this treaty, the whole of Hoopa valley, to be held and used for the sole benefit of the Indians whose names are hereunto affixed as the representatives of their tribes.

Section 2 provided that the reservation "shall include a sufficient area of mountain on each side of the Trinity river as shall be necessary for hunting grounds, gathering berries, seeds, etc." This agreement or "treaty" was never submitted for ratification. However, with corrections, it was approved by the Interior Department.

On August 21, 1864, at Fort Gaston, California, Superintendent Wiley issued a proclamation, under the authority of the 1864 Act and instructions from the Interior Department, establishing the Hoopa Valley Reservation on the Trinity River in Klamath County, California. Wiley's proclamation provided that the metes and bounds of the reservations would be established later by order of the Interior Department, subject to the approval of the President.

The Trinity River in the Hoopa Valley flows north through the valley to the junction of the Trinity and Klamath Rivers. Since the reservation was described as extending six miles on each side of the river to the junction of the two rivers, the reservation formed a 12-mile square bisected by the last 12 miles of the Trinity River, and has come to be called the "Square" or the "12-mile Square". As of February 18, 1865, when Wiley defined the boundaries of the Hoopa Valley Reservation, there have been identified, among the various tribes resident there, a substantial number of Indians of the Hoopa Tribe living in several villages in the Hoopa Valley proper, a smaller group of Lower Klamath or Yurok Indians living in a few villages in the northern and northwestern part of the reservation, and a number of Indians of the Redwood or Chilula tribe.

On June 23, 1876, President Grant issued an executive order formally establishing the boundaries of the Hoopa Valley Reservation and provided that the land embraced therein "be, and hereby is, withdrawn from public sale, and set apart in California by act of Congress approved April 8, 1864." As bounded, the reservation was a square, twelve miles on a side, now recognized as encompassing approximately 88,665.52 acres.

The Court of Claims in the *Jessie Short* case found that, at about the time of the 1876 Executive Order, there had been identified as living within the boundaries of the reservation established the following tribes:

| Tribe | 1875 | 1876 |
|---|---|---|
| Hoopas | 571 | 511 |
| Klamaths (Yuroks) | 43 | 44 |
| Redwoods | 46 | 12 |
| Saias | 56 | 13 |

### CREATION OF THE "ADDITION"

In the late 1880's and early 1890's, the legal validity of the 1855 Klamath River Reservation came under attack. There was growing pressure from surrounding white settlers to open these lands to homesteading. In addition, the Department of the Interior sought to control the activity of non-Indians on the reservation. In 1888, the United States brought suit against a non-Indian trader on the reservation for unauthorized activity. The district court, in an 1888 decision later upheld by the circuit court in 1889, held that the Klamath River Reservation did not have legal status as an Indian reservation. *United States* v. *Forty Eight Pounds of Rising Star Tea etc.*, 35 Fed. 403. The court held that the President's power to establish Indian reservations in California was controlled by the 1864 Act which provided for only four such reservations and that the President had exhausted his power thereunder by establishing four reservations, including the Hoopa Valley Reservation.

In order to protect the Klamath or Yurok Indians residing on the Klamath River Reservation, the Department sought to find a way to preserve reservation status. Since the 1864 Act limited the number of Indian reservations in California to four and since there were already four reservations established pursuant to that Act, the 1855 reservation could not be validated by a further executive order establishing it as a reservation. In order to get around the limitations of the 1864 Act, the Interior Department used the provisions of the 1864 Act itself.

On October 16, 1891, President Harrison issued an executive order which enlarged the Hoopa Valley Reservation "to include a tract of country 1 mile in width on each side of the Klamath River, and extending * * * to the Pacific Ocean.". In effect, the order incorporated the questionable 1855 Klamath River Reservation into the Hoopa Valley Reservation by connecting the two reservations with a strip of land one mile on either side of the Klamath River extending 25 miles from the southern boundary of the Klamath River Reservation to the northern boundary of the Hoopa Valley Reservation.

After the addition of lands by the 1891 order, the combined reservation contained about 147,000 acres, 25,000 in the original Klamath River Reservation, 33,168 acres in the "Connecting Strip", and 88,666 acres in the original Hoopa Valley Reservation or "Square".

