The Committee is also aware that although Congress later authorized the establishment of additional reservations in California, the Act of April 8, 1864 authorized the estasblishment of four reservations, including Hoopa Valley, Round Valley, Tule River and Mission. As noted above, in the *Puzz* case, a federal district court construed the Act as requiring that the Bureau of Indian Affairs run the Hoopa Valley Reservation for the benefit of all individuals (including non-tribal members) who had ancestral connections with the Reservation, and also construed the Act as prohibiting the exercise of reserved tribal sovereign powers by Indian tribal governments, with respect to the Hoopa Valley Reservation. The Committee believes that the *Puzz* case is confined to the peculiar facts and law applicable to the Hoopa Valley Reservation, and it is the purpose of S. 2723 to reject the application of this view of the 1864 Act to any California reservation. S. 2723 should therefore help ease the concerns of other tribal councils whose reservation lands are affected in whole or in part by the 1864 Act or similar legislation. It is not true, as a general rule, that federally recognized tribal governing bodies on reservations set apart for more than one historical tribal group need federal authority conferred upon them in order to exercise territorial management powers. Application of such a rule would seriously interfere with tribal sovereignty and modern federal Indian policy.

## SETTLEMENT PROVISIONS

S. 2723, as reported by the Committee, is a fair and equitable settlement of the dispute relating to the ownership and management of the Hoopa Valley Reservation. The Section-by-Section Analysis and Explanation which follows sets out in detail the provisions of the bill.

The bill provides for the partition of the joint reservation between the Hoopa Valley Tribe and the Yurok Tribe. As noted, the Committee has concluded that there are no tribal or individual vested rights in the reservation and that Congress has full power to dispose of the reservation as proposed. As a consequence, the Committee need not overly concern itself with precise comparable values in such partition. The Committee intends to deal fairly with all the interests in the reservation, and believes it has done so. The nature of the interests involved here, however, is such that Congress need not precisely determine, or provide, the full value that a fee simple interest in these lands and resources might have.

It is alleged that the "Square", to be partitioned to the Hoopa Valley Tribe, is much more valuable than the "Addition" which is to go to the Yurok Tribe. Tribal revenue from the "Square" is in excess of $1,000,000 annually. Tribal revenue derived from the "Addition" recently has totalled only about $175,000 annually. However, the record shows that individual Indian earnings derived from the tribal commercial fishing right appurtenant to the "Addition" is also in excess of $1,000,000 a year. The Committee also notes that because of the cooperative efforts of the Hoopa Valley Tribe and other management agencies to improve the Klamath River system, and because of the Fisheries Harvest Allocation Agreement apportioning an increased share of the allowable harvest to the

Indian fishery, the tribal revenue potential from the "Addition" is substantial. While in recent years tribal income from the "Square" has exceeded tribal income from the "Addition," it is the judgment of the Committee that a functioning tribal government fulfilling the Congress' and the Executive's policy of self-determination merits a certain financial deference over a group of Indians which has previously elected not to have a functioning tribal government. See Indian Self-Determination and Education Assistance Act, Pub. L. No. 93-638, 88 Stat. 2203, codified at 25 U.S.C. §§450, et seq.; President's statement on Indian Policy, 19 Weekly Comp. Pres. Doc. 98, 99 (Jan. 24, 1983); S. Con. Res. 76, ordered reported, Senate Indian Committee, 100th Cong., 2nd Sess. (1988). Furthermore, the Committee is acting out of concern that the Hoopas have tended to live on the reservation and that their government be accorded sufficient resources to provide the services necessary to sustain their habitation. Indeed the majority of the Indians living on the combined reservation live on the "Square." The record shows that the Hoopa Valley Business Council is the only full-service local governmental organization on the combined reservation, and has been the major government service provider in the extremely isolated eastern half of Humboldt County. The Hoopa Valley Tribe was recognized by the Congress as warranting federal assistance and support for its self-governance efforts. Conf. Rep. No. 498, 100th Cong., 1st Sess. 889.

As noted elsewhere in this report, the proposed partition is also consistent with the aboriginal territory of the two named tribes involved, particularly since the Hoopa Valley Tribe formally organized in a way encompassing all Indian allotted land on the Square.

The bill also provides for certain settlement options to be made available to individual Indians who can meet the requirement of the court for qualification as an "Indian of the Reservation". With the exception of a limited option to become a member of the existing Hoopa Valley Tribe, the settlement options are either to become a member of the Yurok Tribe or to elect a buy-out option. The settlement terms are to be supported primarily through the use of funds earned from the reservation and maintained by the Secretary in escrow accounts.

