stitution when adopted or at the end of two years after their installation, whichever occurs first.

Subsection (e) provides that the Secretary, upon the request of the Interim Council and the submission of the draft constitution, shall take all steps necessary under the provisions of the Indian Reorganization Act for the adoption of a tribal constitution and the election of the initial tribal council under such constitution when adopted. The Committee recognizes that the Yurok Tribe has a sovereign right to select tribal membership provisions for its constitution. The Tribe may prohibit the dual enrollment of Yurok tribal members in other Indian tribes, for example, as many other tribes do. Both because it is the Yurok Tribe's right to determine its membership criteria and because the Tribe will have to live with the consequences of its decision, the Committee is reluctant to require inclusion of specific membership provisions. Nevertheless, the Committee hopes and presumes that children born after the date of enactment of this Act (who of course are not included in the Hoopa-Yurok Settlement Roll) and who meet the applicable Indian blood requirement, if any, established by the Yurok Tribe, but whose parents may have elected the option of section 6(d) will nevertheless be favorably considered for enrollment in the Yurok Tribe although their parents may not be members of the Yurok Tribe. The Committee is concerned that an injustice will occur if the Yurok Tribe prohibits the enrollment of children born after the date of enactment of this Act who possess the necessary blood quantum required by the Yurok Tribe's constitution, but whose parents elected the lump-sum option instead of enrollment in the Yurok Tribe.

It is not intended by this section that the Indian Reorganization Act shall provide the only means by which the Yurok Tribe may be organized. Nor does the Committee intend that the Constitution prepared by the drafting committee pursuant to subsection (e) is the only one upon which the Secretary may conduct an election in the future.

### SECTION 10—ECONOMIC DEVELOPMENT

The amendment added a new Section 10 directing that a plan for economic self-sufficiency for the Yurok Tribe be developed and submitted to Congress by the Secretary of the Interior, in conjunction with the Interim Council of the Yurok Tribe and the Yurok Transition Team, to determine the long-term needs of the Tribe. The Secretary is expected to seek the assistance and cooperation of the secretaries of Health and Human Services and other federal agencies. The Committee is aware that the Yurok Tribe has not received the majority of services provided to other federally recognized tribes. As a result, it lacks adequate housing and many of the facilities, utilities, roads and other infrastructure necessary for a developing community. In addition, the Committee is aware that many of the road, realty and fisheries management services on the "Addition' have been provided in the past by the Hoopa Valley Tribe. The Committee is, therefore, concerned about how the Bureau of Indian Affairs plans to address these needs, and directs the Secretary to work with the Yurok Tribe to develop proposed solutions to these

and other related problems. The Committee is specifically interested in the feasibility and cost of constructing a road from U.S. Highway 101 to California Highway 96. It is also concerned that the Department of the Interior does not currently have adequate land records and surveys of the "Addition". The Committee, therefore, expects that the Department will conduct all necessary surveys to ascertain the legal status of such lands. It also expects the plan to address such things as the number of additional federal employees required to service the Yurok Tribe and placement of the Tribe's facilities construction needs on the BIA, IHS, and other federal agency construction priority lists. The Committee wishes to clarify, however, that the development of this plan should in no way delay the provision of services to the Yurok Tribe and/or the construction of federal and tribal facilities.

### SECTION 11—SPECIAL CONSIDERATIONS

This section was designated Section 10 in S. 2723, as introduced.

Subsection (a) provides that the 20-acre land assignment on the Hoopa Valley Reservation made by the BIA in 1947 to the Smokers family shall continue in effect and may pass by descent or devise to relatives of one-fourth or more Indian blood of members domiciled on the assignment as of the date of enactment.

Subsection (b) provides that within 90 days after enactment, the Secretary shall conduct elections for the Resighini, Trinidad, and Big Lagoon, Rancherias concerning merger with the Yurok Tribe. If a majority of those voting approves, the Rancherias should fully merge their lands, assets and membership with the Yurok Tribe. The Secretary is to publish in the Federal Register notice of the effective date of any such merger. The Committee deleted reference to Blue Lake, Smith River, Elk Valley, and Tolowa Rancherias on the grounds that these rancherias are not historically of Yurok origin. A new subsection (c) was added to provide protection for existing property rights.

