United States Department of the Interior
BUREAU OF INDIAN AFFAIRS
OFFICE OF TRUST FUNDS MANAGEMENT
505 MARQUETTE N.W. SUITE 700
ALBUQUERQUE, NEW MEXICO 87102

IN REPLY REFER TO:

AUG 22 1991

Memorandum

To: Area Director, Sacramento Area Office

From: Director, Office of Trust Funds Management

Subject: Distribution of funds awarded the Hoopas and Yuroks under the Hoopa-Yurok Settlement Act

Effective April 12, 1991, the distribution of the subject funds was made in accordance with Public Law 101-277 and in accordance with your request dated April 4, 1991.

The total value of the fund on April 12, 1991 was $85,979,348.37 derived in the following manner:

| | | |
|---|---|---|
| Fair Market Value of Investment Securities (Refer to Attachment I and II.) | | $74,339,997.14 |
| Cash-Unallotted Balance | | 139,351.23 |
| Add Back: | Hoopa Drawdowns | 10,000,000.00 |
| | Yurok Drawdowns | 1,500,000.00 |
| Total: | | $85,979,348.37 |

Hoopa's share of the fund was calculated using 39.55% as provided in you letter dated April 4, 1991.

| | |
|---|---|
| Total Value of Fund | $85,979,348.37 |
| | X .39552 |
| Hoopa's Share | $34,006,551.87 |
| Less Hoopa's Drawdowns | 10,000,000.00 |
| Less April 15, 1991 Drawdown | 9,880,000.00 |
| Balance Due Hoopa Tribe: | $14,126,551.87 |

08. 22. 91 04:14PM *B I A ALBUQ T F ACCT P02

The balance due was distributed using a percentage of 21.8679479 derived as follows:

| | |
|---|---|
| Total Value of Fund | $85,979,348.37 |
| Less Hoopa's Drawdowns | 19,880,000.00 |
| Less Yurok's Drawdowns | 1,500,000.00 |
| Balance of Fund to be Distributed: | $64,599,348.37 |

| | | |
|---|---|---|
| Hoopa's Share of Fund | $14,126,551.87 | = 0.218679479 |
| Value of Undistributed Fund | 64,599,348.37 | |

The 21.867947% was applied to each outstanding investment and recorded to Hoopa's appropriation account 7194.

The balance of the fund is Yurok's share which remained in appropriation account 7193.

Subsequent to the above distributions, an internal transfer was done effective August 1, 1991, to transfer $3,000,000.00 into an escrow account to compensate any potential appeal cases. The amounts contributed are $1,186,560.00 and $1,813,440.00 for the Hoopas and the Yuroks respectively. It is our understanding that both tribes agreed to this arrangement. A separate appropriation (J50 A64 7197) was established for this escrow account.

Trust Funds records in the BIA's Finance System are maintained on a cash basis, therefore, income earned but not yet collected by the BIA is not recorded. Only the actual cash transfers and the cost bases of respective investments are shown in the Summary of Trust Funds reports for the Hoopa Tribe.

If you have any questions, please contact Sarah Yepa at FTS 474-3875 or Commercial (505) 766-3875. If you have questions on the valuation of the securities, please contact Fred Kellerup at FTS 474-2975 or Commercial (505) 766-2975.

Jim R. Parris

Attachments

ATTACHMENT I

# INVESTED FUNDS IN TIMED CERTIFICATES OF DEPOSIT

## HOOPA-YUROK SETTLEMENT
## J50 501
## AS OF APRIL 12, 1991

| DATE | 7193 MATURING PRINCIPAL | 7193 ACCRUED INTEREST |
|---|---|---|
| 04/18/91 | 645,000.00 | 47,896.45 |
| 06/13/91 | 1,176,000.00 | 5,985,00 |
| 07/11/91 | 576,500.00 | 10,874.55 |
| 07/22/91 | 386,306.32 | 6,010.00 |
| 07/23/91 | 96,548.08 | 1,495.83 |
| 07/29/91 | 289,729.74 | 4,108.11 |
| 08/05/91 | 580,494.65 | 7,102.71 |
| 08/08/91 | 698,719.14 | 8,476.55 |
| 08/12/91 | 96,802.21 | 1,054.22 |
| 08/15/91 | 1,494,000.00 | 15,617.68 |
| 08/26/91 | 96,703.15 | 819.66 |
| 09/05/91 | 96,500.00 | 641.73 |
| 09/18/91 | 96,836.24 | 369.11 |
| 09/19/91 | 828,000.00 | 38,899.35 |
| 10/17/91 | 1,752,209.61 | 72,007.74 |
| 11/07/91 | 2,952,553.75 | 108,522.92 |
| 11/14/91 | 739,096.84 | 25,139.28 |
| 11/15/91 | 92,378.75 | 3,090.26 |
| 11/19/91 | 92,378.75 | 3,006.74 |
| 11/21/91 | 277,143.27 | 8,949.20 |
| 12/12/91 | 830,500.00 | 22,640.68 |
| 12/31/91 | 92,753.19 | 2,025.14 |
| 01/14/92 | 93,076.94 | 1,669.12 |
| 01/16/92 | 741,500.00 | 13,947.68 |
| 02/13/92 | 698,719.14 | 8,924.50 |
| 02/19/92 | 93,621.56 | 908.71 |
| 02/27/92 | 1,868,000.00 | 17,224.96 |
| 03/03/92 | 93,294.03 | 716.53 |
| 03/12/92 | 279,500.00 | 1,871.67 |
| TOTAL: | 17,854,865.36 | 439,996.08 |

