# United States Department of the Interior

OFFICE OF THE SECRETARY
WASHINGTON, D.C. 20240

MAR 15 2002

The Honorable J. Dennis Hastert
Speaker of the House of
Representatives
Washington, D.C. 20515

Dear Mr. Speaker:

Pursuant to Section 14(c) of the Hoopa-Yurok Settlement Act, Public Law 100-580, I respectfully submit the attached report. The Report includes a general history of the Hoopa-Yurok Settlement Act, and recommendations of the Department in this regard.

The Act requires that a "Report to Congress" be submitted, following the resolution of any claims brought against the United States which would challenge the constitutionality of the Act. After nearly a decade of litigation on the matter, claims filed by the Yurok Tribe of California, were decided earlier this year in favor of the United States. The conclusion of this litigation now triggers the requirement of the Act that this "report" be submitted to Congress. These matters are discussed more fully within the enclosed "report."

Should you have further questions on this matter, please feel free to contact me.

Sincerely,

Neal A. McCaleb

Assistant Secretary - Indian Affairs

Enclosure

# REPORT TO CONGRESS

## HOOPA-YUROK

Pursuant TO Section 14(c), Public Law 100-580

Submitted by the Secretary of the Interior
March 2002

# REPORT TO CONGRESS
## HOOPA-YUROK, Pursuant to Section 14(c ) Public Law 100-580
## Submitted by the Secretary of the Interior, February 2002

TABLE OF CONTENTS:

Introduction........................................................................Pg.1

History.........................................................................Pg. 1

Yurok "conditional waiver"...............................................Pg. 2

Entitlement to fund/benefits...............................................Pg. 2

Recommendations of the Department....................................Pg. 3

Appendix Cover Sheet......................................................Pg. 5

## Introduction

This report is submitted pursuant to Section 14(c) of the Hoopa-Yurok Settlement Act of 1988 (Public Law 100-580, October 31, 1988) ("Act"). The major purpose of the Act was to establish definitive boundaries for the Hoopa Valley Reservation and the Yurok Reservation. Section14(c) of the Act directs the Secretary of the Interior to prepare and submit to Congress a report describing the final decision in any claim brought pursuant to subsection Section 14(b) against the United States, its officers, agencies, or instrumentalities. The Act further directs the Secretary to include within the report any recommendations of the Secretary for action by Congress. The Act provides that the Secretary shall submit the report to Congress within 180 days of the final judgment of any claim brought pursuant to the Act. Subsequent to the passage of the Act, the Yurok Tribe filed a "takings claim" against the United States. The Yurok claim was initially denied by the United States Court of Federal Claims, and was later denied a Petition for Writ of Certiorari by the U.S. Supreme Court on March 26, 2001.

## History

In August of 1988, Senator Cranston introduced S. 2723, a bill to partition certain reservation lands between the Hoopa Valley Indian Tribe and the Yurok Tribe in the northern California. Introduction of the legislation followed a long history of contention and confusion surrounding the establishment and boundaries of the Hoopa Valley Reservation, created in 1891 by an executive order of President Harrison("1891 Reservation"). The 1891 Reservation included areas of land inhabited primarily by Yuroks, areas of land inhabited primarily by Hoopas, and a 25-mile strip of land that connected the two areas. The Hoopa-Yurok Settlement Act was enacted with the primary objective of providing finality and clarity to the contested boundary issue.

The Act concluded that no constitutionally protected rights had vested in any tribe or individual, to the communal lands and other resources of the 1891 Reservation, and provided for a fair and equitable resolution of disputes relating to ownership and management of the 1891 Reservation. Pursuant to and in accordance with the Act the 1891 Reservation was partitioned between the Hoopa Valley Tribe and the Yurok Tribe. The section of the 1891 Reservation known as "the Square" was established as the Hoopa Valley Reservation, and the section known as "the Extension" was established as the Yurok Reservation. The Act also created a Settlement Fund initially comprised of funds derived from economic activity occurring on the 1891 Hoopa Valley Reservation and supplemented by additional funds appropriated by Congress. Particular benefits of the Act, i.e., the provisions related to the partitioning of the Reservation, potential expansion of the newly formed reservations, and participation in the Settlement Fund, were conditioned upon the tribes adopting individual tribal resolution's granting their consent to the partition of the 1891 Reservation and waiving potential claims the tribes may have against the United States.

Subsequent to enactment of the Act, the Hoopa Valley Tribe executed and adopted such a resolution. The Yurok Tribe executed what they have described as a "conditional waiver" which they adopted by resolution.

## Yurok "Conditional Waiver"

In November of 1994, the Yurok Tribe submitted documentation to the Department concerning the claims waiver requirement of the Act. This material included Tribal Resolution No. 93-61, which purported to waive claims of the Tribe pursuant to and in accordance with the Act. The Resolution states in relevant part, "[T]o the extent which the Hoopa-Yurok Settlement Act is not violative of the rights of the Yurok Tribe or its members under the Constitution of the United States, or has not effected a taking without just compensation of vested Tribal or individual resources, or rights within, or appertaining to the Hoopa Valley Reservation, the Yurok Tribe hereby waives any claim which said Tribe may have against the United States arising out of the provisions of the Hoopa-Yurok Settlement Act." In a letter dated April 4, 1994, it was communicated to the Yurok Tribe by Assistant Secretary for Indian Affairs, Ada E. Deer, that Resolution No. 93-61 did not effectively waive any Tribal claims as required by the Act, but in fact acted to preserve any such claims.

## Entitlement to the Hoopa-Yurok Settlement Fund/Benefits of the Act

In 1988 the Hoopa Valley Tribe executed a waiver of claims, pursuant to the Act, and as a result, received their portion of the benefits as enumerated within the Act. Accordingly, it is the position of the Department that the Hoopa Valley Tribe is not entitled any further portion of funds or benefits under the existing Act.

