On April 18, 2000, a sharply divided Federal Circuit Court of Appeals affirmed by a 2-1 vote the decision of the U.S. Court of Federal Claims dismissing the Yurok Tribe's claim. Karuk Tribe of California v. Ammon, 209 F.3d 1366 (Fed.Cir. 2000). The majority ruled that the 1864 Act of Congress that created the Reservation did not give any Indians constitutionally compensable rights in the Hoopa Square. They held that the Square could be terminated or abolished without compensation to the Indian tribes that resided there. Relying on a case from the Termination era of federal Indian law and policy, the court ruled that Indian occupancy may be extinguished by the government "without compensation, unless an Act of Congress has specifically recognized the Indians' ownership rights." Id. at 1380.

The majority accepted the Yurok Tribe's argument that the 1864 Act was designed to secure a permanent peace, but concluded that this was to be accomplished by the President's total discretion to change and abolish the reservations. The court concluded: "Because plaintiffs have not shown possession of compensable property rights, this court need not examine whether the 1988 Settlement Act took or extinguished any rights." Id.

Judge Newman dissented from the decision and wrote an opinion characterizing the majority's reasoning as "incorrect as well as unjust." She particularly faulted the majority for its disregard of the fact that the Yurok Tribe has been in "unchallenged possession" of the Joint Reservation for "over a century." Id. at 1381. She also disagreed with the majority's definition of compensable property rights, finding that "[o]n any definition of the property rights and interests cognizable under the Fifth Amendment, those of the Indian plaintiffs constitute an interest subject to just compensation." Id. at 1382-83.

On March 26, 2001, the U.S. Supreme Court declined to review the decision, and the judgment dismissing the case became final. 121 S.Ct. 1402 (2001).

Settlement Negotiations

In 1996, the Yurok tribe and the Department of the Interior engaged in settlement negotiations. These negotiations were att the behest of the Yurok Tribe and were based on Assistant Secretary Deer□s determination that although the Yurok Tribe□s conditional waiver, was not yet effective in her view, it was filed in a timely basis and could be amended if negotiations were successful and Yurok Tribe v. United States was then dismissed. Secretary Babbitt appointed a special negotiator and extensive settlement discussions were held that focused on the demonstrated inequity caused by the HYSA in the relative, land, resource, and income base of the two separated and newly created Reservations. The Yurok Tribe was able to demonstrate that the annually the timber resource was economically at least 80 times more lucrative than commercial fishery resource. As noted the Yurok land base was a mere 3500 acres compared to the 89,000 acres of the Hoopa Valley Reservation. The Yurok Tribe asked for a coherent land base, including reacquiring all or most of the lands within the current

Reservation boundaries, a sufficient forestry landbase within the Reservation and from nearby lands (however, not from the Hoopa Valley Reservation), significant money damages, the establishment of a cultural district (pristine wilderness) in an area adjacent to the Reservation necessary to protect the religious and cultural identity of the Yurok people, and a commitment of designated federal program dollars to provide for the necessary infra-structure for the Reservation (roads, bridges, telephone service, electrification), and restoration and enhancement of the Klamath River and its tributaries. Although progress was made in these negotiations, the Department, in concert with the Department of Justice decided to suspend settlement negotiations until the legal issues could be fully litigated.

Recommendations for Legislation

The Department's recommendations for legislation are based on premise that Congress' assumption about fairness of the Act and the relative value of benefits provided to the Hoopa Valley Tribe and the Yurok Tribe have turned out to be erroneous. In fact, Congress provided for this eventuality in section 1300i-11(c), which directs the Department to submit a report to Congress with recommendations for supplemental funding and any "modifications" to the Act required to correct inequities that have arisen. The value of Yurok land received under the Act and the value of the land and resources received by the Hoopa Valley Tribe were grossly disproportionate in favor of the Hoopa Tribe. Congress' apparent reliance on the value of the Yurok fishery was based on the mistaken assumption of its value. The fishery is in steep decline and rarely provides any income to the Tribe. Coho salmon were recently listed as endangered by the National Marine Fisheries Service under the Endangered Species Act, which prohibits the Tribe from harvesting these fish. The listing indicates that other salmon species are in trouble as well.

Under these circumstances, the Department recommends that as a matter of history, fairness and equity, the Yurok Tribe is entitled an enhanced asset base.

a. The Settlement Fund. As noted, the Settlement Fund was made up of escrowed timber revenues from the joint assets of the Reservation, after the decisions in the Short cases, but before the Reservation was divided pursuant to HYSA. These escrow accounts were set up after providing the Hoopa Valley Tribe with 30% of the timber proceeds. At the time of the development of the escrow accounts, it was contemplated that the remaining 70% would go the remaining 70% of the population of the joint Reservation. Instead HYSA transformed these escrowed funds into the Settlement Account. The Hoopa Valley Tribe received 30% off the top from the timber revenues and then under the HYSA another 40% of the balance of the revenues at the time on the distribution to it based on its waiver and relative population. This means that of the 100% of the timber revenues post Short but before the HYSA,, the Hoopa Valley Tribe received approximately 60% of

the funds. While the balance of the Fund, intended for the Yurok Tribe has grown to $70 million through accumulated interest/investment, no new post HYSA timber revenues or federal appropriations have been added to the Account. Since the HYSA, the more than $80 million in timber revenues from the Square has belonged to the Hoopa Valley Tribe. The Department believes there is no further legal or equitable basis for allocating these funds between the two Tribes and that the balance of the fund should be transferred to the Yurok Tribe. The waiver executed by the Hoopa Valley Tribe in 1988, should preclude any claims it may assert on the balance of the funds

b. Clarify that the other benefits provided for in section 2 (c ) of the HYSA be transferred to the Yurok Tribe.

c. Congress, should, in cooperation with the Administration and the Yurok Tribe, develop legislation authorizing equitable relief for the Yurok Tribe. Such legislation should be modeled upon the Settlement Negotiations efforts made in 1996 and should include: a land acquisition fund and authority to reacquire the lands within the Reservation boundary; acquisition of adjacent federal lands (not Hoopa lands) to provide an adequate timber resource; the establishment of cultural district adjacent to the Reservation to preserve in a pristine manner the high country used for religious observances; dedicated federal programs to address infra-structure needs(e.g., roads, electrification, telephone service, bridges, etc.); a financial settlement; and enhancement of the Klamath River system (restoration of the vitality of the fishery).

