S. HRG. 107–648

# HOOPA-YUROK SETTLEMENT ACT

## HEARING

BEFORE THE

## COMMITTEE ON INDIAN AFFAIRS UNITED STATES SENATE

ONE HUNDRED SEVENTH CONGRESS

SECOND SESSION

ON

OVERSIGHT HEARING ON THE DEPARTMENT OF THE INTERIOR SECRETARY'S REPORT ON THE HOOPA YUROK SETTLEMENT ACT

AUGUST 1, 2002
WASHINGTON, DC

U.S. GOVERNMENT PRINTING OFFICE

81–636 PDF WASHINGTON : 2003

For sale by the Superintendent of Documents, U.S. Government Printing Office
Internet: bookstore.gpo.gov Phone: toll free (866) 512–1800; DC area (202) 512–1800
Fax: (202) 512–2250 Mail: Stop SSOP, Washington, DC 20402–0001

COMMITTEE ON INDIAN AFFAIRS

DANIEL K. INOUYE, Hawaii, *Chairman*
BEN NIGHTHORSE CAMPBELL, Colorado, *Vice Chairman*

KENT CONRAD, North Dakota
HARRY REID, Nevada
DANIEL K. AKAKA, Hawaii
PAUL WELLSTONE, Minnesota
BYRON L. DORGAN, North Dakota
TIM JOHNSON, South Dakota
MARIA CANTWELL, Washington
FRANK MURKOWSKI, Alaska
JOHN McCAIN, Arizona,
PETE V. DOMENICI, New Mexico
CRAIG THOMAS, Wyoming
ORRIN G. HATCH, Utah
JAMES M. INHOFE, Oklahoma

PATRICIA M. ZELL, *Majority Staff Director/Chief Counsel*
PAUL MOOREHEAD, *Minority Staff Director/Chief Counsel*

# CONTENTS


Page

Statements:

Campbell, Hon. Ben Nighthorse, U.S. Senator from Colorado, vice chairman, Committee on Indian Affairs ..... 2

Inouye, Hon. Daniel K., U.S. Senator from Hawaii, chairman, Committee on Indian Affairs ..... 1

Jarnaghan, Joseph, tribal councilman, Hoopa Valley Tribal Council ..... 14

Marshall, Sr., Clifford Lyle, chairman, Hoopa Valley Tribal Council ..... 12

Masten, Sue, chairperson, Yurok Tribe ..... 20

McCaleb, Neal, assistant secretary, BIA, Department of the Interior ..... 3

Schlosser, Thomas, counsel, Hoopa Valley Tribal Council ..... 16

APPENDIX

Prepared statements:

Jarnaghan, Joseph ..... 29

Marshall, Sr., Clifford Lyle (with attachments) ..... 33

Masten, Sue (with attachments) ..... 62

McCaleb, Neal (with attachments) ..... 82

Schlosser, Thomas ..... 30

Additional material submitted for the record:

Hoopa-Yurok Settlement Act Funding History ..... 89

# HOOPA-YUROK SETTLEMENT ACT

---

**THURSDAY, AUGUST 1, 2002**

U.S. SENATE,
COMMITTEE ON INDIAN AFFAIRS,
*Washington, DC.*

The committee met, pursuant to other business, at 10:18 a.m. in room 485, Senate Russell Building, Hon. Daniel K. Inouye (chairman of the committee) presiding.

Present: Senators Inouye, Campbell, and Reid.

## STATEMENT OF HON. DANIEL K. INOUYE, U.S. SENATOR FROM HAWAII, CHAIRMAN, COMMITTEE ON INDIAN AFFAIRS

The CHAIRMAN. This is the oversight hearing on the Department of Interior Secretary's report on the Hoopa Yurok Settlement Act submitted to the Congress in March 2002 pursuant to Section 14 of Public Law 100–580.

As with almost all matters in Indian affairs, there is a long history that preceded enactment of the legislation the Secretary's report addresses. It is a history of deception, I am sad to say, of a Senate that apparently met in secret session in 1852 and rejected the treaties that had been negotiated with California tribes, and didn't disclose their action for another 43 years.

In the interim, the California tribes proceeded in good faith, relying upon their contracts with the U.S. Government. In 1864, the Congress enacted legislation to establish four reservations in the State of California with the intent that these reservations would serve as the new homeland for tribes that had no cultural, linguistic, or historical ties to one another. The Hoopa Valley Reservation was one such reservation that was established for "the Indians of the Reservation."

Litigation later spawned a series of a series of court rulings, which while resolving the issues before each court, engendered considerable uncertainty into the daily lives of those who resided on the reservation, and soon,, the Congress was called upon to bring some final resolution to the matter.

Today, as we receive testimony on the Secretary's report, it is clear that a final resolution was not achieved through the enactment of the Hoopa-Yurok Settlement Act in 1988, and that the Congress will once again have to act. Accordingly, we look forward to the testimony we will receive today so that the committee and members of Congress may have a strong substantive foundation upon which to construct a final solution.

May I call upon the vice chairman.

**STATEMENT OF HON. BEN NIGHTHORSE CAMPBELL, U.S. SENATOR FROM COLORADO, VICE CHAIRMAN, COMMITTEE ON INDIAN AFFAIRS**

Senator CAMPBELL. Thank you.

I think you have explained very well the situation Mr. Chairman but just a couple of minutes for my opening statement. I'd like to broaden it to something that has always bothered me and many others because I was born and raised in California in the foothills among many of the Me-wok Tribes, a small tribe that has a number of bands in the foothills and valley country around Sacramento.

As you alluded, I can tell you that the story of the American Indian in the State of California was one of the most gruesome and bloody chapters in the history of this country. They say before the gold rush, there was about five times more Indian people in California than non-Indian people. It was literally a paradise. The weather was nice in most areas, the production of natural plants, fruits and things was abundant, people ate well, people lived well, they were at harmony with their neighbors and at that time, as I understand there were over 100 tribes in that area. In fact, some estimates say about one-tenth of all American Indians lived in the California area because living was a bit easier.

In 1848 when gold was discovered in a little place now called Coloma on the north fork of the American River, it started a wholesale change in their lifestyle. In fact, there have been documented instances of Indian people in those days being hired by gold miners and when payday came, they would shoot them, throw them in a hole and just get some more Indians to do the work again. So they know what real tragedy is, the people who are descendants of the Native Americans who lived in that area before the gold rush.

Even before that time if you look at California history, as early as the late 1700's when Father Junipero Serra came north from Mexico and developed what was later called the El Camino Real, or the King's Highway, and the chain of missions from San Diego all the way north of San Francisco, almost all those missions were built with indentured Indian labor, if not slave labor. If you visit some of those missions right now, like the mission in Monterey, if you turn the roofing tile over and look under the old, old roofing tile, you can find the skin imprints of Indian people in that clay where they would take the wet clay and bend it over their leg to make that curved feathered kind of roof structure on all the old missions. They were never paid for that and some of them were kept around the missions for so long, many against their will, that some of the smaller tribes in southern California lost their original identity. I can remember when I was a boy many of them were called mission Indians which was a kind of generic name for people who had lost their identity but had been in the servitude of the missions for so long.

There is no question that people who are descendants of the Native peoples of California have a real gripe and a history of mistreatment by both the Federal Government and people that made millions, if not billions of dollars, from the wealth of California. I'm just glad that two of the major tribes are here today, the Hoopa and the Yurok and I know this hearing will focus on their settle-

ment but I wanted to put that in the record of my own personal experiences in California.

The CHAIRMAN. I'm glad that your remarks were made for the record because though it is rather sad, we who are the successors to the Senators two centuries ago must remember that our predecessors were a part of this terrible conspiracy.

With that, may I call upon the Assistant Secretary of the Bureau of Indian Affairs, Department of the Interior, Neal McCaleb. It's always good to see you, sir.

**STATEMENT OF NEAL A. MCCALEB, ASSISTANT SECRETARY, BUREAU OF INDIAN AFFAIRS, DEPARTMENT OF THE INTERIOR**

Mr. MCCALEB. Thank you, Chairman Inouye. I am pleased to be here this morning to bring to you a report pursuant to section 14 of the Settlement Act.

Although I will not read my introductory background remarks because you did such an excellent job of presenting the history, I would have my entire testimony become a part of the record.

The CHAIRMAN. Without objection, so ordered.

Mr. MCCALEB. Prior to the Settlement Act, legal controversies arose over the ownership and management of the Square, that being the 12 square miles that were provided by the United States Government for the Indians of California, that ultimately became the Hoopa Reservation and its resources. Although the 1891 Executive order joined the separate reservations into one, the Secretary had generally treated the respective sections of the reservation separately for administrative purposes. A 1958 Solicitor's Opinion also supported this view.

In the 1950's and 1960's, the Secretary distributed only the timber revenues generated from the Square to the Hoopa Valley Tribe and its members. All the revenues from the Square were allocated to the Hoopa Valley Tribe. In 1963, Yurok and other Indians, eventually almost 3,800 individuals, challenged this distribution and the U.S. Court of Claims subsequently held that all Indians residing within the 1891 reservation were Indians of the reservation and were entitled to share equally in the timber resources proceeds generated from the Square. *Short* v. *United States* was the embodiment of that litigation.

Following the decision, the Department began allocating the timber proceeds generated from the Square between the Yurok Tribe, approximately 70 percent, and the Hoopa Valley Tribe, 30 percent. The 70/30 allocation was based upon the number of individual Indians occupying the joint reservation that identified themselves as members of either the Yurok or the Hoopa Valley Tribe respectively.

Another lawsuit challenged the authority of the Hoopa Valley Business Council to manage the resources of the Square among other claims. These and related lawsuits had profound impacts relating to the tribal governance and self determination, extensive natural resources that compromised the valuable tribal assets and the lives of thousands of Indians who resided on the reservation.

In order to resolve longstanding litigation between the United States, Hoopa Valley, Yurok, and other Indians regarding the own-

ership and management of the Square, Congress passed the Hoopa-Yurok Settlement Act in 1988. This act did not disturb the resolution of the prior issues through the *Short* litigation. Rather, the act sought to settle disputed issues by recognizing and providing for the organization of the Yurok Tribe by petitioning the 1891 Yurok joint reservation between the Hoopa Valley and the Yurok Tribes and by establishing a settlement fund primarily to distribute moneys generated from the joint reservation's resources between the tribes.

Section 2 of the act provided for the petition of the joint reservation. Upon meeting certain conditions of the act, the act recognized and established the Square, the original 12 square miles, as a Hoopa Valley Reservation to be held in trust by the United States for the benefit of the Hoopa Valley Tribe. The act recognized and established the original Klamath River Reservation and the connecting strip as the Yurok Reservation to be held in trust by the United States for the benefit of the Yurok Tribe.

In accordance with the conditions set in section 2(a), the Hoopa Valley Tribe passed a resolution, No. 88–115 on November 28, 1988 waiving any claims against the United States arising from the act and consenting to the use of the funds identified in the act as part of the settlement fund. The BIA published a notice of the resolution in the Federal Register of December 7, 1988. These actions had the effect of partitioning the joint reservation.

As for the settlement fund itself, section 4 of the act established a settlement fund which placed the moneys generated from the joint reservation into an escrow account for later equitable distribution between the Hoopa Valley and Yurok Tribes according to the provisions of the act. The act also authorized $10 million in Federal contribution to the settlement fund primarily to provide lump sum payments to any Indian on the reservation who elected not to become a member of either tribe. It allocated about $15,000 to any individual Indian who elected not to claim tribal membership of either tribe.

As listed in section 1(b)(1) of the act, the escrow funds placed in the settlement fund came from moneys generated from the joint reservation and held in trust by the Secretary in seven separate accounts, including the 70 percent Yurok timber proceeds account and the Hoopa 30 percent timber proceeds account. The Secretary deposited the money from these accounts into the Hoopa-Yurok Settlement Fund upon the enactment of the act. The settlement fund's original balance was nearly $67 million. At the beginning of fiscal year 2002, the fund contained over $61 million in principle and interest.

Even with the previous distributions as described below, appendix I to the report provides the relevant figures from the fund. The act sought to distribute the moneys generated from the joint reservation and placed in the settlement fund on a fair and equitable basis between the Hoopa Valley and Yurok Tribes. The Senate committee report briefly described what was then believed to be a rough distribution estimate of the fund based upon the settlement role, distribution ratios established in the act. Twenty-three million, roughly one-third of the fund would go to the Hoopa Valley Tribe pursuant to Section 4(c); a similar distribution to the Yurok

Tribe under Section 4(d) as described below assuming roughly 50 percent of those on the settlement roll would accept Yurok tribal membership; and the remainder to the Yurok Tribe after individual payments discussed below.

Substantial distributions have already been made from the settlement fund in accordance with the act. The Department disbursed to the Hoopa Valley Tribe just over $34 million between passage of the act and April 1991. The total amount determined by the BIA to be the tribe's share under 4(c) of the act. The Department also distributed $15,000 to each person on the settlement roll who elected not to become a member of either tribe under the act. Approximately 708 persons chose the lump sum payment option for a total distribution for this purpose in the amount of approximately $10.6 million, exceeding the $10 million Federal contribution authorized by the act for this payment.

Section 4(d) of the act provided the Yurok Tribe's share of the settlement fund similar to the determination of the Hoopa Valley share under section 4(c). Section 7(a) further provided the Yurok Tribe would receive the remaining moneys in the settlement fund after distributions were made to individuals in accordance with the settlement membership options under section 6 and to successful appellants left off the original settlement roll under section 5(d).

Under section 1(1)(4), the condition that the Hoopa Valley Tribe and Yurok Tribe received these moneys requiring the tribes adopt a resolution waiving any claim against the United States arising from the act. The Hoopa Valley Tribe adopted such a resolution but the Yurok Tribe did not. In November 1993, the Yurok Tribe passed Resolution 93–61 which purported to waive its claims against the United States in accordance with section 2(c)(4). The tribe, however, also brought a suit alleging that the act affected a constitutionally prohibited taking of its property rights as described below. In effect, the tribe sought to protect its rights under section 2 of the act to its share of the settlement fund and other benefits while still litigating the claims as contemplated in section 14 of the Act.

By a letter dated April 4, 1994, the Department informed the tribe that the Department did not consider the tribe's conditional waiver to satisfy the requirements of the act because the waiver acted to preserve rather than waive its claims. Instead of waiving its claims as the Hoopa Valley Tribe did, the Yurok Tribe as well as the Karuk Tribe and other individual Indians brought suit against the United States alleging the act constituted a taking of their vested property rights in the lands and resources of the Hoopa Valley Reservation contrary to the Fifth Amendment of the U.S. Constitution.

In general, the complaints argued that the 1864 Act authorizing Indian reservations in California and other acts of Congress vested their ancestors with compensable rights in the Square. Alternatively, plaintiffs argued that their continuous occupation of the lands incorporated into the reservation created compensable interest. Potential exposure to the U.S. Treasury was once estimated at close to $2 billion. This litigation began in the early 1990's and was only recently ended.

