

This photo was taken during the blow out during the Megram fire of 1999. This particular shot was taken from Long Ridge towards the Red Cap Drainage. The Megram fire resulted in approx. 4,500 acres being damaged by the fire suppression on the HVIR.



This photo was taken after the Backburn during the Megram Fire. Prior to this photo, this plantation was fully stocked. These plantations were generally the only areas blackened on the HVIR during the Megram Fire.



The other 50% of the damage that occurred on the HVIR during the Megram Fire, was the creation of a "Contingency Fire Line". This photo illustrates the width of the line and the damage as a result of creating the line. The fire line was as wide as 400 feet in some areas, and was approximately 11 miles long.

**HOOPA-YUROK SETTLEMENT FUND**
**BEFORE AND AFTER**
**ENACTMENT OF PUB. L. 100-580 (Oct. 31, 1988)**

The Hoopa-Yurok Settlement Fund (HYSF) is a pool of Indian monies that Congress tapped to achieve the landmark Hoopa-Yurok Settlement Act (HYSA) in 1988. Because a portion of the settlement was rejected by the Yurok Tribe, the HYSF, now approximately $65 million, constitutes most (but not all) of the assets to be distributed by Congress in amending the HYSA pursuant to § 14(c) of that Act, 25 U.S.C. § 1300i-11(c).

The Secretary of the Interior collects Indian monies into trust accounts pursuant to a variety of statutes, enacted since the 1880s, which authorize the Secretary to conduct logging on Indian tribal land, lease tribal or individual lands held in trust status, or otherwise market Indian resources. About $86 million was available to Congress in fashioning the HYSA. Nearly all of the money came from specific "escrow funds" itemized in § 1(b)(1) of the HYSA. Of the seven Indian trust funds itemized as "escrow funds," over 98 percent of the funds were derived from logging on Hoopa Indian Reservation trust lands, the portion called the Hoopa Square, which was established as a reservation in 1864.[1]

Section 4 of the HYSA, 25 U.S.C. § 1300i-3, established the HYSF. It directed the Secretary to cause "all of the funds in the escrow funds, together with all accrued interest thereon, to be deposited into the Settlement Fund." Thereafter, the HYSA called for dividing the HYSF into three portions, based upon the number of qualified Indians in three categories: (1) Hoopa Valley tribal members; (2) Yurok tribal members; and (3) qualified Indians who chose the lump sum option and disaffiliated from the Hoopa and Yurok tribes. All three groups of qualified individual Indians received payments from the HYSF, in varying amounts, commencing in 1991.

Monies in the HYSF that were left over after making the payments to individual Indians became available to the Hoopa Valley Tribe and the Yurok Tribe if those tribes agreed to surrender their possible legal claims against the United States relating to the HYSA, and halt litigation. The Hoopa Valley Tribe chose that option and received a portion of the HYSF, but the Yurok Tribe rejected the option and waged a long litigation battle which culminated in defeat in 2001. *See Karuk Tribe of California, et al. v. Ammon*, 209 F.3d 1366 (Fed. Cir. 2000), *cert. denied*, 121 S. Ct. 1402 (2001).

---

[1] The Secretary of Interior was forced to determine the origin of monies in the seven itemized escrow funds in response to a claim by attorneys for some of the Yurok Indians filed in *Heller, Ehrman, White & McAuliffe v. Lujan*, Civ. No. 91-2012 (U.S.D.C. D.C. 1991). The *Heller* plaintiffs did not seek fees based on funds derived from the Yurok Reservation. The Secretary determined that exemption shielded 1.26303 percent of the settlement fund because 98.74 percent of the escrow funds were derived from the Hoopa Square.

The Hoopa Valley Tribe brought its resources to bear in defending the HYSA, alongside the Interior Department, and was successful after an expensive ten-year lawsuit. The HYSA prohibits award of HYSF funds to individual Indians or tribes who refused the settlement. As a result, unexpended money remains in the HYSF. These funds should now be returned to the beneficial owners of the lands that were logged or leased to generate the original monies placed in the escrow accounts.

