Further, other federal laws concerning forestry practices on Indian lands acknowledge the trust responsibility toward Indian forest lands and require that Indian forest land activities undertaken by the Secretary not only use sound silvicultural and economic principles but also use sale proceeds to rehabilitate Indian forests.[9] The Interior Department clear-cutting at Hoopa that produced nearly all of the money deposited in the HYSA settlement fund removed far more trees and vegetation than modern forestry standards permit. That logging left forest rehabilitation needs, washed-out roads, inadequate culverts, and extreme erosion and siltation problems for which the Hoopa Valley Tribe is now the responsible party. Silt in the Trinity River is a major obstacle to fisheries restoration efforts. The Hoopa Valley Tribe's timber harvest funds should be repatriated to the Hoopa Valley Tribe to address these local needs.

The Section 14(c) Report does not advocate weighing "equities." Any argument about equity in the ultimate distribution of the Settlement Fund is misguided. The equities were weighed in 1988 when developing the Hoopa-Yurok Settlement Act. It would be unwise for Congress to reexamine the approach chosen in the Act to encourage settlement.

The Act, not equity, is the proper basis for distributing the unexpended funds. However, if it were the basis, equity is on the side of the Hoopa Valley Tribe. The Yurok Tribe refused to enact the required waiver resolution in 1988 under the Act. Instead, the Yurok Tribe took its chances and litigated all the way to the Supreme Court and lost. It is now returning to try to claim a share of the unexpended funds - - which was available to them in 1988 *if* they waived their claims. Equity also sides with the Hoopa Valley Tribe since the source of 98.7% of the settlement funds is from Hoopa and the forest resource management needs created by the overharvest of tribal timber exists at Hoopa. Further, Hoopa not only abided by the Act but also played a lead role in the defense of the settlement.

3. <u>Other Benefits Withheld from the Yurok Tribe due to its Refusal to Waive</u>.

Although the Yurok failure to enact the waiver caused the other valuable benefits of the HYSA to be withheld, the Yurok Tribe is not seeking them. These benefits include national forest system lands within the Yurok Reservation, the improved properties located in the former Yurok Experimental Forest, the $5 million appropriated for land acquisition on and near the Yurok Reservation, and a plan for economic self-sufficiency.

0004.062101.HYSAbriefingpaper.2

[9] See, National Indian Forest Resources Management Act, 25 U.S.C. Sec. 3101-3120.

TESTIMONY OF SUSAN MASTEN

CHAIR, THE YUROK TRIBE

BEFORE

THE UNITED STATES SENATE COMMITTEE

ON INDIANS AFFAIRS

ON

THE DEPARTMENT OF THE INTERIOR'S REPORT

ON THE HOOPA-YUROK SETTLEMENT ACT.

AUGUST 1, 2002

Good morning, I am Susan Masten, Chairperson of the Yurok Tribe. As you may be aware, the Yurok tribe is the largest Tribe in California with approximately 4528 members, of whom 2579 live on or near our Reservation.

Thank you for holding today's hearing. We consider it a most important hearing for the Yurok people. In particular, thank you, Chairman Inouye for taking this very significant step toward addressing our concerns for equity under the Hoopa-Yurok Settlement Act (Act); and that is to look at what has been achieved or not achieved in the 14 years since the Act was passed and asking what now may need to be done. We are deeply appreciative of your letter of October 4, 2001, in which you invited both Tribes to step beyond the existing Act and address current and future needs.

We know that this Committee, as is reflected in your Report on the Act in 1988, sought to achieve relative equity for both the Hoopa Valley Tribe and the Yurok Tribe. During the course of our many meetings with members of congress and their staff, we have been asked why Congress should look at this matter again. After all, the local congressman introduced the bill; both California Senators supported the bill; as did the Administration.

The answers to these questions are clear. The Act has not achieved the full congressional intent and purpose and congress often has had to revisit issues when its full intent is not achieved. Additionally, we believe that the Departments of the Interior and Justice did not completely or adequately advise Congress of all relevant factors that were necessary to achieve equity.

The Departments had battled the Yuroks over numerous issues during the twenty-five year period preceding the Act. Because of lingering animosity over Short and fishing issues, it appears that Congress may have been misled. Congress did not have the full assistance from the Departments that you should have had. In reviewing the testimony and official communications from the Department, we were appalled that the Yuroks historic presence on the Square was minimized or ignored, and that the relative revenue and resource predictions for the Tribes were erroneous. Furthermore, We are also concerned about the significant disparity in actual land base that each Tribe received after the partition.

We understand that an unspoken but significant

motivation for the Departments, was to keep Puzz, (which held that the Hoopa Valley Tribal Council did not have exclusive governing authority over the multi-tribal Reservation), from subjecting the United States to significant fiscal liability for mistreating so-called "minority" interest tribes or their descendants on multi-tribe Reservations. While the Committee correctly focused on the sovereignty implications of Puzz, the Departments focused on their liability - (reminiscent of Cobell, today). Also, and perhaps, more important, apparently the Department was not cognizant that the United States also had a trust responsibility to the Yurok Tribe and the Yurok people.