Even though the 1891 order combined the two reservations, they continued to be treated by the Department and the Indian Service, in some respects, as two reservations, the "Addition" for the Klamath River or Yurok Indians and the "Square" for the Hoopa Indians. In 1892, Congress, by the Act of June 17, 1892 (27 Stat. 52), provided for the allotment of lands on the "Klamath River Indian Reservation" to "any Indians now located upon said reservation"

and the sale of the remainder for homestead purposes. In addition, from that date forward until the present, the Department of the Interior continued to administer the combined reservations as if they were still two reservations for certain purposes.

Under this method of administration, the Hupa or Hoopa Tribe was generally recognized as being located on, and owning, the "Square" portion of the reservations. The Indians on the "Square" later formally organized a tribe and tribal government as the Hoopa Valley Tribe. The Department generally recognized the land of the original Klamath River Reservation and the 1891 "extension" as the reservation of the Yurok tribe. That tribe has never organized.

### 1891 TO 1955

From 1891 to 1955, the official position of the Department of the Interior and the Bureau of Indian Affairs (Indian Service) regarding the rights of tribes in the Hoopa Valley Reservation varied with the official involved and the issue under consideration.

As noted earlier, for many purposes, the "Square" and the "Addition" were treated as two separate reservations and the Yurok or Klamath Indians and the Hoopa Indians were treated as two separate tribes. Indeed, the allotment of the lands of the reservation to individual Indians and the opening of the remainder to white homesteading under various Acts of Congress dealt with the reservation as three separate tracts: the original Klamath River Reservation; the "Connecting Strip"; and the "Square". Yet, official correspondence in certain years relating to the allotment process of the three tracts evidences an understanding that there was only one reservation and that the right of individual Indians to allotments were to be determined from that perspective.

The attitude of Federal officials during this time relating to the existence of tribal status and the early attempts of the Hoopa and Yurok Indians to organize was equally vacillating and confusing. In some respects, these officials encouraged and approved of efforts to organize separate entities and councils representing the two tribes. Yet, conflicting correspondence exists indicating an understanding that these separate organizations could only represent local interests and could not act with respect to the reservation as a whole.

By 1952, however, when the Commissioner of Indian Affairs approved the constitution and bylaws of the Hoopa Valley Tribe, the position of the Department, at least on a de facto basis, was that the "Square" was a reservation for the Hoopa Valley Tribe and subject to the management of the Hoopa Valley Business Council elected pursuant to that constitution. Under the constitution, the Department recognized the membership of the Hoopa Valley Tribe which did not include most of the Yurok or Klamath Indians.

### JESSIE SHORT V. UNITED STATES

This administrative position continued basically unchallenged until 1955, when substantial tribal revenues from the sale of commercial timber from the "Square" began to be realized. Beginning in 1955, the Secretary of the Interior began to credit revenue de-

rived from the "Square" to a trust account separate from revenue earned from other portions of the Hoopa Valley Reservation.

From January of 1955 until February of 1969, the Secretary, upon the request of the Hoopa Valley Business Council, each year disbursed from the Hoopa Valley trust fund per capita payments to the Indians on the official roll of the Hoopa Valley Tribe. The total amount of such funds disbursed per capita was $12,657,666.50. (Subsequently, on 21 separate occasions commencing on April 10, 1969, and ending on March 7, 1980, additional per capita payments amounting to some $16,660,492 were made to individual Hoopa Indians on the offical roll of the Hoopa Valley Tribe.)

In 1963, certain Indians identified as "Yurok" Indians) claiming descent from Indians allotted on the reservation, but not enrolled as members of the Hoopa Valley Tribe, brought a suit against the United States in the United States Court of Claims in the case of *Jessie Short et al.* v. *U.S.* (Ct. Cl. 102-63) alleging that the government had wrongfully excluded them from sharing in the per capita payments from revenues of the communal lands of the Square made by the Secretary from 1955 onward. In 1972, a Tribal Commissioner of the Court of Claims sustained the plaintiff's position. His decision was later upheld on October 17, 1973, by the Court of Claims (202 Ct. Cl. 870) and the Supreme Court refused to review the decision in 1974.

In construing the various relevant laws and executive orders noted above, the court held that—

> (1) the Hoopa Valley Reservation, as established by the Executive Order of June 23, 1876, pursuant to the 1864 Act, and as augmented by the addition of land under the Executive Order of October 16, 1891, was a single Indian reservation;
>
> (2) no Indian tribe as a tribe had, or has, a vested right to the ownership of, the reservation or its resources;
>
> (3) the reservation had been duly set apart for Indian purposes in 1876 to accommodate the Indian tribes of northern California;
>
> (4) the Secretary had wrongfully paid per capita payments only to members of the Hoopa Valley Tribe to the exclusion of the plaintiffs; and
>
> (5) that any Indian who had certain connections to the reservation and who could meet the court's standards for qualification as an "Indian of the Reservation" was entitled to share in the distribution of revenues from the "Square" and, therefore, was entitled to damages against the United States.