The Committee wishes to make very clear that this offer of options by way of settlement of this problem in no way is to be construed as any recognition of individual rights in and to the reservation or the funds in escrow.

## Legislative History

On April 26, 1988, Congressman Bosco introduced H.R. 4469 to partition certain reservation lands between the Hoopa Valley Tribe and the Yurok Indians, to clarify the use of tribal timber lands, and for other purposes. The bill is co-sponsored by Representatives Coelho and Miller of California. The intent of the legislation is to resolve a long-standing controversy between the Hoopa Valley Tribe which is organized under constitutional provisions approved by the Secretary of the Interior and persons who are primarily, but not exclusively, of Yurok Indian descent.

On August 10, 1988, the House Committee on Interior and Insular Affairs adopted an amendment in the nature of a substitute and ordered H.R. 4469 reported. The bill is scheduled for a further hearing before the House Judiciary Committee on Friday, September 30, 1988.

On June 30, 1988, Chairman Inouye held an oversight hearing in Sacramento, California, to receive testimony on the general background of the problems and issues on the Hoopa Valley Reservation. This hearing was not directed to specific legislation, but was only for purpose of collecting background information.

On August 10, 1988, Senator Cranston introduced S. 2723, which is identical to H.R. 4469 as ordered reported. The Select Committee held hearings on this bill on September 14, 1988. On September 29, 1988, the Select Committee in open business session, adopted an amendment in the nature of a substitute, and ordered the bill reported with a recommendation that the bill, as amended, be passed.

## Committee Recommendation and Tabulation of Vote

The Select Committee on Indian Affairs, in open business session on September 29, 1988, by unanimous vote of a quorum present, adopted an amendment in the nature of a substitute and ordered the bill reported with a recommendation that S. 2723, as amended, be passed by the Senate.

## Section-by-Section Analysis

There follows a section-by-section analysis of S. 2723 a reported and, where appropriate or necessary, a further explanation of the provisions of the bill.

### SECTION 1—SHORT TITLE AND DEFINITIONS

Subsection (a) provides that the Act may be cited as the "Hoopa-Yurok Settlement Act".

Subsection (b) contains definitions of various terms used in the bill.

Among the more important definitions is the definition of "Escrow funds", which lists the accounts maintained by the Secretary of the Interior into which income from reservation economic activity (as opposed to individual trust monies) are deposited; "Indian of the Reservation", which is a term of art developed in the *Short* case to define those persons entitled under *Short* and companion cases as eligible plaintiffs in the claims against the United States arising from the distribution of income from reservation wide economic activities; and definition of "Short cases" to include all companion cases filed thus far.

### SECTION 2—RESERVATIONS; PARTITION AND ADDITIONS

Subsection (a), paragraph (1), provides that, when the Hoopa Valley Tribe adopts a resolution waiving certain claims and granting consent as provided in paragraph (2), the Hoopa Valley Reservation as now constituted and as defined by the Federal Court in the *Short* case, shall be partitioned as provided in subsection (b) and (c). A technical amendment is added to make clear that the

partition is linked to recognition and confirmation of the governing documents of the Hoopa Valley Tribe, as provided in Section 8.

Paragraph (2) provides that the partition of the reservation as provided in paragraph (1) shall not be effective unless the Hoopa Valley Tribe adopts a tribal resolution within 60 days of enactment waiving any claim they may have against the United States arising out of the provisions of the Act. The Secretary is required to publish the resolution in the Federal Register.

An amendment is added to make clear the consent of the Hoopa Valley Tribe to the contribution of the escrow funds to the Settlement Fund. This amendment was requested by the Justice Department. The Committee does not intend that the requirement for a Hoopa tribal waiver under this section or the Yurok tribal waiver requirement under section 9(d)(2) shall constitute a congressional recognition that such tribes or any other Indian tribe may have vested rights in the lands and resources of the joint reservation. In *Hynes* v. *Grimes Packing Co.* 337 U.S. 86, 103 (1949), the Supreme Court held that an executive order reservation "conveys no right of use or occupancy to the beneficiaries beyond the pleasure of Congress or the President."

Subsequent cases establish that the compensable right of a tribe in an executive order reservation depends upon its status as a confirmed or unconfirmed reservation. The exact legal status of the reservation is unclear from the various Federal court decisions relating to it. However, the decision of the Court of Claims in the *Short* case and the District Court in the *Puzz* case make clear that no existing Indian tribe as a tribe, including the Hoopa and Yurok tribes, have a vested right in the assets and resources of the Hoopa Valley Reservation as now constituted.