### SECTION 12—KLAMATH RIVER BASIN FISHERIES TASK FORCE

Subsection (a) amends the Act of October 27, 1986, establishing the Klamath River Basin Fisheries Task Force, by providing for a representative of the Yurok and of the Karuk Tribes on such task force. The Secretary is to appoint the first Yurok representatives who will serve until the Yurok Tribe is organized and appoints its own representative.

Subsection (b) provides that the term of the initial Yurok and Karuk members appointed shall be for that time remaining on the terms of existing task force members and, thereafter, as provided by the provisions of the 1986 Act.

### SECTION 13—TRIBAL TIMBER SALES PROCEEDS USE

Section 11 amends section 7 of the Act of June 25, 1910 (25 U.S.C. 407) by making clear that timber sales proceeds from Indian reservations shall be used only for the benefit of the tribe or tribes located on such reservations and their members.

In the *Short* case, the Circuit Court interpreted section 407, as applicable to the facts and circumstances of that case, in a manner

which could cause mischief if applied to other Indian tribes and other facts and circumstances. The amendment simply makes clear that revenue from tribal timber resources are to be used solely for the tribes located on such reservation and, through such tribes, their members.

SECTION 14—LIMITATIONS OF ACTIONS; WAIVER OF CLAIMS

A statute of limitations is very necessary to avoid uncertainty about the possible applicability of 28 U.S.C. §§ 2501 (six years), 2409a (12 years) and *County of Oneida* v. *Oneida Indian Nation,* 470 U.S. 226 (1985) (no statute of limitation). The Committee finds that the periods provided in this section are reasonable under the circumstances. Further, the limitations here are rationally related to fulfillment of Congress' unique obligation to Indian tribes and individuals. E.g., *Littlewolf* v. *Hodel,* 681 F. Supp. 929 (D.D.C. 1988).

Subsection (a) provides that any claim challenging the constitutionally of this Act as a taking under the 5th Amendment of the Constitution shall be brought in the United States Claims Court under sections 1491 and 1505 of title 28, United States Code.

Subsection (b), paragraph (1), provides that any such suit by an individual, entity, or tribe other than the Hoopa Valley or Yurok Tribes, shall be barred unless brought within 210 days of the date of partition of the joint reservation or 120 days after the date for the election of options as established by section 6(a)(3), whichever is later.

Paragraph (2) provides that any such claim by the Hoopa Valley Tribe must be brought within 180 days of enactment or be barred.

Paragraph (3) provides that any such claim by the Yurok Tribe must be brought within 180 days of the date of the general council meeting under section 9(c)(2)(A) or be barred.

Again, the Committee reiterates its conclusion that no individual or tribe has a vested, constitutionally protected right in the lands and resources of the joint reservation. The statute of limitations in this subsection are simply included to bring about some certainty and out of an abundance of caution.

Subsection (c) provides that the Secretary shall make a report to the Congress on any final judgment in any litigation brought pursuant to this section together with any recommendations deemed necessary. New language was added by the Committee to provide for a stay of payment of any judgment that might be rendered against the United States, in order to provide time for the Department to provide Congress with a report.

SECTION 15—HEALTH ISSUES

A new Section 15 was added to provide for clean up of dump sites on the newly established Yurok Reservation. The Secretary of Health and Human Services and the Secretary of the Interior are directed to enter into a memorandum of understanding with Humboldt County for the clean up and maintenance of these sites. Costs are estimated at approximately $40,000 for the clean up and $8,000 per year for maintenance.

## COST AND BUDGETARY CONSIDERATIONS

The authorization levels and purposes for which funds may be expended set forth in S. 2723 are identical to the companion bill, H.R. 4469, reported out of the House Committee on Interior and Insular Affairs on August 10, 1988. The cost estimate for H.R. 4469, and thus S. 2723, are set forth below:

### CONGRESSIONAL BUDGET OFFICE COST ESTIMATE

SEPTEMBER 9, 1988.

1. Bill number: H.R. 4469.
2. Bill title: Hoopa-Yurok Settlement Act.
3. Bill status: As amended and ordered reported by the House Committee on Interior and Insular Affairs, August 10, 1988.
4. Bill purpose: This bill would, if certain conditions are met, partition specified joint Indian reservation lands in northern California into the Hoopa Valley Reservation and the Yurok Reservation. It would also establish the Hoopa-Yurok Settlement Fund, and require the Secretary of the Interior to deposit into it escrow funds and interest earnings from designated trust accounts. The bill would require the Secretary to make distributions from the fund into trust accounts for the Hoopa Valley and Yurok tribes, and to make payments to eligible individuals electing certain tribal membership options. The bill authorizes the appropriation of $10 million to be deposited into the Settlement Fund for the purpose of making lump-sum payments to such individuals.