ATTACHMENT II

VALUATION OF GOVERNMENT SECURITIES
AS OF APRIL 12, 1991

| G.S. | 7193 MARKET VALUE | 7193 ACCRUED INTEREST |
|---|---|---|
| 02/15/92 | 5,013,812.50 | 51,243.09 |
| 07/25/91 | 5,489,848.71 | 87,710.00 |
| 08/26/91 | 1,459,409.71 | 20,334.96 |
| 04/01/91 | 5,118,125.00 | 15,812.50 |
| 08/15/96 | 5,104,687.50 | 66,895.83 |
| 08/15/96 | 5,104,687.50 | 66,895.83 |
| 09/26/91 | 2,007,429.16 | 36,216.67 |
| 12/20/91 | 1,976,828.13 | 35,414.38 |
| 06/01/91 | 1,340,040.97 | 13,590.68 |
| 09/06/91 | 2,205,383.01 | 0.00 |
| 12/27/91 | 1,298,528.90 | 0.00 |
| 01/15/92 | 2,143,234.58 | 0.00 |
| 01/15/92 | 2,374,293.75 | 0.00 |
| 07/15/92 | 3,096,890.21 | 0.00 |
| 08/15/97 | 5,126,585.51 | 0.00 |
| 11/15/91 | 2,057,570.53 | 0.00 |
| 11/15/91 | 1,930,533.34 | 0.00 |
| 05/15/91 | 2,803,132.75 | 0.00 |
| TOTAL: | 55,651,021.76 | 394,113.94 |

SUMMARY:

| | PRINCIPAL | ACCRUED INTEREST | TOTAL |
|---|---|---|---|
| SUB-TOTAL CD'S | $17,854,865.36 | $439,996.08 | $18,294,861.44 |
| SUB-TOTAL GOVT. SEC. | 55,651,021.76 | 394,113.94 | 56,045,135.70 |
| TOTAL FUND: | $73,505,887.12 | $834,110.02 | $74,339,997.14 |

08 '22 '91 04:14PM *B I A ALBUQ T F ACCT P05

# United States Department of the Interior

BUREAU OF INDIAN AFFAIRS
Washington, D.C. 20240

OCT 24 1991

IN REPLY REFER TO:

Memorandum

To: Superintendent, Northern California Agency

Through: Sacramento Area Director

From: Acting Director, Office of Tribal Services

Subject: Issuance of Per Capita Checks from the Hoopa-Yurok Settlement Act Funds

Judge Royce C. Lamberth, in the case of Heller, Ehrman, White & McAuliffe, *et al.* v. Hon. Manuel Lujan, Jr., Civil Action No. 91-2012 signed an order on October 2, 1991, staying his order of payment of attorneys' fees pending consideration for appeal and pending appeal. This order permits the Secretary to withhold the contested amounts from per capita payments to be made under the Hoopa - Yurok Settlement Act. The amount withheld will be maintained in the Settlement Fund as ordered by the Court on October 2, 1991. The withheld funds will continue to be invested in accordance with 25 U.S.C. §162(a) with interest earned for the benefit of the ultimate payee.

The Superintendent, Northern California Agency is instructed to proceed to reprocess the per capita payment to the eligible recipients using the following categories:

1. Jessie Short plaintiffs involved in Jessie Short, *et al.* v. United States (Cl. Ct. No. 102-63) are to have 6.5 percent withheld from the amount due them. Determination of who are Jessie Short plaintiffs is to be made from the list supplied by the attorneys in the Jessie Short case. (see attached)

2. Eligible recipients who are not represented in Cl. Ct. No 102-63 and who are represented in cases Charlene Ackley v. United States (Cl. Ct. No. 460-78); Bret Aanstadt v. United States, (Cl. Ct. No. 146-85L); and Norman Giffen v. United States, (Cl. Ct. No. 746-85L) are not to have any amounts withheld as the Jessie Short attorneys make no claims against them.