In 1993, the Yurok Tribe submitted to the Secretary a tribal resolution which according to the tribe, purports to waive potential claims against the United States as required within the Act. As previously stated, the Department responded to Yurok submission with a letter stating that the Department could and would not accept the resolution as a valid waiver within the confines of the Act. The Yurok Tribe subsequently filed a "takings" claim, *Yurok Indian Tribe v. United States*, No. 92-CV-173 (Fed. Cl.), *Karuk Tribe of California v. United States*, 28 Fed. Cl. 694 (1993), *Karuk Tribe of California v. United States*, 41 Fed. Cl. 468 (Aug. 6, 1998), and *Karuk Tribe of California v. Ammon*, 209 F. 3d 1366 (Fed. Cir. 2000), that lasted nearly a decade. In briefings before the U.S. Supreme Court, the Yurok claimed that this was, "the most important Indian-lands takings case to come before the courts in this generation". Possible exposure to the U.S. Treasury was estimated close to $2 billion. The question for the Court was whether the Yuroks had a compensable interest in the 1891 Reservation under the 5th Amendment. In 1864, Congress had authorized the President, "at his discretion", to set apart land, "to be retained by the United States for purposes of Indian Reservations" (Act of 1864, 13

Stat. 39). Both trial and appellate courts held, in two-to-one decisions, that the executive order that created the reservation allowed permissive, not permanent, occupation. The U.S. Supreme Court denied certiorari. Accordingly, it is the position of the Department that the Yurok Tribe did not meet the waiver conditions of the Act and is therefore not entitled to the benefits enumerated within the Act.

Following a request from the Department, each of the interested tribes submitted their written position regarding future actions of the Department with respect to the Settlement Fund, and the Section 14(c) "Report to Congress", required under the Act.The Department has consulted tribes on this report and reviewed information describing both the Hoopa and Yurok Tribes submitted as appendices to this report. Also, attached as appendices to this report, is the historical account information and supplemental present earning potential of the fund.

**Recommendations of the Department**

Notwithstanding the factual legal standing regarding tribal entitlement to the settlement fund under the existing Act, the Department recognizes that a financial and economic need currently exists within both Tribes and their associated reservations. The presence and extent of this need, combined with the historical difficulties in the administration of the provisions of the Act, make predominant the necessity to take further measures to accomplish the original intent of the Act. Further, it is the opinion of the Department that to withhold funds/benefits of the Act in their entirety, or to allow any accrued funds to revert to the Treasury, would not be an effective administration of the overall intent of Act and would, in effect be in direct opposition to the spirit of the Act. In this regard, it is the opinion of the Department that in addition to partitioning the 1891 Reservation, Congress intended the Act to provide the respective tribes and their reservations with the means to acquire a degree of financial and economic benefit and independence which would allow each tribe to prosper in the years to come.

Therefore, it is the recommendation of the Department that:

I. No additional funds be added to the current HYSA Settlement Fund;

II. Funds comprising the current HYSA Settlement Fund would not revert to the general fund of the Treasury, but would be retained in trust account status by the Department pending future developments;

III. There would be no general "distribution" of the HYSA Settlement Fund dollars to any particular tribe, tribal entity, or individual. But rather, the Fund dollars would be administered for the mutual benefit of both the Hoopa Valley and Yurok tribes, and their respective reservations, taking into consideration benefits either tribe may have heretofore received from the HYSA Settlement Fund;

IV. That Congress in coordination with the Department, and following consultation with the Hoopa and Yurok Tribes, fashion a mechanism for the future administration of the HYSA Settlement Fund;

V. That Congress, in order to accomplish the underlying objective of the HYSA, resolving any future issue of entitlement, give serious consideration to the establishment of one or more new Act(s) that provide the Secretary with all necessary authority to establish two separate permanent Fund(s) with the balance of the current HYSA Fund, for the benefit of the Hoopa and Yurok Tribes in such a manner as to fulfill the intent of the original Act in full measure.

## APPENDIX:

I. Financial information on Hoopa-Yurok Settlement Fund
II. Informational submittal of Yurok Tribe
III. Informational submittal of Hoopa Tribe

# FINANCIAL INFORMATONAL SHEET – "HYSA" FUND

The Hoopa/Yurok Settlement Fund was established in 1988, pursuant to Public Law 100-580, the Hoopa-Yurok Settlement Act.
The Act was intended to partition certain reservation lands between the Hoopa Valley Tribe and the Yurok Tribe, and to clarify the use of timber proceeds from the Hoopa Valley Reservation established originally in 1864.
Recognizing the Federal role in the creating of the problems then associated with the Hoopa Valley Reservation, the Act authorized the appropriation of $10,000,000 in federal funds, to be added to the corpus of the HYSA Fund.
The remainder of the settlement fund was made up of funds held as "Escrow funds" by the federal government, which were derived from the use/resources of the "joint reservation". These funds were held by the Secretary in accounts benefiting both the Hoopa and Yurok tribes, individually.
The Act was intended to settle any dispute over any/all such "Escrow funds".
The original principal balance of the fund was $66,978,335.93

United States Department of the Interior
BUREAU OF INDIAN AFFAIRS
OFFICE OF TRUST FUNDS MANAGEMENT
505 MARQUETTE N.W. SUITE 700
ALBUQUERQUE, NEW MEXICO 87102

IN REPLY REFER TO:

A
ASST A
ASST AD ADMIN
ROUT[redacted]
RESPO
DUE DATE
MEMO
TELE OTHER

AUG 2 2 1991

Memorandum

To: Area Director, Sacramento Area Office

From: Director, Office of Trust Funds Management

Subject: Distribution of funds awarded the Hoopas and Yuroks under the Hoopa-Yurok Settlement Act

Effective April 12, 1991, the distribution of the subject funds was made in accordance with Public Law 101-277 and in accordance with your request dated April 4, 1991.