July 27, 2001

Gale Norton, Secretary
Department of Interior
1849 C Street NW
Washington, D.C. 20240

Re: Secretarial Report to Congress Required by Hoopa-Yurok Settlement Act § 14(c)

Dear Secretary Norton:

Litigation anticipated by the Hoopa-Yurok Settlement Act has been completed. Although the United States and the Hoopa Valley Tribe prevailed in that litigation, and the Hoopa-Yurok Settlement Act was upheld in every respect, the Act requires the Secretary to prepare and submit to Congress a report by September 24, 2001 (180 days after denial of certiorari in *Karuk Tribe of California v. Ammon*, 121 S. Ct. 1402 (2001)).

Section 14(c) of the Act requires:

> The Secretary shall prepare and submit to the Congress a report describing the final decision in any claim brought pursuant to subsection (b) of this section against the United States or its officers, agencies, or instrumentalities . . . . no later than 180 days after the entry of final judgment in such litigation. The report shall include any recommendations of the Secretary for action by Congress, including, but not limited to, any supplemental funding proposals necessary to implement the terms of this subchapter and any modifications to the resource and management authorities established by this subchapter.

25 U.S.C. § 1300i-11(c).

Attached is our recommendation for that report. Please contact me or our tribal attorney, Tom Schlosser ((206) 386-5200), as issues arise in the preparation of that report.

Sincerely yours,

HOOPA VALLEY TRIBAL COUNCIL

C. Lyle Marshall, Chairman

Enclosure

C:\WINDOWS\TEMP\Nort0720.wpd
ajd:07/20/01

**DRAFT**

# REPORT OF THE SECRETARY OF THE INTERIOR PURSUANT TO SECTION 14(c) OF PUB. L. 100-580

## 1. Introduction.

The landmark Hoopa-Yurok Settlement Act adopted by the 100th Congress was intended to partition certain reservation lands between two tribes in Northern California, the Hoopa Valley Indian Tribe and the Yurok Tribe, to resolve lengthy litigation between the United States, the Hoopa Valley Tribe, and a large number of individual claimants, and to remove the legal impediments to Hoopa Valley Tribe and Yurok Tribe self-governance. Congress accurately foresaw that the Settlement Act would be tested in court. Now that such litigation is completed, this is the report required by § 14(c) of the Act, codified at 25 U.S.C. § 1300i-11(c).[1]

---

[1] Section 14(c) provides:

> (1) The Secretary shall prepare and submit to the Congress a report describing the final decision in any claim brought pursuant to subsection (b) of this section against the United States or its officers, agencies, or instrumentalities.
>
> (2) Such report shall be submitted no later than 180 days after the entry of final judgment in such litigation. The report shall include any recommendations of the Secretary for action by Congress, including, but not limited to, any supplemental funding proposals necessary to implement the terms of this subchapter and any modifications to the resource and management authorities established by this subchapter. Notwithstanding the provisions of section 2517 of Title 28, any judgment entered against the United States shall not be paid for 180 days after the entry of judgment; and, if the Secretary of the Interior submits a report to Congress pursuant to this section, then payment shall be made no earlier than 120 days after submission of the report.

25 U.S.C. § 1300i-11(c).

This report will summarize the Settlement Act, the litigation concerning it, the final decision and claims regarding it, and the recommendations of the Secretary for action by Congress. As set forth below, the Secretary recommends that funding be provided for preparation of the plan for economic self-sufficiency of the Yurok Indian Tribe; that Bureau of Land Management parcels adjacent to the reservations be conveyed to the tribes; and that consideration be given to legislation to address the consequences of the Yurok Tribe's refusal to enact the claim waiver required by § 2 of the Settlement Act to obtain certain benefits and to clarify the resource and management authorities approved through ratification of the Hoopa Valley Tribe's Constitution in § 8 of the Act.

**2. Reasons for the Hoopa-Yurok Settlement Act.**

The lengthy and complex crisis that led to the Hoopa-Yurok Settlement Act grew from a single source: federal actions construed in the *Short* case. The Hoopa Valley Reservation, as it existed from 1891-1988,[2] consisted of three parcels, of which the "Square" was the largest. The first parcel, the Klamath River Reservation was reserved by Executive Order in 1855. In 1864 Congress passed a statute authorizing only four reservations for the Indians in California and later that year the Square was identified as one of them. An Executive Order in 1876 formally defined the boundaries of the Square. The third parcel, a thirty-five mile strip along the Klamath River between the two reservations, gained reservation status in 1891 by an Executive Order that joined

---

[2] The reservation consisting of the Square, the former Klamath River Reservation, and the Connecting Strip has been referred to variously as the "Hoopa Valley Reservation," "former Reservation" and "Joint Reservation." For clarity, this Report uses the term "1891 Reservation" to refer to the three-parcel reservation as it existed between 1891 and 1988.

the Klamath River and Hoopa parcels. Thus after 1891, the three parcels were enclosed within continuous boundaries.

As connected by the Executive Orders, the 1891 Reservation spanned traditional tribal areas of two tribes, the Hoopas and the Yuroks. Although their traditional areas were connected by Executive Orders, the social structure and political organization of the groups remained separate. The Hoopas on the Square and the Yuroks on the "Extension" (the Klamath River Reservation plus the "Connecting Strip") both rejected the 1934 Indian Reorganization Act. Strong tribal government developed and flourished on the Square, starting just after the turn of the century. Yurok organization splintered, and in the 1950s the Bureau of Indian Affairs declined to approve Yurok constitutions.