The U.S. Court of Federal Claims and the Federal Circuit Court of Appeals disagreed with the positions of the Yurok and other plaintiffs. The Federal courts generally followed the reasoning provided in the committee reports of the bills ultimately enacted as the Settlement Act. Unless recognized as vested by some Act of Congress:

> Tribal rights of occupancy and enjoyment, whether established by Executive order or statute may be extinguished, abridged or curtailed by the United States at any time without payment of just compensation.

The courts concluded that no act of Congress established vested property rights and the plaintiffs or their ancestors in the Square. Rather the statutes and Executive orders creating the reservation allowed permissive, not permanent occupation. Thus, the courts held the act did not violate the takings clause. Plaintiffs petitioned the U.S. Supreme Court for a writ of certiorari to review the lower court decision and on March 26, 2001, the Court denied certiorari thereby concluding the litigation.

On the Department's report, section 14 of the act provides:

> The Department shall submit to Congress a report describing the final decision that an illegal claim challenging the act as affecting a taking of property rights contrary to the Fifth Amendment to the U.S. Constitution or as otherwise providing inadequate compensation.

The Court's denial of the certiorari triggered this provision. The Department solicited the views of the Hoopa Valley and Yurok Tribes regarding future actions of the Department with respect to the settlement fund as required under the act. The report briefly describes issues both leading up to the subsequent act, attaches the written positions of the tribes and provides recommendations of the Department for further action with respect to the settlement fund.

In July 2001, the Hoopa Valley Tribe submitted its proposed draft report for consideration by the Department. After describing the history of the disputes, the Settlement Act and subsequent actions, the Hoopa Valley Tribe provided various recommendations and observations. The Hoopa submission noted that the separate lawsuit determined that only 1.26 percent of the settlement fund moneys were derived from the Yurok Reservation, with the remainder of the moneys derived from the Hoopa Reservation.

The Hoopa Valley Tribe has continued to assert its right to a portion of the benefits offered to and rejected by the Yurok Tribe. Prior to its July submission, the tribe previously requested the Department recommend the remaining funds from the Hoopa Square be returned to the Hoopa Valley Tribe. The Hoopa submission ultimately suggested the following recommendations.

First, the suspended benefits under the act, including the land transfer and land acquisition provisions for the Yurok Tribe and the remaining moneys in the settlement fund be valued and divided equally between the two tribes.

Second, the economic self-sufficiency plan of the Yurok Tribe be carried forward, including any feasibility study concerning the cost of the road from U.S. Highway 101 to California Highway 96 and other objectives of the self sufficiency plan.

Third, that additional Federal lands adjacent to or near the Yurok and Hoopa Valley Reservation be conveyed to and managed by the respective tribes.

The Yurok position. In August 2001, Counsel for the Yurok Tribe submitted the tribe's position and proposed a draft report. The Yurok Tribe submission similarly outlined the history of the dispute and other considerations in its recommendations for the Department to consider. In general, the Yurok Tribe takes the position, among others, that its conditional waiver was valid and became effective upon the Supreme Court's denial of certiorari in the taking litigation.

The Yurok submission discusses the tribe's concern with the process leading up to and ultimately resulting in the passage of the Settlement Act. In the tribe's view, the act nullified a large part which allowed all Indians of the reservation to share equally in the revenues and resources of the joint reservation. "The tribe, not formally organized at the time, was not asked and did not participate in this legislative process" and had the act imposed on the Yurok who were left with a small fraction of their former land resources.

In its view, the act divested the Yurok Tribe of its communal ownership in the joint reservation lands and resources and relegated that much larger tribe to a few thousand acres left in trust along the Klamath River with a decimated fishery, while granting to the Hoopa Tribe nearly 90,000 acres of unallotted trust land and resources including the valuable timber resources thereon.

With respect to the waiver issue, the Yurok submission considers the Department's view discussed above as erroneous. The tribe references a March 1995 letter from the Department in which the Assistant Secretary of Indian Affairs indicated the tribe could cure the perceived deficiencies with its conditional waiver by "subsequent tribal action or final resolution of the tribes lawsuit in the U.S. Court of Federal Claims."

The tribe takes the position that it made a reasonable settlement offer and would have dismissed its claim with prejudice but the Department never meaningfully responded. Now the tribe considers the Supreme Court's denial of certiorari as a final resolution suggested as curing the waiver. As a support for its position, the tribe states, "The text of the Act and the intent of Congress make clear that filing a constitutional claim and receiving the benefits of that act are not mutually exclusive." The tribe suggests that principles of statutory construction, including the canon ambiguities be resolved in favor of the tribes and that the provisions within the statute should be read so as not to conflict or be inconsistent requires that a broader reading of the waiver provision in section 2(c)(4) in light of the act's provision allowing a taking claim to be brought under section 14.

The tribe considers the Department's reading of the statute to be unfair and unjust. For these and other reasons, the tribe is of the view that it is now entitled to its benefits under the act.

Because the Yurok Tribe litigated its claims against the United States based on the passage of the Act rather than waiving those claims, the Department is of the view that the Yurok Tribe did not meet the conditions precedent to the establishment of section 2(c)(4) of the act for the tribe to receive its share of the settlement fund or other benefits.

The Department is also of the view that the Hoopa Valley Tribe has already received its portion of the benefits under the act and

is not entitled to further distributions from settlement funds under the provisions of the act.

Ultimately, this situation presents a quandary for the Department and for the tribes. We believe the act did not contemplate such a result. The moneys remaining in the settlement fund originated from seven trust accounts which held revenues generated from the joint reservation. Thus, the moneys remaining in the settlement fund should be distributed to one or both tribes in some form. Moreover, the Department recognizes that substantial financial and economic needs currently exist within both tribes and their respective reservations. Given the current situation, the report outlines five recommendations of the Department to address these issues.

First, no additional funds need be added to the settlement fund to realize the purpose of the Act.

Second, the remaining moneys in the settlement fund should be retained in a trust account status by the Department pending further considerations and not revert to the General Fund of the U.S. Treasury.

Third, the settlement fund should be administered for the mutual benefit of both tribes and their respective reservations taking into consideration prior distributions to each tribe from the fund. It is our position that it would be inappropriate for the Department to make any general distribution from the fund without further action of Congress.

Fourth, Congress should fashion a mechanism for the further administration of the settlement fund in coordination with the Department and in consultation with the tribes.

Fifth, Congress should consider the need for further legislation to establish a separate permanent fund for each tribe from the remaining balances of the settlement fund in order to address any issue regarding entitlement of the moneys and fulfill the intent and spirit of the Settlement Act in full.

This concludes my testimony and I will be happy to respond to any questions at the appropriate time. We have attached a schematic for the committee with a flow chart of the funds and the dates funds were disbursed pursuant to the short litigation in the 1988 Act.

[Prepared statement of Mr. McCaleb appears in appendix.]

The CHAIRMAN. Thank you very much, Mr. Secretary.

The chart you speak of, entitled "Hoopa-Yurok Settlement Act Funding History," received by the committee yesterday will be made a part of the record.

[The information appears in appendix.]

The CHAIRMAN. At this juncture, there will be a recess for 10 minutes.

[Recess.]

The CHAIRMAN. We will resume our hearings.

The vice chairman of the committee has a very urgent matter to work on this afternoon, so he will have to be leaving us in about 10 minutes, so may I call upon him for his questions.

Senator CAMPBELL. Thank you. I apologize for having to leave, we have some terrible wildfires out west and some of them are in Colorado, so I'm doing a joint event with some of the other Colo-

rado delegation on our fire problem. It just closed Mesa Area in our part of the State which is a big tourist attraction, so I probably won't be able to ask the representatives from the two tribes questions. I'll submit those in writing if they can get those back to me.

This is a very tough one for me because to me this is like refereeing a fight among family. Some folks on both sides of this issue I've known for years and years and am real close to from my old California days. Let me ask you just a couple.

We have two reservations, one allotted, one not allotted, and this is certainly a sad history but the Yurok land and resources were allotted and dissipated. The Hoopa lands and resources remain in tact. Why were they treated so differently when they are so geographically close in our history? Do you happen to know that?

Mr. MCCALEB. I don't have personal knowledge of that, Senator. Let me get that information and respond in writing to you. I have an impression but I don't have a real factual answer to that.

Senator CAMPBELL. Let me ask another general question. We've been through a lot of disagreements between tribes and it seems to me those that can settle their issues without intervention from the courts are a lot better off than the ones who are not. I have no problem with the legal profession but let me tell you, the attorneys end up getting paid very well from the Indians that are fighting with each other. In keeping with the spirit of the settlement in 1988, shouldn't we try to bring this to a conclusion that both tribes can live with without fighting it out in courts?

Mr. MCCALEB. That would certainly be my desire, Senator Campbell.

Senator CAMPBELL. Have you personally tried to impress on both sides your sentiments?

Mr. MCCALEB. I have met with representatives of both sides, yes, and made those kinds of suggestions.

Senator CAMPBELL. I understand there is a lot of money involved. Let me ask about the account balance. What is the balance of revenues of the settlement fund and can you trace where the moneys from the fund came from?

Mr. MCCALEB. Aside from interest that had accrued over time, the source of all the funds was timber sale proceeds.

Senator CAMPBELL. Did they come primarily from Hoopa or Yurok lands or both?

Mr. MCCALEB. I'm advised a little over 98 percent of the funds derived from the Square, are on Hoopa land.

Senator CAMPBELL. Before they were put in the settlement fund, was there any audit performed to verify the accuracy of the transactions?

Mr. MCCALEB. I'm not aware of that but I will investigate that and reply in writing to you.

Senator CAMPBELL. In the Secretary's report, I read part of it and the staff read all of it, but they make two key findings, that the Hoopas have been made whole and have no claims against the United States and that because the Yuroks failed to provide necessary waivers, they are not entitled to benefits under the act.

My question is, with a multimillion dollar fund sitting in the Treasury, how should it be divided?

Mr. MCCALEB. Senator, I was hoping you'd have some suggestion for me on that. I don't mean to be flip about it but it is a very difficult answer. The two extreme positions of the tribes are the Hoopas want half of all the proceeds and the Yuroks think they should have all of the funds.

Senator CAMPBELL. Would you recommend some kind of development fund for both tribes be established?

Mr. MCCALEB. I think that would be a good solution. As opposed to per capita payments, you mean?

Senator CAMPBELL. Yes.

Mr. MCCALEB. Yes; I almost always favor that kind of investment as opposed to per capita payments.

Senator CAMPBELL. Thank you, Mr. Chairman. I have no further questions. I appreciate you giving me that time.

The CHAIRMAN. Thank you.

Mr. Secretary, I have a few questions for clarification. Do the funds in the settlement fund represent revenues derived from the sale of timber located on the Square?

Mr. MCCALEB. Over 98 percent. According to the facts furnished to me, only about 1.26 percent were not derived from timber on the Square.

The CHAIRMAN. Were those revenues generated from the Square while members of the Yurok and Karuk Tribes were still considered "Indians of the reservation"?

Mr. MCCALEB. The money in the settlement fund is there pursuant to the *Short* litigation that was resolved in 1974 and the subsequent timber cuttings. Would you restate your question so I can make sure I understand it?

The CHAIRMAN. Were those revenues generated from the Square while members of the Yurok and Karuk Tribes were still considered "Indians of the reservation"? That is the phrase in the statute.

Mr. MCCALEB. Yes.

The CHAIRMAN. So they were Indians in the reservation at the time the revenues were generated in the Square?

Mr. MCCALEB. Yes; that's my understanding.

The CHAIRMAN. Because the *Short* case instructs us that if there is to be a distribution of revenues, the distribution must be made to all Indians of the reservation. Would that mean Hoopa, Yurok, Karuk?

Mr. MCCALEB. Yes, sir.

The CHAIRMAN. The Hoopa Valley Tribe contends it is the only tribe entitled to the funds in the settlement fund, so your response does not agree with that?

Mr. MCCALEB. No; for the reasons you just said. The *Short* case is, I think, specific on that point.

The CHAIRMAN. So it seems it may be critical to the resolution of the competing claims of entitlement to funds in the settlement fund to know whether the timber revenues that were placed in the fund were generated after the reservation was partitioned or whether they were generated while there were three tribal groups making up the "Indians of the reservation," isn't that correct?

Mr. MCCALEB. The revenues that make up the original amount, almost $17 million in the chart, were generated prior to the partitioning of the reservation, while other revenues were generated

from the timber fund after 1988, the partitioning actually occurred in 1988 by act of Congress.

The CHAIRMAN. There are two time periods?

Mr. MCCALEB. Yes; there are.

The CHAIRMAN. Can you tell the committee what disbursements have been made from the settlement fund, when the disbursements were made and to whom these disbursements were made?

Mr. MCCALEB. From the settlement fund, $15 million was disbursed to individual Indians who elected to become Yurok. There was another $10.6 million distributed to individual Indians who elected to buy out. That $10.6 million was offset by a $10-million direct appropriation of Congress. There has been another $1.5 million distributed to the Yurok Tribe since 1991 given they were provided about $500,000 a year for 3 years to help them in the process of establishing their tribal government.

The CHAIRMAN. Anything distributed to the Karuk Tribe?

Mr. MCCALEB. None directly to the Karuk to my knowledge. There was another $34 million distributed to the Hoopa Tribe, $34,651,000 pursuant to their signing their waiver in keeping with the act.

The CHAIRMAN. Given the Department's position as set forth in the Secretary's report that neither the Hoopa Valley Tribe nor the Yurok Tribe is entitled to the balance of the funds remaining in the HYSA fund, what benefits of the act or activities authorized in the act does the Department envision should be carried out and funded by the recommended two separate permanent funds to fulfill the intent of the original Act in full measure?

Mr. MCCALEB. I think all the funds should be distributed that are in the settlement fund. I don't think there is much debate over that. I think the issue is over the distribution, how the money should be distributed.

The CHAIRMAN. How shall the distribution be made?

Mr. MCCALEB. I guess if you go to our third recommendation, it touches as closely as anything on that:

> The settlement fund should be administered for the mutual benefit of both tribes and the reservations taking into consideration prior distributions to each tribe from the fund.

If you assume that 30–70 percent distribution was appropriate originally and take into consideration the prior distribution of the funds, that would provide some guidance in that area.

The CHAIRMAN. In your opinion, were all the provisions of the Act benefiting the Hoopa Valley Tribe implemented?

Mr. MCCALEB. Yes.

The CHAIRMAN. Would you say the same of the act benefiting the Yurok Tribe implemented?

Mr. MCCALEB. No; that's not correct.

The CHAIRMAN. So the Hoopa Valley got all the benefits, Yurok did not?

Mr. MCCALEB. One of the provisions was the partitioning of the tribal lands. That was done, that was accomplished but the Yuroks got none of the money except for the $1.5 million I indicated. There were other provisions for economic development that were supposed to be carried out pursuant to an economic development plan submitted by the Yuroks. The plan was never submitted, so it was

never implemented. For example, there was some roadbuilding to be done pursuant to that economic development plan that has never been done. The Yurok only received a partitioning of tribal lands plus the $1.5 million.

The CHAIRMAN. Because of the obvious complexities, may we submit to you questions of some technicality that you and your staff can look over and give us a response?