## ABORIGINAL TITLE WITHIN THE HOOPA SQUARE HAS ALREADY BEEN RESOLVED

**Issue:** The Yurok Tribe argued[1] that it had substantial aboriginal territory in the Hoopa Valley Reservation ("the Square") in an attempt to influence any legislation arising out of the Department of the Interior's Section 14 (c) Report on the Hoopa-Yurok Settlement Act

**Hoopa Position:**

Congress and the courts have already resolved the issue of which tribe held aboriginal title where. There should be no further discussion to determine aboriginal title. It has already been determined.

The Yurok Tribe's statement about aboriginal title is incorrect.

- The Hoopa-Yurok Settlement Act partitioned the Hoopa Valley Reservation into the Square for the Hoopa Tribe and the Addition for the Yurok Tribe. The legislation was enacted to end decades of litigation between the United States and thousands of Indian individuals. Congress believed it dealt fairly with all the interests in the reservation and that the Act was a fair and equitable settlement of the dispute relating to the ownership and management of the Hoopa Valley Reservation[2]. Aboriginal title of the Hoopa Tribe and the Yurok Tribe was an important factor that Congress took into consideration when developing and enacting the Act. The Senate Committee on Indian Affairs reported:

> "The aboriginal lands of the Yurok of Klamath Indians were generally centered on the drainage of the valley of the Klamath River from the Pacific Ocean to its fork with the Trinity River. These lands lay northward from that fork and westward to the Pacific. ...
>
> The aboriginal lands of the Hupa or Hoopa Indians were centered on the drainage of the Hoopa Valley of the Trinity River southward from its fork with the Klamath. ..."[3]

The land partitioned to the Hoopa Tribe is only that land centered on the Hoopa Valley of the Trinity River, South of the Klamath River confluence. The Senate Committee reported further that:

> "... Although some scholars disagree, the U.S. Court of Claims noted in the case of *Jessie Short et al. v. The United States* (202 Ct. Cl. 870, 886):
>
> > ' The Indian tribes of Northern California were not organized or large entities; Indians resident on a particular river or fork were a "tribe". Tribal names were often applied inexactly and usually meant only a place of residence. To call an Indian a "Hoopa" or Trinity Indian meant he was an Indian resident in the valley of the Trinity called Hoopa. The names "Yurok" and "Karok" * * * also meant a place of residence. '"[4]

For this reason, Indians residing on the Square, and allotted land there, became Hoopa Tribe members regardless of their ancestral associations. The Committee reiterated its consideration of aboriginal title in developing the legislation. It stated:

---

[1] Yurok President Sue Masten included this in her testimony before the SCIA and Senate Commerce Committee on May 14, 2002, at the oversight hearing on telecommunications service in Indian Country.
[2] Senate Report 100-564 at 14.
[3] Senate Report 100-564 at 3.
[4] Senate Report 100-564 at 3.

"As noted elsewhere in this report, the proposed partition is also consistent with the aboriginal territory of the two named tribes involved, particularly since the Hoopa Valley Tribe formally organized in way encompassing all Indian allotted land on the Square." [5]

- The Yurok Tribe along with the Karuk Tribe and individual Indians filed suit against the United States claiming that the Hoopa-Yurok Settlement Act constituted a Fifth Amendment taking of their property interests. The U.S. Court of Appeals for the Federal Circuit ruled that the plaintiffs did not possess compensable vested property interest in the reservation in 1988 and, thus, the partition of the reservation was not an unconstitutional taking.[6] In ruling, the court considered aboriginal title of the tribes and stated:

  "Historically, the Yuroks resided along the lower Klamath, in what became the addition, while the Karuks resided along the upper Klamath, an area outside any reservation . . . The Hoopa Valley Indians lived in the Hoopa Valley along the Trinity River. Therefore, the square – now the Hoopa Valley Reservation – was historically the homeland of the Hoopas. The addition was the homeland of the Yuroks. Weitchpec, on the square's northern boundary, was originally a Yurok settlement."[7]

**The issue of aboriginal title has been resolved. Further discussion on this issue with regard to the Department of the Interior's Section 14 (c) Report or otherwise is misguided and irrelevant.**

A:/aboriginaltitlebriefing

[5] Senate Report 100-564 at 15

[6] *Karuk Tribe of California v. Ammon*, 209 F.3d 1366 (Fed. Cir. 2000), *cert. denied*,532 U.S. 941(2001).