Can you imagine in this day and age, an Assistant Secretary addressing a serious dispute between tribes by describing one side as "a model Indian tribe" and then dismissing the other tribe as some sort of remnant whose members needed no more than 3000 acres, because barely 400 Indians remained on what would become their Reservation? This same Interior Department that told Congress that the income of the Tribes would be reasonably equivalent; the Hoopa Valley Tribe would earn somewhat over a million dollars a year from timber resources and that the Yuroks had just had a million dollar plus commercial fishing year.

Here are the real facts. Several thousand Yuroks lived on or near the reservation; "On or near " is the legal standard for a Tribe's service population. As the Committee is aware, the Yurok Reservation straddles a River Gorge and has a severe lack of infrastructure - lack of roads, telephones, electricity, and housing, as well as significant unemployment and poverty levels. Further, there is a desperate need for additional lands - particularly lands that can provide economic development opportunities, that provide adequate housing sites and that meet tribal subsistence and gathering needs.

The Department gave the impression that the predominantly Yurok Short plaintiffs had abandoned their traditional homelands; that they were spread out in over 36 states; that they were predominately absentee; perhaps non-Indian descendants and were just in the dispute for the dollars, was highly insulting to the Yurok people and a disservice to Congress. There were at least as many Yuroks on or near the Reservation as there were Hupas. And as noted above we still have significant land and resource needs that have not been met.

With respect to the relative income or resource equivalency status projected for the partitioned

Reservations, which was so critical to Congress' intent to provide an equitable partition; it is true over the past three decades there has been a couple of commercial fishing years that were viable and there was one such year shortly before the HYSA was enacted. True, but also very misleading. First of all, commercial fishing income, if any, went predominately to Hoopa and Yurok fishermen. Moreover, the fact was that in most years there was no commercial fishery whatsoever; in many years there were not enough fish for subsistence and ceremonial purposes.

Since the Act, in the Klamath River system, COHO salmon have been listed as an endangered species and some other Klamath River fish are threatened to be listed. Other Klamath River fish species have become extinct. The causes are multiple. However, recently the fish runs we depend on are subject to fragile water flows. Although we have the senior water right and a judicially recognized and protected fishing right, we have to fight for water with the Department of the Interior's Bureau of Reclamation almost every year to protect our "fishery" resource. In short, the average annual income of the Yurok Tribe from our salmon resource was and is non-existent. Since the Settlement Act, the Yurok Tribe has had a small income from timber revenues, averaging $600,000 annually.

With respect to land base, the Yurok Tribe's Reservation contains approximately 3000 acres of tribal trust lands and approximately 3000 acres of individual trust lands. The remainder of the 58,000 acre Reservation is held in fee title and mostly by commercial timber interests. The Hoopa Valley Reservation contains approximately 90,000 acres, 98% in tribal trust status.

With respect to the million plus dollars in timber revenues projected for the Hoopa Valley Tribe, written testimony of the Hoopa Tribal attorney in 1988, indicated that at the time of the Act, the annual timber revenue income from the Square was around 5 million dollars. In the 14 years since the Act, the timber revenue has been 64 million dollars. Additionally, the new Hoopa Valley Reservation has considerable mining resources (aggregate) that were known at the time of the Act. Our understanding is that aggregate mining currently produces a substantial income.

The point is, that the projected revenue comparison that should have been before the Committee was zero fisheries income and more than 5 million dollars in annual timber and

other revenues from the Square, and not the nearly equivalent million or so dollars for each Tribe that the Committee Report relied upon. This inequality of lands, resources, and revenues continues today and significantly hinders the Yurok Tribe's ability to provide services to its people.

Unfortunately, the Yurok Tribe in 1988, unlike today, was unable to address this misleading provision of key information. The Yurok Tribe, although federally recognized since the mid-nineteenth century, was not formally organized and had no funds, no lawyers, no lobbyists, no historians, no anthropologists, etc. to gather data to analyze the bill to present facts and confront misinformation. Individual Indians did testify, albeit ineffectively, during field and D.C. hearings of relevant Committees. Some of these witnesses were exceedingly hostile to Congressman Bosco and his bill; some witnesses seemed to support the legislation; while others appeared to support aspects of the legislation such as the organizing provisions for the Yurok Tribe. Today, some of these witnesses are Yurok Tribal members, some took the buy-out option and others became members of near-by rancherias. However, they were not the Yurok Tribe.

In some ways the lack of formal organization of the Yurok Tribe seemed to have hamstrung the Yurok people. As noted in our chronology, attached hereto, none of the traditional tribes of our area were organized before 1950, and in spite of that fact, they managed to negotiate treaties, survive the gold rush and periodically go into federal court to protect their fishing and cultural rights. It was the Interior Department that assisted in organizing some Hoopa Valley residents as the Hoopa Valley Business Council for the purpose of selling timber. The Interior Department did not attempt to organize the other tribal Indians of the Reservation or near-by communities. At that time, the Interior Department was busy illegally terminating 110 other tribes in California at the height of the "termination era." There was no political or economic imperative to organize Indian tribes in our area. By the time the Short plaintiffs again went to Court to vindicate their rights, the Department had so polluted Indian relations on the Joint Reservation that any organizing efforts were tainted by distrust.

It is also our view that before the passage of the Settlement Act, the Interior Department did not do enough to pursue Yurok tribal input. There were things they could have done in the years following the Short decision. For example, they could have utilized the General Council of the

Yurok Tribe which then existed, to address land and governance issues. The General Council was after all the entity that authorized the Yurok Tribe v. United States lawsuit and the "conditional" waiver. Lack of formal organization is not a complete bar to governing. We are aware that other Tribes in California are currently not formally organized and operate by General Council, including running 100 million-dollar plus casinos.