The court in the *Short* case is now engaged in determining which of the plaintiffs meet that criteria. Once this process has been completed, the court will enter judgment against the United States on behalf of each individual plaintiff found to meet that criteria.

### PUZZ V. UNITED STATES

The decision of the Court of Claims in the *Short* case involved a money damage claim against the United States by individual Indians with respect to their right to share in the revenue derived from

the resources of the "Square" upon individualization by the Secretary. The case did not deal with the issue of where the authority to make management decisions relating to the lands and resources of the "Square" or, for that matter, the reservation as a whole was vested.

In 1980, some of the plaintiffs in the *Short* case filed suit against the United States in the United States District Court for the Northern District of California in the case of *Puzz* v. *U.S.* (No. C 80 2908 TEH). In this case, the plaintiffs challenged the right of the United States to recognize the governing body of the Hoopa Valley Tribe as the sole governing authority of the reservation entitled to manage the reservation resources. On April 8, 1988, the court held that the reservation, as extended, was intended for the communal benefit of northern California Indian tribes and groups and that, absent statutory delegations, existing tribes lacked power to manage the resources. The Court ordered the Bureau of Indian Affairs to assume the management of the reservation and its resources and to consult fairly with all persons having an interest in the reservation on its decisions.

## BACKGROUND

### NATURE OF U.S.-INDIAN RELATIONSHIP

From the earliest contact with the Indians of this continent, the European powers and the United States have dealt with the Indians on a government-to-government or tribal basis. The historical development of the relationship between the United States and the Indian tribes, whether it is denominated as a trust, guardianship, or government-to-government relationship, has resulted in a political relationship focusing on the Indian tribes, not on individual Indians.

The great mass of treaties, statutes, and executive orders implementing Federal Indian policy are premised upon this tribal, political relationship. To the extent such laws confer special benefits on individual Indians or impose special burdens or limitations on such Indians or their property, these laws are nevertheless founded upon the status of such Indians as members of Indian tribes enjoying a political relationship with the United States.

The Supreme Court, in upholding the constitutionality of the law extending a preference to Indians for Federal employment in the Bureau of Indian Affairs, held that the law, and the many other Federal laws for the benefit of Indians, were not invidiously discriminatory because the laws were not based upon the racial background of the individual, but upon their status as members of an Indian tribe. *Morton* v. *Mancari,* 417 U.S. 535 (1974). In those limited cases where the Congress has legislated specially with respect to individual Indians outside their relationship as a member of an Indian tribe, other National grounds are, or will be, found.

### CREATION OF INDIAN RESERVATIONS

Where the United States has not recognized the title of an Indian tribe to its aboriginal lands, usually through creation of a permanent reservation for such tribe from those aboriginal lands,

the tribe does not have a compensable title in such lands and the Congress may take the lands without incurring a liability to the tribe. *Tee-Hit-Ton Indians* v. *United States,* 348 U.S. 272 (1955).

As a consequence of the nature of the relationship between Indian tribes and the United States, Indian reservations were recognized or set aside by treaty, statute, or executive order for Indian tribes, not individual Indians. In most cases, the enabling law specifically denominated the Indian tribes or tribes for whose benefit the reservation was established.

In certain cases, particularly with respect to reservations established by executive order, the source authority does not designate a particular tribe as the beneficiary of the reservations. In those cases, discretion is left in the responsible executive official to later designate the tribe or tribes to be settled on such reservation. Until such official has acted under that discretion, no tribe is deemed settle on the reservation. In the December 16, 1882, Executive Order establishing a reservation for the Hopi Tribe, the language set the lands apart for the "Moqui (Hopi) and such other Indians as the Secretary of the Interior may see fit to settle thereon." The Federal court found that the Secretary did not settle the Navajo Tribe on that reservation until long after 1882.

Whether the establishing instrument designates a tribe or tribes as beneficiaries of the reservation or leaves to the discretion of an executive official the authority to later designate beneficiary tribes, in every case, the reservation is set aside for tribal or communal purposes. Individuals have an interest in resources of the reservation only insofar as they are members of the tribal entity for whose benefit the reservation is set aside.