The Committee also does not intend that the waivers of the tribes, if given, shall present the tribes from enforcing rights or obligations created by this Act.

Subsection (b) provides that, effective with the partition as provided in subsection (a), that portion of the reservation known as the "Square" shall be recognized as the Hoopa Valley Reservation and shall be a reservation for the Hoopa Valley Tribe. The Committee notes that, while the record before the Committee and the findings of the court in the *Short* cases show that the "Square" included aboriginal lands of the Yurok or Klamath Indians, most of the lands of the "Square" were within the aboriginal territory of the Hoopa and related bands and villages. This partition also conforms generally with the geography of the reservation which, as currently constituted, comprises two river drainages.

Subsection (c), paragraph (1), provides that, effective with the partition as provided in subsection (a), that portion of the reservation known as the "extension", excluding the lands of the Resighini Rancheria, shall be recognized as the Yurok Reservation and shall be a reservation for the Yurok Tribe. The Committee again notes that the lands comprising the new Yurok reservation were within the aboriginal lands of the Yurok or Klamath bands or villages. Karuk tribal aboriginal lands generally lay upstream of Yurok lands along the Klamath River, outside of the Yurok and Hoopa Valley Reservations.

Paragraph (2) provides that, subject to all valid existing rights, all national forest lands in the Yurok Reservation and about 14 acres of the Yurok Experimental Forest shall be transferred to the Yurok Tribe in trust. These lands contain buildings which will be immediately utilized by the Yurok Tribe. The Committee, therefore, expects the Secretary of the Interior to work with the Yurok Interim Council to ensure that these facilities are cleaned and renovated as soon as possible. This clean-up and renovation should be accomplished under the BIA's existing facilities maintenance and repair budget. In addition, the Secretary shall within six months report to Congress concerning the advantages, disadvantages, and procedural aspects of conveying to the Yurok Tribe all National Park System lands within the Yurok Reservation. If the Secretary does not recommend immediate conveyance of such lands, his recommendation shall include a proposed inter-governmental agreement which, pending any conveyance, will assure Yurok tribal hunting, fishing, and gathering rights, and reasonable ceremonial and religious access and use on such lands within the reservation.

Paragraph (3) provides that the existing authority of the Secretary to acquire lands for Indians and Indian tribes under the Indian Reorganization Act of 1934 shall be applicable to the Yurok Tribe. $5,000,000 is authorized to be appropriated and is directed to be used for land acquisition for the Yurok Tribe with the limitation that such funds can be used to acquire land outside the reservation only for purposes of exchange for lands inside. An amendment is added to permit acquisition of lands adjacent to and contiguous with the Yurok reservation. The Committee expects that the Secretary will make use of this and other authority to, among other things, insure that Indian lands within the reservation are not, or do not become, landlocked. The Committee is aware that the acquisition of new lands will increase the costs of land and resource management. The Committee, therefore, directs the Secretary to consider these additional costs when preparing the future budgets of the Yurok Tribe.

Paragraph (4) provides that (1) the transfer of funds to the Yurok Tribe under section 4 and 7; (2) the land transfer under subsection 2(c)(2); (3) the land acquisition authority of section 2(c)(3); and (4) the organizational authorities for the Yurok Tribe under section 9 shall not be effective unless the Interim Council of the Yurok Tribe adopts a resolution waiving any claims it might have against the United States under this Act and granting consent as provided in section 9(d)(2). Section 9 of the bill provides for an Interim Council to be elected by the General Council of the tribe.

Subsection (d) provides that the boundary line between the Hoopa Valley and Yurok reservations, as partitioned in this section, shall be the line established by the Bissel-Smith survey and that the Secretary shall publish the boundary descriptions in the Federal Register. Use of the Bissel-Smith survey for purposes of defining the Hoopa Valley Indian Reservation results in the addition of lands to the Yurok Reservation in the upper reaches of the extension near the junction of the Kalamath River with the Trinity River. The transition village known as "Peekta" Point, claimed by the Yurok Tribe, now apparently becomes part of the Yurok Reservation.

Subsection (e) provides for the management of the tribal lands of the Yurok Reservation by the Secretary until the organization of the tribe under section 9 and, thereafter, by the Yurok Tribe.

Subsection (f) provides that the State of California shall continue to have criminal and civil jurisdiction on the two reservations under Public Law 83-280 with authority to retrocede such jurisdiction to the United States.