The bill would also require the Secretary of the Interior to administer the partitioning of the lands and the two tribes. This responsibility would include specifying the reservation lands and boundaries, preparing an eligibility roll and final Settlement Roll, providing for the election of a settlement option by those on the Settlement Roll and establishing them as tribal members, organizing a general council meeting of the Yurok Tribe, and providing for the election of an Interim Council for that tribe. The bill permits the Secretary to use up to $5 million of Bureau of Indian Affairs (BIA) funds to acquire lands or interest in lands for the Yurok Tribe or its members.

5. Estimated Cost to the Federal Government:

[By fiscal year, in millions of dollars]

| | 1989 | 1990 | 1991 | 1992 | 1993 |
|---|---|---|---|---|---|
| Estimated authorization level | 10 | (1) | | | |
| Estimated outlays | (1) | 10 | | | |

[1] Less than $500,000.

The costs of this bill fall within budget function 450.

*Basis of Estimate*

The estimated costs of this bill reflect the authorization and distribution of $10 million for lump-sum payments of $20,000 each to eligible individuals choosing not to become members of either the Hoopa Valley or Yurok Tribes. Based on information provided by

the BIA, the number of individuals expected to choose this option is at least 500, the number that would exhaust $10 million authorization.

Additional lump-sum and other payments required under this bill would come out of the Settlement Fund, which would have a balance of more than $50 million. The Settlement Fund money is currently being held in escrow and, in the absence of legislation, would be available for distribution upon resolution of a pending court claims. The estimate assumes that the bill would not significantly affect the timing or amount of spending of the amounts currently held in escrow relative to current law.

The administrative task associated with partitioning the reservation and the tribes are estimated to result in additional costs of approximately $500,000 in the first two fiscal years after enactment. We estimate no additional costs for land acquisition, based on information provided by the BIA that the agency would not exercise the authority provided in the bill for such activity. Other provisions of the bill are not expected to result in significant additional cost.

6. Estimated cost to State and local governments: None.
7. Estimated comparison: None.
8. Previous CBO estimate: None.
9. Estimate prepared by: Carol Cohen.
10. Estimate approved by: C.G. Nuckols (for James L. Blum, Assistant Director for Budget Analysis).

## Regulatory Impact Statement

Paragraph 11(b) of rule XXVI of the Standing Rules of the Senate requires each report accompanying a bill to evaluate the regulatory and paperwork impact that would be incurred in carrying out the bill. The Committee believes that S. 2723, as amended, will have a minimal impact on regulatory or paperwork requirements.

## Executive Communications

The Committee received the following statements from the Department of the Interior and the Department of Justice at its hearing on September 14, 1988:

### Statement of Ross O. Swimmer, Assistant Secretary for Indian Affairs, Department of the Interior

Good morning Mr. Chairman and members of the Committee. I am pleased to be here today to discuss S. 2723, a bill "To partition certain reservation lands between the Hoopa Valley Tribe and the Yurok Indians, to clarify the use of tribal timber proceeds, and for other purposes."

We object to enactment of S. 2723 unless it is amended to meet our concerns, especially with regard to the deletion of an unjustified Federal contribution of $15 million, we would recommend that the President veto the bill.

Since the 1950's there has been a dispute among the Indians of the Hoopa Valley Reservation in Northern California as to who is

entitled to share in the timber proceeds from the "Square" portion of that Reservation. (The Square is in Hoopa Valley, and the "Extension" follows the Klamath River to the Pacific.) Following a 1958 opinion of the Solicitor's Office that the Hoopa Valley Tribe was entitled to receive all the timber income, individual Indians, now numbering some 3800 of Yurok and other tribal groups, brought suit in 1963 for damages for their exclusion from shares in the income (*Jessie Short, et al.* v. *United States,* No. 102-63, United States Claims Court). The Yurok Tribe has never organized itself as a political or corporate entity, and thus has no spokesmen or official representatives.

At the time the litigation was begun, the Square was treated as a separate reservation from the Extension. In 1973, the Court of Claims held that there was but a single reservation. Subsequently, the Court ruled that all the "Indians of the Reservation" are entitled to participate in per capita distributions of the income from the timber on the unallotted (tribal) lands of the Square. From 1974-1978 efforts were made to determine the identity of the "Indians of the Reservation" and to mediate a settlement.