3. All other eligible recipients are to have 25 percent withheld from their amount due.

Since the Jessie Short attorneys realize that the Settlement Fund included funds that their firms are not entitled to assess, a joint motion to modify the final judgment was filed and in response the judge has ordered certain funds excluded. Only those funds in 25 U.S.C. §1300i (b) (1) (A) and (B) and a portion of one of the funds, 25 U.S.C. § 1300i (b) (1) (F) is to be assessed. Therefore, before the 6.5 percent or 25 percent is calculated for each eligible individual, the proportional amounts from the accounts identified in 25 U.S.C. § 1300i (b) (1) (C), (D), (E), and (G) and that portion of 25 U.S.C. § 1300i (b) (1) (F) that is agreed to by the Department of Justice and the Jessie Short attorneys are to be excluded and not used in the calculation of the amount which is to be withheld from each eligible recipient.

The procedure is first to determine the total amount of the escrow funds at the date of the creation of the Settlement Act Fund account. (see attachment) Based on the information provided by your office this amount was $66,625,800.39. Then the total amount of the excluded moneys is to be determined. These moneys include the following: Proceeds of Klamath River Reservation, J52-562-7056, $75,616.41; Proceeds of Labor -Yurok Indians of Lower Klamath River, J52-562-7153, $16,626.36; Proceeds of Labor-Yurok Indians of Upper Klamath River, J52-562-7154, $218,837.02; and Klamath River Fisheries, No. 5628000001/Fish, $458,705.18.

Funds in Proceeds of Labor-Hoopa Reservation for Hoopa Valley and Yurok Tribes, Hoopa Yurok Settlement Act designation I.b.I.F, J52-575-7256, $14,344,254.75, are derived from both Hoopa as well as Yurok resources. It is necessary to determine the Yurok share of this account. The total amount in this fund is to be multiplied by one half of one percent, the figure which your office determined as the appropriate Yurok share.

The excluded funds are then totaled and equal, $841,505.97. The percentage of these funds is then calculated by dividing the total amount included in the Settlement Act and this amounts to 1.26303 percent. This amount is not subject to the 6.5 percent or 25 percent lien.

Using this percentage the amount to be excluded from the assessment is to be calculated for the $5000, $7500, or $15,000 that was to be paid to the qualified individuals on the Settlement Roll and, pursuant to §1300i3(d) of the Settlement Act, to the Yurok Tribe.

/S/ CAROL A. BACON

Attachment

cc: Sacramento Area Director

Surname/SOL/400 RF/Chronv-440A/Holdup

**CALCULATION OF YUROK PER CAPITA PAYMENTS**

1. Total Funds at time of creation of Settlement Fund Account
$66,625,800.39

2 Total Funds derived from Klamath River portion (see below) $841,505.97

3. Percentage of funds derived from Klamath River portion: .0126303

$$\frac{841,506}{66,625,800} = .0126303$$

4: Examples of the amount on which attorney fees are to be calculated

$15,000 - (.0126303 x 15,000) = 14,810.55
$7,500 - (.0126303 x 7,500) = 7,404.27
$5,000 - (.0126303 x 5,000) = 4,936.85

5. Examples of the calculation for the amounts to be withheld from each payment and the amount of payment for the recipient.

For $15,000: Amount withheld Payment to recipient

$15,000 - (.25 x 14,810.55 = 3702.64) = $11,297.36
$15,000 - (.065 x 14,810.55 = 962.69) = $14,037.31

For $7,500:

$7,500 - (.25 x 7,405.27 = 1851.32) = $5,648.68
$7,500 - (.065 x 7,405.27 = 481.34) = $7,018.66

For $5,000

$5,000 - (.25 x 4936.85 = 1234.21) = $3,765.79
$5,000 - (.065 x 4936.85 = 320.90) = $4679.10

---

Funds used in calculating Klamath River Funds

| | | |
|---|---|---|
| C | Proceeds of Klamath River Reservation | 75,616.41 |
| D | Proceeds of Labor (Lower Klamath) | 16,626.36 |
| E | Proceeds of Labor (Upper Klamath) | 218,837.02 |
| G | Klamath River Fisheries | 458,705.18 |
| F | Proceeds of Labor (Hoopa and Yurok) ($14,344,254.75 x .005 ) = | 71,721.00 |
| TOTAL | | $841,505.97 |

United States Department of the Interior

TAKE PRIDE IN AMERICA

OFFICE OF THE SOLICITOR
WASHINGTON, D.C. 20240

FEB 3 1992

In reply, please address to:
Main Interior, Room 6456

BIA.IA.1154

RE[illegible]
FEB 24 1992
HOOPA/YUROK

Memorandum

To: Area Director, Sacramento Area Office

Through: Director, Office of Tribal Services

From: Assistant Solicitor, Branch of General Indian Legal Activities

Subject: Issues raised at organizational meeting of the Yurok Interim Council held November 25, 26, 1991