The total value of the fund on April 12, 1991 was $85,979,348.37 derived in the following manner:

| | |
|---|---|
| Fair Market Value of Investment Securities (Refer to Attachment I and II.) | $74,339,997.14 |
| Cash-Unallotted Balance | 139,351.23 |
| Add Back: Hoopa Drawdowns | 10,000,000.00 |
| Yurok Drawdowns | 1,500,000.00 |
| Total: | $85,979,348.37 |

Hoopa's share of the fund was calculated using 39.55% as provided in you letter dated April 4, 1991.

| | |
|---|---|
| Total Value of Fund | $85,979,348.37 |
| | X .39552 |
| Hoopa's Share | $34,006,551.87 |
| Less Hoopa's Drawdowns | 10,000,000.00 |
| Less April 15, 1991 Drawdown | 9,880,000.00 |
| Balance Due Hoopa Tribe: | $14,126,551.87 |

The balance due was distributed using a percentage of 21.8679479 derived as follows:

| | |
|---|---|
| Total Value of Fund | $85,979,348.37 |
| Less Hoopa's Drawdowns | 19,880,000.00 |
| Less Yurok's Drawdowns | 1,500,000.00 |
| Balance of Fund to be Distributed: | $64,599,348.37 |

| | | |
|---|---|---|
| Hoopa's Share of Fund | $14,126,551.87 | = 0.218679479 |
| Value of Undistributed Fund | 64,599,348.37 | |

The 21.867947% was applied to each outstanding investment and recorded to Hoopa's appropriation account 7194.

The balance of the fund is Yurok's share which remained in appropriation account 7193.

Subsequent to the above distributions, an internal transfer was done effective August 1, 1991, to transfer $3,000,000.00 into an escrow account to compensate any potential appeal cases. The amounts contributed are $1,186,560.00 and $1,813,440.00 for the Hoopas and the Yuroks respectively. It is our understanding that both tribes agreed to this arrangement. A separate appropriation (J50 A64 7197) was established for this escrow account.

Trust Funds records in the BIA's Finance System are maintained on a cash basis, therefore, income earned but not yet collected by the BIA is not recorded. Only the actual cash transfers and the cost bases of respective investments are shown in the Summary of Trust Funds reports for the Hoopa Tribe.

If you have any questions, please contact Sarah Yepa at FTS 474-3875 or Commercial (505) 766-3875. If you have questions on the valuation of the securities, please contact Fred Kellerup at FTS 474-2975 or Commercial (505) 766-2975.

Jim R. Parris

Attachments

HOOPA-YUROK SETTLEMENT FUND, ESTABLISHED 12/9/88 AS J50/501/7193

| DATE | BEGINNING FY BALANCE | FISCAL YEAR END BALANCE | DIFFERENCE | | | |
|---|---|---|---|---|---|---|
| FY 1989 | 66,978,335.93 | 69,982,201.01 | 3,003,865.08 | | | |
| FY 1990 | 69,982,201.01 | 71,799,321.72 | 1,817,120.71 | | | |
| FY 1991 | 71,799,321.72 | 48,940,123.38 | (22,859,198.34) | | | |
| FY 1992 | 48,940,123.38 | 37,819,371.79 | (11,120,751.59) | | | |
| FY 1993 | 37,819,371.79 | 39,700,898.45 | 1,881,526.66 | | | |
| FY 1994 | 39,700,898.45 | 40,600,210.26 | 899,311.81 | | | |
| FY 1995 | 40,600,210.26 | 42,916,637.49 | 2,316,427.23 | | | |
| FY 1996 | 42,916,637.49 | 45,103,786.42 | 2,187,148.93 | | | |
| FY 1997 | 45,103,786.42 | 50,708,006.06 | 5,604,219.64 | | | |
| FY 1998 | 50,708,006.06 | 53,748,146.46 | 3,040,140.40 | | | |
| FY 1999 | 53,748,146.46 | 56,912,744.76 | 3,164,598.30 | | | |
| FY 2000 | 56,912,744.76 | 61,207,883.29 | 4,295,138.53 | | | |
| FY 2001 | 61,207,883.29 | 64,824,655.61 | 3,616,772.32 | | | |

***(1) the date the fund was established,***

The Hoopa-Yurok Settlement Fund was established in the BIA's Finance System **12/9/88.**

***(2) the original principal amount of the fund,***

The original principal balance amount of the Fund was **$66,978,335.93.**

***(3) the date and amount of the Hoopa disbursement (principal and interest),***

Effective April 12, 1991, Hoopa's share of the fund was determined to be **$34,006,551.87.**

Deduction of $19,880,000 for previous drawdowns and Hoopa's per capita payment left a final balance due of **$14,126,551.87.** which was distributed to Hoopa April 12, 1991.

***(4) the breakdown between principal and interest and gain if any, on the balance remaining after the Hoopa disbursement,***

The FY 91 year end balance for the account, which was determined to be Yurok's share, was **$48,940,123.38**

According to the Act, a separate account for Yurok should have been established and this amount transferred.

***(5) the projected yearly interest on these two amounts.***

At 6%, $3,889,479, and at 2%, $1,296,493

YURROK TRIBE

15900 Hwy 101 N. • Klamath, CA 95548
(707) 482-2921
FAX (707) 482-9465

1034 6th Street • Eureka, CA 95501
(707) 444-0433
FAX (707) 444-0437

# BACKGROUND

## Yurok Waiver Now Effective for Distribution of Settlement Fund and Acreage Pursuant to the Hoopa-Yurok Settlement Act

### Hoopa-Yurok Settlement Act

In 1988 Congress passed the Hoopa-Yurok Settlement Act, 25 U.S.C.1301i et seq. ("HYSA"). The HYSA partitioned the former joint Reservation into two separate Reservations. According the the federal courts, prior to partition of the former Hoopa Valley Reservation under the HYSA, there was one single Reservation, and the Hoopa and Yurok Tribes enjoyed communal ownership of the lands and resources of the 90,000 acre joint Reservation.

The HYSA gave the Hoopa Tribe exclusive use and benefit of the 87,000 acres of unallotted trust lands, assets and timber resources of the valley area of the Reservation. The HYSA relegated the much larger Yurok Tribe to the Klamath river area of the Reservation, which contains only a few thousand acres of trust land and a fishery inadequate to provide even for the minimal subsistence needs of Yurok Tribal members.