The Yurok parcels were largely allotted in the 1890s, including valuable timber land, but most of the timbered areas of the Hoopa Square were reserved from allotment. By 1955 little unallotted land and timber remained on the Extension. In 1955, at the request of the Hoopa Valley Tribe, the Bureau of Indian Affairs began to sell timber from the unallotted lands of the Square. The Bureau distributed the proceeds as directed by the constitutionally-established Hoopa Valley Business Council, primarily in per capita payments to Hoopa tribal members. The Interior Department Solicitor approved this. 65 I.D. 59, 2 Op. Sol. Int. 1814 (1958). Nonmembers of the Hoopa Valley Tribe sued the United States in 1963, claiming that, although they were not enrolled in any tribe, they too should receive per capita payments. *Jessie Short, et al. v. United States*, No. 102-63 (Ct. Cl.).[3]

---

[3] *Short v. United States* includes seven reported opinions, 202 Ct. Cl. 870 (1973); 661 F.2d 150 (Ct. Cl. 1981); 719 F.2d 1133 (Fed. Cir. 1983); 12 Cl. Ct. 36 (1987); 25 Cl. Ct. 722 (1992); 28 Fed. Cl. 590 (1993); and 50 F.3d 994 (Fed. Cir. 1995), and hundreds of unreported

In 1973 the *Short* court ruled that from 1891 onward the three reservation parcels were a single unified reservation and that the Bureau had violated statutory trust duties to non-Hoopa "Indians of the Reservation" when it excluded them from tribal per capita payments. 202 Ct. Cl. 870 (1973) (per curiam), *cert. denied*, 416 U.S. 961 (1974). In 1981 the Court of Claims rejected arguments that it was improperly determining tribal membership for the plaintiffs, but it nevertheless directed the trial judge to fashion standards for determining which of the 3,851 plaintiffs were "Indians of the Reservation." The standards were created by adapting five separate membership standards used by the Hoopa Valley Tribe in preparing its roll in 1949-72. 661 F.2d 150 (Ct. Cl. 1981) (en banc), *cert. denied*, 455 U.S. 1034 (1982).

On remand in 1982, the *Short* trial judge defined Standards A, B, C, D and E based on the Hoopa standards and suggested that other plaintiffs could qualify as needed to avoid a "manifest injustice." On appeal, the new court of appeals upheld those standards. It also ruled that 25 U.S.C. § 407, the general tribal timber statute applicable to all reservations (which requires that timber proceeds should be used for the benefit of Indians who are "members of the tribe or tribes concerned"), does not restrict proceeds to federally-recognized tribes, or organized tribes, but instead includes all the individual Indians who were "communally concerned with the proceeds." 719 F.2d 1133, 1136 (Fed. Cir. 1983), *cert. denied*, 467 U.S. 1256 (1984).

While the *Short* judge worked on the entitlement claims of thousands of individual plaintiffs, six of the *Short* claimants filed a new suit in the federal district court for the Northern District of California. *Puzz v. Department of the Interior and the Hoopa Valley Business Council*,

---

orders. *Short*, still pending after 38 years, also spawned many related lawsuits. *Short* is a "breach of trust" case against the United States, filed in the Court of Claims in 1963 because of Bureau of Indian Affairs' handling of timber monies generated from the "Hoopa Square."

No. C 80 2908 TEH (N.D. Cal.). The *Puzz* group sought an order withdrawing federal recognition from the Hoopa Valley Tribe as the governing body of the Square and compelling creation of a tribal government for the entire 1891 Reservation, which would govern both Hoopas and plaintiffs.

In an unreported order dated April 8, 1988, Judge Henderson refused the relief the *Puzz* plaintiffs had requested, but he ruled that the Bureau had a trust obligation to administer the 1891 Reservation for the benefit of all persons who trace their ancestry to Indians connected with any of the three parcels comprising the 1891 Reservation, either now or any time in the past. Judge Henderson prohibited the Bureau from permitting use of tribal timber funds for any purpose that did not equally benefit all "Indians of the Reservation" (a term that he did not define), and he ruled that the Bureau must run the 1891 Reservation for the benefit of the "Indians of the Reservation" and could not permit the Hoopa Valley Business Council to exercise sovereignty over the Hoopa Square as provided in the Hoopa Valley Tribe's constitution.

Settlement efforts in *Short* in the 1970s and 1980s were frustrated by the thousands of individuals involved. No agreement could be reached that suited every claimant. Finally, Judge Henderson's April 8, 1988, order created such a morass that the California congressional delegation acted. On April 24, 1988, the Hoopa-Yurok Settlement Act was introduced by Congressman Bosco as H.R. 4469. Two House and two Senate hearings were held in June and September 1988. The Senate version of the bill, S. 2723, was signed into law on October 31, 1988, as Public Law 100-580, 102 Stat. 2924.[4]

[4] The Settlement Act mooted the April 8 *Puzz* order, and Judge Henderson vacated it on December 17, 1988.

### 3. Provisions of the Hoopa-Yurok Settlement Act.

The Settlement Act was tailored to the unique legal situation and problems created by *Short*, *Puzz*, and the related cases. The cases frustrated territorial management by the Hoopa Valley Tribe, made it impossible for the Yurok Tribe to organize, and for either Tribe to effectively define its members. Those cases also held that neither Indian tribes nor individual Indians held vested (Fifth Amendment-protected) rights in the lands of the 1891 Reservation. Instead, 1891 Reservation rights remained subject to alteration and divestment, as did such rights in Hopi and Navajo lands for some time. Basically, therefore, the Settlement Act established a method to divide the 1891 Reservation lands into two reservations, to expedite the completion of the litigation, and to enable the Yurok Tribe to organize a tribal government so that each tribe could exercise sovereignty over its reservation.[5]

Section 2 of the Settlement Act authorized splitting the 1891 Reservation into the new Hoopa Valley Reservation and the Yurok Reservation, conditioned upon the Hoopa Valley Tribe enacting a resolution waiving certain claims. Yurok reservation land benefits were similarly conditioned upon a claims waiver. Section 2 provided the permanent vested legal rights in the new reservations that the *Short* case found lacking.[6]

The Hoopa Valley Business Council adopted the required resolution waiving certain claims. As a result, the 1891 Reservation was partitioned into the Hoopa Valley Reservation and

---

[5] The report of the Select Committee on Indian Affairs, *Partitioning Certain Reservation Lands Between the Hoopa Valley Tribe and the Yurok Indians, to Clarify the Use of Tribal Timber Proceeds, and for Other Purposes*, S. Rep. 564, 100th Cong., 2nd Sess. (1988), contains the most authoritative legislative history on the Act.