Mr. MCCALEB. I would appreciate that because I really need to rely on the historical and technical views of the staff to answer the meaningful questions that are attendant to this really sticky issue.

The CHAIRMAN. Thank you very much, Mr. Secretary.

Mr. MCCALEB. May I be excused at this point?

The CHAIRMAN. Yes; and thank you very much, sir.

The second panel consists of the chairman of the Hoopa Valley Tribal Council of Hoopa, California, Clifford Lyle Marshall, Sr., accompanied by Joseph Jarnaghan, tribal councilman, Hoopa Valley Tribal Council and Thomas Schlosser, counsel, Hoopa Valley Tribal Council and Sue Masten, chairperson, Yurok Tribe, Klamath, CA.

**STATEMENT OF CLIFFORD LYLE MARSHALL, SR., CHAIRMAN, HOOPA VALLEY TRIBAL COUNCIL, ACCOMPANIED BY JOSEPH JARNAGHAN, TRIBAL COUNCILMAN, HOOPA VALLEY TRIBAL COUNCIL AND THOMAS SCHLOSSER, COUNSEL**

Mr. MARSHALL. I am Clifford Lyle Marshall, chairman of the Hoopa Valley Tribe.

At this time, I ask that our written testimony be included in the record.

The CHAIRMAN. Without objection.

Mr. MARSHALL. Thank you for this opportunity to present the Hoopa Tribe's position on the Interior Report on the Hoopa Yurok Settlement Act. I am here today with council member Joseph Jarnaghan and attorney Tom Schlosser.

First, let me express the Hoopa Tribe's deepest gratitude to Chairman Inouye, Vice Chairman Campbell and the other members of this committee for the leadership in achieving passage of the landmark Hoopa Yurok Settlement Act. We also acknowledge and appreciate the hard work of your dedicated staff. This act could not have occurred without your decision to resolve the complex problems that had crippled our reservation and tribal government for more than 20 years.

The years since its passage have demonstrated the outstanding success of the Settlement Act. It resolved the complex issues of the longstanding *Jesse Short* case, the act vested rights and established clear legal ownership in each of the tribes to the respective reservations. It also preserved the political integrity of the Hoopa Tribe by confirming the enforceability of our tribal constitution.

The Hoopa Tribe waived its claims against the United States and accepted the benefits provided in the act and since then we have accomplished a number of tribal objectives. We immediately embarked on a strategy to reestablish control of our small Indian nation and were one of the self-governance tribes. We believe that tribal self-governance is the true path to trust reform.

Although the Yurok Tribe rejected the settlement offer provided in the act, it nevertheless provided a means for organization of the

Yurok Tribe, use of Federal properties for establishment of tribal government offices and the ability to obtain Federal grants and contracts. The act ultimately enabled the Yurok Tribe to join the ranks of self-governance tribes. The Yurok Tribal Council could not stand before you today as tribal government officials without this act.

The Settlement Act called for an end to litigation. It provided benefits to the Hoopa Tribe and the Yurok Tribe on the condition that they waive all claims which they might assert against the United States as arising from the act. The Hoopa Tribe accepted that offer. The Yurok Tribe rejected that offer and sued the United States and so the act as applied did not authorize payments to them. As a result, the Yurok Tribe is now clearly prohibited by the act from receiving a portion of the settlement fund. Congress should not now conclude that the act was unfair due to the fact the Yurok Tribe did not receive the benefits of the act. The Yurok Tribe made a conscious decision to sue and thereby chose to forego nearly 13 years of potential development and economic opportunity.

The Hoopa Tribal Council would be remiss in our duties to our members if we did not see return of the timber revenues derived exclusively from the Hoopa Valley Indian Reservation. Over 98 percent of the settlement fund balance comes from Hoopa escrow accounts derived from logging on Hoopa lands. I must respectfully disagree with Secretary McCaleb's referring to this fund as the Yurok account. The act refers to the money as Hoopa escrow moneys.

In 1988, the Hoopa Tribe enacted a resolution authorizing the use of these Hoopa escrow moneys as a settlement offer to end the effects of the litigation leading to the act. That consent was required in the act. The Hoopa Tribe's resolution, however, does not authorize use of these moneys for purposes not provided in the act. The Hoopa Tribe's agreement that the act provided a settlement offer of Hoopa moneys to the Yurok Tribe was withdraw by operation of law when the Yurok Tribe sued the United States.

The answer to the question what happens now to the settlement fund must be found outside the act. Federal law provides for payment of proceeds from logging on tribal lands to the tribe whose reservation was logged. It is clear that the Hoopa Valley Indian Reservation belongs to the Hoopa Tribe and that the Hoopa Tribe is the only governing body concerned with the sale of timber on the unalloted trust land of the Hoopa Reservation.

It simply follows that to the extent money remaining in the settlement fund came from the Hoopa Tribe's Reservation, the Hoopa Tribe is the only tribe entitled to those proceeds. Certainly a party to any other legal dispute which rejected the settlement offer, sued instead and lost could not come back and claim the previously made settlement offer. The Hoopa Tribe should not now be forced to pay for prior injustices that resulted during the allotment era or from the Yurok Tribe's decision to sue.

Using the settlement fund remainder for such purposes forces the Hoopa Tribe to be liable for the Federal Government's actions. Moreover, it would force the Hoopa Tribe to pay for the poor judgment of the Yurok Tribe's decision to litigate. We know of no other situation where Congress has taken resources and resource reve-

nues derived from one reservation and simply given it to another reservation.

Congress was thorough in developing the Settlement Act. Congress considered history, aboriginal territory, demographics and equity. Likewise, Federal courts have held that the Hoopa Valley Indian Reservation was historically the homeland of the Hoopa Tribe as a matter of history and as a matter of law. We know today that the Yurok Tribe would attempt to claim otherwise.

These are not new issues and after 40 years of litigation, the courts have heard and determined this issue and every other possible issue to be raised in regard to this piece of legislation. The litigation is now over. We ask Congress now to respect these judicial decisions and move forward.

In conclusion, the Interior report to Congress is disappointing. Interior concludes that neither tribe is entitled to the fund under the act but recommends that they administer the fund for the benefit of both the Hoopa and Yurok Tribes. This is clearly contradictory. We have long and hard experience with such administration during the *Short* v. *United States era.* As another witness will testify, Interior lacks the legal authority and the competence to carry-out such responsibilities fairly.

We believe the issues now before Congress should be resolved through considered thought and hard work over some period of time, not necessarily years but long enough to ground any new legislation on substance and reason rather than emotion.

We have attempted to negotiate and remain open to negotiation.

Thank you for your time.

[Prepared statement of Mr. Marshall appears in appendix.]

The CHAIRMAN. Thank you, Mr. Chairman.

Would your councilman and the counsel wish to say something?

Mr. MARSHALL. Yes.

**STATEMENT OF JOSEPH JARNAGHAN, COUNCIL MEMBER, HOOPA VALLEY TRIBE**

Mr. JARNAGHAN. My name is Joseph Jarnaghan. I thank you for the opportunity to speak before you. I consider it a great honor.

I am a council member of the Hoopa Valley Tribe. Before being elected to the council, I worked for the tribe's timber industry for many years. I have a written statement and request that it be included in the record.

The CHAIRMAN. Without objection, so ordered.

Mr. JARNAGHAN. Our forests are invaluable to our tribe. I want to tell you with the use of some slides why the return of the Hoopa escrow moneys to the Hoopa Valley Tribe is particularly appropriate in this case now that the payment provisions of the act have been exhausted.

The first slide is a map of the roads built on the Hoopa Valley Reservation beginning in the 1940's. There are 550 miles of road on the reservation. These roads are a major source of sediment production and contamination of our waters because the Bureau of Indian Affairs' maintenance of these roads was grossly inadequate.

When the BIA clearcut our forests, which ultimately generated the settlement fund, the BIA was more interested in the volume of

timber going to the mill to create the settlement fund account than it was in the environmental state of our reservation.

Today, the Hoopa Tribe is still faced with the forest resource management and rehabilitation costs that were left undone. As a result, we have been spending $200,000 to $400,000 per year from tribal revenues to fix this road system. This year in the Pine Em Timber Sale, we have over 100 culverts that need to be installed as a result of the job not being done when the BIA harvested our timber between 1972 and 1988. That was 424 million board feet of timber.

The road construction standards the BIA used when harvesting our timber were deplorable and created ongoing problems that we continue to deal with today. The road erosion is devastating to our fisheries, water quality and riparian organisms. As you can see by this slide which shows a log jam that blocks fish passage, you will also notice the unit went right into the creek itself. The BIA logged 33,000 acres of tribal timber before the Settlement Act was passed. Most of the rest of our reservation is difficult to log because of steep slopes and in many cases, it is impossible to log because of ESA and National Marine Fisheries Service restrictions. Most of the easy units were logged to create the settlement fund.

These slides show that the BIA simply clearcut our reservation. This degraded cultural resources and created large areas for the tribe to now rehabilitate. Assistant Secretary McCaleb said Tuesday at the trust reform hearing that most tribes would not clearcut their land and that is a fact but unfortunately, the BIA did clearcut our forest. Timber stand improvements cost us over $500 per acre to treat. At 2 to 3 years old, we grub around trees for conifer release; 10 to 15 years after the harvesting, these clearcuts are invaded by brush and must be brushed by hand because we don't allow herbicide spraying. We do this at increased cost to promote tree growth as well as to ensure water quality.

We have suffered terrible forest fires. The Megram fire of 1999 shown here destroyed 4,500 acres of our reservation, mostly 30 year old stands that had been previously treated at the cost of $1,000 per acre.

Our tribe must not be forced to withstand losing escrow moneys that came from timber cuts on our reservation and having to finance the forest restoration and rehabilitation costs resulting from forest fires or poor BIA timber mismanagement. The settlement fund remainder was generated almost exclusively from timber from our reservation. Our forest has been ravaged by the BIA, our money has been taken from our people to create this fund and we have been forced to fight clear to the Supreme Court to defend our reservation, costing the Hoopa Tribe much money, time and lost opportunity.

Now the Yurok Tribe wants the settlement fund anyway. Is that fair? The fund that was left on the table by the Yurok Tribe's refusal to waive its claim should be returned to us so we can rehabilitate our aboriginal territory and our forests after the damage that was done to them by the BIA clearcutting.

Thank you.

[Prepared statement of Mr. Jarnaghan appears in appendix.]

The CHAIRMAN. Thank you very much.

Mr. Schlosser.

**STATEMENT OF THOMAS SCHLOSSER**

Mr. SCHLOSSER. My name is Thomas Schlosser. I thank the committee for the opportunity of submitting testimony on the Secretary's report.

I have been honored to serve as the litigation counsel for the Hoopa Valley Tribe for over 20 years. During that time, I have represented the Tribe in the *Short* litigation and in the litigation concerning the Settlement Act.

I have several points I would like to make. First, the Secretary's report threatens a return to the situation the tribes were in prior to passage of the Settlement Act. The Settlement Act was necessitated by complex litigation among the United States, the Hoopa Valley Tribe and a large number of individual Indians, most of whom but not all, have become members of the Yurok Tribe.

The chairman mentioned the Karuk Tribe and there are a few members of the Karuk Tribe who were involved in the *Short* litigation and were held to be Indians of the reservation. It is a very small fraction of the Karuk Tribe, I would guess less than 10 percent. Whereas of the people who were held to be Indians of the reservation who elected to join the Yurok Tribe in 1991, the base roll of the Yurok Tribe was entirely made up of Indians of the reservation.

There is another large fraction of Indians of the reservation that Mr. McCaleb referred to who chose to disaffiliate from both tribes, the so-called lump sum option under section 6(d). The Secretary's report mistakes the Settlement Act as having primarily been a boundary resolution act and instead suggests that the settlement fund be administered for the mutual benefit of both tribes.

Boundary clarification was only a small part of this act and the efforts to administer the fund for mutual benefit were dramatically unsuccessful prior to the Settlement Act. For years, long proceedings were necessary to get a tribal budget approved. Sometimes the tribal budget would get approved in the last month of the fiscal year because of Interior's inability to adopt standards and to determine whether things affected the reservation fairly. This led to conflicts between rulings in the *Short* case and the *Puzz* case over which kinds of expenditures were permissible.

For example, the *Short* case in 1987 held that money that was distributed to the tribe for tribal governmental purposes did not damage the *Short* plaintiffs, was not an injury to the Indians of the reservation and did not invade their rights. The *Puzz* court, a district court in the Northern District of California, held to the contrary, that funds used by the Hoopa Valley Tribe did damage the Indians of the reservation. So there are insufficient standards and not enough expertise to make that recommendation work well. As George Santayana said, "Those who cannot remember the past are condemned to relive it." There is an error found in Interior's recommendation.

Under the Settlement Act, there are some benefits potentially available to the Hoopa Valley and Yurok Tribes. Only 22 *Short* plaintiffs were adjudicated to be Indians of the reservation in 1973, so the court embarked on a long process which actually is still un-

derway of identifying the eligible Indians of the reservation and their heirs for inclusion in per capita payments.

This ruling precipitated other lawsuits, precipitated administrative actions that brought tribal government to a standstill, jeopardized public health, and made necessary the Hoopa Yurok Settlement Act. The Settlement Act originated in the House and in the House two hearings were conducted, one by the Interior and Insular Affairs Committee and another by the Judiciary Committee, and this committee conducted two hearings on its bill. And as you recall, at least three law firms appeared and participated in the proceedings on behalf of various groups of what have become Yurok tribal members. This included the Faulkner and Wunsch firm which represented most of the *Short* plaintiffs, many who became Yurok tribal members, the Heller, Ehrman White & McAuliffe firm which represented the *Short* plaintiffs, the Jacobsen, Jewitt & Theirolf firm which represented the *Puzz* plaintiffs, and so although the Yurok Tribe had not organized in a fashion to designate its own attorney, its members participated completely and fully.

With the committee's guidance, after all these legal issues were discussed and the equities were considered, the parties came together on a settlement package to be laid before each one of the contestants. At the request of the House, the Congressional Research Service analyzed the House bill to determine whether Congress could lawfully do this or whether it would involve a taking of property. The Congressional Research Service concluded that because of the unique background of this reservation and the litigation, it was possible that a court would conclude that non-tribal Indians, Indians of the reservation, had some vested interest in reservation property.

Ultimately, the courts didn't conclude that but the fact that there was a risk there is part of why the committee and Congress in the Settlement Act went to great pains to offer benefits in exchange for waivers of claims. So the settlement fund, for example, was allocated essentially in three ways, partly to the Hoopa Valley Tribe and the Yurok Tribe, if those tribes waived their claims, and partly to Indians as individuals who qualified as Indians of the reservation and appropriated money was provided which defrayed most of the cost of the lump sum payments.

As Mr. McCaleb correctly said, the appropriated money was not sufficient for the people who disaffiliated from both tribes, so some of the Yurok and Hoopa escrow funds went to that payment.

This act nullified the *Short* rulings. That was the purpose of the act. The act, this committee said in its report, was not to be considered a precedent for individualization of tribal communal assets but rather, sprang from the realization that there were some judicial decisions that were unique and the committee concluded,

> The intent of this legislation is to bring the Hoopa Valley Tribe and the Yurok Tribe within the mainstream of Federal Indian law.