[7] *Karuk Tribe of California v. Ammon*, 209 F.3d at 1370-1371, *cert. denied*, 532 U.S. 941(2001) (emphasis added).

## THE YUROK TRIBE DID NOT WAIVE ITS CLAIMS UNDER THE HOOPA-YUROK SETTLEMENT ACT

The Hoopa-Yurok Settlement Act (HYSA) withheld benefits of the settlement from both the Hoopa Valley Tribe and the Yurok Tribe unless each waived potential legal claims against the United States.[1]

**Issue:** The Yuroks contend that Resolution 93-61 enacted by the Yurok Interim Council constituted a waiver under the Hoopa-Yurok Settlement Act that should now be given effect.

**Response:** The Yurok Tribe did not meet the waiver requirements under the Act and is, therefore, not entitled to receive the Settlement Fund or other benefits under the Act. The Hoopa Valley Tribe provided the required waiver of claims in 1988 by executing and adopting a tribal resolution, which was published in the Federal Register. The Yurok Tribe, however, refused to waive its claims. Instead, it filed an unsuccessful lawsuit against the United States challenging the constitutionality of the Act. The Supreme Court ultimately denied certiorari of the case in 2001, 13 years after passage of the Act. The Yurok Tribe enacted what it called a "conditional waiver" in 1993, but this action did not meet the waiver requirements under the Act and cannot be given effect now.

- *The Yurok Interim Council's Resolution 93-61 did not constitute a waiver.* A 1994 decision of then Assistant Secretary–Indian Affairs Ada Deer declared that Resolution No. 93-61 did not effectively waive any tribal claims as required in the Act, but, in fact, acted to preserve any such claims.[2] The Yurok Tribe failed to challenge this final agency decision before the time limitation for doing so expired

- *Resolution 93-61 has no effect.* The Department of the Interior made this determination in 1994, as noted above, and it was conveyed to the Yurok Tribe in writing. The Yurok Tribe argues that the resolution was a conditional waiver that should now be given effect because the condition to its effectiveness has been removed. The Act, however, clearly required the tribe to stop its court challenges to the settlement in order to receive the benefits. A waiver of all potential legal claims *conditioned on being allowed to pursue legal claims* is illogical and certainly not within the intent of the HYSA.

- *The Yurok Tribe wants a second chance.* The Yurok Tribe made a fully considered choice between 1988 and 1993 to pursue legal claims rather than waive them. It litigated its claim all the way to the Supreme Court and lost. It is now returning to try to claim a share of the unexpended settlement funds - - which was available to them up until 1993 *if* they settled. The Yuroks made a decision then; they cannot now, with the hindsight of their legal defeat, try to turn back time and start anew. Resolution 93-61 did not meet the waiver requirements under the Act in 1993 and it certainly cannot be given effect now. There is nothing left for the Yurok Tribe to waive; their claim is barred by final judgment.

- *The Department of the Interior's position does not support the Yurok claim to the HYSA benefits.* The Section 14 (c) Report clearly states that "it is the position of the Department that the Yurok Tribe did not meet the waiver conditions of the Act and is, therefore, not entitled to the benefits enumerated within the Act.[3]"

a:WaiverRqmnt.briefing

[1] 25 U.S.C. Sec 1300i-1(a)(2)(A); 25 U.S.C. Sec. 1300i-1(c)(4).

[2] Section 14 (c) Report at 2.

[3] Section 14 (c) Report at 3.

## HOOPA TRIBE'S 1996 SUPPORT FOR YUROK TRIBE'S PROPOSED SETTLEMENT HAS NO PRESENT DAY EFFECT

**Issue:** The Yurok Tribe has incorrectly stated that the Hoopa Valley Tribe agreed to waive all rights to the Settlement Fund and declared that those funds should be made available to the Yurok Tribe to obtain the Yurok Tribe's support for legislation to convey Forest Service lands in the southeast corner of the Square to the Hoopa Tribe.