Other devices and approaches were also available other than partition. Where for example was the use of Reservation wide referenda; a tool widely used in restoration and recognition processes? Although Congressman Campbell inquired about the Wind River model in House hearings, the Department did not appear to have considered this pertinent model for multi-tribe Reservations where each Tribe retains its sovereignty and some territorial jurisdiction. There are other models that come readily to mind, that also did not appear to have been considered. There are many tribally consolidated Reservations in the northwest, such as the Quinault Indian Reservation where membership in 8 historic Indian tribes is the basis for membership in the Quinault Indian Nation. These approaches do not appear to have been considered. Did the advice Congress received have to be limited to partition?

It is important to acknowledge that from a Yurok perspective a positive result of the HYSA was that it helped develop the preliminary Yurok tribal Roll and provided us with limited funds to retain attorneys and others to assist us in the creation of this base Tribal Roll and the development of the Yurok Constitution. We also appreciate that the Senate Committee report recognized and acknowledged that the Tribe could organize under its inherent sovereignty.

Had we been a formally organized Tribe with even limited financial and technical resources and testified before you in 1988, we would have pointed out that while it is true that the Square (Hoopa Valley) is part of the homelands of the Hupa people, it is also true that the Square is part of the ancestral homelands of the Yurok people. Almost without fail throughout the testimony you received in 1988, the Square is described as Hoopa and the Addition is described as Yurok. As the Ancestral Map that you see here indicates, Yurok ancestral territory was quite large, encompassing all of the current Yurok reservation and 80% of what is now Redwood National Park as well as significant portions of the U.S. national Forest. You should note that a portion of the Square has always been

part of Yurok ancestral territories. Yurok Villages existed in the Square and their sites have been verified by anthropologists. This fact is not a matter of dispute. The United States Department of Justice and the Hoopa valley Tribe in the Yurok Tribe v. United States litigation agreed in the joint fact statement that the Yuroks were always inhabitants of the Square. (Statement provided for the record) We are not claiming that we had Indian title to the whole Square, but that we have always been part of the Square. The Short cases made the same determination.(See attached summary of Short) At the time of your 1988 hearings, there were 400-500 Yuroks living on the Square. As one of the individual Yurok witnesses noted, over 50% of the students at Hoopa High School were not members of the Hoopa valley Tribe. Today, some 800 Yuroks live on the Square. The Square is included in one of the largest Yurok Council districts population-wise and the Yuroks living there elect one Yurok Council member from that District. I in fact live there.

We think that these different perspectives are important as we consider today's issues, however, it is critical for everyone to be aware that the Yurok Tribe has not, will not and is not asking Congress to take back anything from the Hoopa Valley Tribe that it received under the Act. We have no current legal interest in the land or resources the Hoopa Valley Tribe received from the Act

What we do want is the Committee to look at are the relative equities achieved under the Act understanding that the Yuroks have always been inhabitants of the Square and have never abandoned our connection to our territories, our culture, and our traditions.

We have already noted that there is a significant disparity in income, resources, land base, and infrastructure as a result of the Settlement Act. The data provided by the Interior Department today supports our positions. I need to acknowledge that Interior Department officials today treat the Yurok Tribe in a fairer manner than previously and for that we are appreciative.

The Hoopa Valley Tribe received a 90,000 acre timbered Reservation, of which 98% are held in tribal trust status. The Yurok Tribe received a Reservation whose boundaries contained 58,000 acres, however, only 3000 acres were in tribal trust and only a small portion of those acres contained harvestable timber. If you look at the Map that we have provided showing the two Reservations and trust and fee lands, you can visualize the extreme disparity.

We have already noted that the income projections for the respective Tribes were erroneous. Time has verified that the predictions of a bountiful or restored fishery have not come to pass and that the fishery infrequently produces any income. It is also a resource that we share with non-Indians, as well as the Hoopa. Hoopa timber resources, however, have produced substantial income exceeding the 1988 predictions, as reflected in the Interior Department's records.

In addition, as this Committee is aware from your recent joint hearing on telecommunications, infrastructure on the Yurok Reservation is dismal. This in part is due to the fact that it is difficult to develop a remote River Gorge. The lack of infrastructure is also due to the fact that the B.I.A.'s agency office was on the Square. The B.I.A. provided some infrastructure to the Square, but it totally neglected the "Addition".

In our response to Senator Inouye's letter of October 4, 2001, we have submitted an outline of an economic development and land acquisition plan to the Committee. (See attached Plan.) We have provided copies of our Proposed Plan to the Department of the Interior. The Plan is based in large part on the Settlement negotiations that occurred with the Department in 1996 and 1997.

What we would like to see as a result of this hearing is the creation of a Committee or a working group composed of Tribal, Administration, and Congressional representatives. We would also hope the Committee would be under the leadership of Chairman Inouye. This committee would have as its task the development of legislation that would provide to Yurok people the viable self-sufficient Reservation that was the original intent of this Committee in its effort to achieve equity.

If there are issues that the Hoopa Tribe wishes to address for the same end for its Reservation, we would support a separate working group for them.