Where the law creating an Indian reservation designates the tribe(s) for whose benefit the reservation is created and where it is clear that the reservation is intended for the permanent benefit of such tribe, the beneficial interest in the reservation becomes vested in that tribe and the power of Congress to deal with the property is limited. Congress, in the exercise of its plenary power over Indian affairs, may modify or take the tribe's property interest in such reservation, *Lone Wolf* v. *Hitchcock*, 187 U.S. 553 (1903), but, in doing so, will be held to one of two standards.

Congress may act as trustee for the benefit of the Indians and, if it makes a good faith effort to replace the property taken with property of equal or nearly equal value, it will not be held to the 5th Amendment standard. If it take the tribe's property for the United States or for others without making such good faith effort, such action will constitute a 5th Amendment taking. *Shoshone Tribe* v. *U.S.*, 299 U.S. 476 (1937); *Three Tribes of Fort Berthold Reservation* v. *U.S.*, 182 Ct. Cl. 543 (1968); *United States* v. *Sioux Nation of Indians*, 448 U.S. 371 (1980).

In other cases, particularly with respect to executive order resevatrions, the law creating an Indian reservation may not designate the tribe for whose benefit it is intended or, where discretion is left to an executive official to so designate a tribe, that discretionary authority may not have been exercised or exhausted. Or such law may not be clear that the reservation is intended for the permanent benefit of Indians. In those cases, no right, as against the exercise of the plenary power of Congress, has vested in any tribe and

Congress may deal with that property as it sees fit without subjecting the United States to a liability for an unconstitutional taking. *Hynes* v. *Grimes Packing Co.*, 337 U.S. 86 (1949); *Healing* v. *Jones*, *174 F. Supp. 211;* 210 F. Supp. 125 (1962), aff'd. 373 U.S. 758; *Crow Nation* v. *United States*, 81 Ct. Cl. 238, 279–80 (1935).

### RECOGNITION OF INDIAN TRIBES; TRIBAL MEMBERSHIP

As noted above, the relationship between the United States and Indian tribes is a political one. While the validity of congressional or administrative actions may depend upon the existence of tribes, the courts have made clear that it is up to Congress or the Executive to extend recognition of that status. *Handbook on Federal Indian Law*, 1982, p. 3–5; *U.S.* v. *Rickert*, 188 U.S. 432 (1903). While the power of Congress, in the exercise of its plenary power over Indian affairs under the Commerce clause, to extend political recognition to an Indian tribe is very broad, it cannot be used arbitrarily. In *U.S.* v. *Sandoval*, 231 U.S. 28, 46 (1913), the Supreme Court held:

> Of course, it is not meant by this that Congress may bring a community or body of people within the range of this power by arbitrarily calling them an Indian tribe, but only that in respect of distinctly Indian communities the questions whether, to what extent, and for what time they shall be recognized and dealt with as independent tribes requiring the guardianship and protection of the United States are to be determined by the Congress, and not by the courts.

As the power of Congress to extend such recognition is very broad, so also is the power to terminate that recognition. *Menominee Tribe* v. *U.S.*, 391 U.S. 404 (1968).

In general, an Indian tribe has the power to establish its own membership and membership requirements and this right has been consistently recognized by the Congress and the courts. Tribal membership and membership requirements are normally determined by the tribal governing authorities, typically under a tribal constitution or other recognized governing documents.

Nevertheless, Congress retains broad power to determine or modify, for various purposes, a tribe's membership. The United States may assume full control over Indian tribes and determine membership in the tribe for the purpose of adjusting rights in tribal property. *Stephens* v. *Cherokee Nation,* 174 U.S. 445 (1899). Congress may disregard existing tribal membership rolls. In the case of *Sizemore* v. *Brady,* 235 U.S. 441, 447 (1914), the Supreme Court said:

> Like other tribal Indians, the Creeks were wards of the United States, which possessed full power, if it deemed such a course wise, to assume full control over them and their affairs, to ascertain who were members of the tribe, to distribute the lands and funds among them, and to terminate the tribal government.

And it is clear that tribal membership does not confer upon the individual a vested right in tribal or communal property. As stated in *Handbook on Federal Indian Law, 1982,* p. 605–606:

> It is well established that title to the communal land or personal property of a tribe resides in the tribe itself and is not held by tribal members individually. An individual member cannot convey title to any particular tract of tribal land and has no right against the tribe to any specific part of tribal property, absent a federal law or treaty granting vested rights to individual members. . . . A member's right to tribal property is no more than prospective and inchoate unless federal law or tribal law recognizes a more definite right." [Citations omitted.]