SECTION 3—PRESERVATION OF SHORT CASES

Section 3 provides that nothing in this Act shall affect, in any way whatsoever, the individual entitlements already established in the various decisions of the Federal courts in the so-called *Short* cases nor any eventual entry of final judgment in those cases.

When final judgment is entered in the *Short* cases, the court will have determined which of the 3,800 intervening individual plaintiffs have met the standards of the court for qualification as an "Indian of the Reservation" and will have determined the amount of monetary damages to which each such individual plaintiff is entitled from the United States. Nothing in this legislation is intended to affect the right of such individuals to that final award under the law of the case. While the Committee does not believe that this legislation, as a prospective settlement of this dispute, is in any way in conflict with the law of the case in the *Short* cases, to the extent there is such a conflict, it is intended that this legislation will govern.

SECTION 4—HOOPA-YUROK SETTLEMENT FUND

Subsection (a), paragraph (1), establishes a Hoopa-Yurok Settlement Fund into which the Secretary is directed to deposit all Escrow funds, together with accured income, derived from revenue of the reservation. The definition of the Excrow funds is intended to be a comprehsnsive list of the funds and accounts, in federal hands, derived from the lands or resources of the joint reservation. It is estimated that this amount now totals approximately $65,000,000.

Paragraph (2) permits the Secretary to continue to make payments to the Hoopa Valley Tribe, out of the interest or principal of the Settlement Fund, for tribal governmental and management purposes, excluding per capita payments, in an amount not to exceed $3,500,000 per fiscal year. These payments will be deducted from what would otherwise be the Hoopa Valley Tribe's share as apportioned by subsection (c).

Paragraph (3) as added by the Committee authorizes the Secretary to provide appropriated funds to the Yurok Transition Team, and also authorizes the Secretary to make payments to the Yurok Transition Team, out of the interest or principal of the Settlement Fund, for the purposes for which the Yurok Transition Team is established under section 9, in an amount not to exceed $500,000 per fiscal year. These payments will be deducted from what would otherwise be the Yurok Tribe's share as apportioned by subsection (d).

Subsection (b) provides that the Secretary shall make payments from the Settlement Fund as provided in this Act and, pending dis-

solution of the Fund, shall administer and invest such funds as Indian trust funds are administered.

Subsection (c) directs the Secretary, upon publication of the option election date pursuant to section 6(a)(4), to pay out of the Fund and to hold in trust for the Hoopa Valley Tribe an amount which shall be based upon the percentage arrived at by dividing the number of members of the Hoopa Tribe as of such date by the sum of the number of such members and the number of persons on the final roll prepared pursuant to section 5. After the elections pursuant to section 6 have been made, the payment to the Hoopa Valley Tribe shall be increased or decreased based on the persons who are enrolled in the Tribe pursuant to section 6. Under this formula, it is estimated that approximately $23 million will be paid to the Hoopa Tribe. This is roughly one-third of the entire Settlement Fund.

Subsection (d) directs the Secretary to make a similar payment for the Yurok Tribe with the amount being determined by dividing the number of persons on the Settlement Roll electing to be members of the Yurok Tribe by the sum of the number of members of the Hoopa Tribe, as determined under subsection (c), and the number of persons on such roll prepared under section 5. The amount allocated to the Yurok Tribe will be based on how many individuals meeting the *Short* case standards elect to become members of the Yurok Tribe. If only 25% of the adults eligible accept the Yurok membership option, approximately $6.7 million remaining in the Settlement account, for a total tribe share of $18.1 million. According to the pro-organization Yurok group the 25% membership estimate is extremely low. They estimate that the percentage accepting tribal membership will exceed 50%. If this is true the Yurok Tribe will receive in excess of $23.5 million. This is roughly one-third of the entire Settlement Fund.

Subsection (e) authorizes the appropriation of $10,000,000 for deposit in the Settlement Fund as the Federal share after Hoopa and Yurok tribal payments pursuant to section 4 and the payments to the Yurok member pursuant to section 6(c) are made. The Fund, with the Federal share and with any earned income, is to be available to make the payments authorized by section 6(d).

As noted elsewhere in this report, it is in large part due to the unjust, historical treatment of California Indians by the United States, to the enactment and promulgation of confusing and ambiguous laws, and to the vacillating and uncertain policies of U.S. officials that his unfortunate situation now exists. The Committee feels that $10,000,000 of Federal funds, added to the funds of the Indians, is a small price to pay to rectify this situation and permit implementation of the federal policy of government-to-government relations with the Hoopa Valley and Yurok Tribes.