In 1979, the Government moved to substitute the Yurok Tribe for the 3800 individual plaintiffs, and the Hoopa Valley Tribe, as intervenor, moved to dismiss the case. In 1981, the Court of Claims denied the motions and ruled that successful plaintiffs would be determined on standards similar to the standards for membership in the Hoopa Valley Tribe. The Federal Circuit Court of Appeals affirmed. The petitions for certiorari filed by the Hoopa Valley Tribe and 1200 of the plaintiffs, the third unsuccessful effort to obtain certiorari in the case, were denied by the Supreme Court on June 19, 1984.

In 1980 another suit was filed (*Lillian Blake Puzz, et al.* v. *United States et al.*, No. C-80-2908 TEH, U.S.D.C., N.D. California) by six individuals claiming to be Indians of the Hoopa Valley Indian Reservation whose rights to participate in reservation administration and to benefit from the reservation's resources were allegedly denied by the Federal Government in violation of their constitutional rights to equal protection.

Plaintiffs' claims were initially premised on individual Indian ownership of the unallotted reservation resources, although they later also asserted that all "Indians of the Reservation" constituted one tribe, and that all individual Indians should have a vote in that tribe's government. The Government's position was that the reservation was created for Indian tribes, not individual Indians, and that the recognition of Indian tribes is a political question for determination by the Congress and the Executive Branch and such determinations are not reviewable by the courts.

On April 8, 1988, the court issued an order in which Judge Henderson agreed with the Government that the reservation was created for Indian tribes except that the Hoopa Valley Reservation was not created for a single tribe but for "all tribes which were living there and could be induced to live there." Order at p. 7. The court concluded that Federal recognition of the Hoopa Tribe did not give the tribe exclusive control over any reservation lands and resources.

The court also found that the individual plaintiffs have standing to litigate reservation management issues and that the 1864 statute authorizing the creation of the reservation imposed a trust responsibility on the U.S. Government extending to all the Indians of the Reservation.

Having addressed these issues the court ordered three specific actions:

1. The Federal defendants may lawfully allow the Hoopa Business Council (HBC) to participate in reservation administration, and the HBC may lawfully conduct business as a tribal body sovereign over its own members, and, as an advisory body, participate in reservation administration;

2. Federal defendants shall not dispense funds for any project or services that do not benefit all Indians of the reservation in a nondiscriminatory manner. Federal defendants shall exercise supervisory power over reservation administration, resource management, and spending of reservation funds, to ensure that all Indians receive the use and benefits of the reservation on an equal basis. Specifically, Federal defendants shall not permit any reservation funds to be used for litigation among Indians or tribes of the reservation.

3. To fulfill the requirements of this Order, Federal defendants must develop and implement a process to receive and respond to the needs and views of non-Hoopa Valley tribal members as to the proper use of reservation resources and funds.

On June 7, 1988, we submitted to the court a plan of operation for the management of the Hoopa Valley Reservation resources, as required by the court's April 8, 1988 order. On September 2, 1988 the court denied plaintiffs' motion to strike the plan, although it emphasized that the issues raised in that motion would have to be addressed if this legislation is not enacted and the court is left with the task of approving a final long-term plan for the management of the reservation.

Obviously, the District Court's orders are changing the management of the reservation and its resources. However, we do not believe that they provide the appropriate vehicle for a satisfactory permanent resolution to all the problems on the Hoopa Valley Indian Reservation. We believe that partitioning the communal reservation and encouraging the Yuroks to organize as a tribe would lead to more satisfactory results.

Now I would like to address our major concerns regarding S. 2723. I have attached our technical concerns to my written statement.

S. 2723 partitions the Hoopa Valley Reservation only if the Hoopa Valley tribe passes a resolution waiving any claims they may have against the United States arising out of the provisions of the Act. The resolution must be presented to the Secretary within 60 days of enactment of the Act. The Secretary then publishes the resolution in the Federal Register and the existing communal reservation becomes two reservations. The "square" would become the Hoopa Valley Reservation and the "extension" would become the Yurok Reservation. Additional forest service land would be added to the Yurok Reservation and an authorization of $5 million would be provided for the purchase of additional land for the Yurok Reservation.