This is in response to your informal request for an opinion on a number of issues relating to the interpretation of certain provisions of the Hoopa Yurok Settlement Act, Pub. L. 100-580, 102 Stat. 2924, 25 U.S.C. §§ 1300i et seq. These issues were raised at the organizational meeting of the Interim Council of the Yurok Tribe held in Arcata, California, November 25 and 26, 1991. They are as follows: 1) When does the dissolution of the Interim Council occur under 25 U.S.C. § 1300i-8(d)(5). 2) Whether 25 U.S.C. § 1300i-8(d)(2) requires a single resolution waiving claims against the United States, affirming tribal consent to contribution of Yurok Escrow monies to the Settlement Fund, and authorizing the Interim Council to receive grants and enter into contracts for Federal programs. 3) What are the consequences of refusing to enact a resolution waiving claims against the United States and/or filing a claim under 25 U.S.C. § 1300i-11(a) on the Yurok Tribe's ability to organize or form a government. 4) Whether a tribal resolution waiving claims against the United States is required for purposes of conferring the benefits specified in 25 U.S.C. § 1300i-1(c)(4) notwithstanding the expiration of the statute of limitations in 25 U.S.C. § 1300i-11(b)(3). 5) Whether individuals who receive and cash the payment authorized under the Yurok tribal membership option in 25 U.S.C. § 1300i-5(c) are precluded from filing claims against the United States arising out of the provisions of the Settlement Act. We address these issues seriatim.

1. Dissolution of the Interim Council of the Yurok Tribe

Section 9(d)(5) of the Settlement Act, 25 U.S.C. § 1300i-8(d)(5) provides as follows:

> The Interim Council shall be dissolved effective with the election and installation of the initial tribe governing body elected pursuant to the constitution adopted under subsection (e) of this section or at the end of two years after such installation, whichever occurs first.

The structure of this subsection is confusing because the words "such installation" would normally be construed to refer to the installation of the initial tribe governing body. However, to so construe this subsection makes the words "whichever occurs first" meaningless. It is clear from the legislative history that Congress intended the Interim Council to be dissolved with the installation of the initial tribal governing body, or at the end of two years after the installation of the Interim Council, whichever occurs first. As stated in the Senate Report accompanying the legislation:

> Paragraph (5) provides that the Interim Council shall be dissolved upon election of the initial governing body under such constitution when adopted or at the end of two years after their installation, whichever occurs first. S. Rep. 100-564, 100th Cong., 2d Sess. (September 30, 1988) at 27-28.

Therefore, it is clear that the Interim Council's lifespan is two years from the date of its installation on November 25, 1991, unless a tribal governing body is elected before the expiration of the two-year period, whereupon the Interim Council would be dissolved following such election. If a tribal governing body is not elected within this two-year period, the Interim Council would still be dissolved at the end of the two-year period.

2. <u>Number of Tribal Resolutions Required or Permitted under 25 U.S.C. § 1300i-8(d)(2)</u>

Section 9(d)(2) of the Settlement Act, 25 U.S.C. § 1300i-8(d)(2) provides as follows:

> The Interim Council shall have full authority to adopt a resolution:
> (i) waiving any claim the Yurok Tribe may have against the United States arising out of the provision of this subchapter, and
> (ii) affirming tribal consent to the contribution of Yurok Escrow monies to the Settlement Fund, and for their use as payments to the Hoopa Tribe, and to individual Hoopa members, as provided in this subchapter, and
> (iii) to receive grants from, and enter into contracts for, Federal programs, including those administered by the Secretary and the Secretary of Health and Human Services, with respect to Federal services and benefits for the tribe and its members.

It is our understanding that at the organizational meeting held November 25 and 26, 1991, the Bureau of Indian Affairs (BIA) indicated that it did not want to restrict the Interim Council by requiring a single resolution addressing all three concerns, and preferred a more permissive interpretation of this subsection if possible. The section-by-section analysis of the Senate Report, S. Rep. 100-564, states the following with respect to this subsection:

> Paragraph (2) provides that the Council shall have full authority to secure the benefits of Federal programs for the tribe and its members, including those administered by the Secretary of the Interior and the Secretary of Health and Human Services and shall have authority to execute the necessary waiver of claims against the United States, and consent to allocation of the escrow funds to the Settlement Fund. Id. at 27.