The HYSA also a Settlement Fund to be paid the Yurok Tribe, and provided for the government's purchase of additional acreage for the Yurok Tribe. This Fund and acreage were to be delivered to the Yurok Tribe upon the Tribe's waiver of its Fifth Amendment claim for an unconstitutional taking without just compensation, which claim Congress anticipated. 25 U.S.C.1301i-1(c). Upon the waiver, the Tribe is to receive:

* Distribution of the Settlement Fund; and

* All right, title, and interest to all national forest system lands within the Yurok Reservation, (approximately 3,000 acres) and

* Specified portions of the Yurok Experimental Forest, part of which shall be held in trust by the United States as part of the Reservation; and

* Federal expenditure of not less than $5 million to acquire land, interests in land, and rights-of-way for the Tribe or its members, to be declared part of the Reservation. Such

lands must be within or contiguous with and adjacent to the Reservation, or if outside the Reservation must be purchased in order to exchange for lands within the Reservation.

## Final Disposition of Claim for Taking Without Just Compensation

Due to the HYSA's lopsided division of tribal lands and resources, Congress expressly contemplated that the Yurok Tribe might sue the United States for an unconstitutional taking without just compensation. 25 U.S.C. ☐ 1301i-11. The Yurok Tribe in fact brought such a suit, along with another Tribe and individual plaintiffs. As of March 26, 2001, the takings claim was finally resolved against the Yurok Tribe when the United States Supreme Court denied without comment the Tribe's Petition for Writ of Certiorari to the Federal Circuit. This denial let stand the Federal Circuit's sharply divided 2-1 ruling last year denying the Tribe's takings claim.

## The Yurok Tribe's Conditional Waiver

As required by the HYSA, the Tribe by Resolution 93-61 timely executed a waiver of claims on November 24, 1993. In light of Congress' express contemplation of litigation, the waiver was conditioned on exhaustion of legal appeals challenging the constitutionality of the HYSA. It reads as follows:

> 1. To the extent which the Hoopa-Yurok Settlement Act is not violative of the rights of the Yurok Tribe or its members under the Constitution of the United States, or has not effected a taking without just compensation of vested Tribal or individual resources, or rights within or appertaining to the Hoopa Valley Reservation, the Yurok Tribe hereby waives any claim which said Tribe may have against the United States arising out of the provisions of the Hoopa-Yurok Settlement Act.
>
> 2. To the extent which the determination of the Yurok Tribe's share of the Escrow monies defined in the Hoopa-Yurok Settlement Act has not deprived the Tribe or its members of rights secured under the Constitution of the United States, the Yurok hereby affirm its consent to the contribution of the Yurok Escrow monies to the Settlement Fund, and for their use as payments to the Hoopa Tribe and to individual Hoopa members, as provided in the Hoopa-Yurok Settlement Act.

By contrast, the Hoopa Valley Tribe in 1993 unconditionally waived any claims or rights it might have had, and has fully

received all monies and lands to which it was entitled under the HYSA. The Hoopa Tribe has no remaining interest in the balance of the Settlement Fund or the acreage promised the Yurok Tribe.

**The Conditional Waiver Is Now Effective By Operation of Law**

As of March 26, 2001, the United States Supreme Court effectively removed the sole condition of the Yurok Tribe's 1993 Conditional Waiver. The Fifth Amendment takings claim has been finally and fully resolved by the courts against the Yurok Tribe. As a legal matter, there has been no unconstitutional taking of Yurok lands and resources. No further legal appeals are available. The Yurok Tribe's waiver, by its terms, is now in full force and effect.

Because the sole condition to the Tribe's 1993 waiver has been removed, the expressed intent of Congress -- to allow litigation of the takings claim and to allow distribution of the Settlement Fund and acreage to the Yurok Tribe upon the final waiver of such claim - has now been satisfied. The Yurok Tribe is now entitled to receive the Settlement Fund and acreage specified by the HYSA.

**Proposed Technical Amendment to the HYSA to Confirm and Secure the Waiver**

The Yurok waiver is now effective by its own terms and by operation of law. However, should any further certainty be desired, a technical amendment to the HYSA would confirm and secure the waiver and distribution of funds and acreage to the Yurok Tribe.

[FIRST OPTION]

Eliminate the entirety of Section 1300i-1(c)(4)(D).

[SECOND OPTION]

After the word "waiving" in Section 1300i-1(c)(4)(D), add the words "or conditionally waiving".

[THIRD OPTION]

An additional clause may be added to the end of Section 1300i-1(c)(4)(D), as follows:

> , or when any claim contemplated by section 1300i-11 has been finally adjudicated against the Yurok Tribe thereby removing the condition of a conditional waiver adopted by the Tribe.

Such an amendment would be encompassed by the provision of the HYSA that requires the Secretary of the Interior to submit a report to Congress after the litigation ends, including recommendations for supplemental funding necessary to implement the Act and for "any modifications to the resource and management authorities" established by the Act. 25 U.S.C.1300i-11(c).

# REPORT TO CONGRESS ON THE HOOPA-YUROK SETTLEMENT ACT

Introduction

The 1988 Hoopa-Yurok Settlement Act divided the joint Hoopa Valley Reservation into separate and unequal parts for the Hoopa Valley Tribe and the Yurok Tribe. In the Act, Congress overturned 25 years of litigation that established that all Indians of the Hoopa Valley Reservation, whether or not enrolled in the Hoopa Valley Tribe, have equal rights to share in the resources of the Reservation. The Act disrupted and cut short the orderly and fair administration of the federal courts' judgments in Short v. United States and Puzz v. United States that had for the first time in history recognized the equal and permanent rights of the Yurok people in the joint Hoopa Valley Reservation, part of the aboriginal home of the Yurok people. The Act deprived the Yurok Tribe and its members of rights and resources that the courts had determined belonged to them as a lawful and constitutional mandate.

Congress contemplated that claims would be brought challenging the constitutionality under the 5th Amendment of the partitioning of the former Joint Hoopa Valley Reservation. 25 U.S.C. ▯ 1300i-11. The Yurok Tribe, along with the Karuk Tribe and a group of individuals known as the Ammon plaintiffs, filed such a claim in 1992, alleging that the partitioning of the Reservation was a taking of the Tribe's property without just compensation in violation of the 5th Amendment. This litigation was concluded on March 26, 2001, when the U.S. Supreme Court refused to review lower court decisions dismissing the Tribe's claim on the ground that no tribe or Indian individuals had a property interest in the joint reservation that was a property interest protected by the Constitution.