[6] S. Rep. at 2.

the Yurok Reservation on December 7, 1988. 53 Fed. Reg. 49,361. The Hoopa Valley Reservation comprised approximately 89,000 acres (mostly in trust status) and the Yurok Reservation, approximately 58,000 acres (mostly in nontrust status). S. Rep. at 6. As required by § 2(d)(2) of the Act, a description of the boundaries of the two new reservations appeared in the Federal Register. 54 Fed. Reg. 19,465 (May 5, 1989). Later in the year the Assistant Secretary-Indian Affairs withdrew all pre-Settlement Act policy statements on management of resources of the 1891 Reservation or the Hoopa Valley Tribe. This withdrawal mooted old controversies about the Gerard Plan, the Issue-by-Issue Process, and other *Short*-based restrictions on tribal sovereignty.

Section 4 of the Settlement Act established a Hoopa-Yurok Settlement Fund comprising all Hoopa or Yurok trust funds in existence on the date of the Act (about $65 million). Until the fund was divided in 1991, both the Hoopa Valley Tribe and the Yurok Transition Team took advances from it; the Hoopa budget advances were later deducted from the Tribe's shares. Under § 2(c), the Tribes' portions of the Settlement Fund were to be the percentage of the fund determined by dividing the number of enrolled members by the sum of those enrolled tribal members and the persons on the Hoopa-Yurok Settlement Roll, established pursuant to § 5.

Section 5 directed the Bureau to establish the Hoopa-Yurok Settlement Roll in a manner that closely followed eligibility criteria established for Indians of the Reservation in the *Short* case. With respect to *Short* plaintiffs, the Bureau was directed to follow the court's decisions on eligibility. Non-*Short* plaintiffs qualified, if at all, by meeting the court's Standards A, B, C, D, E, or MI (manifest injustice). In Pub. L. 101-301, 104 Stat. 210 (May 24, 1990), the Act was amended to make the criteria for the Settlement Roll more closely conform to rulings in *Short*. *See Making Miscellaneous Amendments to Indian Laws, and for Other Purposes*, S. Rep. 226,

101st Cong., 1st Sess. (1989). The Settlement Roll was completed and published on March 21, 1991. 56 Fed. Reg. 12062.

Section 6 established three choices that were available to persons on the Hoopa-Yurok Settlement Roll: Hoopa tribal membership, Yurok tribal membership, or receipt of a lump sum payment. No person chose Hoopa tribal membership. Approximately 2,955 persons selected the Yurok tribal membership option, together with a $5,000 payment ($7,500 for persons over age 50). The lump sum payment option, selected by approximately 708 persons, provided $15,000 in lieu of membership in the Hoopa Valley or Yurok Tribes and rights in those tribes' reservations. Opting for the lump sum payment had no effect on membership in other tribes, however. Most of the persons selecting Yurok tribal membership (about 1,800) were plaintiffs held qualified in the *Short* case. In addition to the Settlement Act payments made to those members, qualified *Short* plaintiffs ultimately received damage awards of approximately $25,000, depending upon the plaintiff's age. The *Short* damages award included principal, interest, cost reimbursement, and attorney fees under the Equal Access to Justice Act.

Sections 8 and 9 addressed tribal governance problems. Section 8 ratified and confirmed the 1972 Constitution of the Hoopa Valley Tribe. Section 9 established a Yurok Transition Team, appointed by the Secretary. After option selections were made by persons on the Settlement Roll, an Interim Council of the Yurok Tribe was elected in November 1991 to adopt a constitution and perform certain other functions, including consideration of a resolution waiving claims in order to obtain certain benefits offered in the Settlement Act.

By memorandum to the Area Director, Sacramento Area Office, the Assistant Solicitor, Branch of General Indian Legal Activities, decided certain issues raised by the Yurok Interim Council (Feb. 3, 1992):

> 1. The Interim Council of the Yurok Tribe automatically dissolved two years after November 25, 1991;
>
> 2. The Settlement Act permits three separate Yurok Interim Council resolutions, if necessary, to address claim waiver, contribution of escrow monies, and receipt of grants and contracts;
>
> 3. Refusal to pass a resolution waiving claims against the United States and/or filing a claim would prevent the Yurok Tribe from receiving the apportionment of funds, the land transfers, and the land acquisition authorities provided by various sections of the Settlement Act, but would not completely preclude the Yurok Tribe from organizing a tribal government;
>
> 4. A tribal resolution waiving claims as required by the Settlement Act is necessary to receipt of specified benefits regardless of the statute of limitations provisions of the Act; and
>
> 5. Those individuals electing the Yurok tribal membership option waive certain claims against the United States, but persons who did not choose an option within the authorized time limit and who refused to cash the check issued to them would be free to pursue litigation.

The Yurok Tribe completed a constitution on October 22, 1993, which was adopted by vote of the membership later that year. As a result, a Yurok Tribal Council was elected to govern the Tribe by the time the Interim Council of the Yurok Tribe was dissolved.

Under § 10, the Bureau, the Yurok Transition Team, and the Interim Council of the Yurok Tribe were to prepare a plan for economic self-sufficiency for presentation to Congress. However, as noted below, the plan was not actually prepared.

The Secretary was required by § 11(b) to conduct secretarial elections on three Yurok rancherias within 90 days after enactment to determine whether those tribes and rancherias would merge with the Yurok Tribe. All three rancherias rejected merger.

Sections 12-14 addressed Indian participation in the Klamath River Basin Fisheries Task Force, amendment of the general timber statute, 25 U.S.C. § 407, and a series of statutes of limitations, which set deadlines for individuals or entities wishing to challenge the legislation dividing the 1891 Reservation. All the statutes of limitation have now expired.