That is in the committee's report on page 2.

The Settlement Act preserved the money judgments that had been won by the individual *Short* plaintiffs, so they ultimately recovered about $25,000 each from the treasury in addition to the payments that were made to them in exchange for claim waivers under section 6 of the act.

The committee said while it didn't believe the legislation was in conflict with the *Short* case, "To the extent there is such a conflict, it is intended that this legislation will govern." The reason that is important now is because it is indisputable that over 98 percent of the remainder in the settlement fund is derived from Hoopa escrow funds, from Hoopa timber sales, trees cut on the Hoopa Square. That proportion in our view belongs to the Hoopa Valley Tribe.

The *Short* case is not to the contrary. The Hoopa Valley Tribe has a right to timber proceeds for trees cut on the Square. As a historical matter, tribes didn't have a right to proceeds for timber sales on reservation until 1910 when Congress passed a general timber statute now enacted in section 407. In 1964, Congress changed the designation of beneficiaries from the 1910 Act which said the proceeds would be used for the benefit of Indians of the reservation. In 1964 that was changed to say that proceeds would be used for the benefit of Indians who are members of the tribe or tribes concerned.

At that time, the Department of the Interior, which advocated that technical correction, explained that Indians of the reservation didn't really describe anyone and that in fact members of the relevant tribe shared in the proceeds of sale of tribal properties. In the *Short* case, the 1983 opinion, the court held to the contrary and said Congress, when it used the term tribe here meant only the general Indian groups communally concerned with the proceeds and not officially organized or recognized tribes.

So another important part of the Settlement Act was correcting the damage done to the general timber statute. A section of the Settlement Act amended section 407 to say the proceeds of sale shall be used as determined by the governing bodies of the tribes concerned.

In the litigation that came after the Settlement Act, the Yurok Tribe and other plaintiffs continued to presume the correctness of some of the rulings in the *Short* case, in particular, the 1891 Executive order. The *Short* case did not support their claim that they had a right to the Hoopa escrow funds generated from timber cut on the Hoopa Square. Instead, in two opinions in 1987, an opinion discussed in this committee's report, and later in 1993, in the sixth published *Short* opinion, the *Short* court held that the plaintiffs there did not have a right to the trust funds, the escrow funds. Instead, the court made very clear that all it held in *Short* was that if money is distributed to individuals, not distributions to tribes but individualization of money, gave rise to a right by Indians of the reservation to share.

The Federal courts rejected this most recently in the litigation concerning the Hoopa Yurok Settlement Act. Without the theories of the *Short* case that as Indians of the reservation, they have some claim to the timber revenues of the Square, without that theory, there is no connection between the Yurok Tribe and the Hoopa escrow moneys. The Hoopa escrow moneys were part of a settlement package and that is the only method by which they could have had access to them.

As the court ruled in the most recent case, *Karuk Tribe of California* v. *United States,* this litigation is the latest attempt by plaintiffs to receive a share of the revenues from timber grown on

the Square. The Settlement Act nullified the *Short* rulings by establishing a new Hoopa Valley Reservation. A necessary effect of the Settlement Act was to assure payment of the timber revenues from the Square exclusively to the Hoopa Valley Tribe.

It was the purpose of the Settlement Act to return these tribes to the mainstream of Federal Indian law. In the mainstream of Federal Indian law, the proceeds of trees cut on a tribe's reservation go to that tribe.

I want to mention one other issue that comes up recurrently and that is the assertion that a portion of the Hoopa Square was actually traditional Yurok Tribe territory or some even say traditional Karuk Tribe territory.

As the chairman pointed out, this is not a new issue, it is an issue that has been litigated specifically and in the just completed litigation concerning the Settlement Act, *Karuk Tribe* v. *United States,* the court's ruling was that both as a matter of history and as a matter of law, the record does not support the Yurok's claim to Indian title to the site of the Square. This issue is adverted to in this committee's report concerning the Settlement Act where the committee pointed out that the Settlement Act's choice of the Bissell Smith Line as the dividing line between the two reservations had the effect of putting a traditional Yurok village into the Yurok Reservation where it might previously have been in the Square.

With that, I would conclude my remarks and would be happy to answer questions.

[Prepared statement of Mr. Schlosser appears in appendix.]

The CHAIRMAN. Thank you.

One of the first issues confronting me as chairman of this committee was this matter. Obviously I knew very little about Indian country or Indian history or relationship. I spent 2 whole days in Sacramento conducting hearings, I visited the Valley, I would never fly back again and I must say that I thought the committee did pretty well.

But this committee was a successor of other committees in the U.S. Senate that felt that all the answers were in Washington, that the answers were in the minds of lawyers and government officials. What we have here today is the product of government officials and lawyers, starting off with deception and based upon the deception coming forth with conclusions and then obviously wanting to justify the deception.

In the years that followed my tenure as chairman beginning in 1987, I have become much more dependent upon the wisdom of Indian country, to tell me and to tell Washington what the solutions should be. We have too often tried to impose our will upon Indian country and this is one example.

In looking at the activities of 1852 and 1864, one must assume that the Indians were well organized with a whole array of lawyers who knew the Constitution inside and out and therefore they had their rights and liabilities all determined and that was not so. The Government of the United States went out of its way to make certain that Indians never got organized. I wish we could start all over and I could tell the Hoopa and the Yuroks why don't you all get together as you did in the old days. In the old days, it was either war and kill each other and decide or you sit down, have a

big conference. In some places they smoked tobacco or exchanged gifts. Maybe the time has come for the restoration of the old method because as certain as I sit here if the Congress of the United States should come forth with Settlement Act No. 2, we will be back here in about 20 years trying to draw up Settlement Act No. 3.

I have a series of technical questions but those are all legal questions. It is good to know the history but I was trained to be a lawyer myself and when one presents his case, you make certain you don't say good things about the other side, you speak of the good things about your side. That is what you are paid for. I would expect lawyers to do the same.

With that, I will be submitting questions of a technical nature for the record.

May I thank you, Mr. Chairman and your staff.

Our next witness is the most distinguished member of Indian country, the chairperson of Yurok Tribe of Klamath, California, Sue Masten.

## STATEMENT OF SUE MASTEN, CHAIRPERSON, YUROK TRIBE

Ms. MASTEN. Good morning.

I have the distinct honor to serve as the chairperson of the Yurok Tribe. The Yurok Tribe is the largest tribe in California with over 4,500 members of which 2,800 members live on or near the reservation.

Thank you for holding this hearing. We appear today with deep resolve and a commitment to working hard toward addressing the issues before you.

I know you can appreciate that the issues here run deep and are heart felt. I also know that when the act was passed Congress believed that the act reached equity for both tribes. Thank you for your willingness to hear our concerns that those goals were not achieved.

We especially thank you, Chairman Inouye, for taking this very significant step toward addressing our concerns for equity under the Hoopa Yurok Settlement Act to look at what has been achieved or not achieved during the last 14 years and for asking what now may need to be done.

We are deeply appreciative of your October 4, 2001 letter where you invited both tribes to step beyond the act to address current and future needs. We know this committee sought to achieve relative equity for both the Hoopa Valley Tribe and the Yurok Tribe in 1988.

During the course of our many meetings with members of Congress and their staff, we have been asked why Congress should look at this matter again. The answer to this question is clear, the act has not achieved the full congressional intent and purpose and Congress often has to revisit issues when its full intent is not achieved.

Additionally, we believe that the Departments of the Interior and Justice did not completely or accurately inform Congress of all the relevant factors. Congress did not have the full assistance from the departments that you should have had.

In reviewing the Department's testimony and official communications, we were appalled that the Yurok historic presence on the Square was minimized or ignored and that the relative revenue and resource predictions for the tribe were also wrong. Furthermore, we are also concerned about the significant disparity of actual land base that each tribe has received.

Can you imagine in this day and age an Assistant Secretary addressing a serious dispute between tribes by describing one tribe as a model tribe and dismissing the other, as some sort of remnant who would only need 3,000 acres because only 400 Indians remain on what would become their reservation.

Interior also told Congress that the income of the tribes was comparable. The Hoopa Tribe would earn somewhat over $1 million a year from timber resources and the Yuroks had just had $1 million plus fishery the year before. Here are the real facts.

Several thousand Yuroks lived on or near the reservation, on or near is the legal standard for a tribe's service district. There is a serious lack of infrastructure, roads, telephones, electricity, housing on the Yurok Reservation and we have 75 percent unemployment and a 90-percent poverty level. Further, there is a desperate need for additional lands, particularly lands that can provide economic development opportunities, adequate housing sites and meet the tribal subsistence and gathering needs.

The Department gave the impression that the *Short* plaintiffs who were mostly Yurok had left our traditional homelands, were spread out over 36 States, were perhaps non-Indian descendants and were just in the dispute for the dollars. This impression was highly insulting to the Yurok people and a disservice to Congress.

There are at least as many Yuroks on or near the reservation as are Hoopas. With respect to the relative income or resource equity projected for the new reservations, it is true there was a commercial fishery shortly before the act, true but also very misleading. Commercial fishing income, if any, went predominantly to the Hoopa and Yurok fishermen. The fact was that in most years, there was no commercial fishery and in many years, we did not meet our subsistence and ceremonial needs.

Since the act, Klamath River coho salmon have been listed as an endangered species and other species are threatened to be listed. In fact, the Klamath River is listed as one of the 10 most threatened rivers in the Nation and has lost 80 to 90 percent of its historic fish populations and habitat. Today, the fish runs we depend on are subject to insufficient water flows and in spite of our senior water right and federally recognized fishing right, we continue to have to fight for water to protect our fishery.

The average annual income of the Yurok Tribe from our salmon resource was and is nonexistent. To be fair, we should note that since the Settlement Act, the Yurok Tribe has had a small income from timber revenues, averaging about $600,000 annually. With respect to the land base, the Yurok Tribe's Reservation contains approximately 3,000 acres of tribal trust lands and approximately 3,000 acres of individual trust lands. The remainder of the 58,000 acre reservation is held in fee by commercial timber interests.

The Hoopa Tribe Reservation has approximately 90,000 acres with 98 percent in tribal trust status. Regarding the $1 million

plus in timber revenues projected for the Hoopa Tribe, testimony of the Hoopa tribal attorney in 1988 indicated the annual timber revenue from the Square was approximately $5 million. Since the act, the Hoopa timber revenues have been $64 million. The point is the projected revenue comparison that should have been before the committee in 1988 was zero fisheries income for the Yurok Tribe and more than $5 million in annual timber and other revenues from the Square for the Hoopa Valley Tribe, not the comparable $1 million or so for each tribe the committee report relied upon.

This disparity of lands, resources and revenues continues today and hinders our ability to provide services to our people. Unfortunately, the Yurok Tribe in 1988 unlike today was unable to address misleading provisions of key information. The Yurok Tribe, although federally recognized since the mid-19th century, was not formally organized and had no funds, lawyers, lobbyists or other technical support to gather data or analyze the bill, to present facts and confront misinformation.

It is important to acknowledge the positive provisions of the Act which provided limited funds to retain attorneys and others to assist us in the creation of the base roll, the development of our constitution and the establishment of our tribal offices. We also appreciated the Senate committee report recognized and acknowledged that the tribe could organize under our inherent sovereignty which we did.

Had we been an organized tribe, we would have testified before you in 1988 and we would have pointed out that while it is true the Square is part of the Hoopa peoples' homeland, it is also true that the Square is part of the ancestral homelands of the Yurok people.

Almost without fail throughout the testimony received in 1988, the Square is described as Hoopa and the addition is described as Yurok. The Yurok ancestral map provided to you shows that our territory was quite large and included all the current Yurok Reservation, 80 percent of Redwood National Park, as well as significant portions of the U.S. National Forest.

Yurok villages existed in the square and these sites have been verified by anthropologists. This fact should not be a matter of dispute. The Justice Department and the Hoopa Valley Tribe in *Yurok* v. *United States* agreed in a joint fact statement that the Yuroks were always inhabitants of the Square. We are not claiming that we had Indian title to the whole square but that we have always been a part of the Square. The *Short* cases reached that same determination.

We think these different perspectives are important as we consider today's issues. However, it is critical for everyone to understand that we are not asking Congress to take back anything from the Hoopa Valley Tribe that they received under the Settlement Act. What we do want is for the committee to look at the relative equities achieved under the act, understanding the Yuroks have always been inhabitants of the Square and have never abandoned our connection to our territories, our culture and traditions.

We have already noted the significant disparities between the tribes in income, resources, land base and infrastructure after the

act. The data provided by Interior Department today supports our position. To reiterate, the Hoopa Valley Tribe received a 90,000-acre timbered reservation of which 98 percent is held in tribal trust. The Yurok Tribe received a 58,000-acre reservation with 3,000 acres in tribal trust, containing little timber. The map we have provided to you shows this extreme disparity.

We have already noted that the projected income for the tribes were incorrect. Time has verified that the predictions of a bountiful or restored Yurok fishery has not happened. It is also a fishery that we share with the non-Indians as well as Hoopa. Hoopa timber resources however have produced substantial income exceeding the 1988 predictions as reflected in the Interior Department's records. In addition, as this committee is aware from your recent joint hearing on telecommunications, infrastructure on the Yurok Reservation is virtually nonexistent.

In our response to Senator Inouye's letter of October 4, 2001, we have submitted an outline of an economic development and land acquisition plan to you and the Department of the Interior. The plan is based on our settlement negotiations with the Department in 1996 and 1997. We would like to request from you today the creation of a committee or a working group composed of tribal administration and congressional representatives and hopefully, under your leadership, Senator.

We recommend that the committee's responsibility be to develop legislation that would provide a viable self sufficient reservation for the Yurok people as originally intended by the Settlement Act. As you can see, our issues are broad based and focus on equity for the Yurok Tribe. The Department's report has prompted this hearing to address access by the Yurok Tribe to the Yurok Trust Fund. The Interior Department has said that neither tribe has legal entitlement to the Yurok Trust Fund. Our view is simple.

The financial equities and the actual distributions of timber revenues from 1974 to 1988 clearly demonstrate that the Yurok Tribe should receive its share of the settlement fund as the act intended. Arguments based on where the revenue came from on the joint reservation are wrong. These revenues belonged as much to the Yuroks of the Square and the Yuroks of the extension as they did to the Hoopas of the Square. This is the key point of the cases both tribes lost in the Claims Court.

The point is that prior to 1988, the Hoopa Valley Reservation was a single reservation intended for both tribes and whose communal lands and income were vested in neither tribe. *Short* also means that the Department could not favor one tribe above the other in the distribution of assets. These are pre-1988 moneys. We should not have to reargue what Yuroks won in the *Short* cases.