**Response:** In 1996, the Hoopa Tribe did agree to support the Yurok Tribe's proposal to settle its lawsuit, *Yurok Tribe v. United States,* in a manner that included the Yurok Tribe obtaining the remainder of the Settlement Fund. Yet, the Hoopa Tribe did so only to obtain the commitment of the Yuroks to stop opposing the South Boundary Correction Act - - and it did so on the condition that the Yuroks obtain the Settlement Fund remainder only as part of a proposed settlement of its lawsuit. The Yurok Tribe, however, never negotiated a settlement.

The following summarizes the events that occurred in 1996—

- On July 29, 1996, then Yurok Chairwoman Long wrote to then Hoopa Tribe Chair Risling offering to support the South Boundary Correction Act[1] on the conditions that: the benefits of the Settlement Act be made available to the Yurok Tribe, and the Hoopa Tribe support the Yurok Settlement proposal in *Yurok v. United States.*

- At a meeting arranged by Senator Boxer's office, the Yurok Tribe provided a draft resolution for the Hoopa Tribe's approval. The draft stated, in part, that the Hoopa Tribe supported the Yuroks' efforts to settle *Yurok v. United States* and would support the Yuroks obtaining the Settlement Fund remainder. The draft resolution also contained a new provision not previously discussed stating that the "Hoopa Valley Tribe acknowledges the Yurok Tribe's right to the remaining Settlement Fund, and reaffirms that the Hoopa Valley Tribe has waived and does waive whatever all rights to said account it may have or had." The Hoopa Tribe refused to enact the proposed resolution and the new provision was never incorporated into Hoopa Valley Tribe documents.

- The Hoopa Tribe agreed to support the Yurok Tribe to obtain the Settlement Fund remainder if it was part of a settlement of its lawsuit, *Yurok v. United States.* The settlement, however, never occurred. Instead, the Yurok Tribe continued to litigate - - all the way to the Supreme Court and lost its challenge that the Hoopa-Yurok Settlement Act constituted an unconstitutional taking.

- The Yurok Tribe asked the Hoopa Tribe to permanently waive its claims to the Settlement Fund remainder, but the Hoopa Tribe refused to do so.

- The Hoopa Tribe's agreement to support an unconsummated lawsuit settlement in 1996 has no effect in 2002. The conclusion in the *Yurok v. United States* lawsuit makes it impossible to consider further settlement of the suit.

**The Hoopa Tribe's agreement in 1996 to support the Yurok Tribe in their efforts to negotiate a settlement in *Yurok v. United States* has no relevance for 2002 events and current discussions about the Hoopa-Yurok Settlement Act and the Department of the Interior's Section 14 (c) Report.**

southbndrydispute.briefing

---

[1] The *South Boundary Correction Act* was legislation enacted in 1996 to convey to the Hoopa Valley Tribe Forest Service lands in the southeastern portion of the Square that were taken from Hoopa ownership in the 1800s, before the joint reservation was created.

**BRIEFING PAPER ON THE HOOPA-YUROK SETTLEMENT ACT**
**Hoopa Valley Tribe**
June 21, 2002

The 1988 Hoopa-Yurok Settlement Act of the 100th Congress ("HYSA" or "Act")[1] divided federal reservation lands between two American Indian tribes in Northern California, the Hoopa Valley Indian Tribe and the Yurok Tribe. The Act was a landmark for California Indians, made necessary by decades of litigation between the United States and thousands of individuals. The courts held that prior to the Act that neither tribe had vested rights in the reservation. The Act partitioned the Hoopa Valley Reservation into the Square and the Extension and vested rights to the Square in the Hoopa Valley Tribe and rights to the Extension in the Yurok Tribe.

Section 14 of the Act[2] required the Secretary of Interior to report to Congress at the end of any litigation that arose out of the Act. The cases brought by the Yurok Tribe challenging the Act ended in March 2001 with a dismissal of the challengers' claims and denial of certiorari by the United States Supreme Court.[3] The Secretary's Section 14(c) report went to the President of the Senate and the Speaker of the House on March 15, 2002.

The Secretary's Report Recommends Continued Interior Department Administration of the HYSA Settlement Fund.