Although as you can see our issues are broad based and focused on full equity for the Yurok Tribe, the immediate concern that prompted the Department's Report and this hearing is the balance of the Hoopa-Yurok Settlement Fund.

The Interior Department has said that neither Tribe is legally eligible to receive the balance of the Fund and that Congress should address the issue. Our view is simple, the

financial equities and the actual distributions of timber revenues from 1974 to 1988 clearly demonstrate that the balance of the Fund should be made available to the Yurok Tribe as the Act clearly intended. In fact the monies are held in the Yurok Trust Fund. Arguments that the assets are from the Hoopa Reservation, or that most of the income came from the Square, are misplaced. These revenues belonged as much to the Yuroks of the Square and Yuroks of the Addition as they did to the Hupas of the Square. This is the key point of the cases we both lost in the Claims court, Short v. United States, Hoopa Valley Tribe v. United States, and Yurok v. United States. The point being that prior to 1988 the Hoopa Valley Reservation was a single Reservation intended for both Tribes and whose communal lands and income were vested in neither Tribe. Short also means that the Department could not favor one Tribe above the other in the distribution of the assets. These are pre-1988 monies; we should not have to re-argue what Yuroks won in the Short cases.

As noted in our Annotated Chronology, the Department of the Interior, after the final decision in Short I in 1974, ceased to distribute timber revenues exclusively to members of the Hoopa Valley Tribe and began to reserve 70% of the timber revenues for the Yurok plaintiffs. The remaining 30% of the revenues were reserved for Hoopa in a separate escrow account. The proportionate allocation was based on the Hoopa Valley tribe having a population of 1500 members and the Short plaintiffs numbering 3800 persons.(See, Hoopa Valley Tribe v. United States.) For 14 years from the final decision in Short until the passage of the Settlement Act, the Department provided almost all of the 30% of the annual timber revenues reserved to the Hoopa Valley Tribe and retained the other 70% in an escrow account for the Yurok plaintiffs. I believe the Department has provided the Committee with the amount of $18,955,885, of the $19,000,000 reserved as the amount received by the Hoopas for that 14 year period.

When we have discussed the timber revenues from 1974 to 1988 with our colleagues on the Hoopa Tribal Council, they assert that 100% the revenues were theirs or should have been theirs. Legally, as the Committee knows, that was not the determination of the federal courts. No Indian tribe before 1988 had a vested right to the Square or its assets. The Hoopa Tribe even made this same argument in Yurok v. United States. As we have noted several times, both Hupas and Yuroks were aboriginal inhabitants of the Square. The 1876 and 1891 Executive Orders had created a single Reservation of some 155,000 acres in which neither Tribe had

vested property rights.

In 1974, the federal courts had determined that the Secretary had since 1955 wrongfully made per capita revenue distributions to only Hoopa Tribal members and that the plaintiffs (mostly Yurok Indians) were entitled to damages against the United States. Damages were eventually provided to the plaintiffs for the years 1955 through 1974, but not for 1974 through 1988. So the point is that the legal status of the 1974 to 1988 timber revenues was, although neither Tribe had title to timber or a constitutional right to the revenues, if the revenues were distributed to one group, the other group was entitled its fair share. It did not matter what percentage of the timber proceeds came from the Square or came from the Addition, because according to the federal courts, neither revenues were vested in either Tribe.

The 1974 to 1988 revenues were distributed to the Hoopa Tribe and paid out in per capita payments. First under the 30% Hoopa share or $19,000,000 payments and second, under the transformation of the 70% Escrow Account (established for Yurok Plaintiffs) effected by the Settlement Act.

As you are aware, the Settlement Act created a Settlement Fund from the 70% Escrow account ($51,000,000), the small balance of the Hoopa 30% Escrow account, and some smaller joint Hoopa/Yurok, and Yurok escrow accounts, as well as a 10 million dollar federal appropriation. When the 1988 Base Membership Roll of the Yurok Tribe was established in 1991 and the 1991 Membership Roll of the Hoopa Valley Tribe was verified, the Settlement Account was proportionately allocated between the two Tribes based on tribal membership.

The Hoopa Valley Tribe was allocated 39.5% of the Settlement Fund or $34,006,551. Because the Hoopa Valley Tribe had executed a waiver of its rights to challenge the Act for any unconstitutional taking,(in 1988 and the waiver was published by the Department,) the Department provided these funds to the Hoopa Valley Tribe.

Technically because the Act had allowed the Hoopa Valley Tribe to draw down 3.5 million dollars a year from the Settlement Fund and provided for a $5000 per capita payment directly to members of the Hoopa Valley Tribe, the Tribe was provided with the adjusted balance of its 34 million dollar share. Some observers have confused the subtractions from the 1991 payments as adjustments for the 30% payments made from 1974 through 1988; they were not. The Act did not call for adjusting or accounting for these

30% payments and no adjustment was made.

In total, from the 1974 to 1988 timber revenues and interest of approximately $64 million, in 1991 the Hoopa Valley Tribe (39.5% of the then population) received a cumulative total of 53 million dollars or 84.2% of the total amount timber revenues of the period.

Also in 1991, the claims attorneys for the Short cases sued the United States to try to recover attorneys fees from the Settlement Account. Two other Yuroks and I intervened in the case as co-defendants, with the approval of the United States, to protect the Yurok share of the Settlement Account. With the active encouragement of the Justice Department attorneys, (they were very pleased to have us as co-defendants), we won the case and protected the Account.