STATUS OF HOOPA VALLEY RESERVATION

The decisions of the United States Court of Claims in the case of *Jessie Short et al.* v. *United States* (Ct. Cl. No. 102–63) and related cases, with respect to the interest of individual Indians in the revenues from the Hoopa Valley Reservation, and the decision of the Federal district court in the case of *Puzz* v. *United States*, with respect to the obligation to manage the resources of that reservation, while perhaps correct on the peculiar facts and law, have had a very unhappy result.

It is clear from the 1864 Act authorizing the establishment of Indian reservations in California and the 1876 and 1891 Executive Orders creating the Hoopa Valley Reservation pursuant to such Act that the reservation was created for tribal or communal Indian purposes. This is consistent with the foregoing discussion and with the law of the case in the *Short* case.

Yet, the Court of Claims in the *Short* case very clearly has held that neither the organized Hoopa Valley Tribe, the unorganized Yurok Tribe, nor any other Indian tribe has any vested right to the benefits the Hoopa Valley Reservation. This, too, is consistent with the foregoing discussion. The 1876 Executive Order, creating the Hoopa Valley Reservation, merely provides that it is "set apart for Indian purposes". Since, as noted, reservations are set aside for Indian tribes, since no tribes were designated in the order, and since the court did not find that the Secretary had definitely used or exhausted his discretion to settle any Indian tribe on the reservation, it is clear that no tribal vested rights, as against the plenary power of Congress to deal with the property, have arisen. This applies not only of Hoopa and Yurok tribal entitlements but also of Karuk claims and claims of groups such as the Tolowa, Wintun and Shasta who are currently seeking federal recognition of tribal status pursuant to 25 C.F.R. Part 83.

The Conclusions of Law by the Federal district court in the *Healing* v. *Jones* case might be instructive. the 1882 Executive Order creating the reservation did designate the Hopi Tribe as a beneficiary, but retained with the Secretary the right "to settle other Indians thereon". In Conclusion of Law No. 2, the court stated:

> By force and effect of the Executive Order of December 16, 1882, . . . the Hopi Indian tribe, on December 16, 1882, for the common use and benefit of the Hopi Indians, ac-

> quired the non-vested (emphasis added) right to use and occupy the entire reservation . . . subject to the paramount title of the United States, and subject to such diminution in the rights . . . so acquired as might thereafter lawfully result from the exercise of the authority reserved in the Secretary to settle other Indians in the reservation.

It is the Committee's conclusion that, as found by the *Short* case, no constitutionally protected rights have vested in any Indian tribe in and to the communal lands and other resources of the Hoopa Valley Reservation. In carrying out the trust responsibility of the United States under Congress' plenary power, the Committee finds that H.R. 4469, as reported, is a reasonable and equitable method of resolving the confusion and uncertainty now existing on the Hoopa Valley Reservation.

While the court in the *Short* case has found that no tribe have a vested right in the reservation, it was equally clear on the point that none of the plaintiffs nor any other individual has a vested right in the property. Again, this holding of the court is consistent with the discussion above on the rights of tribal members in tribal property. Two cites from the Federal courts' several decisions in this case may be helpful. In a 1983 decision of the Circuit Court in this case, the court said:

> At the close of our opinion we again stress—what the Court of Claims several times emphasized and we have interlaced supra—that *all* we are deciding are the standards to be applied in determining those plaintiffs who should share as individuals in the monies from the * * * Reservation unlawfully withheld by the United States. * * * This is solely a suit against the United States for monies, and everything we decide is in that connection alone; neither the Claims Court nor this court is issuing a general declaratory judgment. We are not deciding standards for membership in any tribe, band, or Indian group, nor are we ruling that Hoopa membership standards should or must control membership in a Yurok tribe or any other entity that may be organized on the Reservation.

In its March 17, 1987, decision, the court said:

> . . . an individual Indian's rights in tribal or unallotted property arise only upon individualization; individual Indians do not hold vested severable interests in unallotted tribal lands and monies as tenants in common.

Again, the Committee agrees with the court in the Short case that neither the plaintiffs nor any other individuals have a vested right in the Hoopa Valley Reservation as against the right of Congress to make further disposition of that property. As noted above, Congress has power to make determinations about tribal membership with respect to the adjustment of participation in tribal property. The power is even more clear in this case, where, except for the Hoopa Valley Tribe, there is no organized tribe which has a definable membership.