SECTION 5—HOOPA-YUROK SETTLEMENT ROLL

Subsection (a) directs the Secretary to prepare a roll of all persons who can meet the criteria established by the Federal courts in the *Short* case for qualification as an "Indian of the Reservation" and who also (1) were born on or prior to, and living on, the date of enactment; (2) are citizens of the United States; and (3) were not

members of the Hoopa Valley Tribe as of August 8, 1988. The Secretary's determination is final except that plaintiffs in the *Short* cases who have been found by the Federal court to meet the qualification as an "Indian of the Reservation" shall be included on the roll if they meet the other requirements and those who are found by the court not to meet such qualifications may not be included on the roll. Persons who are not plaintiffs in the Short cases may also be included on the roll if they timely apply and meet the criteria established. The Committee expects the Secretary to place on the roll the names of all living Indians of the Reservation held qualified in the *Short* cases whether or not an application is timely received from such persons, since address changes or other unforeseen event may prevent persons from receiving actual notice, and the qualifications of such persons are readily verified.

Subsection (b) requires the Secretary, within 30 days of enactment, to give notice of the right to apply for enrollment under this section. It requires actual notice by registered mail to *Short* plaintiffs, notice to their attorneys, and notice in local newspapers. Such notice is also to be published in the Federal Register.

Subsection (c) establishes the deadline for applications as 120 days after the Federal Register publication in subsection (b).

Subsection (d), paragraph (1), provides that the Secretary shall make his determinations of eligibility and publish a final roll in the Federal Register 180 days after the date established in subsection (c).

Paragraph (2) requires the Secretary to establish procedures for the consideration of appeals from applicants not included on the final roll. These appeals will not prevent the roll from being made final. Successful appellants are to be later added to the roll and any payments they become entitled to, as a result of the election of options, are to be paid from any funds remaining in the Settlement Fund before payment to the Yurok tribe as provided in section 7. The subsequent inclusion of such persons on the roll, and any election of option they may make, are not to affect any calculations made for the payments to the Hoopa and Yurok Tribe under section 4. However, deletion of persons found erroneously to have been included on the roll may lead to adjustment of the calculations and payments made under section 4.

Subsection (e) provides that anyone not included on the final Settlement Roll shall not have any interest in the Hoopa Valley Reservation, the Hoopa Valley Tribe, the Yurok Reservation, or the Yurok Tribe or in the Settlement Fund unless they may be subsequently admitted to tribal membership by either of those tribes. The provisions of this subsection are not intended to imply an congressional determination that such persons do now have any such interest. Nor are these provisions intended to imply that the federal Indian status of any person would be lost by omission from the final Settlement Roll. These are not termination provisions, as explained under section 6(d).

SECTION 6—ELECTION OF SETTLEMENT OPTIONS.

As noted elsewhere, the court has determined that, while the lands and resources of the Hoopa Valley Reservation as now consti-

tuted are tribal or communal property, neither the Hoopa or Yurok Tribe nor any other tribe has a vested right in such property. Where the tribal property right is vested, if at all, is problematical and probably remains with the United States subject to disposition pursuant to the rationale of the *Hynes* v. *Grimes Packing Co.* case.

In any case, under the general theories of Federal-Indian law and under the law of the case of the *Short* cases, it is the Committee's conclusion that no individual, including persons meeting the qualifications of the court as an "Indian of the Reservation" or members of the Hoopa Valley Tribe, separately or collectively, have any legally enforceable right in the lands and resources of the reservation.

Therefore, the settlement provisions of this section are not to be construed as a congressional recognition, directly or impliedly, that such individuals have any such right or that the payments or benefits conferred by this section are in payment for the taking of any such rights. The Committee is seeking to further the responsibility of the Congress and the United States as the trustee and guardian of Indian tribes and property to resolve the chaos and uncertainty now affecting these Indians, these tribes, and this property. The benefits made available to individuals under this section are a recognition that they may have an inchoate or expectancy interest in such property and that, as a matter of fairness, they should be given reasonable options for settlement.

It is also the Committee's intent that the election of an option under this section, together with all the valuable benefits which flow therefrom, shall constitute a waiver by the individual so electing of any claim such person may have against the United States arising out of this Act except those created by sections 5 and 6.

Subsection (a), paragraph (1), provides that, 60 days after publication of the Settlement Roll, the Secretary shall give notice by registered mail to all adult persons on the roll of their right to elect an option under the Act.