We do not believe that expanding the reservation is necessary at this time and strongly oppose the addition of Federal money for this purpose. Currently, there are approximately 400 Yuroks living on the "Extension" which includes 5,373.9 acres (including tribal land and allotments). We recommend that this provision be deleted.

Upon enactment of the act, the existing $50 million communal escrow account is to become the basis of a settlement fund. An additional $10 million is authorized to be appropriated to add to the fund. We do not believe the settlement fund should be established until the communal reservation is partitioned. Further, we believe that the bill should not become effective (except for section 12) until the Hoopa Valley Tribe adopts and sends to the Secretary, the resolution called for in section 2(a).

We strongly oppose the addition of Federal money to this fund and believe that the distribution of the fund should be used for making the payments under section 6 and giving any remaining funds to the Yurok Tribe. The partition of the communal reservation and the commual escrow account should not require the addition of Federal funds. If the amount in the escrow fund is not sufficient, we believe the per capita amounts available to individuals under the bill should be changed so that the escrow funds cover those payments. We believe the bill should be amended to specify that if adequate funds are not available in the Settlement fund to make the payments, such payments shall be pro-rated accordingly. Any funds remaining in the Settlement Fund after all payments have been made or provided for, should be held in trust for the Yurok Tribe.

The Secretary is to prepare a settlement roll of all persons who can meet the criteria established by the Federal court in the *Short* case for qualification as an "Indian of the Reservation". The Secretary is to provide each eligible person the opportunity to choose one of the following options: 1) become a member of the Hoopa Valley Tribe (if appropriate criteria are met); 2) become a member of the Yurok Tribe and receive a $3000 payment; or 3) elect to receive a payment of $20,000 and give up all rights to the reservation and all rights to membership in the Yurok Tribe.

Parents and guardians of children on the Settlement Roll under the age of 18 would choose an option for their child.

Although we do not object to the provision allowing parents or guardians making the choice for minor children, we believe that the children's payments should be held in trust until they reach age 18. The Settlement Fund could remain in effect and draw interest until each minor reaches age 18 and receives their payments.

We further recommend that the Settlement Roll be established as of the date of the partition of the communal reservation rather than as of the date of enactment of the Act. This could assure that the roll would include all persons having an appropriate interest at the time of the partition. Anyone born after the partition would of course, not have an interest in the previous single communal reservation.

Section 9 provides for the organization of the Yurok Tribe under the Indian Reorganization Act. Within 45 days of the official notice

the Secretary shall convene a general council meeting of the eligible voters of the Yurok Tribe. The General Council would vote on the adoption of a resolution waiving any claim the Tribe may have against the United States arising out of the provisions of this Act and to nominate candidates for an interim council. The general council would elect an Interim Council to represent the tribe until a constitution and tribal council are in place, or for 2 years, which ever is the shorter period. The Interim Council would appoint a drafting committee to draft a tribal constitution and request the Secretary to authorize an election to vote on the constitution.

The time required for the Secretary to provide notice, call general council meetings, and hold elections is unreasonable. The Bureau would not be able to meet such requirements. Amended requirements are included in our technical amendments attached to my written statement.

We would also commend that the tribe be required to have a constitution and an elected tribal council before they enter into contracts or receive grants from the Federal Government. Under the bill the Interim Council could enter into a contract and then after two years the council would be dissolved. We do not believe this is either good management or fair to the tribal members who my receive services under the contract.

Section 13 provides for statute of limitations for any claim brought against the United States challenging the partition of the communal reservation under this act. We defer to the Department of Justice on these provision.

Mr. Chairman, we urge the Committee to amend the bill to meet our concerns, particularly with respect to the appropriation authorization of $15 million. I have attached a number of technical concerns to my written statement.

This concludes my prepared statement. I will be pleased to answer any questions the Committee may have.

### RECOMMENDED AMENDMENTS TO S. 2723

Section 1(b)(7) defines Karuk Tribe as organized after a special election conducted by the United States Department of the Interior, Bureau of Indian Affairs. The Bureau of Indian Affairs did not hold a special election. We recommend the following amendment:

Section 1(b)(7) line 16 (page 3) after "constitution" delete "after a special election conducted by the United States Department of the Interior, Bureau of Indian Affairs" and change "April 18" to "Aprill 6".

Section 2(c)(3)(A) provides authority for the Secretary to take additional land into trust status for the Yurok Tribe. We recommend that the provision clarify that the land would be part of the Yurok Reservation. We recommend the following amendment:

Section 2(c)(3)(A) line 8 (page 7) add at the end "and that such lands may be declared to be part of the Yurok Reservation".