We believe that the Senate Report language indicates that it is unlikely that Congress intended to tie the award of federal contracts and grants to either the waiver of claims or the contribution of escrow funds. Therefore, we conclude that the statutory language does not preclude the BIA from construing this subsection to permit the Interim Council to enact three separate resolutions at different times.[1]

3. Consequences of Refusing to Pass a Resolution Waiving Claims Against the United States and/or Filing a Claim under 25 U.S.C. § 1300i-11(a) on the Yurok Tribe's Ability to Organize

Section 2(c)(4) of the Settlement Act, 25 U.S.C. § 1300i-1(c)(4) provides as follows:

> The --
> (A) apportionment of funds to the Yurok Tribe as provided in sections 1300i-3 and 1300i-6 of this title;
> (B) the land transfers pursuant to paragraph (2);
> (C) the land acquisition authorities in paragraph (3); and
> (D) the organizational authorities of section 1300i-8 of this title shall not be effective unless and until the Interim Council of the Yurok Tribe has adopted a resolution waiving any claim such tribe may have against the United States arising out of the provisions of this subchapter.

---

[1] Although the statutory language could conceivably be interpreted so as to reach the opposite conclusion, the courts have consistently resolved statutory ambiguities in favor of the Indians, following a traditional canon of construction applicable in Indian law. See Montana v. Blackfeet Tribe, 471 U.S. 759, 766 (1985).

It is clear that should the Interim Council file a claim in the U.S. Claims Court on behalf of the Yurok Tribe pursuant to 25 U.S.C. § 1300i-11(a), the same consequences would follow as if it fails to enact a resolution waiving claims under 25 U.S.C. § 1300i-1(c)(4).

We do not believe that the Settlement Act precludes the Yurok Tribe from having a government if it refuses to waive claims against the United States. The Yurok Tribe's failure to waive claims only affects its authority to organize under the Indian Reorganization Act of 1934 (IRA), 48 Stat. 984, 25 U.S.C. § 461 et seq., pursuant to 25 U.S.C. § 1300i-8. Such an option would be foreclosed without the Settlement Act's specific authorization. Indian tribes, however, are free to form tribal governments independently of the IRA which only provides a certain mechanism for organization, and there are numerous federally recognized Indian tribes presently organized outside of the IRA. See Kerr-McGee Corp. v. Navajo Tribe of Indians, 471 U.S. 195 (1985). The legislative history supports our interpretation of this provision of the Settlement Act. The Senate Report states the following with respect to the Yurok Tribe's decision to organize under 25 U.S.C. § 1300i-8:

> It is not intended by this section that the Indian Reorganization Act shall provide the only means by which the Yurok Tribe may be organized. Nor does the Committee intend that the Constitution prepared by the drafting committee pursuant to subsection (e) is the only one upon which the Secretary may conduct an election in the future. S. Rep. 100-564, supra, at 28.

Therefore, it is our conclusion that the Yurok Tribe's failure to enact a resolution waiving claims against the United States does not prevent the tribe from having a tribal government. Clearly, the Settlement Act neither limits the Yurok Tribe to a single organizational method, nor does it compel the Yurok Tribe to organize under its authority.

4. The Requirement for a Tribal Resolution Waiving Claims against the United States Independently of the Statute of Limitations in 25 U.S.C. § 1300i-11(b)(3)

The Interim Council asked whether it would still be required to pass a tribal resolution waiving claims against the United States to obtain the benefits of §§ 2, 4, and 7 of the Settlement Act notwithstanding their failure to file a Fifth Amendment taking claim in the U.S. Claims Court before expiration of the statute of limitations. Their argument is that such a resolution would have become moot since any claim would be time-barred and no longer valid.

Although it is true that the Yurok Tribe's failure to file a timely claim against the United States in the U.S. Claims Court under the provisions of 25 U.S.C. § 1300i-11 may bar such a

claim, the statutory requirement for a tribal resolution waiving claims against the United States in 25 U.S.C. § 1300i-1(c)((4) is independent of the running of the statute of limitations. The statute simply does not authorize the Interim Council to dispense with the resolution requirement in order to be afforded the benefits conferred under specified sections of the Settlement Act for any reason, including the expiration of the statute of limitations in 25 U.S.C. § 1300i-11(b)(3). In addition, courts have held that a statute of limitations is subject to waiver, estoppel and equitable tolling under certain circumstances. See Jarrell v. United States Postal Service, 753 F.2d 1088, 1091 (D.C. Cir. 1985). Therefore, it is conceivable that the Yurok Tribe could file a claim against the United States in the U.S. Claims Court after the expiration of the § 1300i-11(b)(3) period on March 12, 1992, and argue that the court should allow the claim to be litigated notwithstanding the running of the limitations period. Under these circumstances, it would be imprudent to permit the fund transfers, land transfers, land acquisition authorities, and organizational authorities to become effective without securing a waiver resolution from the Interim Council.