The conclusion of this litigation triggers the requirement of the Act that the Secretary of the Interior prepare and submit to Congress a report describing "the final decision in any claim" brought against the United States which challenged the constitutionality of the Act. 25 U.S.C. ▯ 1300i-11(c)(1). The report must include "recommendations of the Secretary for action by Congress, including but not limited to, any supplemental funding proposals necessary to implement the terms of [the Act] and any modifications to the resource and management authorities established by [the Act]." 25 U.S.C. 1300i-11(c)(2). The report is due 180 days after the entry of "final judgment," or September 22, 2001.

This report contains the recommendations of the Department for legislative proposals which in our view are required to correct inequities in the Act that Congress either overlooked

or have come to light since the enactment of the Act. The report first provides the factual and legal background leading to the Act, the structure and intent of the Act, the takings claims filed by the Yurok Tribe, Karuk Tribe and Ammon plaintiffs, the disposition by the courts, and finally our recommendations for legislative action.

Background

The Hoopa-Yurok Settlement Act is best understood in the context of a long and complex dispute, which, despite the best intentions of Congress, is not yet finally resolved. The Yurok people were aboriginal residents of the area that later became the joint Hoopa Valley Reservation. In the early 1850s, the federal government adopted a reservation policy as the principal means to reduce recurrent warfare between whites and Indians caused by the California gold rush. In 1855, the President established the Klamath River Reservation, a strip of land a mile in width on either side of the Klamath River from the Pacific Ocean to a point about 20 miles upstream, as a permanent home for the Yurok people who then resided along that River. In 1864, Congress clarified the authority of the President to create reservations in California by authorizing four such reserves for Indians residing there. The 1864 Act evinced Congress' intent that reservations created under the Act were to be occupied and owned by more than one tribe at the President's discretion.

In 1876, the President exercised this authority by issuing a trust patent for the Hoopa Valley Reservation, a 12-mile square bisected by the Trinity River (the "Hoopa Square"). The Hoopa Square was home to several groups of Indians, including the Yurok Tribe. In 1891, the then Hoopa Valley Reservation was extended to encompass what had been known as the Klamath River Reservation (the "Lower 20"), as well as the strip of land a mile in width on either side of the Klamath River from the upper limit of the Klamath River Reservation to the confluence of the Klamath and Trinity Rivers at Weitchpec (the "Connecting Strip"); together these lands became known as the "Extension." These actions of the federal government established this area as a single, unified reservation. The U.S. Supreme Court in Mattz v. Arnett, referred to the entire joint reservation as "recognized," explaining that the enlargement was made under the President's authority pursuant to the 1864 Act. 412 U.S. 481 (1973). Since time immemorial, the Yuroks and other Indians of the joint reservation have centered their lives and cultures on the land within the reservation's boundaries.

In the decades following the consolidation of the Hoopa Valley and Klamath River Reservations, the policies of the Bureau of Indian Affairs concerning the beneficiaries of the Hoopa Valley Reservation varied; for some purposes, and at some times, the B.I.A. treated the Reservation and the Indians thereof as a consolidated whole; at other times, and for other purposes, the B.I.A. regarded the Hoopa Square as separate and distinct from the Extension, and only the individuals enrolled in the Hoopa Valley Tribe were recognized as possessing rights in the Hoopa Square.

In 1892, Congress opened the Klamath River portion of the Hoopa Valley Reservation to non-Indian settlement and homesteading through the allotment process. Act of June 17, 1892, 27 Stat. 52. The allotment of this portion of the Reservation affected the Yurok people, who were the dominant population in the lower 20 and connecting strip. By the time the allotment process had run its course, and taking into account land lost through tax sales after the trust period expired and other means, the number of trust acres left to Yurok people was only about 3,500. The U.S. Supreme Court ruled, however, that despite this tremendous loss of land, the reservation status was not terminated by the 1892 Act. Mattz v. Arnett, 412 U.S. 481 (1973).

In the 1950's, the B.I.A. began authorizing the harvesting of timber from lands within the Hoopa Square portion of the joint Reservation. The B.I.A. distributed the revenues from those harvests; some of the revenues were paid to the B.I.A.-recognized Hoopa Tribal Council; other revenues were distributed per capita to individuals, but only to persons on the roll of the Hoopa Valley Tribe. The Hoopa Valley Tribe came into existence in 1950 with membership limited to those with allotted land on the Reservation, non-landholders voted in by the Tribe, and long-time residents of the Square with a prescribed degree of native Hoopa parentage. Karuk Tribe of California v. Ammon, 209 F.2d 1366, 1372 (Fed. Cir. 2000). The B.I.A. made no payments of timber revenues to the Yurok Tribe, nor to any individual Yuroks or other Indians of the Reservation who were not enrolled in the Hoopa Valley Tribe, on the theory that the Hoopa Square was a separate Reservation from the Extension, and thus that only members of the Hoopa Valley Tribe were entitled to share in the revenues.

In 1963, several thousand individuals, primary Yuroks, filed suit in what then was the U.S. Court of Claims seeking damages for the failure to distribute the revenues from the joint Reservation equally to all Indians of the joint Reservation. Specifically, the plaintiffs in Jessie Short, et al. v. United States alleged that the Hoopa Square and the Extension were part of the same Reservation, that all Indians of that Reservation had equal rights to the Reservation's resources, and thus that the exclusion of Yuroks from the distribution of revenues derived from the harvest of timber on the Hoopa Square was an arbitrary and discriminatory breach of federal fiduciary duties for which the United States was liable in money damages.