**4. <u>Litigation Challenging the Hoopa-Yurok Settlement Act</u>.**

On August 28, 1990, 70 individual Indians and the Coast Indian Community of the Resighini Rancheria challenged the constitutionality of the Settlement Act on a variety of grounds. *Shermoen v. United States*, No. 90-CV-2460 (N.D. Cal.). Plaintiffs asserted that, by extinguishing their interest in the Square and conferring vested rights to the Square on the Hoopa Valley Tribe, the Act effected a taking of property for a nonpublic purpose. They also alleged a violation of their First Amendment right of freedom of association in that Indians of diverse tribal affiliations could elect membership in the tribes. Plaintiffs also contended that Congress exceeded its authority over tribes and denied them equal protect of the law.

On May 23, 1991, District Judge Orrick dismissed the action with prejudice pursuant to Fed. R. Civ. P. 19(b), ruling that the absent Hoopa Valley and Yurok Tribes were indispensable parties and immune from suit. Plaintiffs' proposed amended complaint was also rejected. The court of appeals affirmed, noting that plaintiffs' remedy, if any, "must be sought in the forum envisioned by Congress–namely the Court of Claims. *See* 25 U.S.C. § 1300i-11." *Shermoen v.*

*United States*, 982 F.2d 1312, 1321 (9th Cir. 1992), *cert. denied*, 509 U.S. 903 (1993). The *Shermoen* plaintiffs and others had already initiated precisely such a suit.

On December 7, 1990, the Karuk Tribe of California filed the first taking claim in the United States Claims Court. *Karuk Tribe of California v. United States*, No. 90-3993L (Fed. Cl.). The Karuk Tribe alleged that the Act's partition of the 1891 Reservation extinguished Karuk rights in the 1891 Reservation and effected a taking of Karuk property without just compensation. The Karuk Tribe alleged that Karuk possessed real property rights in the 1891 Reservation, in addition to hunting, gathering, fishing, timber, water, mineral, and other unenumerated rights.

The second taking claim was filed on September 16, 1991, by 13 individual plaintiffs and an "identifiable Indian group," defined much as was the plaintiff group in *Short v. United States*. *Ammon v. United States*, No. 91-1432L (Fed. Cl.). *Ammon* plaintiffs also claimed that the land partition authorized in the Settlement Act extinguished or diminished their rights in the 1891 Reservation and effected a taking of their property without just compensation.

The Yurok Tribe filed the third and last taking claim on March 11, 1992. *Yurok Indian Tribe v. United States*, No. 92-CV-173 (Fed. Cl.). The Yurok Tribe, all of whose members were encompassed in the identifiable Indian group of plaintiffs in *Ammon v. United States*, made claims for a compensable taking similar to the claims made in *Karuk* and *Ammon*.

On the United States' motion, the Court of Federal Claims consolidated the three lawsuits. In 1993, the Hoopa Valley Tribe moved to intervene in the consolidated case as a defendant, and Judge Lawrence Margolis (who has retained jurisdiction of the *Short* case since 1983) granted the Tribe's request. *Karuk Tribe of California v. United States*, 28 Fed. Cl. 694 (1993). Judge Margolis noted that, unlike the *Shermoen* litigation, the takings cases did not challenge the

constitutionality of the Settlement Act. However, the Court concluded that in rendering a judgment it would necessarily resolve (1) whether the plaintiffs had property rights in the 1891 Reservation; (2) if so, whether the Settlement Act took those rights away from the plaintiffs; and (3) if it did, whether the taking was compensable. The Court concluded that the Hoopa Valley Tribe had a legally protectable property interest in its exclusive rights in the Hoopa Square and that the United States could not adequately represent the interests involved, particularly in light of the issues that would arise at stages (2) and (3) of the case.

On cross-motions for summary judgment, Judge Margolis determined that the plaintiff groups did not possess a vested, compensable property interest in the 1891 Reservation. As a result, the Court held that plaintiffs never had a compensable property interest prior to 1988, and the Settlement Act did not take away any private property owned by plaintiffs. *See Karuk Tribe of California v. United States*, 41 Fed. Cl. 468 (Aug. 6, 1998).

On April 18, 2000, the United States Court of Appeals for the Federal Circuit affirmed Judge Margolis, by a two-to-one vote. *Karuk Tribe of California v. Ammon*, 209 F.3d 1366 (Fed. Cir. 2000). Like Judge Margolis, the appeals court concluded that the 1864 Act which authorized establishment of the 1891 Reservation did not give California Indians vested property rights in the land set aside. However, pursuant to the Settlement Act, the Hoopa Valley Tribe and the Yurok Tribe did obtain permanent property rights to their reservations in 1988.

After the appeals court panel issued its opinion, plaintiffs asked the full Court to reconsider the issue and revise the panel's conclusions, but the Court refused. Plaintiffs petitioned for U.S. Supreme Court review, but on March 26, 2001, the United States Supreme Court decided not to review the case. 121 S. Ct. 1402 (2001). The denial of certiorari marks the final decision in the

claims brought pursuant to 25 U.S.C. § 1300i-11(b) and thus activates the requirement that the Secretary prepare and submit to Congress a report describing the decision and her recommendations.

### 5. Recommendations and Observations of the Secretary.

#### a. The Withheld Benefits of the Settlement Act Should Be Distributed Fairly Between the Hoopa Valley and Yurok Tribes.

Section 2 of the Settlement Act, 25 U.S.C. § 1300i-1, withheld the benefits of the settlement from both the Hoopa Valley and Yurok Tribes unless and until those tribes enacted a waiver of claims in favor of the United States and affirmed tribal consent to contribution of monies to the Settlement Fund. *See* 25 U.S.C. § 1300i-1(a)(2) and (c)(4). The claim waiver did not affect plaintiffs' entitlement and judgment in the *Short* case. As noted above, the Hoopa Valley Tribe enacted the requisite resolution in 1988. The Yurok Tribe, however, was unable to act upon the resolution until the Yurok Interim Council was elected pursuant to § 9 of the Act.