After the final 1974 decision in *Short* I, the Department ceased to distribute timber revenues only to the members of the Hoopa Valley Tribe and began to reserve 70 percent of the timber revenues for the *Yurok* plaintiffs. The remaining 30 percent of the revenues were for Hoopa and were placed in a separate escrow account which the Department disbursed to the Hoopa Valley Tribe. When we discussed the 1974–88 timber revenues with the Hoopa Tribal Council, they asserted that all of the timber revenues should have been theirs. Legally as the committee knows, that is not what the

courts have said. No Indian tribe, before 1988, had a vested right to the Square or its assets. In 1974, the Federal courts had finally determined that the Secretary had since 1955 wrongfully made per capital distributions to only Hoopa tribal members and the plaintiffs, mostly Yurok, were entitled to damages against the United States. Damages were eventually provided to the plaintiffs for the years 1955–74 but not for 1974–88. The point is that neither tribe had title to timber or a constitutional right to the revenues from 1974–88. If the revenues were distributed to one group, the other group was entitled to its fair share. It did not matter what percentage of the timber proceeds came from the square or came from the addition because according to the Federal courts, neither revenues were vested in either tribe.

In 1974–88, revenues were distributed to the Hoopa Tribe, first under the 30 percent Hoopa share totaling $19 million and second under the Settlement Act. As you are aware, the Settlement Act placed the 70 percent escrow account which was $51 million, the small balance of the Hoopa 30 percent escrow account, some smaller joint Hoopa Yurok escrow accounts, Yurok escrow accounts, as well as the $10 million Federal appropriation all in the settlement fund.

In 1991, the Department split the settlement account between the two tribes based on our enrollments. The Hoopa Valley Tribe was allocated 39.5 percent of the settlement fund or $34 million. Because the Hoopa Valley Tribe had executed its waiver, the Department provided these funds to the tribe. The Yurok Tribe was allocated $37 million and it was put in a Yurok trust account and was not provided to us.

From 1974 to 1988, timber revenues and interest was approximately $64 million of which the Hoopa Tribe received a total of $53 million or 84.2 percent of this total. Also in 1991, the claims attorneys for the Short cases sued the United States to try to recover attorneys fees from the settlement account. Two other Yuroks and I intervened in this case as co-defendants to protect the Yurok share of the settlement funds. The United States approved this intervention and the Justice Department attorneys encouraged our participation and we won this case.

As you are aware, in 1993, the Yurok Tribe sued the United States for a takings claim under the Settlement Act. We lost this case in 2001 when the Supreme Court declined to review a 2 to 1 decision by the Federal Court of Appeals. We lost this case for the same reason that the Hoopa Tribe lost all of their pre-1988 cases. No part of the pre-1988 Hoopa Valley Reservation was vested to any Indian tribe and none of us had title against the United States. We could argue that the case was unfair and historically blind and that it is outrageous to use colonial notions of Indian title in these modern times but it doesn't matter. We lost, as the Hoopa Tribe lost before us, and in this legal system, the only appeal we have left is an appeal to equity and justice before Congress to fix these wrongs.

At the same time in 1993, we adopted the conditional waiver which provided that our waiver was effective if the Settlement Act was constitutional. The courts have determined that the act is constitutional. That determination should have been sufficient to meet

the condition of our waiver but the Department held that our waiver was not valid. Although we disagree, we have not challenged the Department's judgment in the court and will not take the committee's time to debate it today.

The Department determined that the Hoopa waiver was effective and they received their funds under the Act. Therefore, they have no legal right to additional funds. The Department has reported to Congress that you should resolve this issue. Among other things, the Department sees itself as the administrator of the funds for both tribes. In resolving these issues, the report indicates that Congress should consider funds already received and focus on the purpose of the act to provide for two self sufficient reservations. A better solution would be to permit the Yurok Tribe to manage our own funds. We, of course, would be willing to submit a plan for review and approval. In fact, our constitution mandates that a plan be developed and approved by our membership before any of these funds are spent.

As we have stated, a complete review of the record indicates that almost all of the trust lands, economic resource and revenues of the pre-1988 joint reservation have to date been provided almost exclusively to the Hoopa Valley Tribe. A final point to consider is that in 1996, we negotiated an agreement with the Hoopa Valley Tribe to support H.R. 2710 in return for their support of our settlement negotiation issues specifically the balance of the settlement funds. Apparently the Hoopa Valley Tribal Council now believes that its end of the deal ended with the collapse of our settlement negotiations. We lived up to our end of the bargain and the Hoopa Valley Tribe received an additional 2,600 acres of trust land. This almost equals the total tribal trust lands we received under the act. Copies of both of our 1996 commitment letters have been provided with our written testimony.

In closing, back home our people are preparing for our most sacred ceremonies, the White Deer Skin dance and the Jump dance. These ceremonies are prayers to the Creator to keep balance in our Yurok world. When our people are in balance, we are strong, our children's futures are bright, life is as it should be, good. When our people are not in balance, we are weakened, our people are disheartened and we worry about what will become of our children. Life is not good.

In a way, this hearing is a kind of ceremony. We come seeking balance for our people, we come seeking strength, we come seeking a stable future for our children, we come seeking a good life for our tribe. Sadly, our people are not now in balance. Though our dances help our spiritual well being, the resources given to us by the Creator so that we would never want for anything have been taken from us. Once we were a very wealthy people in all aspects in our Yurok world, in our spirituality, in our resources and in our social-economic affairs. The sad irony is that because of our great wealth, we were targeted heavily by the Government's anti-Indian policies for termination and assimilation. Many of our elders have passed on never having received the benefits they were entitled to under *Short* and under the Hoopa Yurok Settlement Act. We hope Congress will not let more pass on without benefiting from the settlement fund.

Be that as it may, we pray Congress will use its power to bring balance back to our people, that it will relieve our fears about our children's futures and make us strong once again, that it will make our lives good as they should be.

Once more, Senator, thank you for the honor of appearing before the committee today and would welcome any of your questions.

[Prepared statement of Ms. Masten appear in appendix.]

The CHAIRMAN. Thank you very much.

If the Congress is called upon to resolve this matter, I can assure you that the Congress can and will do so but I would hope that all of you assembled here would realize under what circumstances these decisions would be made. Here I sit alone before you. This is a committee of 15 members. The vice chairman unfortunately had to leave because of other commitments and other issues. As a general rule, we are the only two who sit through all of these hearings.

Second, I think you should take into consideration that the sanctuary that Indian country once held in the Supreme Court may not be available. Supreme Court decisions of recent times have indicated that they are not too favorably inclined as to the existence of Indian sovereignty. I need not remind you of *Nevada* v. *Hicks* and the *Atkins* on Trading Post cases. Keeping that in mind, I wasn't being facetious when I said if you left it up to us for Settlement Act No. 2, you may get it but it may be worse than Settlement Act No. 1.

Solutions for Indian problems coming from Indian country are always the best and I know you have attempted to sit together in the past but it has not succeeded but I would hope you can do so and come forth with a joint recommendation that both of you can approve and support because if we do it, somebody is going to get hurt. I have no idea who is going to get hurt but I can guarantee you somebody is going to get hurt.

If you have the patience and the wisdom to get together and sit down, have negotiations and discussions and if you want to have the help of this committee to some mediation, we are happy to do so but to try to do this legislatively at this stage, I don't think is a wise thing because the foundation is shaky to begin with and this is not the kind of solution that lawyers can make, only Indians can make it. I would hope that you can sit together, begin a process. We would be very happy to help you and hopefully come forth in the not too distant future, maybe 6 months from now, with some solution. I can assure you that I will act speedily and expeditiously.

The way it is now, I am the only one sitting here but this is the way the Congress of the United States acts unfortunately. If you want people who have no knowledge, no idea of your issues acting upon your case, you can have it but I think that's the wrong way.

I will not ask you any questions at this time. We will just confuse it and maybe anger people further and that's not my mission here, to anger Indians. I think the time has come for Indians to get together. You have big problems ahead of you. If you can't solve the immediate problems at home, then you will have real problems on the big ones.

With that, Chairperson Masten and Chairman Marshall, just for us, would you please stand up and shake hands?

Ms. MASTEN. We have no problem with that, Senator. We work on many issues together where we have mutual benefit but I would like to say before I do that, we would request the committee's assistance because in our prior negotiations there has been a breach of trust because after our last negotiations, the Hoopa Tribe issued a press release.

The CHAIRMAN. When you have negotiations, I will make certain there is a representative from this committee.

Ms. MASTEN. Appreciate that, Senator. Thank you again.

The CHAIRMAN. If you can keep your rhetoric reasonable and rationale and friendly, I think we can work out something.

Mr. MARSHALL. I'm sorry, Senator. I cannot shake hands after being offended in that way. We did not offend them in the last negotiation and I cannot be that hypocritical.

The CHAIRMAN. I think we should start the process.

With that, this hearing is adjourned.

[Whereupon, at 12:04 p.m., the committee was recessed, to reconvene at 2 p.m. the same day.]

# APPENDIX

## ADDITIONAL MATERIAL SUBMITTED FOR THE RECORD

### PREPARED STATEMENT OF JOSEPH JARNAGHAN, COUNCILMAN, HOOPA VALLEY TRIBE OF CALIFORNIA

My name is Joseph Jarnaghan and I am a member of the Hoopa Valley Tribal Council. Our tribe has lived on and governed its affairs in the Hoopa Valley for over 10,000 years. I testify as a tribal official elected in a democratic process by the tribal membership, and expressing the views of our people.

On behalf of the Hoopa Valley Tribe, I want to thank this committee for the opportunity to be here today and to testify in this oversight hearing. I want to tell you why the return of the Hoopa escrow moneys to the Hoopa Valley Tribe is particularly appropriate in this case, now that the payment provisions of the Hoopa-Yurok Settlement Act have been exhausted.

My first slide is a map of roads built on the Hoopa Valley Indian Reservation beginning in the 1940's. There are over 550 linear miles of road on the reservation. These roads are a major source of sediment production and contamination of our waters because the Bureau of Indian Affairs' maintenance of these roads was grossly inadequate, virtually nonexistent, when it clear-cut timber from our reservation. The Bureau was more interested in getting the trees down and to sale rather than forest resource management and rehabilitation. Now, the Hoopa Valley Tribe spends approximately $200,000 to $400,000 per year from tribal revenue to fix this road system. Simply put, the BIA road construction standards employed in harvesting timber from our reservation created a huge ongoing problem. The roads erosion is devastating to fisheries, water quality and riparian organisms. The tribe continues to rehabilitate old logging roads and landings that are major contributors to sediment production and which thereby affect fish habitat and water quality.

The BIA cut down approximately 33,000 acres of tribal timber before the Hoopa-Yurok Settlement Act was passed. Most of the remainder of the reservation cannot be logged. As the photos illustrate, clear cutting management techniques were practiced by the BIA. This type of harvesting disregarded cultural resources and created large areas that the tribe must now rehabilitate through timber stand improvement projects. Even 10 years after harvesting, clear cuts have led to invasion by brush species, understocked timber regrowth, and unhealthy conditions susceptible to fire or insects. Timber stand improvement costs the tribe over $500 per acre to treat. Thin and release programs conducted by hand produce substantial improvements in growth rates.

Our reservation has also been substantially damaged by forest fires. The Megram fire of 1999 resulted in approximately 4,500 acres being destroyed through fire suppression efforts on the reservation. About one-half of the damage was the result of "back bum" operations. The rest of the damage occurred through creation of a "contingency fire line." The fire line was up to 400 feet wide and approximately 11 miles long.

The Hoopa Valley Tribe must not be subjected to the double hit of losing both the Hoopa escrow moneys derived from timbering activities on our reservation and having to finance the restoration and rehabilitation costs resulting from the BIA's poor

timber harvest projects and forest fires. The potential application of Hoopa escrow funds to settlement costs never came to pass, instead we had to incur tremendous defense costs to protect our reservation. The Hoopa escrow funds from our reservation should be restored to meet the needs of our people.

---

PREPARED STATEMENT THOMAS P. SCHLOSSER, COUNSEL, HOOPA VALLEY TRIBE OF CALIFORNIA

My name is Thomas P. Schlosser and I am an attorney for the Hoopa Valley Tribe. I thank the committee for the privilege of presenting testimony concerning the report to Congress submitted by the Secretary of the Interior in March 2002, pursuant to § 14(c) of Pub. L. 100–580, as amended, the Hoopa-Yurok Settlement Act.

I have been honored to serve as litigation counsel to the Hoopa Valley Tribe for over 20 years and, during that time, have represented the tribe in the hopelessly misnamed case of *Short* v. *United States,* a suit still pending after 39 years. Along with numerous lawyers representing various sides of the controversy, I participated in the proceedings of the 100th Congress and this Committee that fashioned the landmark Hoopa-Yurok Settlement Act.

1. *The Secretary's Report Threatens a Return to Pre–1988 Conditions.*

The Settlement Act was necessitated by complex litigation between the United States, the Hoopa Valley Tribe, and a large number of individual Indians, most, but not all of whom were of Yurok decent. Those who do not recall the applicable court rulings or the conditions from which the Settlement Act emerged will not fully appreciate the strengths and weaknesses of the Secretary's § 14(c) report. Thus, the Secretary's report mistakes the Settlement Act as having been enacted "with the primary objective of providing finality and clarity to the contested boundary issue," and concludes with the recommendation that the Settlement Fund "would be administered for the mutual benefit of both the Hoopa Valley and Yurok Tribes." The Secretary's report is not all wrong but boundary clarification was only an aspect of the Hoopa-Yurok Settlement Act. If administration of the Fund for the joint benefit of the tribes is the outcome of this process we will have returned to the difficult era between 1974 and 1988 that required passage of the Settlement Act in the first place. As George Santayana said, "those who cannot remember the past are condemned to repeat it." The error of establishing a "Reservation-wide" account is clear from comparing § 1(b)(1)(F) with *Puzz* v. *United States,* 1988 WL 188462, *9 (N.D. Cal. 1988).

Under the Settlement Act there are potential benefits currently unavailable to the Yurok and Hoopa Valley Tribes because of the Yurok Tribe's decision to reject the conditions of the act. The Hoopa-Yurok Settlement Fund is only one of the undistributed assets, and probably not the most valuable one, by comparison to the hundreds of acres of Six Rivers National Forest land within and near the Yurok Reservation, the money appropriated for Yurok land acquisition, the Yurok self-sufficiency plan which was never submitted or funded, and the statutory authority to acquire land in trust for the Yurok Tribe. Thus. a second shortcoming of the Secretary's § 14(c) report is that it focuses myopically on the Hoopa-Yurok Settlement Fund. Nevertheless, because the Settlement Fund is the only asset in which the Hoopa Valley Tribe has a continuing interest, my testimony will focus on it.

2. *The Short Case Was an Aberration From Federal Indian Law.*

The Settlement Act brought to an end a long detour from a correct decision of the Interior Department on February 5, 1958, the Deputy Solicitor's memorandum regarding rights of the Indians in the Hoopa Valley Reservation, California. The Solicitor's opinion found that a group of Indians had been politically recognized as the Hoopa Tribe by the United States in 1851 and were the beneficiaries of administrative actions in 1864 and an Executive order in 1876 setting aside the Hoopa Square for the benefit of any Indians who were then occupying the area and those who availed themselves of the opportunity for settlement therein. (Those Indians were, as this committee found in 1988, primarily Hoopa Indians, but the Hoopa Valley Tribe included other individuals who joined the community and ultimately became enrolled tribal members.) The Solicitor found that Commissioner of Indian Affairs had been correct in recognizing tribal title to the communal lands in the Hoopa Square to be in the Hoopa Valley Tribe. The Federal Government's action a generation later, in 189 1, to append to the Hoopa Valley Reservation the old Klamath River Reservation and the intermediate Connecting Strip, as an aid to the administration of those areas, could not have had any effect on the rights of Indians to property within the Reservation because Hoopa Valley rights attached in 1864 and Klamath River Reservation rights attached in 1855.