The Secretary's March 15, 2002, report is very brief; it recommends (1) no additional Congressional funds; (2) the HYSA Settlement Fund be retained in trust status (as current law requires); (3) Interior administer the fund for the benefit of both the Hoopa Valley and Yurok Tribes; (4) Congress consult with the Interior Department and the Tribes to fashion a mechanism for administration of the HYSA Settlement Fund; and (5) Congress consider dividing the Settlement Fund into two separate permanent funds. The Secretary's report notes that neither Tribe had a constitutionally-protected right to the money placed in the fund, and that, because of the waiver provisions of the HYSA, neither Tribe can force the United States to distribute further benefits to it.[4]

---

1 Codified in part at 25 U.S.C. § 1300i – 1300i-11 (2001).

2 25 U.S.C. § 1300i-11(c). ("The Secretary shall prepare and submit to the Congress .. any recommendations of the Secretary for action by Congress, including, but not limited to, any supplemental funding proposals necessary to implement the terms of [the Act] and any modifications to the resource and management authorities established by [the Act].").

3 *Shermoen v. United States*, 982 F.2d 1313 (9th Cir. 1992), *cert. denied,* 509 U.S. 903 (1993), and *Karuk Tribe of California v. Ammon*, 209 F.3d 1366 (Fed. Cir. 2000), *cert. denied*, 532 U.S. 941 (2001).

4 *Karuk Tribe of California v. Ammon,* 209 F.3d 1366 (Fed. Cir. 2000), *cert. denied*, 532 U.S. 941 (2001).

The Hoopa Valley Tribe opposes the Interior Department's continued management of the fund and believes it should manage the fund itself in light of Interior's failure to manage trust funds for tribes and individuals.

2. The Settlement Fund Remainder Should Be Distributed Between the Hoopa Valley and Yurok Tribes Based on the Same Proportions as the Funds were Derived.

Section 2 of the Settlement Act,[5] withheld the benefits of the settlement from both the Hoopa Valley and Yurok Tribes unless both tribes promptly waived potential legal claims against the United States. Claim waivers were essential to end the generations of litigation among the U.S. and the Indians that had established that the Indians were merely occupying federal property. (That litigation also produced over $50 million for the Indian plaintiffs in the *Jessie Short* cases[6], and the Act did not disturb that judgment. The Act also authorized additional cash payments to various Indian individuals.)

The Hoopa Valley Tribe enacted the required waiver resolution in 1988. However, the Yurok Tribe refused to waive[7] and sued the United States (and the Hoopa Valley Tribe) in the case recently won by the defendants. The Yurok suit left millions of dollars of money and other benefits unclaimed; these are still held by the United States as the Secretary's report concedes.

The Hoopa Valley Tribe believes that the unclaimed settlement funds should be paid to the Hoopa and Yurok Tribes in the same proportions as the funds were derived from resources of what became the Hoopa Valley Reservation and the Yurok Reservation. Federal law other than the HYSA supports the Tribe's position.

Over 98% of the unclaimed money came from logging on the Hoopa Valley Tribe's Reservation.[8] Only 1.26303 percent of the funds were derived from resources of what became the Yurok Reservation under the Act. The logging that produced the funds is authorized by 25 U.S.C. Sec. 407, which requires that the money be used for the benefit of the Indians who are members of the tribe or tribes concerned. The only tribe concerned with the logging on the unallotted trust land of the Hoopa Valley Reservation is the Hoopa Valley Tribe and, therefore, the revenues from this logging (98.7% of the settlement fund) should be used to benefit the members of the Hoopa Valley Tribe.

---

[5] 25 U.S.C. § 1300i-1.

[6] *See*, e.g., *Short v. United States*, 486 F.2d 561 (Ct.Cl 1973)("*Short I*") and *Short v. United States*, 28 Fed. Cl. 590 (1993)(*Short VI*").

[7] Letter of Ada E. Deer, Assistant Secretary – Indian Affairs, to Susie L. Long, Chair, Interim Tribal Council, Yurok Tribe (April 4, 1994).

[8] Memorandum from Acting Director, Office of Tribal Services, to Superintendent, Northern California Agency, Re: Issuance of Per Capita Checks from the Hoopa-Yurok Settlement Act Funds (October 24, 1991).