After the withdrawal of Revenues for the Hoopas, the remainder of the Settlement Fund was then deposited in a Yurok Trust Account. Payments authorized by the Act to persons who enrolled in the Yurok Tribe or who took the buy-option were also deducted from the Yurok balance of the Fund. We should note as the Interior Departments data confirms, these payments to individuals exceeded the $10,000,000 federal contribution provided by the Act. In 1993, when all the withdrawals were accounted for in the Settlement Fund Statement, (See attachments to Interior March 2002 Report, the Yurok Trust Fund had a balance of $37,819,371.79. We have been provided with statements of the Account's balance every month since and our advice has been consistently solicited with respect to investments.

As you are aware in 1993 the Yurok Tribe, as instructed by its General Council brought suit against the United States for a taking claim under the Act. We lost this case in 2001 when the United States Supreme Court declined to review a 2-1 decision of the Federal Court of Appeals. We lost this case on the same basis that the Hoopa Tribe lost all of their pre 1988 cases; no part of the pre-1988 Hoopa Valley Reservation was vested to any Indian tribe; and none of us had title against the United States. We could argue that the case was unfair and historically blind, and that it is outrageous to use antiquated and colonial notions of Indian title in modern times, as the dissenting federal judge did. But it doesn't matter. We lost, as the Hoopa Tribe lost before us, and in this legal system the only appeal we have left is an appeal to equity and justice before the Congress; the Congress that has plenary power to fix these wrongs.

In 1993, we also adopted the "conditional waiver" which provided that our waiver was only effective if the Settlement Act was constitutional; which as I noted a few moments ago, the courts have determined that the Act is not unconstitutional. That determination should have been sufficient to meet the condition of our waiver. The Department of the Interior, however, determined that our waiver was not effective. Although we disagree, we have not challenged its determination in court and will not take up the Committee's time to debate it today.

The Department, as noted earlier, determined that the Hoopa waiver was effective and that the Hoopa Valley Tribe received what it was entitled to under the Act and it has no addition legal right to the Settlement Fund. In its view the Department cannot disperse the balance of the Settlement Act to either Tribe. The Department has now reported to Congress that you should, consistent with its recommendations, resolve the balance of the Fund issue. Among other things, the Department sees itself as the Administrator of the fund for both Tribes. It indicates that you should take into account funds already received and be cognizant to the purpose of the Settlement Account to provide two self-sufficient Reservations.

We think a better solution would be to permit the Yurok Tribe to administer its own trust fund with the balance of the Settlement Account. We of course, would be willing to submit a Utilization Plan for review and approval. Our Constitution, in any event, requires us to provide a Plan for the approval of our membership. As we have indicated a complete review of the record does indicate that the almost all of the trust lands, economic resources, and revenues of the joint Reservation that existed prior to 1988, when neither Tribe had more legal or historic rights to these resources than the other, have to date been provided almost exclusively to the Hoopa Valley Tribe.

A final point in these prepared remarks, in 1996, we struck a deal with the Hoopa Valley Tribe whereby we supported H.R. 2710 and they supported our settlement negotiation issues, specifically turning over the balance of the Settlement Fund to the Yurok Tribe. Apparently the Hoopa Valley Tribal Council now believes that its end of the deal ended with the collapse of the Settlement negotiations. We lived up to our end of the bargain and the Hoopa Valley Tribe received some 2600 acres of trust lands to "square" off the Square. Copies of both of our 1996 commitment letters have been provided with our written testimony.

I again thank the Committee for the opportunity to appear today and will be very happy to answer any questions you may have.

**ATTACHMENT TO THE TESTIMONY OF THE YUROK TRIBE**

**HEARING BEFORE THE SENATE INDIAN AFFAIRS COMMITTEE**

**AUGUST 1, 2002**

## ANNOTATED CHRONOLOGY

**Pre-Contact with Non-Indians:** Yurok aboriginal territories, which were extensive, included the northern third of the Hoopa Valley (the square). Hoopa aboriginal territory included the southern two-thirds of the Square. "The Yurok people were aboriginal residents of the Square." Short I, 486 F.2d at 565, and Yurok v. United States, Uncontroverted Statement of Facts of the United States and the Hoopa Valley Tribe (hereinafter "Uncontroverted Facts").

**1848:** Discovery of gold in Northern California, followed by the "Gold Rush".

**1850:** California became the 31st State on September 4, 1851.

**1851:** Representatives of the U.S. negotiated a Treaty of Peace and Friendship with the Yuroks (Poh-lik), the Karuks (Pen-tsick) and the Hupa (Hoo-pah) whereby the tribes were to maintain peace with the U.S. and each other, and the U.S. was to provide a Reservation and related services. The treaty, like all other California Indian treaties, was not ratified.

**1855:** The President created the Klamath River Military Reserve by the Executive Order of November 16, 1855, under the authority of 10 Stat. 226, 238 (1853, as Amended (1855). This Reserve which ran from the Pacific Ocean at the mouth of the Klamath River a mile on each side of the River for 20 miles, was a small portion of the aboriginal territories of the Yuroks.

**1864:** Congress enacted legislation that authorizes the President to establish 4 Reservations in California, 13 Stat. 39 (1864).