Paragraph (2) provides that the notice must be comprehensive with an objective analysis of advantages and disadvantages of each option, but couched in easily understood language. S. 2723, as introduced, would provide that the election of an eligible adult would bind minor children under their guardianship who are also on the roll. The Committee deleted this provision and amended paragraphs (2) and (3) provide that minor children will be deemed to have elected membership in the Yurok Tribe, with certain exceptions. In addition, the Committee added language specifying that the notice discuss counseling services that the Yurok Transition Team and the Secretary shall provide, and the affidavit requirement of section 6(d).

Paragraph (3) as amended by the Committee, automatically makes minors on the roll members of the Yurok Tribe unless the parent or guardian comes forward with proof, satisfactory to the Secretary, that the minor is enrolled in another tribe that prohibits members from enrolling elsewhere. Thus, in the case of a child who is already an enrolled member of another federally recognized tribe, such parent or guardian may elect the tribe in which such child will be enrolled. Therefore, with respect to minors on the roll

who do not also have a parent or guardian on the roll, notice is to be given to the parent or guardian of such minor. The paragraph further directs that the minor's funds be invested and administered as Indian trust funds, like the Settlement Fund itself, until the age of majority is reached.

Paragraph (4) provides that the Secretary shall establish the deadline for making a choice as the date which is 120 days after the date of promulgation of the Settlement Roll as provided in section 5(d). Persons not making an election by the date established under this paragraph are deemed to have made an election under subsection (c). The Committee believes it is important that no person on the Hoopa-Yurok Settlement Roll lose benefits and privileges flowing from Yurok tribal membership and connection with the Yurok Reservation by virtue of inadvertence, failure to receive actual notice, accident or other unforeseeable events. Accordingly, persons failing to act timely will be deemed to have elected Yurok tribal membership if they accept and cash the check representing the payment authorized by subsection (c).

The Committee believes that acceptance of the payment also establishes the consensual release of rights that accompanies this election. On the other hand, one who fails or refuses to make an election, and refuses to accept the payment authorized by subsection (c) may not be deemed to have granted a release or to have granted a proxy to the Yurok Interim Tribal Council. Thus, refusing to accept the payment is one method by which persons who do not wish to join the Yurok Tribe may avoid becoming members. Persons already enrolled in another Indian tribe that prohibits dual enrollment may, for example, wish to decline Yurok tribal membership. In addition, a person who becomes a member of any Indian tribe is at liberty to terminate the tribal relationship whenever he or she so chooses. E.g., F. Cohen, Handbook of Federal Indian Law 22 (1982 Ed.).

Subsection (b), paragraph (1), provides that any person on the roll, 18 years or older, who can meet certain membership criteria of the Hoopa Valley Tribe as established by the U.S. Claims Court and who (1) maintains a residence on the reservation on the date of enactment; (2) had, within five years prior to enactment, maintained such residence; (3) owns an interest in real property on the reservation can elect to become a member of the Hoopa Valley Tribe.

Paragraph (2) provides that the Secretary shall cause such person to be so enrolled notwithstanding any laws of the Hoopa Valley Tribe to the contrary and, after being so enrolled, such person will be a full member of the tribe for all purposes.

Paragraph (3) provides that the Secretary will assign to such person the degree of Indian blood or Hoopa Indian blood, as appropriate, based upon the criteria established by the Federal Court in the *Short* case.

Paragraph (4) provides that any person making such an election shall no longer have any interest in the Yurok Reservation, the Yurok Tribe, or the Settlement Fund. This paragraph and paragraphs (c)(4) and (d)(2) do not contemplate that such persons now have any particular interest, but that, to the extent they do, it will

be automatically relinquished upon an election of one of the options.

Subsection (c), paragraph (1), provides that any person on the final roll may elect to become a member of the Yurok Tribe and participate in the organization of the tribe pursuant to section 9.

Paragraph (2) provides that persons making such election shall form the base membership roll of the Yurok Tribe and the Secretary shall assign to a person making such an election the degree of Indian blood determined using the criteria of the Federal court.

Paragraph (3) directs the Secretary, to pay to each person under age 50 and making an election under this subsection $5,000 out of the Settlement Fund; $7,500 for those age 50 or older. These sums were established on the basis of the Committee's amendment. The distribution of such funds shall be subject to the provisions of Section 7 of the Act of October 19, 1973 (87 Stat. 466), as amended (25 U.S.C. § 1407).

Paragraph (4) provides that persons making an election under this subsection shall no longer have any interest in the Hoopa Valley Reservation or the Hoopa Valley Tribe or, except as provided in paragraph (3), in the Settlement Fund. As amended by the Committee, additional language in included to provide that the exercise of the option shall authorize the Yurok Interim Council to waive claims of the Yurok Tribe against the United States.