Section 4(a) establishes a Settlement Fund upon enactment of this act. We believe the fund should be established upon the partition of the reservation. We recommend the following amendment.

Section 4(a) line 8 (page 9) delete "enactment of this Act" and insert "the partition of the Hoopa Valley Reservation under section 2 of this act".

Section 4(a)(2) permits the Hoopa Valley Tribe to use up to $3.5 million annually out of the income or principal of the Settlement Fund for tribal, non-per capita purposes. We believe the Yurok Tribe should also be able to draw this account. We recommend that Sec. 4(a)(2) line 12 (page 9) be amended as follows:

> "(2) Until the distribution is made to the Hoopa Valley and Yurok Tribes under subsection (c), the Secretary may distribute to both tribes an amount not to exceed income and interest earned less 10 per cent for the current operating year out of the Settlement Fund. These funds may be used for tribal purposes and may not be distributed as per capita payments."

Section 4(b) on page 9, line 23 should be amended by striking out "pending" and inserting in lieu thereof "pending payments under section 6 and".

Section 4(c) line 3 (page 10) and 4(d) line 13 refer to the wrong paragraph. Section 6(a)(3) should be changed to "6(a)(4)".

Subsections (c), (d), and (e) of section 4 on page 10, line 1 through page 11, line 6 should be deleted.

Section 5 provides for the Secretary to establish a Settlement Roll of eligible persons living on the date of enactment of this Act. We recommend that the roll be established as of the date of the partition of the reservation to avoid any possible problems regarding the status of a person born between the time of enactment of the Act and the partitioning of the reservation. We also recommend that the Secretary be given more time to complete the necessary procedures for establishing the roll. The following amendments are recommended:

Section 5(a)(A) line 20 (page 11) change "of enactment of this Act" to "of the partition under section 6(a)".

Section 5(b) line 24 (page 11) change "thirty" to "one hundred and twenty".

Section 5(d) line 22 (page 11) change "one hundred and eighty days" to "two hundred and forty days".

Section 6 requires the Secretary to notify all eligible persons of the options available to them under the act. We believe it should be clear that each individual must choose one option. We also recommend that notice be given by certified mail rather than by registered mail. We recommend the following amendments:

Section 6(a) line 23 (page 13) change "registered" to "certified".

Section 6(a) line 1 (page 14) after "elect" insert "one of".

Section 6(a)(3) (page 14) should be amended to designate paragraph "(3)" as "(3)(A)" and add a new subparagraph "(B)" as follows:

> "(B) The funds entitled to such minors shall be held in trust by the Secretary until the minor reaches age 18. The Secretary shall notify and provide payment to such persons including all interest accrued."

Section 6(b) line 3 (page 15) "March 21" should be "March 31".

Section 6(b)(3) requires the Secretary to assign a blood quantum to persons electing to become enrolled members of the Hoopa Valley Tribe. We recommend the following clarifying amendment:

Section 6(b)(3) line 23 (page 15) should be amended to read: "The Secretary shall determine the quantum of "Indian blood" or "Hoopa Indian blood", if any, of each person enrolled in the Hoopa Valley Tribe under this subsection pursuant to the criteria established in the March 31, 1982 decision of the U.S. Court of Claims in the case of *Jessie Short et al.* v. *United States,* (Cl. Ct. No. 102–63)".

Section 6(c)(2) line 17 (page 16) should be amended for clarity and consistency with subsection (b)(3). After "shall" delete "assign each person that quantum of "Indian blood" as may be determined" and insert "determine the quantum of "Indian blood", if any,".

Section 6(c)(3) lines 22 and 23 (page 16) should be amended to read as follows:

"(c) The Secretary shall pay (subject to section 7 of the Act of October 19, 1973, as amended (25 U.S.C. 1407)) to each person".

Section 9 provides for a procedure for the organization of the Yurok Tribe. We believe an interim council should be elected for the primary purpose of drafting a constitution. The Secretary should provide services until the tribe has a constitution and an officially elected tribal council. We recommend the following amendments:

Section 9(c) line 10 (page 19) change "30" to "60".

Section 9(c)(3) line 12 (page 20) change "45" to "60".

Section 9(d)(2) line 6 (page 21) should be amended as follows:

> "(2) The Interim Council shall represent the tribe to assist the Secretary in determining the needs and appropriate programs for the tribe. The Council shall be responsible for determining appropriate use of the funds available to the tribe under section 4(a) of this act."