5. Effect of Cashing the Payment Authorized under the Yurok Tribal Membership Option on an Individual's Ability to File a Claim under 25 U.S.C. § 1300i-11(a)

It is our position that those individuals who affirmatively elected the Yurok tribal membership option, 25 U.S.C. § 1300i-5(c), effectively waived their right to file a claim under 25 U.S.C. § 1300i-11(a). Thus, their cashing the check they received for the payment authorized under the Yurok tribal membership option has no significance with respect to their right to file a claim under 25 U.S.C. § 1300i-11(a). This conclusion is derived from the statutory language itself. Subsection 25 U.S.C.
§ 1300i-5(c)(4) provides as follows:

> Any person making an election under this subsection shall no longer have any right or interest whatsoever in the tribal, communal, or unallotted land, property, resources, or rights within, appertaining to, the Hoopa Valley Reservation or the Hoopa Valley Tribe or, except to the extent authorized by paragraph (3), in the Settlement Fund. Any such person shall also be deemed to have granted to members of the Interim Council established under section 1300i-8 of this title an irrevocable proxy directing them to approve a proposed resolution waiving any claim the Yurok Tribe may have against the United States arising out of the provisions of this subchapter, and granting tribal consent as provided in section 1300i-8(d)(2) of this title.

As stated in the Senate Report, S. Rep. 100-564, "[this paragraph ...[does] not contemplate that such persons now have any interest, but that, to the extent that they do, it will be automatically relinquished upon an election of one of the options." Id at 23-24.

However, any individual who did not choose an option within the authorized time limit, and who subsequently refuses to accept the payment by refusing to cash the check for it, will not be deemed to have given up any claim he or she may have as a result of the partition, and will have preserved his or her legal right to challenge the provisions of the Act. This interpretation of the Settlement Act is bolstered by the Senate Report language addressing this issue:

> The Committee believes it is important that no person on the Hoopa-Yurok Settlement Roll lose benefits and privileges flowing from Yurok tribal membership and connection with the Yurok Reservation by virtue of inadvertence, failure to receive actual notice, accident or other unforeseeable events. Accordingly, persons failing to act timely will be deemed to have elected Yurok tribal membership if they accept and cash the check representing the payment authorized by subsection (c).
>
> The Committee believes that acceptance of the payment also establishes the consensual release of rights that accompanies the election. On the other hand, one who fails or refuses to make an election and refuses to accept the payment authorized by subsection (c) may not be deemed to have granted a release or to have granted a proxy to the Yurok Interim Council. Thus, refusing to accept the payment is one method by which persons who do not wish to join the Yurok Tribe may avoid becoming members. S. Rep. 100-564, supra, at 23.

Thus, in order for a Yurok enrollee who made no election to avoid the preclusion of claims effect of the Yurok tribal membership option by default, refusal to accept the payment is critical.[2]

In a Notice published on May 17, 1991, in the Federal Register, 56 F.R. 22998, the BIA notified all potential claimants except the Hoopa Valley Tribe and the Yurok Tribe that claims under Section 14 of the Settlement Act, 25 U.S.C. § 1300i-11(a), must be filed by September 16, 1991. As of that date, there were two claims filed in the U.S. Claims Court. The first one was filed by the Karuk Tribe in Karuk Tribe of California v. U.S., No. 90-3993-L, U.S. Cl. Ct; and the second one was filed by 32 individuals as "members of, and on behalf of, an identifiable group of American Indians," in Ammon v. U.S., No. 91-1432 L,

---

[2] Mere receipt of the check is not enough to trigger the waiver of claims or grant a release or grant a proxy to the Yurok Interim Council. The check must be both accepted and cashed.

U.S. Cl. Ct. It follows from our interpretation of the relevant statutory provisions that any individual who accepts and cashes the check representing the payment authorized under 25 U.S.C. § 1300i-5(c) would be precluded from recovering under Ammon.[3]

Duard R. Barnes

---

[3]Under our analysis, those individuals who affirmatively selected the Yurok membership option are automatically barred from recovering under Ammon. Therefore, recovery under Ammon, if any, is limited to those individuals for whom the Yurok membership option was selected by default and who subsequently refuse to cash the authorized payment.

Testimony of Richard Haberman, Chairman
Interim Council of the Yurok Tribe
Eureka, California
March 5, 1992

The Yurok Tribe thanks the Committee for the support it has shown Yurok people over the past several years. As you are aware the so-called Hoopa-Yurok Settlement Act (P.L. 100-580), divided the former Hoopa Valley Indian Reservation between the Hoopa Tribe and the Yurok Tribe. This division provided Hoopa Tribe with approximately 95% of of the communal trust lands and economic assets of the former Hoopa Valley Reservation. The new Hoopa Reservation has approximately 80,000 acres of tribally held trust land containing approximately $850 million dollars of timber. The Yurok Reservation, upon waiver of tribal rights would have approximately 3000 acres of tribal trust lands containing approximately $45 million dollars worth of timber.