In 1973, the Court of Claims granted summary judgment in favor of the Short plaintiffs' claims that the United States had breached its trust obligations by arbitrarily excluding from per capita distributions of timber revenues persons who were not enrolled in the Hoopa Valley Tribe. Short v. United States, 486 F.2d 561 (Ct.Cls. 1973). The court's judgment followed and applied established precedent with regard to the nature of the Government's trust obligations and the right of Indians of permanent reservations to share equally in the resources there. The court made a number of rulings that are relevant to Congress' determination of modifications to the Hoopa-Yurok Settlement Act. These rulings

include: The Yurok people were aboriginal residents of the Hoopa Square (486 F.2d at 565); the Yuroks were beneficiaries of an unratified 1864 treaty that called for the creation of a Reservation (486 F.2d at 565); Congress established the Hoopa Valley Reservation in part for the Yuroks (486 F.2d at 565); the 1891 Executive Order adding the 1855 Klamath River Reservation to the Hoopa Valley Reservation created an enlarged single Reservation (486 F.2d at 567-68); the expansion put the Yurok Indians of the Klamath River Reservation on an equal footing with the Hoopa Indians of the Square, such that the Hoopas did not enjoy exclusive rights to the Square (486 F.2d at 567-68); and the Hoopas obtained no preferential rights to the Square by virtue of their early residence on the Reservation (486 F.2d at 562-63).

The court also ruled that no single tribe or group had vested rights as against any other tribe or group of individuals. The court did not, however, address whether any tribe or group had vested rights enforceable against the United States. (486 F.2d at 564: "Any exercise of the President's discretion in favor of the Hoopas, in approving their residence on the reservation gave the Hoopas no vested rights as against such other tribe as might be the beneficiary of a simultaneous or subsequent exercise of the President's discretion"). The next 20 years were spent litigating the questions of the criteria for qualification as an "Indian of the Reservation," evaluating the qualifications of individual claimants, and quantifying damages.

Following the 1973 liability judgment in Short, the B.I.A. began setting aside a portion of the Hoopa Square timber revenues into an escrow account for distribution to the beneficiaries of the Reservation pending identification of Indians of the Reservation eligible to share in the judgment. The Hoopa Valley Tribe and members of that Tribe continued to receive distributions of timber revenues, but no distributions were made to the Yurok Tribe or to Indians of the Reservation who were not enrolled in the Hoopa Valley Tribe.

The Short case did not address the question of how the joint reservation should be governed in light of the finding that all Indians of the Reservation shared equally in the resources found there. A separate case was brought by a group of Yuroks to answer this question, alleging that they were entitled to an equal voice in governing reservation affairs. This suit was also successful. Puzz v. United States, No C 80 2908 TEH (D. N.Cal. 1980). In line with established legal precedent, the Puzz court made the following findings and rulings:

1. Congress and the Executive "never intended one specific tribe, the Hoopas, to have exclusive property or political rights" over the Joint Reservation. Id. at 5.
2. "[T]he 1864 Act did not grant any territorial rights to the Hoopa tribe alone." Id. at 7.
3. The federal government must oversee the governance of the Reservation "for the use and benefit of all, not for the benefit of some to the clear detriment of others." Id. at 20. Federal supervision over Reservation administration,

resource management, and spending of Reservation funds must "ensure that all Indians [of the Reservation] receive the use and benefit of the reservation on an equal basis.". Id. at 23.

As an example of both unfair and improper expenditure of Reservation resources, the court cited the use of reservation funds to pay for the Hoopa defendants' litigation costs in Puzz. Id. at 18. With regard to the federal approval of this allocation of Reservation resources, the court opined that "[i]t is an obvious violation of trust to allow the dissipation of reservation income to arm one faction of the Indians of the reservation against another." Id.

4. The federal government "must develop and implement a process to receive and take account of the opinions of non-Hoopas on the proper use of reservation funds." Id. at 18.

5. The federal recognition of the Hoopa Valley Tribe and the federal approval of the Hoopa Valley Tribe's constitution and bylaws was affirmed. Id. at 21. Further, the court recognized the right of the Hoopa Business Council to "lawfully conduct business as a tribal body sovereign over its own members. . ." Id. at 23.

Accordingly, the result of the Puzz case was an order for the federal government to develop a fair and orderly process for the resources of the Reservation to be equitably used and managed for the benefit of all the Indians of the Reservation. However, before the federal government could develop and implement a process, at the request of the Hoopa Valley Tribe and despite the concerns of Assistant Secretary Swimmer, Congress cut short these efforts and in 1988 enacted the Hoopa-Yurok Settlement Act ("HYSA"), P.L. 100-580, 25 U.S.C. [illegible] 1300i et seq. The Yurok Tribe, who at the time was neither organized nor had legal representation, did not participate in the legislative process that led to the HYSA.

Provisions of the Act

Under the HYSA, the former Hoopa Valley Reservation was partitioned into separate Hoopa Valley and Yurok Reservations upon the concurrence of the Hoopa Valley Tribe; the Hoopa Valley Tribe upon execution of its waiver, received its statutorily designated portion (based on its percentage of enrolled population against the enrolled population of the Yurok Tribe) of the escrowed and other funds that Congress had converted into a "Settlement Fund;" the recognition of both the Hoopa Valley and Yurok Tribes was to be confirmed; a Settlement Roll was to be prepared of "Indians of the Reservation" not already included as enrolled members of the Hoopa Valley Tribe; persons on the Settlement Roll were to choose from among Hoopa Tribal membership, Yurok Tribal membership and non-Tribal membership options, each of which included payment of varying amounts of compensation; the Yurok Tribe was to receive the remainder of the Settlement Fund after payment of the Hoopa Valley Tribe's proportional share and deduction of sums paid to individuals; and upon the enactment

of a resolution waiving claims that the Yurok Tribe might have against the United States arising out of the HYSA, the Yurok Tribe was to become eligible for various benefits, including land acquisition authority, appropriations, governmental organization and other federal benefits and programs provided to Indian Tribes.