The Settlement Act contemplated prompt action by the Hoopa Valley and Yurok Tribes to enact the waivers and obtain the benefits of the Act. *See* HYSA § 2(c)(4)(D), § 9(d)(5). Although elected in 1991, the Yurok Interim Council did not act to make a waiver until November 24, 1993, when it adopted Resolution No. 93-61.

The Department held that Resolution No. 93-61 "is not a resolution 'waiving any claim the Yurok Tribe may have against the United States arising out of the provisions of the Hoopa-Yurok Settlement Act,' within the meaning of 25 U.S.C. § 1300i-1(c)(4) or 25 U.S.C. § 1300i-8(d)(2)." Letter of Ada E. Deer, Assistant Secretary–Indian Affairs, to Susie L. Long, Chair, Interim Tribal

Council, Yurok Tribe (April 4, 1994). What follows is an extensive quotation from Assistant Secretary Deer's letter:

> It is clear to us that the waiver referred to in the above-referenced provisions of the Hoopa-Yurok Settlement Act is a waiver of claims that would challenge the partition of the Joint Reservation or other provision of the Settlement Act as having effected a taking or as otherwise having provided inadequate compensation.
>
> Among other things, Resolution No. 93-61 recites that:
>
>> [T]he Interim Council believes that the Act's purported partition of the tribal, communal or unalloted land, property, resources, or rights within, or appertaining to the Hoopa Valley Reservation as between the Hoopa and Yurok Tribes was effected without any good-faith attempt to define, quantify or value the respective rights therein of the Indians of the Reservation or the Hoopa and Yurok Tribes, and so grossly and disproportionately favored the interest of the Hoopa Tribe over those of the Yurok Tribe as to constitute an act of confiscation rather than guardianship; and
>>
>> [T]he Interim Council does not believe that the Constitution of the United States would allow the federal government simply to confiscate vested Tribal or individual property rights in Reservation lands, resources or other assets without just compensation, or to condition participation in or receipt of federal benefits or programs and enjoyment of tribal property, assets and resources upon acquiescence in an unconstitutional statute.
>
> Following the recitals, the Yurok Interim Council resolved as follows:
>
>> 1. To the extent [to] which the Hoopa-Yurok Settlement Act is not violative of the rights of the Yurok Tribe or its members under the Constitution of the United States, or has not effected a taking without just compensation of vested Tribal or individual resources, or rights within, or appertaining to the Hoopa Valley Reservation, the Yurok Tribe hereby waives any claim which said Tribe may have against the United States arising out of the provisions of the Hoopa-Yurok Settlement Act;
>>
>> 2. To the extent [to] which the determination of the Yurok Tribe's share of the Escrow monies defined in the Hoopa-Yurok Settlement Act has not deprived the Tribe or its members of rights

> secured under the Constitution of the United States, the Yurok [Tribe] hereby affirms its consent to the contribution of Yurok Escrow monies to the Settlement Fund, and for their use as payments to the Hoopa Tribe, and to individual Hoopa members, as provided in the Hoopa-Yurok Settlement Act.

It is quite clear that Resolution No. 93-61 specifically preserves, rather than waives, the Yurok Tribe's taking claim against the United States. Indeed, the Yurok Tribe has filed a claim in the U.S. Court of Federal Claims asserting that the Hoopa-Yurok Settlement Act effected a taking under the Fifth Amendment of the United States Constitution. See Yurok Indian Tribe v. United States, No. 92-173-L. On February 3, 1992, the Assistant Solicitor, Branch of General Indian Legal Activities, issued a memorandum to the Area Director, Sacramento Area Office, regarding issues raised at the organizational meeting of the Yurok Interim Council held on November 25, 26, 1991. That memorandum discussed several aspects of the claim waiver resolution issue. The Assistant Solicitor stated:

> It is clear that should the Interim Council file a claim in the U.S. Claims Court on behalf of the Yurok Tribe pursuant to 25 U.S.C. § 1300i-11(a), the same consequences would follow as if it fails to enact a resolution waiving claims under 25 U.S.C. § 1300i-1(c)(4).

Accordingly, it follows that Resolution No. 93-61 is not a resolution "waiving any claim the Yurok tribe may have against the United States arising out of the provisions of this Act," within the meaning of 25 U.S.C. § 1300-1(c)(4) or 25 U.S.C. § 1300-8(d)(2). Our conclusion is consistent with your statement to the Assistant Secretary–Indian Affairs, in a letter dated August 20, 1993, that the Interim Council would not provide any such waiver during its term.

Our determination that Resolution No. 93-61 fails to meet the requirements of 25 U.S.C. § 1300-1(c)(4) means that the Yurok Tribe will be unable to enjoy the benefits conferred under Section 2 and 9 of the Hoopa-Yurok Settlement Act upon the passage of a legally sufficient waiver of claims, including the Yurok Tribe's share of the Settlement Fund under Sections 4 and 7 of the Act, the $5 million appropriated under the Snyder Act for the purpose of acquiring lands within or outside the Yurok Reservation, ownership of all Six Rivers National Forest lands within the boundaries of the old Klamath River Reservation or the Connecting Strip, and ownership of and reservation status for the Yurok Experimental Forest lands and buildings.

Shortly after the Yurok Interim Council filed its lawsuit to establish a "taking," the Hoopa Valley Tribe, through its Chairman Dale Risling, wrote to the Assistant Secretary–Indian Affairs

asking that the Interior Department establish Hoopa tribal access to the funds that remained in the Hoopa-Yurok Settlement Fund. Hoopa Chairman Risling's letter noted that proceedings in another case, *Heller, Ehrman, White, and McAuliffe v. Babbitt*, 992 F.2d 360 (D.C. Cir. 1993), established that only 1.26303 percent of the money in the Settlement Fund was derived from the Yurok Reservation and the remainder was derived from the Hoopa Reservation.