Unfortunately for all concerned, the Court of Claims differed with the Interior Department's 1958 view in *Short* v. *United States,* 202 Ct. Cl. 870 (1973), *cert. denied,* 416 U.S. 961 (1974) ("Short 1"). *Short I* ruled that the Secretary violated trust duties to non-Hoopa "Indians of the Reservation," when he excluded them from tribal per capita payments. Nearly 4,000 individuals were plaintiffs in *Short,* and *Short I* found only 22 "Indians of the Reservation" and left a very difficult job (which is still underway) for the courts to perform determining which other "Indians of the Reservation" and their heirs were entitled to damages from Treasury for breach of trust. *Short I* precipitated a series of crises and related lawsuits that jeopardized public health and welfare and nearly destroyed tribal government before Congress stepped in with the Hoopa-Yurok Settlement Act.

The Settlement Act originated in the House as H.R. 4469. The Interior and Insular Affairs Committee and the Judiciary Committee of the House conducted hearings on that bill, in addition to the two hearings conducted by this committee. As you may recall, at least three law firms represented factions of Yurok tribal members at those hearings, including Faulkner & Wunsch, Heller Ehrman White & McAuliffe, and Jacobsen, Jewitt & Theirolf. Many legal issues were argued but, with this committee's guidance, the warring factions came together on a settlement package to lay before all parties.

At the request of the House, the American Law Division of the Congressional Research Service prepared an analysis of H.R. 4469 which pointed out that because of the unique statutory and litigation background, a remote possibility existed that litigation concerning H.R. 4469 could create a new Federal Indian law precedent, holding that if the Reservation was established for non-tribal Indians, Indians of the Reservation would have a vested interest in Reservation property. The courts did not ultimately reach that conclusion, but it is useful to recall that issue now in order to realize how the Secretary's § 14(c) report oversimplifies the Settlement Act as merely a division of assets between the Hoopa Valley and Yurok Tribes. Actually, the Settlement Act initially divided the Hoopa-Yurok Settlement Fund between the Hoopa Valley Tribe and the Yurok Tribe, subject to surrender of claims, and then added appropriated funds to finance lump-sum payments to Indians who did not elect to join the Yurok Tribe or the Hoopa Valley Tribe. Because of the long history of Yurok Short plaintiff opposition to organization of the Yurok Tribe and the wide geographic dispersal of Yurok Indians it was simply unknown how many persons on the Hoopa-Yurok Settlement Roll would elect Yurok tribal membership.

3. *The Settlement Act Nullified the Short Rulings.*

This committee emphasized that the Settlement Act should not be considered an individualization of tribal communal assets and that the solutions in the Settlement Act sprang from a series of judicial decisions that are unique in recognizing individual interests that conflict with general Federal policies and laws favoring recognition and protection of tribal property rights and tribal governance of Indian reservations. The committee concluded: "the intent of this legislation is to bring the Hoopa Valley Tribe and the Yurok Tribe within the mainstream of Federal Indian law." S. Rep. 564, 100th Cong., 2d Sess. (1988) at 2.

The Settlement Act preserved the money judgments won by qualified plaintiffs in the *Short* case, and they ultimately recovered about $25,000 each from the United States Treasury in 1996. They also received the payments provided by § 6 of the Act. But this committee noted that while it did not believe "that this legislation, as a prospective settlement of this dispute, is in any way in conflict with the law of the case in the *Short* cases, to the extent there is such a conflict, it is intended that this legislation will govern." *Id.* at 19.

The interplay of the Settlement Act and the *Short* case is important to allocation of the Settlement Fund now for this reason: is indisputable that over 98 percent of the funds remaining in the Hoopa-Yurok Settlement Fund originated in trees cut from the Hoopa Square, now the Hoopa Valley Reservation. That proportion of the funds belongs to the Hoopa Valley Tribe.

4. *The Hoopa Valley Tribe Has a Right to its Timber Proceeds.*

As an historical matter, Indian tribes did not generally have a right to logging proceeds until Congress, by the Act of June 25, 1910, authorized the sale of timber on unallotted lands of any Indian reservation and provided that "the proceeds from such sales shall be used for the benefit of the Indians of the reservation in such manner as he may direct." See 25 U.S.C. § 407. In 1964, Congress changed the identity of the beneficiaries of proceeds in the statute from "Indians of the reservation" to "Indians who are members of the tribe or tribes concerned." As the Interior Department testified in support of that amendment, this was a technical correction because the term "Indians of the reservation" did not describe anybody and actually members of the relevant tribe shared in the proceeds of the sale of tribal property. However, in *Short* v. *United States,* 719 F.2d 1133, 1136 (Fed. Cir. 1983), *cert. de-*

*nied,* 467 U.S. 1256 (1984) (*"Short III"*), the court rejected that explanation and held that "Congress, when it used the term 'tribe' in this instance, meant only the general Indian groups communally concerned with the proceeds—not an officially organized or recognized Indian tribe—and that the qualified plaintiffs fall into the group intended by Congress." Thus, another important portion of the Settlement Act was the correction to the *Short*—caused distortion of 25 U.S.C. § 407 to provide that "the proceeds of the sale shall be used—(1) as determined by the governing bodies of the tribes concerned and approved by the Secretary——" This amendment restored tribal control over enrollment and use of timber proceeds.

The *Short* case, as explained in some detail in this committee's report, found that no vested Indian rights existed at the time the Hoopa Valley Reservation was extended to include the Connecting Strip and Klamath River Reservation in 1891, and that therefore all Indians of the reservation, as extended, had to be included in per capita distributions from reservation revenues. In the litigation that challenged the Settlement Act as a taking of plaintiffs' vested rights, the Yurok Tribe, its members, and the Karuk Tribe of California logically presumed both the propriety of President Benjamin Harrison's 1891 Executive order and the correctness of the Court of Claim's decision in *Short I.* In other words, those plaintiffs assumed that President Harrison acted lawfully in expanding the Hoopa Valley Reservation to include the Addition, and that the effect of 1891 Executive order was to give all Indians having an appropriate connection to the reservation as so expanded an equal claim to all of the expanded reservation's income. If either of those propositions was incorrect, then the Settlement Act could not be thought to deprive plaintiffs of anything to which they were ever entitled. However, those propositions depended in turn on the assumption that the 1876 Executive order did not confer property rights on the inhabitants of the Hoopa Square, as the reservation was then defted, since if such rights were conferred they would have been taken by the 1891 Executive Order, at least as construed in *Short I.*

Here we are again hearing the Yurok Tribe contend that they have a right to receive timber proceeds from the Hoopa Valley Square. The courts have correctly rejected this, not once, but time after time in *Short IV, Short VI,* and *Karuk Tribe of California.* In *Short IV,* 12 Cl. Ct. 36, 44 (1987), the Court held that the escrow fund did not belong to *Short* plaintiffs but was held in the Treasury subject to the discretion of the Secretary of the Interior. That ruling was reaffirmed in *Short VI,* 28 Fed. Cl. 590, 591, 593 (1993), where the Court recalled that prior to 1987 the *Short* plaintiffs claimed a right to the entire escrow fund but that claim was rejected in *Short IV* and remained the law of the case. The Federal courts rejected plaintiffs continued effort to capitalize on *Short. Karuk Tribe of California, et al.* v. *United States, et al.,* 209 F.3d 1366, 1372 (Fed. Cir. 2000), *cert. denied,* 523 U.S. 941 (2001).

Without the theories of the *Short* case, the Yurok Tribe has no claim to portions of the Settlement Fund derived from Hoopa escrow funds and timber on the Square. As the Court ruled in *Karuk Tribe of California,* "This litigation is the latest attempt by plaintiffs to receive a share of the revenues from timber grown on the Square. . . . [but] the Settlement Act nullified the *Short* rulings by establishing a new Hoopa Valley Reservation. . . . A necessary effect of the Settlement Act was thus to assure payment of the timber revenues from the Square exclusively to the 'Hoopa Valley Tribe.'" 209 F.3d at 1372. It was the purpose of the Settlement Act to return the Yurok and Hoopa Valley Tribes to the mainstream of Federal Indian law. The twisted logic of the *Short* case can have no further effect on these tribes. Under mainstream law, the proceeds of Indian timber sales must go to the tribe whose trees were cut.

TESTIMONY OF CLIFFORD LYLE MARSHALL
CHAIRMAN, HOOPA VALLEY TRIBE OF CALIFORNIA
BEFORE THE
SENATE INDIAN AFFAIRS COMMITTEE
August 1, 2002

Mr. Chairman and Members of this Committee, I am Clifford Lyle Marshall, Chairman of the Hoopa Valley Tribe of California. On behalf of our Tribe, thank you for the opportunity to present the position of our Tribe on the Interior Department's Report on the Hoopa -Yurok Settlement Act.

We express our deepest gratitude to Chairman Inouye, Vice Chairman Campbell and the other Members of this Committee for your leadership in achieving passage of the landmark 1988 Hoopa-Yurok Settlement Act. Obviously, this would have never occurred without your valiant efforts and incisive analysis of the problems that had crippled our reservation and our tribal government for more than 20 years. We also acknowledge and appreciate the hard work of your dedicated staff, some of whom I suspect remember all the details of the issues addressed in 1988 and before.

The years since its passage have demonstrated the outstanding success of the Act. It resolved the complex issues in the long - standing *Jesse Short* case brought by thousands of individuals who sued for timber revenues from the Hoopa Valley Tribe's reservation. It provided a means for those individuals who qualified for Yurok tribal membership to establish a tribal government, adopt a tribal constitution and begin to exercise governmental responsibilities. The Act ended years of frustration and inability of unorganized Yurok individuals to act effectively to benefit the Yurok people. The Yurok Tribal Chair and Council Members could not stand before you today in that capacity without that Act.

The Act also vested rights in each of the tribes to their respective reservations. It established in each tribe clear legal ownership of its reservation. The Act also preserved the political integrity of the Hoopa Valley Tribe by confirming the enforceability of our tribal Constitution. The offer was derived from an agreement reached by the Hoopa Tribe and the Yurok Tribe. The Yurok Tribe chose to reject the offer provided in the Settlement Act which would have finally brought an end to litigation. The Act nevertheless authorized the Yurok Tribe to use properties such as the Yurok Experimental Forest where a tribal government center has been established and to obtain federal grants and contracts. The Act ultimately made it possible for the Yurok Tribe to join the ranks of tribes with self-governance compacts.

Most importantly, the Settlement Act called for an end to litigation. In its attempt to accomplish that goal, the Act provided benefits to the Hoopa Valley Tribe and the Yurok Tribe, on the condition that they waive all claims which they might assert against the United States as arising from the Act. The Act specifically preserved claims of the Yurok Indians and other individual Indian claims in the *Jesse Short* case. Damages to individual Indians were determined in 1993 in *Short* and payments made in 1996.

During the era of the *Short* case, in the 1970's and 80's, the Bureau of Indian Affairs placed timber revenues from the Hoopa Valley Indian Reservation into a special escrow fund. The Hoopa Tribe was allowed to use up to 30 percent of those revenues for governmental purposes. The Court of Claims made a number of decisions about this fund. It held that the individual plaintiffs had no claim to these funds and that they could not be used to pay for damages to the plaintiffs caused by the United States.[1] With the agreement of the Hoopa Tribe, Congress provided for use of this fund in the Settlement Act for the benefit of the Hoopa Tribe and the to-be-organized Yurok Tribe.

The Settlement Act was in fact exactly what its title implies. It was an offer to both the Hoopa Tribe and the to-be-organized Yurok Tribe to receive substantial monetary payments from this fund if they would forego suing the United States for any claims they might assert arose from passage of the Act. The Hoopa Tribe accepted that offer. The Yurok Tribe did not. The Yurok Tribe refused to waive any possible claims and instead chose to wage a long and expensive legal battle against the United States and also our Tribe.[2] That legal battle cost our Tribe more than $1 million dollars and years of anguish and uncertainty. Since 1988, we have defended the Act, which has been a great benefit to all Indians of the reservation and to both tribes.

Section 2(a) of the Act is the provision regarding use of the timber revenues which had been placed in escrow. The resolution our Tribe enacted, as required by that section, authorized the use of Hoopa escrow monies as payments to the Yurok Tribe, and to individual Yuroks, as provided in the Hoopa-Yurok Settlement Act.[3] All Yurok tribal members, and other Indians who

---

[1] *Short IV*, 12 Cl. Ct. 36, 44 (1987).

[2] The Yurok Tribe's contention that their suit was not against the Hoopa Valley Tribe, but solely against the United States was rejected in court. The Court of Federal Claims ruled that their suit threatened the Hoopa Valley Tribe's exclusive rights within its Reservation and that the Hoopa Valley Tribe was properly a defendant.

[3] See, 53 Fed. Reg. 49361, 49362 (Dec. 7, 1988).

qualified for the Hoopa-Yurok Settlement Roll, executed claim waivers and received payments offered by the Act. But the Yurok Tribe did not waive, and so the Act, as applied, did not authorize payments to them. The Yurok Tribe is clearly prohibited by the Settlement Act from now receiving a portion of the Settlement Fund.[4] Further, our resolution does not authorize use of Hoopa escrow monies for purposes not provided in the Hoopa-Yurok Settlement Act. The monies were set forth as a settlement offer to end the effects of the litigation leading up to the Act. The Yurok Tribe rejected that offer. The Hoopa Valley Tribe's agreement that the Act provide an offer of Hoopa monies to the Yurok Tribe was withdrawn by operation of law.

Over 98 percent of the balance of the Hoopa-Yurok Settlement Fund comes from the Hoopa escrow accounts and is derived from logging on Hoopa Valley Indian Reservation lands. Since passage of the general timber statutes in 1910, federal law has provided for payment of proceeds from logging on tribal lands to the tribe whose reservation was logged. These timber statutes govern the Hoopa-Yurok Settlement Fund. The Settlement Act funds held in escrow were derived from timber cut on the Hoopa Valley Tribe's Reservation, timber that is only harvestable under the authority of the Secretary of the Interior pursuant to 25 U.S.C. § 407. That statute declares that "the proceeds of the sale shall be used as determined by the governing bodies of the Tribes concerned and approved by the Secretary." It is clear that the Hoopa Valley Tribe is the only governing body concerned with the sale of timber on unallotted trust land of the Hoopa Valley Reservation.

Congress was thorough in developing the Hoopa Yurok Settlement Act. The legislative history shows that Congress considered the history, aboriginal territory, demographics, and equity.[5] Likewise, the courts, after 40 years of litigation have heard and determined every

---

[4] The Secretary of the Interior's Report to Congress states that, "it is the position of the Department that the Yurok Tribe did not meet the waiver conditions of the Act and is therefore not entitled to the benefits enumerated within the Act." Report at 3. Their only opportunity to receive a settlement payment expired when they lost in the courts.