**1864:** Indian Superintendent Wiley negotiated a "treaty" with Hupa and other tribes to establish a Reservation that encompassed the Square. This "treaty" was never submitted to Congress and was never ratified. Nevertheless "The Yuroks were beneficiaries of the 1864 Treaty (never ratified) that called for the creation of the Reservation." Short I, 486 F.2d at 565 and Uncontroverted Facts.

**1876:** The President by Executive Order established the Hoopa Valley Reservation, which encompasses the Square, and was established "in part for the Yuroks" Short I, 486 F.2d at 565 and Uncontroverted Facts.

**1891:** The President by Executive Order added the Klamath River Military Reserve and a connecting strip (Yurok Aboriginal territory) to the Hoopa Valley Reservation creating an enlarged single Reservation of approximately 155,000 acres. Short I, 486 F.2d at 567-68 and Uncontroverted Facts.

**1892:** Congress enacted the first of the allotment statutes (27 Stat. 52) affecting only the former Klamath reserve portion and the Addition of the Reservation. As with allotment elsewhere in Indian Country, allotment was a disaster along the Klamath River; vast quantities of redwood timber lands were removed from communal ownership and then from predominantly Yurok individual ownership. By the time allotment was ended under the reforms of the IRA in 1934, over 50,000 acres were removed from Indian ownership.

**1950:** With the assistance of the B.I.A., some Hupas organized as the Hoopa Valley Business Council. Prior to this time, from time immemorial, none of the Indian Tribes of the area had been formally organized previously.

**1952:** The Secretary of the Interior approved the Hoopa Valley Tribe's Constitution and by-laws.

**1955:** The B.I.A. approveed timber sales for communally held timber in the Square and at the request of the Hoopa Valley Business Council, the B.I.A. begins disbursing per capita payments to individual Hoopa Valley tribal members.

**1958:** Solicitor's opinion provided that it is legal to distribute revenues from the unalloted trust timberlands of the Square in per capita payments to Hoopa Tribal members. (This opinion is determined to be erroneous in Short).

**1963:** A group of Indians, many of whom were Yuroks, sued the United States in Claims Court for damages alleging that they too were entitled to share in the communal timber sales in the Square. Jesse Short, et al v. United States.

**1972:** After extensive hearings and briefs, the Trial Commissioner found for the plaintiffs in Short v. United States. Per Capita payments to Hoopa Valley Tribal members continue uninterrupted.

**1973:** Mattz v. Arnett, 412 U.S. 481 (1973), was decided; it upheld the "Indian Country" status of the Reservation. The case involved the State of California trying to assert jurisdiction to regulate Indian fishers on the Klamath River; The court determined that California had no such jurisdiction.

**1973:** The U.S. Court of Claims in an extensive decision upheld the decision of the Trial Commissioner, and determines:

*The Hoopa Valley Reservation established by executive orders in 1876 and 1891 was a single Indian Reservation

*No Indian Tribe had a vested right to the Reservation or its assets

*The Secretary of the Interior had wrongfully paid per capita revenue distributions to Hoopa Valley Tribal members to the exclusion of the plaintiffs

*Indians "connected" to the Reservation were entitled to damages from the United States.

**1974:** The U.S. Supreme Court declined to review Short v. United States. 486 F.2d 561, 202 Ct. Cl. 870 (1979) *cert. denied,* 416 U.S.961 (1974).

**1974:** The Short court embarks on the task of determining which of the 3800 plaintiffs are bona fide Indians of the Reservation and therefore individually entitled to damages. The U.S. and the Hoopa Valley Tribe vigorously contest the status of many of the plaintiffs and litigation continued for two decades. Eventually, in 1994 plaintiffs were certified and received Treasury checks for damages for the period of 1955 to 1974.

**1974:** The Secretary of the Interior established the 70% escrow account for timber revenues. "Upon the denial of certiorari to this court's decision . . . The Secretary of the Interior ceased to distribute revenues exclusively to members of the Hoopa Valley Tribe. On the theory that all of the 3,800 plaintiff's could eventually be entitled to 70 percent of the revenues and the 1,500 members of the Hoopa Valley tribe entitled to 30 percent, the Secretary put 70 percent of annual timber revenues in escrow pending a final decision on the number of plaintiffs in Short qualifying as Indians of the Reservation entitled to per capita distributions of timber revenues." Hoopa Valley Tribe v. United States, 596 F.2d 435, 440 (1979).

**1979:** The Hoopa Valley Tribe's suit for damages against the United States for breach of trust and otherwise for failing to protect the Hoopa Valley Reservation was decided adversely to the Tribe. Hoopa Valley Tribe v. United States.

**1974 - 1987:** The Hoopa Valley Tribe unsuccessfully urged Congress to over-turn Short.

**1988:** A federal district court decided in Puzz V. United States,No. C 80 2988 THE (D.N.Cal. 1988) that the Department of the Interior can no longer recognize the Hoopa Valley Tribe as the exclusive government of the Hoopa Valley Reservation.