Subsection (d), paragraph (1), provides that any person on the final roll can make an election to receive a lump sum payment from the Settlement Fund and directs the Secretary to pay to each such person the amount of $15,000 out of the Settlement Fund. This sum was decreased from the $20,000 provided in S. 2723 as originally introduced. Election of this option, however, has been conditioned by the Committee upon completion of an affidavit concerning counseling regarding the effects of such an election. This subsection does not suggest, and the Committee does not intend that this Act change the federal Indian status of any person, regardless of the option elected, nor does this Act end federal trust restrictions that may exist as to any allotted or unallotted trust land, property resources or rights. The option provided by section 6(d) is not a termination provision; it merely offers a lump-sum payment to persons on the settlement roll who wish to have no future interests or rights in the tribal, communal, or unallotted land, property, resources, or rights in the tribal, communal, or unallotted land, property, resources, or rights of the Hoopa Valley Reservation or the Yurok Reservation or the Hoopa or Yurok tribes. By contract, the language of the Western Indians Termination Statute declared that the purpose of the Statute was, among other things, "for a termination of Federal services furnished such Indians because of their status as Indians." 25 U.S.C. 691. That termination Act provided that:

> Thereafter individual members of the Tribe shall not be entitled to any services performed by the United States for Indians because of their status as Indians, all statutes of the United States which affect Indians because of their status as Indians * * * shall no longer be applicable to the members of the Tribe, and the laws of the several States

> shall apply to the tribe and its members in the same manner as they apply to other citizens or persons within their jurisdiction. 25 U.S.C. 703(a)(1982)

Neither section 6(d) nor any other provision of this Act is so intended. This Act does not represent a return to a national policy of termination or of encouraging tribal members to withdraw from their tribes. However, the circumstances concerning this reservation and the complex litigation which has prevented tribal self-determination justify the congressional role in restoration of tribal self-governance represented by this Act.

Paragraph (2) provides that any person making an election under this subsection shall no longer have any interest in the Hoopa Valley Reservation, the Hoopa Valley Tribe, the Yurok Reservation, and the Yurok Tribe and, except as provided in paragraph (2), in the Settlement Fund.

SECTION 7—DIVISION OF SETTLEMENT FUND REMAINDER

Subsection (a) provides that any funds remaining in the Settlement Fund after payments made pursuant to section 6 and to successful appellants shall be held in trust by the Secretary for the Yurok Tribe.

Subsection (b) provides that funds apportioned to the two tribes by section 4 and 6 shall not be available for per capita distribution for a period of ten years after the date of division made under this section. Other tribal funds, or income of the apportioned funds, are not intended to be restricted by this subsection. As amended by the Committee this would allow the Hoopa Tribe to make one or more per capital payments to its members from such funds, totalling not more than $5,000, a sum similar to that provided for those electing to become members of the Yurok Tribe. There is no provision for a bonus payment to those 50 years or older since no election is involved and the Hoopa members have been receiving the full range of federal services over the years. Under the Act of August 1, 1983, the Committee understands that payments on behalf of minor tribal members shall be held in trust accounts and invested for the minors.

SECTION 8—HOOPA VALLEY TRIBE; CONFIRMATION OF STATUS

Section 8 preserves, ratifies, and confirms the existing status of the Hoopa Valley Tribe as a Federally-recognized tribe and reinstates full recognition of its governing documents and governing body as heretofore recognized by the Secretary.

In the record before the Committee and in the findings of the court in the *Short* cases, some significance is attached to the fact that some members of the Hoopa Valley Tribe had admixtures of the blood of the Yurok or other tribes or, in some cases, that such admixture was greater than their Hoopa blood. The Committee does not attach any significance to this fact by itself nor does it find that this admixture of tribal blood detracts from the integrity of the Hoopa Valley Tribe as a tribe of Indians. Most, if not all, Federally-recognized Indian tribes have members who are not of the full degree of blood of the ancestral tribe. Through inter-tribal marriages, most Indian tribes have a membership of mixed Indian

blood. Indeed, most have a membership with mixed Indian and non-Indian blood. The Hoopa Valley Tribe clearly has and continues to function as an Indian tribe in the political sense.

SECTION 9—RECOGNITION AND ORGANIZATION OF THE YUROK TRIBE

This section provides for the development of a membership for a Yurok Tribe and for its organization. The Committee realizes that there may be some people on the Settlement Roll who will have little or no Yurok Indian blood who may wish to select this option. The discussion under section 8 above is relevant here.