Delete paragraph "(3)" and renumber "(4)" as "(3)".

Renumber pararaph "(5)" as "(4)" and on line 1 (page 22) delete the words "or at the end of two years after such installation, whichever occurs first".

Section 10 allows the merger of existing Rancherias with the Yurok Tribe. There is no Tolowa Rancheria so that reference should be deleted. We also recommend that since the names listed in this section are names of Rancherias and not names of Tribes that the section be amended to reflect that difference.

Section 10(b) line 23 (page 22) should be amended to add "any of the following Rancherias at" after "members of". Delete "the" after the word "of".

Section 10(b) line 24 (page 23) after "Elk Valley" delete "or Tolowa Rancherias".

Section 11 provides for the addition of a member of the Karok and Yurok Tribes to the Klamath River Basin Fisheries Task Force.

The Secretary is to appoint the member for the Yurok Tribe until the Tribe is recognized. Since the tribe is already Federally recognized we recommend this provision be changed to refer to the tribe's organization.

Section 11(b) line 23 (page 23) delete "established and federally recognized" and insert "organized".

Section 11(b) line 2 (page 24) change "recognized" to "organized".

Add a new section 14 at the end of the bill as follows:

"Sec. 14. This Act (except sections 2(a) and 12) shall be effective upon partitioning of the reservation as provided in section 2(a). Sections 2(a) and 12 shall be effective upon enactment."

STATEMENT OF RODNEY R. PARKER, ASSOCIATE DEPUTY ATTORNEY GENERAL, U.S. DEPARTMENT OF JUSTICE

Mr. Chairman and Members of the Committee, on behalf of the Department of Justice, I am pleased to have this opportunity to present our views on S. 2723, legislation to partition reservation lands between the Hoopa Valley Tribe and the Yurok Indians, as introduced by Senator Cranston. This bill, which is identical to the amended version of H.R. 4469 introduced by Congressman Bosco, satisfies our litigation concerns. However, because of budgetary and other policy concerns, we defer to the Department of the Interior for the Administration's position on the bill.

In 1876, a 12-mile square tract of land in Northern California (the Square), occupied mainly by Hoopa Indians, was set aside by President Grant as the Hoopa Valley Indian Reservation. In 1891, President Harrison extended the boundaries of the Reservation to include the adjoining 1-mile wide strip of land on either side of the Klamath River (the Addition or Extension) which was occupied mostly by Yurok Indians.

Beginning in the 1950's, the Hoopa Valley Tribe, a federally recognized and organized tribe, began receiving proceeds from the harvesting of timber from the Square. Some of the proceeds from the timber harvests were distributed on a per capita basis to individual members of the Hoopa Valley Tribe. This prompted suits by other Indians who were not members of the tribe and thus did not receive per capita payments. *Short* v. *United States,* No. 102–63, Cl.Ct.; *Ackley* v. *United States,* No. 460–78, Cl.Ct.; *Aanstadt* v. *United States,* No. 146–85L, Cl.Ct.; *Giffen* v. *United States,* No. 746–85L, Cl.Ct.

In these cases, the United States Claims Court held, contrary to the government's position, that the Square and the Extension were a single reservation and that all Indians of the Reservation were entitled to share in a money judgment based on past distributions of individualized monies, i.e. the per capita payments. Since the initial ruling in 1973, efforts have been made to identify the qualified plaintiffs, to settle the litigation and to mediate the dispute which is focused on the conflicting positions of the organized Hoopa Valley Tribe and the federally recognized but not organized Yurok Tribe.

S. 2723 would provide for the partition of the Hoopa Valley reservation into two separate reservations, to be held in trust by the United States for the Hoopa Valley Tribe and the Yurok Tribe, respectively. The bill also provides for the establishment and distribution of a Settlement Fund for eligible individuals.

The Department of Justice has worked with Congressman Bosco's staff to draft legislation that satisfied our litigation concerns. S. 2723, which is identical to the amended version of H.R. 4469, would, in general, satisfy our litigation concerns.