Although the Yurok Tribe has been and is a federally recognized Tribe, we have not been an organized Tribe. P.L. 100-580 provided a process for the organization of the Yurok Tribe. The Act established the now defunct Yurok Transition Team, made up of individuals who were appointed by Department of the Interior, who have appeared previously before this Committee.

Today, we are appearing as the first popularly elected entity that has the right to speak on behalf of the Yurok Tribe. The first thing that we must say is that the Yurok Tribe did not consent to the P.L. 100-580 and we do not believe that our Tribe was treated in an equitable and fair manner.

Although our area has suffered through almost thirty years of non-stop litigation, we are faced with having to decide by 3/12/92 whether to challenge the partition of the former reservation by filing suit in the U.S. Claims Court asserting an unconstitutional taking. Litigation is not our option of choice, but P.L.100-580 only provided a six month statute of limitations after the publication of the Settlement Roll, and three of the months had already run when our Council was installed.

We either have to waive our rights to any damages claim against the United States or file suit. Our preference would be for Congress to amend the Settlement Act extending the statute of limitations, and to begin the process of ameliorating the impact of P.L. 100-580 by providing significant funding for land acquisition and economic self-sufficiency. P.L. 100-580 provided an open ended authorization of not less than five million for land acquisition and directed the development of plan for economic self-sufficiency. A long term commitment to providing equity to the Yurok People is what we seek.

All of appropriations requests relate the results of P.L. 100-580, they include: (1) $10,000,000 (Miscellaneous Payments to Indians) for land acquisition pursuant to P.L. 100-580; (2) $1,100,000 adjustment (Aid to Tribal Government) for Yurok programs; (3) $500,000 add-on for undertaking the Plan for Economic Self-Sufficiency; (4) $350,000 (Real Estate Services) for the continuation of the Yurok Reservation Survey; (5) $250,000 add-on (Indian Services - New Tribes) for the Interim Council's budget; and (6) $563,000 add-on (Wildlife & Parks - Tribal Management)for Yurok Tribal Fisheries.

**acquisition pursue to P.L. 100-580.** As noted above P.L. 100-580 resulted in a tota..y lopsided division of th former Hoopa Valley Reservation without our consent. Under an unbroken string of federal court cases, the former Hoopa Valley Reservation was single unified reservation in which none of the various Tribes located there had a vested right to particular land/and assets and all communal land/and assets was held for the benefit of all the Indians of the Hoopa Valley Indian Reservation. P.L. 100-580 divided the Reservation between the Hoopa Tribe and the Yurok Tribe. The Yurok Tribe whose statutorily imposed organizing membership criteria includes bloodlines of various reservation related Indian groups has become the successor-in-interest to Indians of the Reservation.

The Yurok Tribe is now faced with either providing technical consent to P.L. 100-580 in order to receive the residual balance of the Settlement Fund and title to some 3000 acres of Tribe Trust lands or suing the United States in the Court of Claims for damages arising out of the partition.

We know that justice and equity is on our side. We know that in extreme cases such as ours, the Claims Court may look beyond a Congressional assertion of fairness and hold the United States liable upon the bare facts. But, we also know that the prospect of decades of continuing litigation, on the heels of the three decades of Short litigation, is not a desirable prospect for our community. We have other important issues such as the restoration of our fishery, and the development of our organic governing documents which require our energy. There needs to be additional alternative.

We have proposed to our congressional delegation and the authorizing Committees that a better alternative is for the United States to make a clear commitment to providing an appropriate land and economic base for the Yurok Tribe, and we will execute appropriate consent (called waivers in the Act) and end the litigation. We do not know exactly what that "clear commitment" will entail over the next several decades. What we recommend is a beginning $10,000,000 for land purchase beginning for FY 1993, which would be held available until expended; funding of the statutorily authorized Economic Self-Sufficiency Plan; the eventual amendment of P.L. 100-580 to incorporate the Economic Self-Sufficiency Plan once developed and agreed to with the United States; and a 20-25 year funding cycle to make the plan a reality.

The Budget Report of Committee on Interior & Insular Affairs includes $10,000,000 for land purchase for the Yurok Tribe. We are aware that Chairman Yates voted against P.L. 100-580 and has supported the limited efforts to date to help our Tribe and we applaud his sense of justice and commitment.