When the Hoopa Valley Tribe voted in late 1988 to waive its claims against the United States and approve partition of the Reservation, the Hoopa Square included about 89,000 acres of trust land and billions of board feet of timber. By operation of the Act, the Hoopa Valley Tribe received slightly over 40 percent of the Settlement Fund, after having received a previous 30 percentage from timber revenues before escrow. The Hoopa Valley Tribe also became the exclusive beneficial or vested owner under federal law of these lands and resources. At this same time, the Yurok Reservation included only about 3,500 acres of unallotted trust land and no other significant natural resources except rapidly-dwindling runs of salmon that had been inadequate to support even a minimal subsistence fishery for many years. The Act vested the Yurok Tribe with exclusive beneficial ownership of these lands and resources. The Yurok Reservation boundaries also included approximately 55,000 acres held in private ownership by non-Indians.

In developing the HYSA, Congress did not attempt to quantify the relative value of the Hoopa Square and the Extension. Rather, Congress acted on the assumption that neither the Yurok Tribe nor its members had a vested property right in the Reservation, and thus were not entitled to just compensation for the extinguishment of their claims to share in the unallotted lands and resources of the Square (the same would have been true for the right of the Hoopa Tribe and its members to share in the unallotted lands and resources of what would become the Yurok Reservation). However, the legislative history suggests that Congress assumed that the primary value of the Hoopa Square was in its trust land, water and timber resources, while the primary value of the Yurok Reservation was in the right of the Tribe and its members to access and exploit the Klamath River's anadromous fishery resources. Senate Report at 14.

This assumption turned out to be true for the Hoopa Valley Tribe but regrettably not true for the Yurok Tribe. The Yurok Tribe's fishery rarely produces sufficient income to sustain the economy of the Tribe or the livelihoods of its members. The fishery is in decline due to water diversions of the Klamath Irrigation Project and other factors beyond the Tribe's control. The Tribe's commercial fishery is modest by any measurement and produces only periodic income in small amounts for the Tribe. In no year since the Act's passage have tribal earnings in the fishery exceeded the $1 million estimated by the Senate Committee on Indian Affairs at the time of the Act's passage. Id. at 14-15. The principal contribution of the fishery to the economy of the Tribe is as subsistence food for the daily diets of tribal members. A comparison of tribal income for the period is striking. In the first ten years after the Act, the timber income for the Hoopa Valley Tribe has been approximately $80 million, while the fisheries income for the Yurok Tribe has less than $1 million.

The HYSA established procedures for the organization of the Yurok Tribe, for the development of the Settlement Roll and for the distribution of the Settlement Fund. As part of the Tribal organizational process, the HYSA provided for the election of an "Interim Council" having limited powers, including the adoption of a resolution,

> (i) waiving any claim the Yurok Tribe may have against the United States arising out of the provision of this subchapter[.]
>
> (ii) affirming tribal consent to the contribution of Yurok Escrow monies to the settlement fund, and for their use as payments to the Hoopa Tribe, and to individual Hoopa members, as provided in this Act[.]

Among the specific benefits that the HYSA purportedly conferred upon the Yurok Tribe were the transfer to the Yurok Tribe to be held in trust certain federal lands in the Six Rivers National Forest within the boundaries of the old Klamath River Reservation and connecting strip; addition of lands to the Yurok Reservation through consensual acquisitions, the expenditure of not less than $5,000,000 for the purpose of acquiring lands or interests in lands for the Tribe, and apportionment to the Yurok Tribe of the remainder of the Settlement fund after distribution to the Hoopa Valley Tribe and individuals on the Settlement Roll. However, receipt of these benefits, as well as the organizational authorities under the Act, were not to be effective "unless and until the Interim Council of the Yurok Tribe has adopted a resolution waiving any claim such tribe may have against the United States arising out of the provisions of [the Act]." 25 U.S.C. 1300i-1(c)(4).

On November 24, 1993, the Yurok Tribe Interim Council adopted Resolution No. 93-61, which resolved as follows:

1. To the extent which the Hoopa-Yurok Settlement Act is not violative of the rights of the Yurok Tribe or its members under the Constitution of the United States, or has not effecting a taking without just compensation of vested Tribal or individual resources, or rights within, or appertaining to the Hoopa Valley Reservation, the Yurok Tribe hereby waives any claim which said Tribe may have against the United States arising out of the provisions of the Hoopa-Yurok Settlement Act;

2. To the extent which the determination of the Yurok Tribe's share of the escrow monies defined in the [HYSA] has not deprived the Tribe or its members of rights secured under the Constitution of the United States, the Yurok [Tribe] hereby affirms its consent to the contribution of Yurok Escrow monies to the Settlement Fund, and for their use as payments to the Hoopa Tribe, and to

individual Hoopa members, as provided in the Hoopa-Yurok Settlement Act.

While the Department of the Interior initially determined that Resolution 93-61 did not meet the HYSA's requirement that the Tribe adopt "a resolution waiving any claim" against the U.S. under the HYSA, the Yurok Tribe has consistently maintained that its waiver was sufficient to meet the HYSA requirements. Considering the Tribe's waiver in light of both the historical circumstances surrounding the passage of the HYSA and the clear purpose of the HYSA to inter alia establish an adequate land base for the Yurok Tribe as well as to partially compensate it for the loss of its rights to the Square, the Department agrees with the Yurok Tribe as a matter of equity that the language of the tribal resolution should not bar it from receiving Settlement Fund money and an adequate land base under the HYSA. The Department reaches this conclusion based, in part, on the strong legal arguments that exist to support this reading of the HYSA.

The HYSA can fairly be read to allow the Yurok Tribe to pursue a constitutional takings claim and to simultaneously obtain its benefits under the HYSA. Although the HYSA's requirement to waive "any claim" does appears broad, other sections of the Act do indicate that Congress did not intend that the Yurok Tribe give up its constitutional right to sue in order to obtain the benefits to which it is entitled. For example, section 1300i-11 of the HYSA, titled "Limitations of actions; waiver of claims," specifically anticipates and authorizes fifth amendment takings litigation by the Tribe against the United States. Subsection (a) provides that any claim challenging the HYSA "as having effected a taking under the fifth amendment of the United States Constitution or as otherwise having provided inadequate compensation shall be brought . . . in the United States Court of Claims." 25 U.S.C. [] 1300i-11(a). Subsection (b) also affirmatively acknowledges the Tribe's right to file a takings claim under the HYSA and establishes a limitations period. 25 U.S.C. [] 1300i-11(b).