On April 13, 1992, Assistant Secretary–Indian Affairs Eddie F. Brown responded to Chairman Risling as follows:

> It is clear that the Interim Council's decision to file the above-referenced claim in the U.S. Claims Court means that the same consequences follow as if it fails to enact a resolution waiving claims against the United States. Therefore, unless and until the Interim Council waives the Tribe's claims and dismisses its case against the United States, it will neither have access to its portion of the Settlement Fund, nor will title to all national forest system lands within the Yurok Reservation, and to the portion of the Yurok Experimental Forest described in the Settlement Act, be taken in trust for the Yurok Tribe. In addition, the Secretary will be unable to proceed with the acquisition of any lands or interests in land for the Yurok Tribe, or with spending any appropriated funds for this purpose.

The Hoopa Valley Tribe has continued to assert its right to a portion of the benefits offered to and rejected by the Yurok Tribe. The Hoopa Valley Tribe has had the "laboring oar" and has incurred substantial expense in the litigation brought by the Yurok Tribe and its members.

Most recently, on April 4, 2001, Hoopa Valley Tribal Council Chairman Sherman wrote to Ronald Jaeger, Regional Director, Pacific Regional Office, Bureau of Indian Affairs, saying:

> We urge the Bureau to be careful not to permit the Yurok Tribe to seize the benefits it has refused, benefits to which it is not lawfully entitled. The Yurok Tribe has occupied the Experimental Forest lands and buildings and may propose timber sales on the former Forest Service properties. These benefits, like the money in the Settlement Fund, account Hoopa-Yurok Settlement–7193, do not belong to the Yurok Tribe . . . . We recommend that the Interior Department's report . . . include a recommendation that the remaining funds from the Hoopa Square be returned to the Hoopa Valley Tribe.

After due consideration, the Secretary recommends that the suspended benefits of the Hoopa-Yurok Settlement Act, which include the national forest system lands within the Yurok Reservation, the improved properties located in the former Yurok Experimental Forest, the $5 million appropriated for land acquisition on and near the Yurok Reservation, and the funds remaining in the account Hoopa-Yurok Settlement–7193, be valued and divided equally between the two tribes. As a portion of its allocation, the Yurok Tribe should receive the Six Rivers National Forest lands within the boundaries of its Reservation and the Yurok Experimental Forest lands and buildings. Those properties should be declared part of the Yurok Tribe's Reservation.

**b. <u>The Yurok Tribe Economic Self-Sufficiency Plan Should Be Prepared and Funded</u>.**

Section 10 of the Settlement Act required the Secretary to enter into negotiations with the Yurok Transition Team and the Interim Council of the Yurok Tribe with respect to establishing a plan for economic development and, upon approval of that plan, to submit it to Congress. 25 U.S.C. § 1300i-9(a). Among other things, that section of the Act required consultation with state and local officials and directed that real property be taken in trust by the United States for the benefit of the Tribe. The Indian Affairs Committee report on the Act explains the self-sufficiency plan as follows:

> The amendment added a new Section 10 direction that a plan for economic self-sufficiency for the Yurok Tribe be developed and submitted to Congress by the Secretary of the Interior, in conjunction with the Interim Council of the Yurok Tribe and the Yurok Transition Team, to determine the long-term needs of the Tribe. The Secretary is expected to seek the assistance and cooperation of the secretaries of Health and Human Services and other federal agencies. The Committee is aware that the Yurok Tribe has not received the majority of services provided to other federally recognized tribes. As a result it lacks adequate housing and many of the facilities, utilities, roads and other infrastructure necessary for a developing community. In addition, the Committee is aware that many of the road, realty and

> fisheries management services on the "Addition" have been provided in the past by the Hoopa Valley Tribe. The Committee is, therefore, concerned about how the Bureau of Indian Affairs plans to address these needs, and directs the Secretary to work with the Yurok Tribe to develop proposed solutions to these and other related problems. *The Committee is specifically interested in the feasibility and cost of constructing a road from U.S. Highway 101 to California Highway 96.* It is also concerned that the Department of the Interior does not currently have adequate land records and surveys of the "Addition". The Committee, therefore, expects that the Department will conduct all necessary surveys to ascertain the legal status of such lands. It also expects the plan to address such things as the number of additional federal employees required to service the Yurok tribe and placement of the Tribe's facilities construction needs on the BIA, IHS, and other federal agency construction priority lists. The Committee wishes to clarify, however, that the development of this plan should in no way delay the provision of services to the Yurok Tribe and/or the construction of federal and tribal facilities.

S. Rep. 100-564 at 28-29 (Sep. 30, 1988) (emphasis added).

The economic self-sufficiency plan has never been completed or submitted to Congress, for reasons that are not entirely clear. However, the Committee's clarification that development of the plan should not delay provision of services to the Yurok Tribe has been noted. Indeed, the Yurok Tribe has received tens of millions of dollars through its Self-Governance Compact process as well as similar or greater funding from other federal, state, and local agencies. However, the Secretary is unaware of any feasibility study concerning the cost of constructing a road from U.S. Highway 101 to California Highway 96 and this and other objectives of the self-sufficiency plan should be carried forward at this time.

### c. <u>The Effect of the Hoopa Valley Tribe's Ratified Constitution May Need to be Clarified</u>.

Congress addressed tribal authority over the post-1988 Hoopa Valley Reservation in the Settlement Act. The Act restored tribal governmental authority in these words:

> The existing governing documents of the Hoopa Valley Tribe and the governing body established and elected thereunder, as heretofore recognized by the Secretary, are hereby ratified and confirmed.

25 U.S.C. § 1300i-7. This provision responded directly to one of the court cases that led to passage of the Settlement Act, *Puzz v. Department of Interior*, No. C80-2908-TEH, 1988 WL 188462 (N.D. Cal. 1988), which held that because of the peculiar way the 1891 Reservation had been established, unless Congress acted to give tribes authority over the Reservation lands, tribal governments lacked territorial management powers. Congress gave the Hoopa Valley Tribe that authority in 25 U.S.C. § 1300i-7, which gave the force of federal law to provisions of the Tribe's constitution.