[5] The Committee Report states: S. 2723, as reported by the Committee, "is a fair and equitable settlement of the dispute relating to the ownership and management of the Hoopa Valley Reservation . . . . The Committee intends to deal fairly with all the interests in the Reservation, and believes it has done so." S. Rep. 564, 100th Cong., 2d Sess. at 14 (1988). The Committee Report compared incomes from the Reservations and also noted:

> [T]he Committee is acting out of concern that the Hoopas have intended to live on the reservation and that their government be accorded sufficient resources to provide the services necessary to sustain their habitation. Indeed, the majority of

possible issue to be raised in regard to this piece of legislation. *Yurok Tribe v. United States* is over and upheld by the United States Supreme Court. We ask Congress now to respect those prior decisions and move forward. It is clear that to the extent money remaining in the Settlement Fund came from the Hoopa Valley Tribe's reservation, the Hoopa Valley Tribe is the only tribe entitled to those proceeds. The Hoopa Valley Tribal Council would be remiss in our duties to our tribal members if we did not today seek the return of these timber revenues derived exclusively from the Hoopa Valley Indian Reservation.

The Interior Department's report to Congress pursuant to Section14(c) of the Act is disappointing. Interior's chief recommendation appears to be that no additional federal funding be provided, despite the fact that Section 14(c) specifically requests "any supplemental funding proposals necessary to implement" the Act.[6] Moreover, Interior recommends that it administer the Settlement Fund previously offered to the Yurok Tribe for the benefit of the Hoopa Valley and Yurok Tribes. We have long and hard experience with such administration in the past, prior to passage of the Settlement Act. As our other witness will testify, Interior lacks the legal authority and competence to carry out such responsibilities fairly.

Further, if it is found that the Yurok Tribe has suffered injustices, which we believe it has along with all other tribes in Northern California, and that the Federal Government wants to address these injustices and fulfill its current economic development and other needs, we adamantly argue that such needs should be addressed, but they must be addressed with funding appropriated by Congress. In 1988 Congress passed this bipartisan bill to end over 30 years of protracted litigation that resulted in judicial decisions which threatened the existence the Hoopa Valley Tribe, and would have had far reaching ramifications throughout Indian Country.

The Hoopa Tribe was not unfeeling in 1988 about the plight of the Yurok people due to past wrongful actions of the United States and due also to the Yuroks' decision to litigate rather

---

> the Indians living on the combined reservation live on the "Square." The record shows that the Hoopa Valley Business Council is the only full-service local governmental organization on the combined reservation, and has been the major government service provider in the extremely isolated eastern half of Humboldt County.

*Id.* at 15.

[6] 25 U.S.C. § 1300i-11(c).

than accept the Settlement Act's offer and move forward with effective tribal governance. We are not unfeeling now. The Hoopas, however, are not the cause of that plight and have been damaged by the United States' past actions and by the Yuroks' decision.

The Hoopa Tribe should not be forced to pay for such injustices and poor judgment. We want the Yurok Tribe to prosper as we want all tribes to prosper. The point, however, is clear - - the injustices resulted from Federal Government actions. The Federal Government should compensate. Using the Settlement Fund remainder for such purposes forces the Hoopa Tribe to be liable for the Federal Government's actions and the poor judgment of the Yurok Tribe's decision to litigate. This would be unacceptable.

Based on our experience in reaching agreement in 1988, we believe that the issues now before Congress should be resolved through considered thought and hard work over some period of time - - not necessarily years, but at least enough time to ground any new legislation on considered analysis and due diligence.



Hoopa Valley Tribal Council
HOOPA VALLEY TRIBE
Regular Meetings on the First and Third Thursday of Each Month
P.O. Box 1348 • HOOPA, CALIFORNIA 95546 • Phone 625-4211 • Fax 625-4594



Clifford Lyle Marshall, Sr.
Chairman

August 29, 2002

The Honorable Daniel K. Inouye
Chairman
U.S. Senate Committee on Indian Affairs
838 Hart Senate Office Building
Washington, D.C. 20510

Re: Supplemental Testimony for the August 1, 2002, Oversight Hearing on the Interior Secretary's Report on the Hoopa-Yurok Settlement Act

Dear Senator Inouye:

On behalf of the Hoopa Valley Tribe, thank you for holding the August 1, 2002, hearing on the Interior Secretary's Report on the Hoopa-Yurok Settlement Act. We truly appreciate your time and dedication to this issue. The hearing was a good opportunity for interested parties to voice their views on the Secretary's Report, the Act, events since its enactment, and how we move forward from here.

I make detailed points in this letter to address issues raised in the hearing and ask that this letter along with the attached briefing papers and slides which were displayed during the hearing be admitted to the record as supplemental testimony. I would like to reiterate the opening point of my oral testimony. The Hoopa Tribe is grateful for your valiant efforts over these many years, and I want you to know that the Hoopa Tribe stands ready to work with you, the Committee, and the Yurok Tribe to move toward complete resolution of this complex matter. We believe that the Hoopa Tribe in the past and the present has acted with the utmost integrity, forthrightness and good faith toward the Yurok Tribe to resolve the issues resulting from the Yurok litigation. Our leaders have never broken a promise made to the Yurok Tribe and we plan to continue our good faith dealings so that together we can return to your Committee next Congress.

The following touches on specific issues discussed in the hearing.

**Treatment of the Hoopa Valley Reservation and the Yurok Reservation**

As you mentioned in your opening statement, the history of California tribes is a sad one, based on the United States' rejection of the treaties signed with the tribes, but not telling the tribes of this until forty-five years later. The Hoopa leaders signed such a treaty in April 1864. Although the treaty was not ratified, the Hoopa Valley Indian Reservation was established by Executive Order in August 1864. Secret correspondence from the Interior Department advised not telling the Hoopa that their treaty was not ratified, stating that as long as the Hoopa believed they had an agreement they would be peaceful. For over 100 years the Hoopa Valley Indian Reservation was recognized by the United States as the property of the Hoopa Valley Tribe.

In 1891, via an Executive Order, the reservations of the Hoopa and Yurok Tribes were joined to abide by the 1864 Act of Congress authorizing only four reservations in California and to protect the 25,000 acre Yurok Reservation that was established in 1855, the validity of which was questioned in federal court cases in

1888 and 1889. The 1891 Executive Order joined the Yurok Reservation to the Hoopa Valley Reservation with a connecting strip of 33,168 acres which ran one mile wide on each side of the stretch of the Klamath River that flows between the two reservations (ultimately, this connecting strip became part of the Yurok Reservation). This joined reservation, the new Hoopa Valley Reservation, however, was administered, for many reasons, as two reservations with two separate tribes until the decisions in the Jesse Short cases began to detour the treatment of the Hoopa and Yurok Tribes away from mainstream federal Indian law.

The intent of the Settlement Act, in part, was to correct the confusion that arose over the rights of each tribe to their respective reservations and to rein the treatment of the Hoopa and Yurok Tribes back into the mainstream of federal Indian law. S. Rep. No. 564, 100th Cong., 2d Sess. 2 (1988). The Hoopa-Yurok Settlement Act essentially, and finally, honored the promise made by the United States to the Hoopa in 1864 when it originally established the Hoopa Valley Reservation. The Act vested rights in each of the tribes to their respective reservations.

In the hearing, you asked why the two reservations were treated so differently that one would end up decimated and one would remain primarily intact. I want to try to answer your question. The Yurok leadership presented a map showing only 3,000 of the original 58,168 acres remaining on the Yurok reservation. Between 1900 and 1934, Yurok Indians received 40 to 160 acre allotments of valuable redwood timber highly desired by local lumber companies and accessible by road. The Yuroks sold nearly all of their reservation lands by 1955. That is truly unfortunate.

The Hoopa Valley Indian Reservation, on the other hand, had none of the valued redwood timber and roads were inadequate until the 1930's when they were widened and upgraded. During the allotment era, the Hoopa people chose agricultural allotments for farms and livestock grazing rather than timberland. Hoopa timberlands matured and became accessible for harvest after the allotment era ended. The Tribe was not decimated by the gold rush, nor destroyed by the Catholic mission system. It remained intact, its culture and traditional ceremonies continually practiced since the beginning of time. The Hoopa Tribe has always been a cohesive community protective of its lands, the timber lands of which were not targeted until after redwood became scarce. This is the reason for the different treatment.

**Clarifying Points Raised in the Yurok Tribe's Testimony**

The Yurok Tribe's testimony and request to revisit the Settlement Act hinges on assertions that Congress was misled in 1988. The Hoopa Tribe does not believe this is true. Because we want, and have always wanted, the record to be complete and interested parties fully informed, we feel obligated to clarify and address some of the statements made in the Yurok Tribe's written testimony.

The following identifies and responds to statements in the written testimony submitted by Susan Masten, Chair of the Yurok Tribe, on August 1, 2002, that merit correction to ensure an accurate record. The text follows the pagination and paragraphs of the Chairperson's testimony.

P. 2, Para. 1 Here, as well as at page 3, paragraph 3, Chairperson Masten asserts that most Yurok members live on or near their Reservation. "Near" is a relative term and, if very broadly defined, could make the Chairperson's statement correct. At best, however, the statement is misleading. The Yurok Tribe consists of a widely dispersed group. The Yurok Tribe's base roll consists of 2,976 persons who in 1991 selected Yurok membership under the Settlement Act. Of those, 401, or 14 percent, gave their home address as outside the State of California. An additional 992, or 33 percent, gave their home address as within California, but more than 50 miles away from the Yurok Reservation. Thus, about 47 percent of the members lived more than 50 miles from their Reservation. Since the Settlement Act, the Yurok Tribe has changed its membership standards to reduce the degree of Indian blood required for

enrollment. It is unlikely that that change had the effect of increasing the portion of their tribal membership population within a radius of 50 miles of their Reservation. Unlike the dispersed members of the Yurok Tribe, the Hoopa tribal community is concentrated on the Hoopa Square.

P. 2, Para. 3 The objectives of Pub. L. 100-580 were far more complex than simply "to achieve relative equity for both the Hoopa Valley Tribe and the Yurok Tribe," as Chairperson Masten asserts. Many "Indians of the Reservation" as defined in the *Short* cases demanded lump sum awards and opposed the organization of the Yurok Tribe. This Committee recognized that Hoopa tribal members "tended to live on the Reservation," and that the Hoopa Valley Tribe was "the only full-service local governmental organization on the combined Reservation." S. Rep. 564 at 15. The Committee did not propose an equal distribution of assets between the two tribes, noting that "the judgment of the Committee [is] that a functioning tribal government fulfilling the Congress' and the Executive's policy of self-determination merits a certain financial deference over a group of Indians which has previously elected not to have a functioning tribal government." *Id.*

P. 2, Para. 5 Chairperson Masten refers here and at page 6, paragraph 4, to the belief that "the Yuroks' historic presence on the Square was minimized or ignored." She believes that "the Square is part of the ancestral homelands of the Yurok people." The evidence is to the contrary. For example, the final court opinion on the Hoopa-Yurok Settlement Act stated: " Plaintiff Yuroks also argue . . . their tribe's continuous occupancy and use of the joint reservation . . .. Both as a matter of history and as a matter of law, the record does not support the Yuroks' claim, by 'immemorial occupancy,' to Indian title to the Hoopa Valley itself, site of the Square." *Karuk Tribe of California, et al. v. United States, et al.*, 209 F.3d 1366, 1378-79 (Fed. Cir. 2000), *cert. denied*, 121 S. Ct. 1402 (2001). That same court also noted: "Therefore, the Square now the Hoopa Valley Indian Reservation was historically the homeland of the Hoopas. The Addition was the homeland of the Yuroks." *Id.* at 1371. Furthermore, this Committee's report noted that the chosen boundary line between the Hoopa Valley and Yurok Reservations under the Settlement Act moved into the Yurok Reservation a tiny Yurok settlement formerly located on the Square: "Use of the Bissel-Smith survey for purposes of defining the Hoopa Valley Indian Reservation results in the addition of lands to the Yurok Reservation in the upper reaches of the extension near the junction of the Klamath River with the Trinity River. The transition village known as Peekta Point, claimed by the Yurok Tribe, now apparently becomes part of the Yurok Reservation." S. Rep. 564 at 18.

P. 3, Para. 2 Chairperson Masten correctly notes that at the time of the Settlement Act "barely 400 Indians remained on what would become [the Yurok] Reservation." The *Short* proceedings closely examined the residences of the "Indians of the Reservation;" few were found on the Extension.

P. 3, Para. 3 While it is true that the Yurok Reservation straddles a river gorge, Chairperson Masten does not reveal that the downstream end of the Reservation is crossed by a major interstate highway, U.S. 101. That portion of the Yurok Reservation provides potentially lucrative tourist traffic. Chairperson Masten, in this paragraph also invokes an expansive use of "near" the Reservation when discussing the residences of Yurok Indians. This misleading use of language is discussed above on page 3, herein, where the actual residences of the Yurok tribal members are clarified.

P. 3, Para. 4 It was never true that as many Yuroks as Hoopas were on the Hoopa Valley Indian Reservation. As this Committee's report noted, "the Committee is acting out of concern that

the Hoopas have tended to live on the reservation and that their government be accorded sufficient resources to provide the services necessary to sustain their habitation." S. Rep. 564 at 15. Most of the Hoopa Valley Tribe still lives on the Reservation.

P. 4, Para. 1 Chairperson Masten notes that "commercial fishing income, if any, went predominantly to" individual fishermen. That reflects a choice made by the Yurok Tribe. It is also true that some anadromous fish runs in the Klamath River basin have become depressed. The Hoopa Valley Tribe has fought hard to improve habitat and management conditions for fish. S. Rep. 564 at 14. We obtained extra authority by inclusion of Section 3406(b)(23) of Pub. L. 102-575, the Central Valley Project Improvement Act. The Hoopa Valley Tribe has aggressively litigated suits to increase Indian fish harvest. Regrettably, the Hoopa Valley Tribe's efforts to improve water flows and fish returns have not been fully successful nor matched by an equal effort by the Yurok Tribe on the main stem of the Klamath River itself.

P. 4, Para. 3 The acreage of tribal trust land on the Yurok Reservation is much less now than that on the Hoopa Valley Reservation. This is mostly a result of the sale of land by individual Yurok members who received allotments of tribal land in the 1890s, and subsequently sold them. Approximately 28,000 acres were allotted to and sold by Yurok Indians on the Yurok Reservation. The Hoopa Valley Tribe received nothing from the allotments or sales. The statement that the Hoopa Tribe received the 'timber rich Square' while the Yuroks received 'a narrow strip along the Klamath' is clearly a slanted representation of the facts. The Yuroks received their original reservation of 25,000 acres, established in 1855 and the connecting strip consisting of 33,168 acres that connected the Yurok Reservation to the Hoopa Reservation in 1891. This is not a "narrow strip;" the Yurok Reservation is two miles wide and over forty miles long, totaling over 58,168 acres and encompassing the heart of the Klamath River basin from Weitchpec to the mouth of the Klamath River. As such, it is the second largest reservation in California next to Hoopa. This Reservation was once the most valuable "timber rich" portion of the joined reservations because it consisted of virgin redwood timberland. Douglas Fir that grows on the Square became targeted by loggers only after redwood became scarce. The Hoopa Tribe, however, did not benefit from the Yurok allotments, their sales or the harvesting of the redwood timber.