**1988:** Congress enacted the Hoopa-Yurok Settlement Act, which partitioned the then Hoopa Valley Reservation into: the Yurok Reservation, consisting of the former Klamath River Military Reserve and the Addition, and a new Hoopa Valley Reservation, consisting of the "Square." The Act also provided a system for enrolling eligible Indians in either the Yurok Tribe, the Hoopa Valley Tribe, or forfeiting membership in either Tribe (buy-out). The Short escrow accounts, plus some small Yurok escrow accounts, are transformed into a Hoopa Yurok Settlement Fund; and a ten million dollar federal contribution to the Settlement fund was authorized (and appropriated). The Yurok Tribe, subject to adopting a waiver of claims, was given several small land tracts, the authority to organize, and an authorization of not less than 5 million dollars for land purchases. The Settlement Fund was to

be allocated to the Hoopa Tribe and the Yurok Tribe based on their relative enrolled populations at time of distribution. Both Tribes were to provide waivers of claims against any takings of lands or assets effected by the Act.

**1988:** The Hoopa valley Tribe by resolution waived any claims against the United States pursuant to the Act.

**1991:**In Heller, Ehrman v. Lujan, 992 F.2d 360 (D.C.Cir. 1993),the Short claims attorneys sued the Secretary of Interior for attorneys fees of up to 25% of the Settlement Fund. They asserted that the 70% escrow account was derived from their litigation efforts and that the Settlement Fund was in fact the escrow account. Yuroks, Jesse Short, Susan Masten, and Valerie Reed intervened as co-defendants with the consent of the United States to protect the Settlement Fund. The Yurok and United States defendants were successful when the federal court of appeals determined that the plaintiffs could not sue the United States for money damages in federal district court.

**1991:** The Department of the Interior allocated the Hoopa Yurok Settlement Fund based on Hoopa and Yurok tribal enrollments. From the $85,979,348.37 Fund balance, the Hoopa Tribe's share is determined to be 39.5% or $34,006,551.87. This amount has been provided to the Hoopa Valley Tribe. The balance of the Fund, after withdrawals for payments for buy-outs, and enrollments are made, was placed in a Yurok Tribe Trust Fund. The balance after the Hoopa withdrawals and the individual buy-out and enrollment (payment) withdrawals in 1991-93 in the Yurok Trust Account was $37,819,971.79. Each individual Yurok who received an enrollment check had to waive his/her rights to sue the United States for money damages for a unconstitutional taking under the Settlement Act.

**1991 - Present:** The Yurok Tribe has been provided monthly accountings on the Yurok Trust Fund and the Tribe's advice has been solicited on investments.

**1992:** The federal courts dismissed a constitutional challenge to the Hoopa-Yurok Settlement Act brought by individual Yuroks finding that the Hoopa Valley Tribe was an indispensable party to the litigation and could not be joined without its consent. Shermoen v. United States, 182 F.2d 1312 (9th Cir.1992)

**1993:** A General Council meeting of the Yurok Tribe was convened and the Yurok Tribe authorized its attorneys to sue the United States under the 5th amendment's due process clause for a taking without adequate compensation. Yurok Tribe v. United States, No. 92 -CV- 173 (Fed. Cl.) was filed in federal Claims Court. The General Council also authorized a "conditional waiver" whereby the Yurok Tribe provided the statutorily required waiver, but only as long as the taking was constitutional. The Interim Council adopted the Conditional Waiver by Resolution 93-61 and submitted it to the Department of the Interior on November 24,

1993:

"To the extent which the Hoopa-Yurok Settlement Act is not violative of the rights of the Yurok tribe or its members under the Constitution of the United States, or has not effected a taking without just compensation of vested Tribal or individual rights within, or appertaining to the Hoopa valley reservation, the Yurok tribe hereby waives any claim which said Tribe may have against the United States arising out of the provisions of the Hoopa-Yurok Settlement Act."

**1993:** The Hoopa Valley Tribe voluntarily intervened as a defendant in Yurok Tribe v. United States.

**1993:** The Yurok Tribe formally organized and adopted a Constitution under its inherent powers of self-governance. The Department of the Interior recognized the Constitution and the Yurok Tribal Council as the governing body of the Yurok Tribe.

**1994:** In an April 4, 1994 letter to Tribe, the Department of the Interior rejected the Yurok Tribe's "conditional" waiver.

**1995:** Upon the request of the Yurok Tribe of August 30, 1994, to reconsider its decision, the Department in a letter dated March 14, 1995 affirmed its rejection of the conditional waiver, but noted that the waiver had been received on a timely basis and could be amended. Assistant Secretary Deer urged negotiations instead of pursuing litigation.

**1996:** Various efforts to create Settlement negotiations stall until February 13, 1996 when the Department of Justice requested a settlement proposal with "reasonable expectations for settling this litigation" from the Yurok's counsel. The Yurok Tribe provided a settlement proposal. The Interior Secretary appointed a special negotiator and serious Settlement negotiations were undertaken. Justice notified the trial Judge that the Interior Department was seriously looking at the Yurok Tribe's Settlement proposal and Judge Margolis granted a six-month delay in the proceedings. Interior and Yurok negotiators tentatively agreed on concepts for settlement and the Yurok Tribe was to receive a counter-proposal from the United States.

**1996:** The Hoopa Valley Tribe sought an additional 2600 acres "boundary correction" to its Reservation in H.R. 2710; the Yurok Tribe opposed the bill and H.R.2710 stalled. The Yurok Tribal Council and the Hoopa Tribal Council met at Senator Boxer's San Francisco's offices at her request to try to resolve their positions on H.R.2710. The Yurok Tribe agreed to withdraw its opposition to H.R.2710 and the Hoopa Valley Tribe agreed to support Yurok positions in Settlement negotiations and specifically to support:

*Providing Yurok the Trust Fund (the balance of the Settlement Fund to the Yurok Tribe

*Providing a 2.5 million dollar land acquisition appropriation to the Yurok Tribe

*Providing section 2 C (2) (A) & (B) lands to the Yurok Tribe.