Subsection (a), paragraph (1), provides that those persons electing the Yurok Membership option under section 6 shall form the base roll of the Yurok Tribe whose status as a Federally-recognized tribe, subject to the adoption of the Interim Council resolution required by subsection (c), is ratified and confirmed. The Committee substituted the term "Interim Council" for the term "General Council."

Paragraph (2) provides that the Indian Reorganizaiton Act of 1934 shall apply to the Yurok Tribe.

Paragraph (3) directs the Secretary promptly to consult with the Select Committee on Indian Affairs, the House Insular and Interior Affairs Committee and any other appropriate committee and, within 30 days of enactment, appoint five individuals to compromise the Yurok Transition Team. Since the Interim Council will not be nominated or elected until after preparation of the Settlement Roll and election of options, a process that will take over one year, a Transition Team to aid the Yurok Tribe's organizational process is essential.

A key function of the Yurok Transition Team is to provide counseling to persons who are or may be eligible for inclusion in the Hoopa-Yurok Settlement Roll with respect to inclusion in the Settlement Roll, the advantages and disadvantages of each of the settlement options available under section 6, and related issues. In particular, the Yurok Transition Team must counsel people concerning the current or potential benefits which will or may be derived by membership in the Yurok Tribe or the Hoopa Valley Tribe, and from connections with the Yurok or Hoopa Valley reservation. This must include discussion of any possible effect on the future tribal membership of children of individuals who may elect the option of sections 6(c) and 6(d). However, this paragraph does not suggest, and the Committee does not intend that any part of this Act change the federal Indian status of any person, for purposes of programs and benefits in which membership in a federally recognized Indian tribe is not a prerequisite, regardless of the option elected. Nor does this Act end federal restrictions that may exist as to any allotted or unallotted trust land or resources. As noted elsewhere, the option provided by section 6(d) is not a termination provision; and it should not be portrayed as such; the subsection merely offers a lump-sum payment to persons on the Settlement Roll who wish to have no future interest or right in the tribal, communal, or unallotted land, property, resources, or rights of the Hoopa Valley Reservation or the Yurok Reservation or the Hoopa or Yurok tribe.

Subsection (b) provides for the creation of an Interim Council for thed Yurok Tribe of five members to represent the Yurok Tribe in the implementation of the Act and to act as the tribal governing body until a tribal council is elected under a constitution adopted pursuant to this section.

Subsection (c), paragraph (1), provides that the Secretary, within 30 days of the deadline for election of options, shall prepare a list of all adults on the Settlement Roll who elected the Yurok Membership option who will constitute the eligible voters of the tribe for organizational purposes. The Secretary must send them notice of date, time, purpose, and order of procedure of the general council meeting to be scheduled pursuant to paragraph (2).

Paragraph (2) provides that, within a set time after such notice, the Secretary shall convene a general council meeting of the Yurok Tribe on or near the Yurok Reservation. The business of such meeting is to nominate candidates for election to the Interim Council. Only persons on the list prepared under paragraph (1) are eligible for nomination. As amended by the Committee the resolution waiving claims against the United States may be executed by the Interim Council based upon the proxies received from persons electing tribal membership.

Paragraph (3) provides that, within 45 days after the general council meeting, the Secretary shall conduct an election for the Interim Council from among the persons nominated. Absentee balloting and write-in voting is to be permitted. The Secretary must give the eligible voters adequate notice of the election.

Paragraph (4) requires the Secretary to certify the results of the election and to convene an organizational meeting of the newly elected Interim Council.

Paragraph (5) provides that vacancies on the Council shall be filled by a vote of the other members.

Subsection (d), paragraph (1), provides that the Interim Council shall have no powers except those conferred by this Act.

Paragraph (2) provides that the Council shall have full authority to secure the benefits of Federal programs for the tribe and its members, including those administered by the Secretary of the Interior and the Secretary of Health and Human Services and shall have authority to execute the necessary waiver of claims against the United States, and consent to allocation of the escrow funds to the Settlement Fund.

Paragraph (3) provides that the Council shall have such other powers as the Secretary normally recognizes in an Indian tribal governing body, except that it may not legally or contractually bind the tribe for a period in excess of two years from the date of their election. The Committee's amendment revised this language to provide that any contract of more than two years duration will be subject to disapproval by the Secretary of the Interior under limited circumstances.

Paragraph (4) provides that the Interim Council shall appoint a drafting committee which shall be responsible for the development of a draft constitution for submission to the Secretary.

Paragraph (5) provides that the Interim Council shall be dissolved upon election of the initial governing body under such con-