We have, however, two remaining concerns with the bill. Our first concern is clarification that no Fifth Amendment taking is in-

tended by the sections providing for the contribution of tribal monies to the Settlement Fund. The bill already provides for a waiver of claims by the Hoopa Tribe and, under certain circumstances, the Yurok Tribe. While we understand the waiver language as already evidencing tribal consent, we think a provision requiring express tribal consent could provide a clearer acknowledgment by the tribal government that no taking has occurred. We therefore suggest that section 2(a)(2)(A) be changed to read as follows:

> (2)(A) The partition of the joint reservation as provided in this subsection shall not become effective unless, within 60 days after the date of the enactment of this Act, the Hoopa Valley Tribe shall adopt, and transmit to the Secretary, a tribal resolution:
>
> (i) waiving any claim such tribe may have against the United States arising out of the provisions of this Act, and
>
> *(ii) affirming tribal consent to the contribution of Hoopa Escrow monies to the Settlement Fund, and for their use as payments to the Yurok Tribe, and to individual Yuroks, as provided in this Act.*

We likewise suggest that section 9(c)(2)(A) be changed to read as follows:

> (A) the adoption of a resolution, by a vote of not less than two-thirds of the voters present and voting:
>
> (i) waiving any claim the Yurok Tribe may have against the United States arising out of the provision of this Act, and
>
> *(B) (ii) affirming tribal consent to the contribution of Yurok Escrow monies to the Settlement Fund, and for their use as payments to the Hoopa Tribe, and to individual Hoopa members, as provided in this Act.*

Our second concern involves section 13(c)(2) of the bill, which provides that, in the event of a judgment against the United States based on a Fifth Amendment taking, the Secretary of the Interior shall submit a report to Congress recommending possible Congressional modifications to the bill. Pursuant to this section, Congress could change the nature of the act that constituted a taking, and thus make payment for a permanent taking by the United States unnecessary. In order to ensure that payment is not made in the event that Congress takes action to make the payment unnecessary, we suggest that the following provisions be added to section 13(c)(2) of the Act:

> Notwithstanding the provisions of 28 U.S.C. 2517, any judgment entered against the United States shall not be paid for 180 days after the entry of judgment; and, if the Secretary of the Interior submits a report to Congress pursuant to this section, then payment shall be made no earlier than 120 days after submission of the report.

The bill's remaining provisions largely involve budget and policy matters and we defer to the Department of the Interior on them. I would be pleased to answer any questions you might have.

## CHANGES IN EXISTING LAW

In compliance with subsection 12 of Rule XXVI of the Standing Rules of the Senate, the Committee notes that changes in existing law made by the bill are shown as follows (existing law proposed to be omitted is enclosed in black brackets, new matter is printed in italic, and existing law in which no change is proposed is shown in roman):

### ACT OF JUNE 25, 1910, AS AMENDED

* * * * * * *

[SEC. 7. The timber on unallotted lands of any Indian reservation may be sold in accordance with the principles of sustained yield, or in order to convert the land to a more desirable use, under regulations to be prescribed by the Secretary of the Interior, and the proceeds from such sales, after deductions for administrative expenses pursuant to the Act of February 14, 1920, as amended (25 U.S.C. 413), shall be used for the benefit of Indians who are members of the tribe or tribes concerned in such manner as he may direct.]

*SEC. 7. Under regulations prescribed by the Secretary of the Interior, the timber on unallotted trust land in Indian reservations or on other land held in trust for tribes may be sold in accordance with the principles of sustained-yield management or to convert the land to a more desirable use. After deduction, if any, for administrative expenses under the Act of February 14, 1920 (41 Stat. 415; 25 U.S.C. 413), the proceeds of the sale shall be used—*

*(1) as determined by the governing bodies of the tribes concerned and approved by the Secretary or*

*(2) in the absense of such a governing body, as determined by the Secretary for the tribe concerned.*

* * * * * * *

### ACT OF OCTOBER 27, 1986

(100 Stat. 3086; 16 U.S.C. 460ss)

* * * * * * *

SEC. 4. KLAMATH RIVER BASIN FISHERIES TASK FORCE

* * * * * * *

(c) Membership and appointment. The Task Force is composed of [12] *14* members as follows:

* * * * * * *

*(11) A representative of the Karuk Tribe, who shall be appointed by the governing body of the tribe.*

*(12) A representative of the Yurok Tribe, who shall be appointed by the Secretary until such time as the Yurok Tribe is established and Federally recognized, upon which time the Yurok Tribe shall appoint such representative beginning with the first appointment ordinarily occurring after the Yurok Tribe is recognized. History Aboriginal Tribers and Lands of Northern California*

○