**2.$1,100,000 (Aid to Tribal Government) for Yurok programs.** In this Committee's report on the FY 1992 Appropriations the Bureau of Indian Affairs was instructed to readjust funding for the Yurok Tribe when its membership numbers became known. The membership base number has been known six months now; it is 2820 persons; making the Yuroks the largest Tribe in California. No readjustment in Bureau funding occurred. This year's Budget request reflects the Bureau's failure to readjust its FY 1992 figures. Approximately $1,700,000 is identified in the Budget Request under Aid to Tribal Government. It is our understanding that under the standard BIA formula for New Tribes this number should be $2,800,000; hence our request for an adjustment.

**3. $500,000 add-on for undertaking the Plan for Economic Self-Sufficiency.** As noted in the discussion accompanying item No. 1, this study which is called for in P.L. 100-580 is a critical ingredient in determining what the long term needs of the Yurok Tribe are in order to provide some semblance of congressionally determined fairness with respect to the partition of the former Hoopa-Valley reservation. The Department's FY 1993 Budget request does not contain any funds for this purpose. Inquiries to Agency and Area levels of the BIA in California indicated that $500,000 is a realistic amount for FY 1993.

4. **$350,000 (Real Estate Services) for the continuation of the Yurok Reservation Survey.** In FY 1991 and Fy 1992 Congress funded our request to begin the process of Surveying the Reservation. As you know, the Senate Report accompanying P.L. 100-580 indicated "concern that Department does not have adequate survey(s)" for the Yurok Reservation and "therefore expects the Department to conduct all necessary surveys... ." Although the funding technically is a BIA budget item, the actual work is being done by the Bureau of Land Management. The amount that we are requesting --$350,000-- is the amount that the local BLM staff predicts is necessary to keep the work on the surveying at the same level in FY 1993 as it is ongoing in FY 1992.

5.**$250,000 add-on (Indian Services - New Tribes) for the Interim Council's budget.** In FY 1992, the budget for the Interim Council is approximately $500,000; $250,000 was requested in the Department's budget and an additional $250,000 was added on by the Appropriations Committees. This funding as we understand it is to enable the Council to proceed with the organizing process for the Tribe as well as address the myriad of legal/policy questions such as the Waiver Issues, that must be resolved before the Tribe takes its place as an equal among the other federally recognized and organized Tribes. We have two distinct problems: (1) the Department has again only requested $250,000 for the Council; and (2) local BIA officials treat us as if we were incompetent two year olds with respect to funding and the use of funding. At one point they maintained that the $250,000 add-on was the only funding available; and at another point they maintained that we could not hire counsel with appropriated funds earmarked for the Interim Council to advise us concerning any of the issues faced -- arguing in effect that we had to execute a waiver of our rights in order to access our Trust funds in order to hire counsel to advise us on the rights that we had to waive to get counsel in the first place. Although we eventually prevailed, at least in principle, we still do not have in hand FY 1992 funds for the Interim Council or an approved Attorney contract.

The full $500,000 is essential for the operation of the Interim Council. We also request report language that will give some appropriate guidance to the BIA: "The Yurok Interim Council may expend such funds to accomplish its responsibilities including the retention of counsel and other experts." "The authority of Yurok Interim Council, whether or not it institutes litigation or executes waivers relative to claims under the Hoopa-Yurok Settlement Act, to enter into contracts and expend appropriated funds is to be recognized by the Bureau of Indian Affairs."

(6) **$563,000 add-on (Wildlife & Parks - Tribal Management) for Yurok Tribal Fisheries.** As the Committee is well aware, the

Klamath River fisheries were identified in the Hoopa-Yurok Settlement Act as a key resource of the Yurok Tribe. In fact the fisheries are key resources of both the Yurok Tribe and the Hoopa Tribe whose fishery is up river from ours. The reality of the fishery is that in the last four year, only two years provided a Yurok Tribal commercial fishery income and that income averaged only $185,000 for each of the 2 years. Some of the problems relate to Ocean fishery and the allocation of the resources by the Regulating agencies. Other problems are related to the quality and quantity of water resources on the Trinity/Klamath River system, and the damage to the system resulting from forest practices. Critical to addressing these and other issues is a Tribal Fisheries Department. We appreciate the limited funds that the Congress has been able to make available to us to start-up the Yurok Fisheries Department. This year our request includes a one time cost of $150,000 and annual operating costs of $372,000.

Attached to our testimony is a fact sheet that provides more details concerning the gross inequities that resulted from the partition of the former Hoopa Valley Reservation.

At this point in time it appears unlikely that we will be to have the Act amended before March 12, 1992 to provide a longer statute of limitations period. We therefore will file a protective law suit in the U.S. Claims Court, a law suit which we will withdraw when a new statute of limitations period is provided. this will enable us all to work for the solutions that we have recommended.