In addition, interpreting the HYSA as forcing the Tribe to choose between either accepting its benefits under the HYSA or protecting its constitutional rights by asserting a takings claim would appear to frustrate Congress' intent of establishing an adequate land base for the Yurok Tribe and distributing to the Yurok Tribe a portion of the Settlement Fund. Such a narrow reading would necessitate the view that Congress intended to force such a choice, even in light of the uncertainties of federal takings litigation and the fact that such a scheme would conflict with fundamental principles of fairness. As the Yurok Tribe reasonably maintains, it would be an entirely unfair result if, in addition to divesting the Tribe of its long-standing and legitimate interest in the Square, the HYSA also serves to deny the Tribe its portion of the Settlement Fund and the much-needed land within the Extension simply because the Tribe challenged the underlying constitutionality of the HYSA.

Consistent with this reasoning, the basic legal principle that United States laws must be constitutional and are subject to judicial review for constitutional defects is relevant. Congress should not be imputed with the intent of circumventing the Constitution by forcing parties directly affected by a law to waive their constitutional rights in exchange for obtaining specific federal benefits. This position is supported by the judicial doctrine of unconstitutional conditions, under which the United States may not condition receipt of a government benefit upon the waiver of constitutionally-protected rights, thereby indirectly accomplishing a restriction on constitutional rights. Consistent with these principles, it can fairly be reasoned that Congress, though it demanded a broad waiver under the HYSA, stopped short of requiring the Tribe to forsake its fundamental right to judicial review of the underlying constitutional takings question. The establishment of a statute of limitations for takings claims is evidence of Congress' intent in this regard.

Further, the view that Congress did not intend to present the Yurok Tribe with the unfair choice between receiving the benefits of the HYSA and challenging the Act's underlying constitutionality is also supported by Congress' finding contemporaneous with the passage of the HYSA that the Act does not effectuate a taking. S. Rep. supra, at 30. Given this finding, Congress' allocation of part of the Settlement Fund to the Yurok Tribe could not have been intended as compensation for a taking; but instead as funding to facilitate Yurok self-government and to partially off-set the Tribe's lost interest in the Square. Id. at 22.

Finally in applying the HYSA, the Department has allowed the Yurok Tribe to receive the benefits of the Act and to simultaneously challenge the constitutionality of the Act even though the Yurok Tribe filed a takings claim in 1992. The United States continues to treat the Yurok Tribe in all procedural and substantive respects as a federally-recognized Indian tribe precisely because Congress reconfirmed the federal recognition of the Yurok Tribe and the Tribe's Reservation through enactment of the HYSA. The Secretary's recognition of the Yurok Tribe's Constitution and election results, as well as its treatment of the Yurok Tribe as a federally-recognized tribe for all purposes, is evidence that the Yurok Tribe's 1993 waiver was at least partially effective.

Because the Yurok Tribe did pass a timely waiver resolution in 1993 and given the existence of credible legal arguments that the Yurok Tribe's waiver was sufficient under the HYSA, the Department recommends that the language in the Tribe's waiver resolution not serve as a basis to deny the Yurok Tr

Litigation

The first suit challenging the legality of the Hoopa-Yurok Settlement Act was filed by a group of Yurok individuals led by Lillian Shermoen. The suit was filed in federal district

court in San Francisco, California on August 28, 1990. Shermoen v. United States, No. 90-CV-2460 (N.D. Cal.). The suit sought to invalidate the Act on constitutional grounds, alleging that the Act deprived Yurok people of settled and vested rights in land and resources as adjudged by the courts in Short and Puzz. The principal theories of the suit were unconstitutional taking of land contrary to the Fifth Amendment, and unconstitutional imposition of conditions on the enjoyment of statutory benefits in that the Act sought to force the Yurok Tribe to waive its claims against the United States in order to obtain the organizational benefits of the Act, to access its share of the Settlement Fund and to obtain other benefits of the Act. The district court did not address the merits of these claims because the suit was dismissed on the procedural point that the Hoopa Valley Tribe could not be forced to join the lawsuit as a defendant against its will, and the Tribe refused to consent to have these issues litigated. The Plaintiffs efforts to amend the complaint to assert claims against Hoopa tribal officers were rejected by the court on the ground that the suit in legal effect was against the Hoopa Valley Tribe itself, which enjoyed immunity from unconsented suit. The Court of Appeals affirmed this ruling, Shermoen v. United States, 982 F.2d 1312 (9th Cir. 1992), and the plaintiffs declined to seek review in the Supreme Court.

Following Shermoen, tribes and individuals aggrieved by the Act sought relief in the form of monetary compensation in the federal claims court. The first claim was filed by the Karuk Tribe in 1990, followed by a similar claim in 1991 by a group of Yurok plaintiffs led by Carol Ammon. The Yurok Tribe filed a takings claim under the Fifth Amendment in 1992. These cases were consolidated for decision by the Court of Federal Claims.

The Yurok complaint asserted a single cause of action alleging that the Yurok Tribe had a compensable interest in the joint Hoopa Valley Reservation, and that the Act took that interest without due process and just compensation as required by the Fifth Amendment to the Constitution. Alternatively, the complaint alleged that the Yurok Tribe had compensable rights based on its 125 years of continuous occupation and use of the joint reservation. Although the complaint sought no relief against the Hoopa Valley Tribe, the Tribe voluntarily intervened in order to protect a perceived threat to the benefits it received under the Act. A successful suit under the Fifth Amendment takings theory advanced by the Yurok Tribe would not have affected the interests of the Hoopa Valley Tribe, inasmuch as the only relief would have been monetary compensation from the United States to the Yurok Tribe for the loss of its rights in the joint reservation.

Judge Margolis ruled that none of the plaintiff tribes or groups had an interest in the joint reservation that was "compensable" under the Constitution. As a result, the court held that the Hoopa-Yurok Settlement Act did not take any property interest of the plaintiffs that was protected by the Constitution. Karuk Tribe of California v. United States, 41 Fed.Cl. 468 (Fed.Cl. 1998).