The Hoopa Valley Tribe's Constitution was carefully identified in 25 U.S.C. § 1300i(b)(4), and contains specific authorization to the Hoopa Valley Tribal Council to govern all lands within the "Hoopa Valley Reservation." Several provisions of the Tribe's Constitution apply to nontribal members on the Reservation and the Tribe's 1988 claims waiver resolution (which the Bureau approved and published) noted the Tribe's need "to govern non-members." In *Bugenig v. Hoopa Valley Tribe*, No. C98-3409CW (U.S. D.C. N.D. Cal. 1999), Judge Wilken held § 8 of the Act gave to every clause of the ratified Constitution the full force and effect of a congressional statute. However, that holding is challenged in a pending appeal.

Upon division of the 1891 Reservation into a new Hoopa Valley Reservation and a Yurok Reservation, the Hoopa Valley Tribe became the sole beneficial owner of the unallotted (communal) land of its Reservation. 25 U.S.C. § 1300i-1(b). That provision changed the facts that led the *Puzz* court to hold that the Hoopa Valley Tribe lacked territorial management authority over the 1891 Reservation. The result of § 2 of the Act was that non-Indians would own less than

1 percent of the land of the new Reservation and that the Tribe would have the ability to "define the essential character" of the Reservation. *See Brendale v. Confederated Tribes and Bands of the Yakima Indian Nation*, 492 U.S. 402, 441 (1989). However, testimony received by the House and the Senate showed that restoring tribal government authority required more–a delegation of express statutory authority to the Tribe to administer matters over all Reservation residents, including nonmembers. As a result, at mark-up the House Interior and Insular Affairs Committee added Section 8 to H.R. 4469, which became part of the final Act and is codified at 25 U.S.C. § 1300i-7.

Congress's "fix" of tribal government authority may need to be clarified because of *Bugenig v. Hoopa Valley Tribe*, 229 F.3d 1210 (9th Cir. 2000), an opinion that held Congress did not authorize the Hoopa Valley Tribe to regulate the actions of nonmembers because its delegation was not truly "expressed." The court said that "if Congress uses the 'notwithstanding proviso,' which is an easily invoked, court-approved 'gold standard' for delegation, then an appropriate delegation has been made . . . . [A]lternative language must, on its face, represent a pellucid delegation of the claimed authority." *Bugenig*, slip op. at 12,742-43. The court found Congress's action delegating governmental authority to the Tribe in the Hoopa-Yurok Settlement Act did not meet that high standard. Although this problem arose in the context of the *Bugenig v. Hoopa Valley Tribe* case, it is a broad ruling and by no means limited in scope to protection of archeological sites (the *Bugenig* situation). General land use authority may not be exercisable without congressional action. A technical amendment to § 8 of the Settlement Act could clarify matters by adding the following: "The Tribe shall have jurisdiction in accordance with such documents notwithstanding the issuance of any fee patent or right-of-way."

On February 28, 2001, the Ninth Circuit Court of Appeals issued an order granting rehearing en banc in *Bugenig*, 240 F.3d 1215 (9th Cir. 2001). The case was argued and submitted on June 19, 2001, but remains undecided. Unless the Court of Appeals ultimately agrees with the lower court and concludes that Congress in § 8 of the Settlement Act intended to make the Hoopa Valley Tribe's Constitution applicable to all persons and property within the geographic limits of the Reservation, in accordance with the terms and procedures of the Constitution, then legislative clarification will be necessary.

In the Secretary's view, Congress did consider tribal authority over fee-patented land owned by nonmembers of the Hoopa Valley Tribe. That authority was specifically mentioned by witnesses representing various interests[7] and the Committee reports make clear the Act's intent to approve and confirm in the Hoopa Valley Tribal Council territorial management power throughout its reservation.

**d. Bureau of Land Management Parcels Adjacent to the Reservation Should be Conveyed to the Tribes.**

In addition to Six Rivers National Forest, a variety of federal agencies have come into possession of lands adjacent to or near the Yurok and Hoopa Valley Indian Reservations. Some of these lands have a clear historical connection to the tribes or the Reservations. These properties should be conveyed to and managed by the Tribes.

---

[7] *E.g.*, House Interior Committee Hearing–Serial No. 100-75 (June 21, 1988) at 57, **101**, **145** (nonmember fears zoning her fee land); Senate Select Committee Hearing, S. Hrg. 100-946 (June 30, 1988) at 28; Senate Select Committee Hearing, S. Hrg. 100-949 (Sept. 14, 1988) at 50, 66-67, 152-53; Subcom. of the House Judiciary Committee, Serial No. 77 (Sept. 30, 1988) at 27, 32, 54, 64, **155**.

For example, along the northern boundary of the Hoopa Square, a wedge of BLM land has become known as the "no man's land." The origin of those BLM lands seems to be found in the conflicting efforts of two federal surveying parties, the Bissel-Smith group and the Haughn group, to project the northern boundary of the Hoopa Valley Reservation. Section 2(d) of the Settlement Act provides that the boundary of the Hoopa Valley Reservation and the Yurok Reservation after partition shall be that established by the Bissel-Smith survey. However, that boundary did not resolve the disposition of the BLM parcels in that area which are adjacent to the Hoopa Valley Reservation but do not touch the Yurok Reservation. The Hoopa Valley Tribe and BLM staff have discussed the procedure for transferring these lands to tribal ownership for a number of years, but it is clear that direct legislative authorization is the simplest way to achieve this. Accordingly, conveyances to the Tribe should occur.[8]

C:\WINDOWS\TEMP\HYSARpt.wpd
ajd:07/20/01

[8] Specifically, these parcels are: T.9N., R.4E., HUM, Section 8, Lot 3, Section 9, Lots 19 and 20, Section 17, Lots 3-6, Section 18, Lots 7-10 (317.16 acres); T.9N., R.3E., HUM, Section 13, Lots 8-12, Section 14, Lot 6, Section 23, Lots 7 and 8, Section 26, Lots 1-3 (228.68 acres); and T.7N., R./4E., HUM, Section 7, Lot 6, Section 7, Lot 1, Section 18, NENE (59.24 acres). The total transfer of BLM land would be 605.08 acres.