P.4, Para. 4 The claim that timber income of the Square since 1988 has been $64,000,000 is utterly unsupported and completely wrong. Even gross revenues prior to expenses of logging and reforestation would not reach that figure.

P. 5, Para. 2 It is misleading for Chairperson Masten to assert that the Yurok Tribe had "no lawyers, no lobbyists, and no historians" to gather information and present facts in 1988 concerning the Hoopa-Yurok Settlement Act. Factions of the Yurok Tribe were well represented and presented hundreds of pages of testimony in a highly organized fashion. The key term in Chairperson Masten's statement is that the Yurok Tribe was "not formally organized." That belies the organization led by three major Yurok families, Quinn, Jones, and Williams, and represented by the two major law firms representing over 3,700 plaintiffs in the *Short* case: Faulkner, Sheehan & Wunsch and Heller, Ehrman, White & MacAuliffe. An additional major Williams family faction of Yurok Indians was represented by Richard B. Theirolf, Yurok plaintiffs' counsel in *Puzz v. United States*. Congress conducted four hearings on the bills that later became the Hoopa-Yurok Settlement Act and Yurok interests testified at every one and identified themselves as speaking for Yurok people. See Hearing Before the Committee on Interior and Insular Affairs, H.R. Serial No. 100-75, 100th Cong., 2d Sess. (1988); Hearing Before the Select Committee on Indian Affairs, Oversight Hearing on Hoopa-Yurok Indian Reservation, S. Hrg. 100-946, 100th Cong., 2d Sess. (1988); Hearing

Before the Select Committee on Indian Affairs, H. Hrg. 100-949, 100th Cong., 2d Sess. (1988); Hearing Before the Subcommittee on Administrative Law and Governmental Relations of the Committee of the Judiciary, Serial No. 77, 100th Cong., 2d Sess. (1988). That the Yurok Tribe's governing group had not been approved by the BIA does not mean Yurok interests were absent, not adequately represented in the hearings, or unorganized.

P. 5, Para. 3 The assertion that "none of the traditional tribes of our area were organized before 1950" is simply wrong. In 1958, the Interior Department ruled that we had been politically recognized as a Hoopa Tribe by the United States as early as 1851 when a treaty was negotiated. Rights of Indians in the Hoopa Valley Reservation, California, 65 I.D. 59, M-36450, II Ops. Sol. Interior 1814 (Feb. 5, 1958). The Settlement Act itself notes that the Hoopa Valley Tribe was organized under a Constitution approved by the Secretary on November 20, 1933. *See* 25 U.S.C. Section 1300i(b)(4). This Committee's report notes that after the reservations were combined in 1891, " 'Indians of the Square' later formally organized a tribe and tribal government as the Hoopa Valley Tribe." S. Rep. 564 at 7. Indeed it is clear that a Hoopa Tribal Council existed prior to 1933, particularly in 1916, during the allotment era. *Short v. United States*, 202 Ct. Cl. 870, 943-44 (1973) (*Short I*). It is simply false to assert that the Interior Department "assisted in organizing" the Hoopa Valley Tribe simply "for the purpose of selling timber." Also misleading is the omission of the fact that Yurok plaintiffs in the *Short* case adamantly opposed tribal organization and successfully sued to prevent the organizational efforts of the Interior Department following the initiative of Assistant Secretary Forrest Gerrard. See *Short v. United States*, 661 F.2d 150, 153 (Ct. Cl. 1981) (*Short II*).

P. 6, Para. 2 Chairperson Masten decries the failure to use "referenda" about organization omitting that the suit by Yurok plaintiffs in *Beaver v. Secretary of the Interior*, Civ. No. 79-2925 (N.D. Cal. Feb. 11, 1980), involved precisely such a referendum. In that referendum, 1,909 *Short* plaintiffs voted against establishment of an interim Yurok governing committee and 65 in favor. *See Short II*, 661 F.2d at 153.

P. 7, Para. 1 The fact statement not contested in *Yurok Tribe v. United States* merely said that "Yurok people were aboriginal residents of the Square." This is true of Yurok individuals, such as Chairperson Masten, herself, who resides on the Square because she is married to a member of the Hoopa Valley Tribe. That does not suggest that the Square was traditional territory for the Yurok Tribe. As noted above, the courts have consistently rejected the Yurok territorial claims except as to the "transition village," now part of the Yurok Reservation. *See* S. Rep. 564 at 18. Similarly, it is no surprise that "over 50% of the students at Hoopa High School were not members of the Hoopa Valley Tribe," as Chairperson Masten recalls. The Hoopa High School is a public school operated by the Klamath-Trinity Joint Unified School District. Many of its students are non-Indians, not members of any tribe.

P. 7, Para. 5 It is true that little of the Yurok Reservation is now held in tribal trust status. This is primarily because the Yurok Tribe refused the Settlement Act's offer which would have conveyed hundreds or thousands of acres of Six Rivers National Forest land within the Yurok Reservation to the Yurok Tribe and would have expanded the Yurok Reservation to include additional acreage and buildings along U.S. Highway 101. The Act also provided appropriations for land acquisition and authority to acquire additional property for the Yurok Tribe in trust. These valuable lands were refused by 1992 and 1993 votes of the Yurok Interim Council.

P. 8, Para. 3 The "outline of an economic development and land acquisition plan" evidently submitted to

the Committee is long overdue. 25 U.S.C. Section 1300i-9 called for submission of a Yurok plan for economic self-sufficiency not later than two years after the date of enactment of the 1988 Act. The Settlement Act called for that plan to facilitate the rebuilding of a Yurok land base and homeland economy. That the plan has been submitted 12 years late is not a fault of the Hoopa Valley Tribe or the Committee's judgment in designing the Settlement Act in 1988.

P. 8, Para. 6 The Hoopa Valley Tribe did not understand the Committee's August 1, 2002, oversight hearing as one simply addressing the disposition of "the balance of the Hoopa-Yurok Settlement Fund." The Hoopa Valley Tribe has a strong interest in those funds since they are overwhelmingly derived from Hoopa escrow monies and the clear cutting of our Reservation. The Committee's review of the Secretary's report should include the other major, perhaps more valuable, benefits withheld from the Yurok membership by the decision of the Yurok Interim Council to reject settlement. As noted above, the proffered benefits included Six Rivers National Forest lands within the Yurok Reservation, the Yurok Experimental Forest land and buildings along Highway 101, $5,000,000 in appropriations for land acquisition, authority to take land into trust for the Yurok Tribe, and other organizational benefits.

P. 9, Para. 1 The balance of the Settlement Fund is not "held in the Yurok Trust Fund." Nor was "the key point of the cases" cited that the revenues belonged to the Yuroks. Indeed the opposite is true: the courts refused Yurok access to the funds, holding the funds did not belong to the Yuroks. As explained by the *Short* court:

> [P]laintiffs have previously argued that they are entitled to the entire escrow fund. It is true that, prior to 1987, the plaintiffs claimed a right to the entire escrow fund. This Court rejected that claim in 1987. *Short IV*, 12 Cl. Ct. at 44.* As the law stood . . . in August 1991, the plaintiffs were not entitled to the escrow fund. The law remains the same today. [FN*] In *Short IV*, the Court held that plaintiffs were entitled to damages from the United States government, not to the escrow fund itself. 12 Cl. Ct. at 44.

*Short VI*, 28 Fed. Cl. 590, 593 (1993). Chairperson Masten believes she "should not have to re-argue what Yuroks won in the *Short* cases." But while the *Short* cases' one-Reservation theory provided the Yurok Tribe's only connection to the lands of the Square (prior to the Settlement Act), those cases themselves do not support the Yurok Tribe's claims, as illustrated by the ruling in *Short VI*. *Short VI* was affirmed on appeal, *Short v. United States*, 50 F.3d 994, 997, 1001 (Fed. Cir. 1995) (*Short VII*). The *Short* cases were, in any event, intentionally superseded by the Settlement Act itself. As this Committee noted, "to the extent there is such a conflict [with the law of the case in the *Short* cases], it is intended that this legislation will govern." S. Rep. 564 at 19. The governing provisions of the Settlement Act do not provide for payments from the Settlement Fund to groups or individuals who refused to halt litigation and enact claim waivers.

P. 9, Para. 2 The assertion that the Interior Department has advised the Committee that the Hoopa Valley Tribe received approximately $19,000,000 between 1974 and 1988, is unfounded. The chart entitled *Hoopa-Yurok Settlement Act Funding History*, submitted with the written testimony of Assistant Secretary Neal McCaleb, makes no such claim.

P. 10, Para. 1 The assertion that *Short* plaintiffs received no damages for the years beyond 1974 is wrong. The opinion in *Short IV* devotes a section to plaintiffs' damages based on per capita distributions after 1974. It holds "Per capita distributions were made before and after 1974,

but the plaintiffs were denied participation. Hence, they are entitled to recover." *Short IV*, 12 Cl. Ct. 36, 41 (1987). The *Short* court emphatically did not rule that if revenues were distributed to one group, the other group was entitled to its fair share. Instead, *Short IV* held:

> [P]laintiffs arguably were not benefited by tribal services that they were ineligible to receive because they were not enrolled Hoopas. .... Just as an enrolled Hoopa could not claim a 'share' of monies used by the Hoopa Valley Tribe as a government, plaintiffs may not recover a portion of monies distributed to the Tribe. .... To mandate that the Secretary distribute monies dollar-for-dollar between an organized tribal government and a group of individual Indians could hinder the Secretary's implementation of the Congress' and Executive's policy of strengthening tribal governance and self-determination.

*Short IV*, 12 Cl. Ct. 36, 42. In other words, although revenues were distributed only to the Hoopa Valley Tribe throughout the period at issue in *Short*, and used for tribal governmental purposes, neither the plaintiffs nor the Yurok Tribe were entitled to a share of those revenues under the *Short* court rulings.

P. 11, Para. 1 Chairperson Masten's figures for timber revenues and amounts received by the Hoopa Valley Tribe are unsupported by evidence. The chart submitted with Assistant Secretary McCaleb's written testimony shows total Reservation timber proceeds in 1974-79 of approximately $17,000,000 and in 1980-88 of approximately $15,300,000, for a total of $32,300,000. Most of that amount did <u>not</u> go to the Hoopa Valley Tribe.

P. 12, Para. 1 The "conditional waiver" resolution enacted by the Yurok Interim Council could not rationally have been considered sufficient to meet the conditions of a valid waiver, as Chairperson Masten now contends. The resolution expressly permitted the Yurok Tribe to maintain its lawsuit against the United States. The Yurok Tribe proceeded to litigate vigorously until the final decision of the Supreme Court in 2001. To call that litigation campaign a "waiver of claims" would be to make a mockery of the language used by this Committee in the Settlement Act's provisions and the Settlement Act's purpose of inducing all tribes and groups to lay down their lawsuits and build a new community.

P. 12, Para. 4 Chairperson Masten suggests that the Yurok Tribe's action in 1996 led to the Hoopa Valley Tribe receiving some 2,600 acres of trust land. The truth is that Congress corrected a surveying error by Pub. L. 105-79 and 105-256 which restored to Hoopa ownership lands wrongfully omitted in 1876. The land lost to the Hoopa Valley Tribe in 1876, and restored in 1998, was never held by or subject to the claims of the Indians of the Addition or the Yurok Tribe. While the Yurok Tribe asked the Hoopa Valley Tribe to waive "all rights to said account" [the remaining Settlement Fund] as a condition for Yurok's nonopposition to the proposed Hoopa legislation, the Hoopa Valley Tribe refused to do so or go beyond its support for settlement of the lawsuit. The extent of the Yurok Tribe's participation in the 1997-98 congressional proceedings was the submission of a one-sentence letter indicating they did not oppose the Act. Despite the Hoopa Valley Tribe's 1996 support for the Yurok Tribe's settlement negotiations, the Yurok Tribe chose not to settle or to waive its claims then or subsequently.

**The History from 1988 to the Present and How to Proceed**

We spoke to you during the hearing about the hardships our Tribe has been forced to endure as a result of the United States' actions toward our reservation and over forty years of litigation defending our

rights. We are attaching the slides shown during the hearing that display the egregious timber mismanagement and environmental damage done to our Square. We trusted that the Hoopa-Yurok Settlement Act brought an end to the long, destructive litigation and because of that we made a considered decision to waive our legal claims under the Act. Unfortunately, the Act did not end the litigation because the Yurok Tribe chose not to waive its future legal claims and continued litigating for another decade, imposing expense and burdens on the Hoopa Valley Tribe.

The Senate Committee did not act precipitously in 1988. It took into consideration the history of actions affecting our reservation and tribal government before 1988. Moreover, we fervently believe that the provisions of the Act cannot be ignored and that the history from 1988 until today cannot be forgotten as we move forward. The Act required a waiver of claims for a tribe to its benefits. The Yurok Tribe did not waive and, therefore, does not have a right to claim the benefits of the Act.

We support meeting the needs of the Yurok Tribe for economic development and assistance, but such needs arose from actions by the Federal Government - - not the Hoopa Valley Tribe. We cannot now move forward in a manner that will break the promises made in 1988 to the Hoopa Valley Tribe.

We propose, as we did in the hearing, returning the timber monies to the place from which they were derived. They were derived from the Hoopa Square. They should be returned to the Hoopa Tribe. Although the history of Yurok Reservation is tragic, the Hoopa Valley Tribe should not be forced to pay for wrongs committed by the United States.

We have made every attempt to initiate negotiation with the Yurok Tribe and have actively sought to work with its leaders to resolve these issues. Our offer to divide the timber escrow funds equally with the Yurok Tribe is documented in the testimony of the Department of the Interior. The Hoopa Tribe made that offer even though under the Act the Yurok Tribe is not entitled to those funds. The Yurok Tribe rejected that offer outright and demanded all of the escrow funds.

The Hoopa Tribe is willing to negotiate a division of the escrow funds from the Hoopa Square that are part of the Act's undistributed benefits. We remain open to negotiation, as we are anxious for the return of our timber revenues. We want to be sure that you understand this, and ask that you reinforce this truth with Chairperson Masten.

We will work with the Yurok Tribe and look forward to continuing to work with you on this significant matter.

Very truly yours,

Clifford Lyle Marshall
Chairman

cc: The Honorable Ben Nighthorse Campbell, Vice-Chairman, U.S. Senate Committee on Indian Affairs
Ms. Patricia Zell, Majority Staff Director, Committee on Indian Affairs
Mr. Paul Moorehead, Minority Staff Director, Committee on Indian Affairs

enclosures




This map illustrates the roads that were built on the HVIR beginning in the 1940's thru 1980's. There are over 550 miles of linear roads on the HVIR. These roads are a major source of sediment production. The BIA maintenance of these roads is grossly inadequate, and virtually non-existent. The Tribe spends approximately $200,000 to $400,000 annually from tribal revenue to rehabilitate this road system.