Hoopa Chairman Risling signed a commitment letter and the Yurok Tribe notified the Legislative Committees of its support of H.R. 2710. This bill passed and the Hoopa Valley Tribe received the additional 2,600 acres of trust lands.

**1996:** Hoopa Valley Chairman Sherman in a September 13, 1996 letter to the Yurok Chair confirmed former Hoopa Chairman Risling's commitment.

**1997:** The Department of Justice informed the Yurok Tribe in a November 11, 1997, letter that "no settlement offer will be forthcoming." Court proceedings activated.

**1998:** U.S. Court of Claims dismissed the Yurok Tribe's complaint because it determined that the Tribe had no vested property right as against the United States in the pre-1988 Hoopa Valley Reservation upon which to base a 5th amendment claim.

**2000:** U.S Court of Appeals for the Federal Circuit affirmed the Court of Claims in a 2 to 1 opinion.

**2001:** U.S. Supreme Court declined to review Yurok Tribe v. United States, 41 Fed Cl 468 (1998), 209 F. 3d 1366 (Fed. Cir. 2000) *cert. denied* 121 S. Ct. 1402 (2001).

**2001:** Senator Inouye In an October 4, 2001 letter, anticipated the Interior Department's report, invited the Hoopa valley Tribe and the Yurok Tribe to address the issue of the Settlement Fund Balance, and other matters such as land acquisitions, boundaries, resources, infra-structure relative to the Settlement Act.

**2002:** On March 15, 2002, the Interior Department filed its required report recommending that Congress address the disposition of the Settlement fund and allow the Department to administer the Fund for the benefit of the Tribes taking into account disbursements previously made, and the objective of achieving equity.

**2002:** Two meetings between the Hoopa Valley Tribal Council and the Yurok Tribal Council failed to reach agreement on the disposition of the Settlement fund balance. The Hoopa Chairman informed the Yurok Tribal Council that the Hoopa Valley Tribal Council believes that its 1996 commitment (e.g., to support turning over the balance of the Fund to the Yuroks) was only relevant while settlement negotiations were under way and did not survive the failure of 1996-1997 settlement negotiations.

**Table I. Comparison of assets and resources received under the HYSA.**

| | Yurok Tribe | Hoopa Tribe |
|---|---|---|
| Land | 3000 acres of Tribal trust | 89,000 acres of Tribal trust |
| Funds | 1974-1988: 0<br><br>1988-1991: $1.5 million | 1974-1988: $ 19 million<br><br>1988-1991: $34 million |
| 1998 – Present Resources Income | Fishery: 0<br>Timber: $9 million | Fishery: 0<br>Timber: $64 million |
| Other | Organizing Assistance | Recognition of governing Authority over territory |
| Provided to Yurok Tribe But not received | 1) $37 million ($76 million with 11 years of interest)<br>2) Assorted Land parcels<br>3) $2.5 million land purchase appropriations | |

1 1

**Testimony of**
**Neal A. McCaleb**
**Assistant Secretary for Indian Affairs**
**before the Committee on Indian Affairs**
**United States Senate**
**on the**
**Hoopa-Yurok Settlement Act**
**August 1, 2002**

Good morning. I am Neal McCaleb, and I serve as the Assistant Secretary of Indian Affairs for the Department of the Interior. I am pleased to be here before you today to report on the status of events subsequent to the passage of the Hoopa-Yurok Settlement Act (Settlement Act or Act) in 1988, Public Law 100-580, 25 U.S.C. section 1300i *et seq.*, as amended. Earlier this year, the Department submitted its Report to Congress (Report) pursuant to section 14 of the Act (25 U.S.C. § 1300i-11(c)).

**Background**

**Establishment of Reservations**

As recognized in the legislative history of the Act, the attachments to the Report, and numerous other documents, the federal government set aside lands bisected by the Trinity and lower Klamath Rivers in the mid- to late-1800s, in accordance with statutes and executive orders, to establish what are known today as the Hoopa Valley and Yurok Indian Reservations. Based on an 1853 Act of Congress, President Pierce set aside the Klamath River Reservation by executive order in 1855. The reservation extended approximately 20 miles up the Klamath River from the Pacific Ocean and including lands one mile in width on either side of the river. Based on an 1864 Act of Congress and an 1864 proclamation by the Department, President Grant issued an executive order in 1876 which formally set aside the original Hoopa Valley Reservation, a 12-mile square reservation (the "Square") bisected by the Trinity River and extending upstream from the Klamath-Trinity River confluence.

Because of some confusion about the effect of the two separate congressional acts and concern regarding the status of the original Klamath River Reservation, President Harrison issued another executive order in 1891 forming the extended or "joint" Hoopa Valley Reservation. The extended reservation, termed the "1891 Reservation" in the Report, encompassed the original Hoopa Valley Reservation, the Klamath River Reservation, and an additional strip of land down the Klamath River from the Klamath-Trinity confluence which connected the two reservations ("connecting strip"). Pursuant to section 2 of the Settlement Act, Congress partitioned the extended reservation between the two tribes.