**Legal claims to the Reservation**

Prior to the Settlement Act, legal controversies arose over the ownership and management of the Square and its resources. Although the 1891 executive order joined the separate reservations into one, the Secretary had generally treated the respective sections of the reservations separately for administrative purposes. A 1958 Solicitor's opinion also supported this view. 62 I.D. 59, 2 Op. Sol. Int. 1814 (1958). In the 1950s and 1960s, the Secretary thus only distributed timber revenues generated from the Square to the Hoopa Valley Tribe and its members.

In 1963, Yurok and other Indians (eventually almost 3800 individuals) challenged this distribution, and the United States Court of Claims subsequently held that all Indians residing within the 1891 Reservation were "Indians of the Reservation" and were entitled to share equally in the timber proceeds generated from the Square. *Short v. United States*, 486 F.2d 561 (Ct. Cl. 1973) (per curiam), *cert. denied*, 416 U.S. 961 (1974). Following this decision, the Department began allocating the timber proceeds generated from the Square between the Yurok Tribe (70%) and the Hoopa Valley Tribe (30%). The 70/30 allocation was based upon the number of individual Indians occupying the Joint Reservation that identified themselves as members of either the Yurok Tribe or Hoopa Valley Tribe, respectively. Another lawsuit (*Puzz*) challenged the authority of the Hoopa Valley Business Council to manage the resources of the Square, among other claims. These and related lawsuits had profound impacts relating to tribal governance and self-determination, extensive natural resources that comprise valuable tribal trust assets, and the lives of thousands of Indians who resided on the Reservation.

**1988 Settlement Act**

In order to resolve longstanding litigation between the United States, Hoopa Valley Tribe, and Yurok and other Indians regarding the ownership and management of the Square, Congress passed the Hoopa-Yurok Settlement Act in 1988. The Act did not disturb the resolution of prior issues through the *Short* litigation; rather, the Act sought to settle disputed issues by recognizing and providing for the organization of the Yurok Tribe, by partitioning the 1891 Joint Reservation between the Hoopa Valley and Yurok Tribes, and by establishing a Settlement Fund primarily to distribute monies generated from the Joint Reservation's resources between the Tribes. The testimony below discusses relevant sections of the Act with respect to current issues.

**Partition**

Section 2 of the Act provided for the partition of the Joint Reservation. Upon meeting certain conditions in the Act, the Act recognized and established the Square as the Hoopa Valley Reservation, to be held in trust by the United States for the benefit of the Hoopa Valley Tribe; and the Act recognized and established the original Klamath River Reservation and the

connecting strip (the "extension") as the Yurok Reservation, to be held in trust by the United States for the benefit of the Yurok Tribe.

In accordance with the conditions set in section 2(a), the Hoopa Valley Tribe passed Resolution No. 88-115 on November 28, 1988, waiving any claims against the United States arising from the Act and consenting to use of the funds identified in the Act as part of the Settlement Fund. The BIA published notice of the resolution in the Federal Register on December 7, 1988 (53 Fed. Reg. 49361). These actions had the effect of partitioning the joint reservation.

**Settlement Fund**

Section 4 of the Act established a Settlement Fund which placed the monies generated from the Joint Reservation into an escrow account for later equitable distribution between the Hoopa Valley and Yurok Tribes according to the provisions of the Act. The Act also authorized a $10 million federal contribution to the Settlement Fund, primarily to provide lump sum payments to any "Indian of the Reservation" who elected not to become a member of either Tribe.

As listed in section 1(b)(1) of the Act, the escrow funds placed in the Settlement Fund came from monies generated from the Joint Reservation and held in trust by the Secretary in seven separate accounts, including the Yurok 70% timber proceeds account and the Hoopa 30% timber proceeds account. The Secretary deposited the monies from these accounts into the Hoopa-Yurok Settlement Fund upon enactment of the Act. The Settlement Fund's original balance was nearly $67 million. At the beginning of Fiscal Year 2002, the Fund contained over $61 million in principal and interest, even with previous distributions as described below. Appendix I to the Report provides relevant figures from the Fund.

**Distribution of Settlement Fund**

The Act sought to distribute the monies generated from the Joint Reservation and placed into the Settlement Fund on a fair and equitable basis between the Hoopa Valley and Yurok Tribes. The Senate Committee Report briefly described what was then believed to be the rough distribution estimates for the Fund based on the settlement roll distribution ratios established in the Act: $23 million (roughly 1/3 of Fund) would go to the Hoopa Valley Tribe pursuant to section 4(c); a similar distribution to the Yurok Tribe under section 4(d), as described below, assuming roughly 50% of those on the settlement roll would accept Yurok tribal membership; and the remainder to the Yurok Tribe after individual payments discussed below. *See* S. Rep. No. 564, 100th Cong., 2d Sess. 20, 25 (1988).

Substantial distributions have already been made from the Settlement Fund in accordance with the Act. The Department disbursed to the Hoopa Valley Tribe just over $34 million between passage of the Act and April 1991, the total amount determined by the BIA to be the Tribe's share under section 4(c) of the Act. The Department also distributed $15,000 to each person on the settlement roll who elected not to become a member of either Tribe under section 6(d) of the Act. Approximately 708 persons chose the "lump sum payment" option for a total distribution

for this purpose of approximately $10.6 million, exceeding the $10 million federal contribution authorized under the Act for this payment.

Section 4(d) of the Act provided for the Yurok Tribe's share of the Settlement Fund, similar to the determination of the Hoopa Valley Tribe's share under section 4(c). Section 7(a) further provided that the Yurok Tribe would receive the remaining monies in the Settlement Fund after distributions were made to individuals in accordance with the settlement/membership options in section 6 and to successful appellants left off the original settlement roll under section 5(d). Section 1(c)(4), however, conditioned the Hoopa Valley Tribe's and Yurok Tribe's receipt of these monies, requiring the Tribes to adopt a resolution waiving any claim against the United States arising from the Act. The Hoopa Valley Tribe adopted such a resolution but the Yurok Tribe did not.

In November 1993, the Yurok Tribe passed Resolution 93-61 which purported to waive its claims against the United States in accordance with section 2(c)(4). The Tribe, however, also brought suit alleging that the Act effected a constitutionally prohibited taking of its property rights, as described below. In effect, the Tribe sought to protect its rights under section 2 of the Act to its share of the Settlement Fund and other benefits while still litigating its claims as contemplated in section 14 of the Act. By letter dated April 4, 1994, the Department informed the Tribe that the Department did not consider the Tribe's "conditional waiver" to satisfy the requirements of the Act because the "waiver" acted to preserve, rather than waive, its claims.

**Takings Litigation**

Instead of similarly waiving its claims as the Hoopa Valley Tribe did, the Yurok Tribe--as well as the Karuk Tribe and individual Indians--brought suit against the United States alleging that the Act constituted a taking of their vested property rights in the lands and resources of the Hoopa Valley Reservation contrary to the 5th Amendment to the U.S. Constitution. In general, the complaints argued that the 1864 Act authorizing Indian reservations in California or other Acts of Congress vested their ancestors with compensable rights in the Square. Alternatively, plaintiffs argued that their continuous occupation of the lands incorporated into the Reservation created compensable interests. Potential exposure to the U.S. Treasury was once estimated at close to $2 billion. This litigation began in the early 1990s and only recently ended.

The United States Court of Federal Claims and the Federal Circuit Court of Appeals disagreed with the positions of the Yurok Tribe and other plaintiffs. *Karuk Tribe et al. v. United States et al.*, 41 Fed. Cl. 468 (Fed. Cl. 1998), *aff'd*, 209 F.3d 1366 (Fed. Cir. 2000) (2-1 decision). The federal courts generally followed the reasoning provided in the Committee Reports to the bills ultimately enacted as the Settlement Act. *See* S. Rep. No. 564, *supra*, at 9-11; H.R. Rep. No. 938, 100th Cong., 2d Sess. 15-16 (1988). "Unless recognized as vested by some act of Congress, tribal rights of occupancy and enjoyment, whether established by executive order or statute, may be extinguished, abridged, or curtailed by the United States at any time without payment of just compensation." *Karuk Tribe et al. v. United States et al.*, 41 Fed. Cl. at 471 (citing, *inter alia*, *Tee-Hit-Ton Indians v. United States*, 348 U.S. 272, 278-79 (1955) and *Hynes v. Grimes Packing*

*Co.*, 337 U.S. 86, 103-04 (1949)); *see also* 209 F.3d at 1374-76, 1380. The courts concluded that no Act of Congress established vested property rights in the plaintiffs or their ancestors to the Square; rather the statutes and executive orders creating the Reservation allowed permissive, not permanent, occupation. Thus, courts held the Act did not violate the Takings Clause.

Plaintiffs petitioned the U.S. Supreme Court for a writ of *certiorari* to review the lower court decisions. On March 26, 2001, the Court denied *certiorari*, thereby concluding this litigation. 532 U.S. 941 (2001).

**Departmental Report**

Section 14(c) of the Act provides that the Department shall submit to Congress a Report describing the final decision in any legal claim challenging the Act as effecting a taking of property rights contrary to the 5th Amendment to the U.S. Constitution or as otherwise providing inadequate compensation. The Supreme Court's denial of *certiorari* triggered this provision.

The Department solicited the views of the Hoopa Valley and Yurok Tribes regarding future actions of the Department with respect to the Settlement Fund and the Report required under the Act. The Report briefly describes issues both leading up to and subsequent to the Act, attaches the written positions of the Tribes, and provides recommendations of the Department for further action with respect to the Settlement Fund.

**Hoopa Position**

In July 2001, the Hoopa Valley Tribe submitted its proposed draft report for consideration by the Department. After describing the history of the disputes, the Settlement Act, and subsequent actions, the Hoopa Valley Tribe provided various recommendations and observations.

The Hoopa's submission noted that a separate lawsuit determined that only 1.26303 percent of the Settlement Fund monies were derived from the Yurok Reservation, with the remainder of the monies derived from the Hoopa Reservation. "The Hoopa Valley Tribe has continued to assert its right to a portion of the benefits offered to and rejected by the Yurok Tribe." *Id.* at 16. Prior to its July submission, the Tribe previously requested that the Department recommend "that the remaining funds from the Hoopa Square be returned to the Hoopa Valley Tribe." *Id.*

The Hoopa's submission ultimately suggested the following recommendations:

> –that the "suspended benefits" under the Act–including the land transfer and land acquisition provisions for the Yurok Tribe and the remaining monies in the Settlement Fund--"be valued and divided equally between the two tribes";
>
> –that the economic self-sufficiency plan for the Yurok Tribe be carried forward, including "any feasibility study concerning the cost of a road from U.S. Highway 101 to California Highway 96 . . . and other objectives of the self-sufficiency plan";

–that additional federal lands adjacent to or near the Yurok and Hoopa Valley Reservations be conveyed to and managed by the respective Tribes.

**Yurok Position**

In August 2001, counsel for the Yurok Tribe submitted the Tribe's positions and proposed draft report. The Yurok Tribe's submission similarly outlined the history of the dispute, other considerations, and its recommendations for the Department to consider. In general, the Yurok Tribe takes the position, among others, that its "conditional waiver" was valid and became effective upon the Supreme Court's denial of *certiorari* in the takings litigation.

The Yurok's submission discusses the Tribe's concerns with the process leading up to and ultimately resulting in passage of the Settlement Act. In the Tribe's view, the Act "nullified in large part the *Short* ruling" which allowed all "Indians of the Reservation" to share equally in the revenues and resources of the Joint Reservation. The Tribe, not formally organized at the time, "was not asked and did not participate in the legislative process" and had the Act "imposed on the Yuroks who . . . were left with a small fraction of their former land and resources." In its view, the Act divested the Yurok Tribe of its "communal ownership" in the Joint Reservation's lands and resources and "relegated the much larger" Tribe to a few thousand acres in trust along the Klamath River with a decimated fishery while granting to the Hoopa Valley Tribe nearly 90,000 acres of unallotted trust land and resources, including valuable timber resources.

With respect to the waiver issue, the Yurok's submission considers the Department's view, discussed above, as erroneous. The Tribe references a March 1995 letter from the Department in which the Assistant Secretary-Indian Affairs indicated that the Tribe could cure the "perceived deficiencies" with its "conditional waiver" by "subsequent tribal action or the final resolution of the Tribe's lawsuit in the U.S. Court of Federal Claims." The Tribe takes the position that it made a reasonable settlement offer and would have dismissed its claim with prejudice, but that the Department never meaningfully responded. Now, the Tribe considers the Supreme Court's denial of *certiorari* as the "final resolution" suggested as curing the waiver.

As support for its position, the Tribe states: "The text of the Act and the intent of Congress make clear that filing a constitutional claim and receiving the benefits of the Act are not mutually exclusive." The Tribe suggests that principles of statutory construction, including the canon that ambiguities be resolved in favor of tribes and that provisions within a statute should be read so as not to conflict or be inconsistent, requires a broader reading of the waiver provision in section 2(c)(4) in light of the Act's provision allowing a taking claim to be brought under section 14. The Tribe considers the Department's reading of the statute to be unfair and unjust. For these and other reasons, the Tribe is of the view that it is now entitled to its benefits under the Act.

**Departmental View**

Because the Yurok Tribe litigated its claims against the United States based on passage of the Act rather than waiving those claims, the Department is of the view that the Yurok Tribe did not meet the condition precedent established in section 2(c)(4) of the Act for the Tribe to receive its share of the Settlement Fund or other benefits. But, the Department is also of the view that the Hoopa Valley Tribe has already received its portion of the benefits under the Act and is not entitled to further distributions from the Settlement Fund under the provisions of the Act. Ultimately, this situation presents a quandary for the Department and for the Tribes, as we believe the Act did not contemplate such a result. The monies remaining in the Settlement Fund originated from the seven trust accounts which held revenues generated from the Joint Reservation. Thus, the monies remaining in the Settlement Fund should thus be distributed to one or both Tribes in some form. Moreover, the Department recognizes that substantial financial and economic needs currently exist within both Tribes and their respective reservations.

Given the current situation, the Report outlines five recommendations of the Department to address these issues:

> First, no additional funds need to be added to the Settlement Fund to realize the purposes of the Act;
>
> Second, remaining monies in the Settlement Fund should be retained in trust account status by the Department pending further considerations and not revert to the general fund of the U.S. Treasury;
>
> Third, the Settlement Fund should be administered for the mutual benefit of both Tribes and their respective reservations, taking into consideration prior distributions to each Tribe from the Fund. It is our position that it would be inappropriate for the Department to make any general distribution from the Fund without further instruction from Congress;
>
> Fourth, Congress should fashion a mechanism for the future administration of the Settlement Fund, in coordination with the Department and in consultation with the Tribes; and,
>
> Fifth, Congress should consider the need for further legislation to establish a separate, permanent fund for each Tribe from the remaining balance of the Settlement Fund in order to address any issue regarding entitlement to the monies and to fulfill the intent of the Settlement Act in full.

This concludes my testimony. I would be happy to respond to any questions you may have.

## HOOPA-YUROK SETTLEMENT ACT FUNDING HISTORY



IN THE UNITED STATES COURT OF FEDERAL CLAIMS

| | |
|---|---|
| KARUK TRIBE OF CALIFORNIA, Plaintiff, v. UNITED STATES OF AMERICA, Defendant. | No. 90-3993L Judge Lawrence S. Margolis |
| CAROL AMMON, et al., Plaintiffs, v. UNITED STATES OF AMERICA, Defendant. | No. 91-1432L Judge Lawrence S. Margolis |
| YUROK INDIAN TRIBE, Plaintiff, v. UNITED STATES OF AMERICA, Defendant. | No. 92-173L Judge Lawrence S. Margolis |

UNITED STATES' AND HOOPA VALLEY TRIBE'S JOINT STATEMENT OF GENUINE ISSUES AND PROPOSED SUPPLEMENTAL FINDINGS OF UNCONTROVERTED FACT OFFERED IN OPPOSITION TO THE CROSS-MOTIONS OF THE YUROK TRIBE RELATING TO THE DEFENDANTS' MOTION FOR PARTIAL SUMMARY JUDGMENT

| THE YUROK TRIBE'S STATEMENT OF UNCONTROVERTED FACT | DEFENDANTS' STATEMENT OF GENUINE ISSUES, UNCONTROVERTED FACTS, AND PROPOSED SUPPLEMENTAL FINDINGS |
|---|---|
| 1. The Yurok people were aboriginal residents of the Square. (Short I, 486 F.2d at 565). | UNCONTROVERTED. |

| THE YUROK TRIBE'S STATEMENT OF UNCONTROVERTED FACT | DEFENDANTS' STATEMENT OF GENUINE ISSUES AND PROPOSED SUPPLEMENTAL FINDINGS |
|---|---|
| 2. The Yuroks were beneficiaries of the 1864 Treaty (never ratified) that called for the creation of the Reservation (Short I, 486 F.2d at 565). | UNCONTROVERTED. |
| 3. Congress established the Hoopa Reservation in part for the Yuroks (Short I, 486 F.2d at 565). | UNCONTROVERTED. |
| 4. Congress in 1864 intended that the Reservation be the solution to the problem of Indian/white conflict in Northern California. (Short I, passim; comments of Sen. Doolittle, March 21, 1864 Hearing, Cong. Globe at 1209; Beckham Decl. at 36-47 (April 30, 1993)). | UNCONTROVERTED. |
| 5. The 1891 Executive Order adding the Addition created an enlarged, single Reservation (Short I, 486 F.2d at 567-68). | UNCONTROVERTED. |
| 6. The expansion put the Yurok Indians of the Addition on equal footing with the Hoopa Indians of the Square, such that the Hoopas did not enjoy any exclusive rights to the Square (Short I at 486 F.2d at 567-68, and passim). | UNCONTROVERTED. |
| 7. Individual Yurok Indians of the Reservation were entitled to a par capita share of the Joint Reservation resources. (Short I at 561, 568, passim). | CONTROVERTED. Defs.' Proposed Fdg 61 in Defs.' Comprehensive Table. |

| THE YUROK TRIBE'S STATEMENT OF UNCONTROVERTED FACT | DEFENDANTS' STATEMENT OF GENUINE ISSUES AND PROPOSED SUPPLEMENTAL FINDINGS |
|---|---|
| 8. Numerous Interior Department administrative opinions subsequent to the 1891 Extension confirmed that the Yuroks of the Reservation "were entitled to rights on the reservation." (Short I at 567-68). | UNCONTROVERTED. Defs.' Proposed Fdg 26 in Defs.' Comprehensive Table. |
| 9. Both the Square and the Extension are "recognized" Reservations. Mattz v. Arnett, 412 U.S. 481, 494, 505 (1973). | CONCLUSION OF LAW; CONTROVERTED. Defs.' Proposed Fdgs 18-22 in Defs.' Comprehensive Table. |
| 10. Between enactment of the 1864 Act and the enactment of the Hoopa-Yurok Settlement Act ("HYSA") in 1988, no act of Congress or Executive Order purported to expel Yuroks or the Yurok Tribe from the Square. | UNCONTROVERTED. |
| 11. Between enactment of the 1864 Act and the enactment of the HYSA in 1988, no act of Congress or Executive Order purported to divest Yuroks or the Yurok Tribe of their rights to the land or resources of the Square. | CONTROVERTED. Defs.' Proposed Fdgs 27-36 in Defs.' Comprehensive Table. |
| 12. Between enactment of the 1864 Act and the enactment of the HYSA in 1988, no act of Congress or Executive Order purported to put Yuroks or the Yurok Tribe on notice that they had no right to consider the Reservation their permanent home. | IMMATERIAL; CONTROVERTED. Defs.' Proposed Fdgs 27 in Defs.' Comprehensive Table. |
| 13. Since 1891 the Yurok people have considered the Joint Reservation to be their | IMMATERIAL; CONTROVERTED. Defs.' Proposed Fdg 157 in Defs.' Comprehensive Table. |

| THE YUROK TRIBE'S STATEMENT OF UNCONTROVERTED FACT | DEFENDANTS' STATEMENT OF GENUINE ISSUES AND PROPOSED SUPPLEMENTAL FINDINGS |
|---|---|
| permanent home. See generally Mattz v. Arnett, supra; Donnelly v. United States, 228 U.S. 243 (1913); Mattz v. Superior Court, 46 Cal.3d 355 (1988); People v. McCovey, 36 Cal.3d 517, 205 Cal. Rptr. 643, 685 P.2d 687 (1984); United States v. Eberhardt, 789 F.2d 1354 (9th Cir. 1986); Pacific Coast Fed. v. Secretary of Commerce, 494 F. Supp. 626 (N.D.Cal. 1980); Blake v. Arnett, 663 F.2d 906 (9th Cir. 1981); Elser v. Gill Net Number One, 246 Cal.App.3d 30, 54 Cal.Rptr. 568 (1966); Arnett v. Five Gill Nets, 48 Cal.App.3d 454, 121 Cal. Rptr. 906 (1975); Donahue v. Justice Court, 15 Cal.App.3d 557, 93 Cal.Rptr. 310 (1971). | |
| 14. Since 1891 the Yurok people have centered their cultural and social life in and around the Joint Reservation. See generally the cases cited in Paragraph 13 above. | IMMATERIAL; UNCONTROVERTED. |
| 15. Since 1891 many of the Yurok people have earned their living in whole or in part from the resources of the Joint Reservation. See generally the cases cited in Paragraph 13 above. | IMMATERIAL; UNCONTROVERTED. |
| 16. The Yuroks "rely in their daily lives" on the expectation that they have a permanent home on the Reservation. See generally the cases cited in Paragraph 13 above. | IMMATERIAL; UNCONTROVERTED. |

| THE YUROK TRIBE'S STATEMENT OF UNCONTROVERTED FACT | DEFENDANTS' STATEMENT OF GENUINE ISSUES AND PROPOSED SUPPLEMENTAL FINDINGS |
|---|---|
| 17. The Yurok Tribe is the duly organized representative of the Yurok people. 25 U.S.C. § 1300i(b)(16), 1300i-8; Letter from Assistant Secretary Indian Affairs re recognition of ratification of Tribal Constitution (Exhibit A to Yurok Memorandum). | UNCONTROVERTED. |

DATED this 12th day of September, 1994.

LOIS J. SCHIFFER
Acting Assistant Attorney General

[signature]
John S. Gregory
U.S. Department of Justice
Environment & Natural Resources Division
General Litigation Section
P.O. Box 663
Washington, D.C. 20044-0663
(202) 272-6217

OF COUNSEL:

GEORGE SKIBINE, Esq.
U.S. Dept. of the Interior
18th & C Street, N.W.
Washington, D.C. 20240
(202) 208-4388

PIRTLE, MORISSET, SCHLOSSER & AYER

[signature]
Thomas P. Schlosser
801 Second Avenue, Suite 1115
Seattle, Washington 98104
(206) 386-5200

Attorney of Record for Intervenor Hoopa Valley Tribe

OF COUNSEL:

K. ALLISON McGAW, Esq.

71:041394
C:\TPS\20-9561\CONT-YRK.003
Printed: September 8, 1994

CERTIFICATE OF SERVICE

I hereby certify that a true copy of the foregoing was served by first class mail, postage prepaid, this 12th day of September, 1994 to:

Dennis J. Whittlesey, Esq.
WINSTEAD SECHREST & MINICK, P.C.
Suite 500
1133 21st Street, N.W.
Washington, D.C. 20036-3371
(202) 296-5195
Fax: (202) 872-6430

George Forman, Esq.
ALEXANDER & KARSHMER
2150 Shattuck Ave, Suite 725
Berkeley, CA 94704
(510) 841-5056
Fax: (510) 841-6167

Thomas P. Schlosser
PIRTLE, MORISSET, SCHLOSSER & AYER
1115 Norton Building
801 Second Avenue
Seattle, Washington 98104-1509
(206) 386-5200
Fax: (206) 386-7322

William C. Wunsch, Esq.
FALKNER, SHEEHAN & WUNSCH
351 California Street
San Francisco, CA 94104
(415) 362-6340
Fax: (415) 362-6341

John S. Gregory

**ATTACHMENT TO THE TESTIMONY
OF THE YUROK TRIBE**

**Issues for Congress**

The items below are issues identified by the Tribal Council. They are broken out by categories identified in Senator Inouye's letter to Chairperson Masten, October 4, 2001. These items reflect the fact that at the time of the Hoopa-Yurok Settlement Act, the Hoopa Tribe had a significant income base, infrastructure that met power, water and telecommunication needs, and economic and community infrastructure (e.g. hotel, gas station, recreational facilities, library etc.).

**Disposition of the Settlement Fund**
The Yurok Tribal Council has prepared a draft plan for disposition of the Settlement Fund. The plan recognizes the opportunity to address long-standing need for the Yurok Tribe. A highlight of this plan is the proposition that interest from the fund be utilized for various needs. The principle would remain untouched and grow each year.

**Acquisition of Lands**
This item is closely related to the clarification of boundaries item below. The Tribe currently lacks a cohesive land base sufficient to support subsistence and economic activities. Additionally, ceremonial and religious sensitive lands are a priority for the Tribe. The following list represents lands that the Tribe has identified that it would like to acquire:

1. All Federal Lands and facilities within Yurok Reservation boundaries including BLM, USFS, RNP and any other Federal lands;
2. Redwood National Park "dog leg" located at the north side of the current Reservation;
3. 55,000 acres owned by Simpson Timber Co. within current Reservation boundaries and as much land as possible beyond that within the Lower Klamath River Basin. Lands to be purchased or traded for USFS lands yet to be identified;
4. All USFS lands within the Blue Creek watershed. These lands to be managed as a Cultural district;
5. Lands, both within Simpson Timber Company and U.S. Forest Service, identified as a cultural district above Weitchpec, in Blue

Creek and Cappell watersheds. Management of these lands will be in accordance with cultural objectives and traditional values. No timber harvest activities will be conducted in these areas;

6. All USFS lands within Yurok Tribe ancestral territory. These lands to provide for timber harvest and subsistence activities. Tribal management will be at least as conservative as current management.

The above lands should be obtained through a land acquisition plan.

**Clarification of Boundaries**
The Yurok Tribe proposes that current Reservation boundaries be extended. While the amount of proposed land is based on the above, and acreage may be greater than acreage lost due to the Hoopa-Yurok Settlement Act, more acreage is needed to accomplish Tribal objectives due to constraints the Tribe is willing to place on various management activities. Additionally, funds necessary to survey current and proposed reservation lands/boundaries need to be appropriated.

**Amendments to other Federal Statutes**
Federal statutes need to be clarified that provided for various access, vehicle included, by Tribal members for hunting, fishing, and gathering subsistence activities. It is essential that unfettered cultural access for these and other activities should be provided for. Access and resource use will be provided through sound management plans developed by the Tribe. This need includes:

1. Access to all RNP lands for subsistence activities. Access includes all coastal and other areas within Yurok ancestral territories;
2. Provisions that require the Park Service to recognize Tribal management plans;
3. Provisions that require the National Park Service to cooperatively manage Park lands within Yurok ancestral territories. The Park Service should be required to recognize Tribal co-management in all agreements developed with other agencies/organizations;
4. Provisions that recognize the Yurok Tribe's ocean fishing rights.

**Protection of Fishery resources**
The protection and restoration of fisheries resources in the Klamath River Basin has been and continues to be a priority of the Tribe. The Tribe has

invested considerable resources in these activities. Adequate protection includes:

1. Legislative language that reaffirms the Tribe's interest and role in water and fisheries management within the Klamath River Basin, including the Trinity River;
2. Sufficient funding to support scientific research and restoration needs of the Tribe;
3. Legislative language that requires implementation of the ROD for the Trinity River.

**Programs to address Infrastructure Needs**
There is a tremendous infrastructure need for the Yurok Tribe. The following list represents those needs. Please note that there is much more need than identified here:

1. $ 40 million for Bald Hills road improvement;
2. $ 15 million for Highway 169 road improvement;
3. $ 11.25 million for electricity needs;
4. $ 9.5 million for telecommunication needs.

The Tribe has prepared a comprehensive list of infrastructure needs.

**Economic Need**
The Yurok Tribe has very little in place to address economic needs. Key here is the need to acquire properties for economic development purposes.

1. $ 30 million for economic development. These funds will go to priority areas for economic development
2. Specific properties necessary for economic development. These properties will be developed based upon an economic plan.

COPY

Hoopa Valley Tribal Council

P.O. Box 1348 • Hoopa, California 95546 • (916) 625-4211

Dale Risling, Sr.
Chairman

HOOPA VALLEY TRIBE

September 16, 1996

Honorable Susie Long
Chairperson, Yurok Tribe
1034 6th Street
Eureka, CA 95501

Dear Ms. Long:

The Hoopa Tribal Council has studied the proposals you presented in your July 29, 1996 letter and is supportive of them. Your proposals are as follows:

1. The Yurok portion of the Hoopa-Yurok Settlement Fund (approximately 47 million dollars) be made available to the Yurok tribe;

2 The 2.5 million dollars appropriated by Congress after passage of the Act for land purchase be made available to the Yurok tribe;

3. The National Forest System and Yurok Experimental Forest lands identified in sec. 2(c)(2)(A) and (B) of the Hoopa-Yurok Settlement Act be made available to the Yurok tribe;

4. The Hoopa tribe will support the Yurok Settlement proposal in Yurok v. United States or, as an alternative, would agree not to oppose the Yurok settlement.

We pledge to proceed cooperatively with you on these issues in the new Congress. We appreciate your stated willingness to support enactment of H.R. 2710 at this time.

It is in the interests of both of our tribes to have a comprehensive settlement of the legal issues affecting our reservations, and we have so advised the court in Yurok Tribe v. United States case. As soon as your settlement proposal is available we would like to review its details with you.

Sincerely,

/S/

Dale Risling, Sr., Chairman
Hoopa Valley Tribal Council

# Hoopa Valley Tribal Council

HOOPA VALLEY TRIBE

Regular Meetings on the First and Third Thursday of Each Month

P.O. Box 1348 • HOOPA, CALIFORNIA 95546 • Phone 625-4211 • Fax 625-4594

Duane J. Sherman, Sr.
Chairman

October 22, 1997

The Honorable Susie Long, Chairperson
Yurok Tribe
1034 6th Street
Eureka, California 95501

Dear Ms. Long:

Since my election to succeed Dale Risling as Chairman of the Hoopa Valley Tribe, you and I have had the opportunity to speak on a number of occasions about continuing our commitment to building a constructive relationship between our Tribes. One issue that you have raised with me is support of the Hoopa Valley Tribe for the Yurok Tribe's efforts to settle the litigation in Yurok Tribe v. United States. The purpose of this letter is to assure you that the Hoopa Valley Tribe's pledge to proceed cooperatively with you on the issues in that litigation which the Tribe made in its letter of September 13, 1996, to you remains in effect. As soon as your settlement proposal is available we would like to review its details with you.

Sincerely,

Duane Sherman, Sr., Chairman
Hoopa Valley Tribal Council

**YURUK TRIBE**

15900 Hwy 101 N. • Klamath, CA 95548
(707) 482-2921
FAX (707) 482-9485

1034 8th Street • Eureka, CA 95501
(707) 444-0433
FAX (707) 444-0437

September 19, 1996

Honorable John McCain
Chairman, Committee on Indian Affairs
United States Senate
838 Hart Office Building
Washington, DC 20510

Attention: Michael Jackson

Dear Senator McCain:

This letter is to confirm our September 16, 1996 telephone message to your staff indicating that the Yurok tribe had no objection to the enactment of H.R. 2710, the Hoopa Valley Reservation Boundary Adjustment Act.

Thank you for your continued support of Indian country.

Sincerely,

Susie Long

Susie L. Long
Chairperson



Hoopa Yurok Settlement Act 1988 (HYSA)
Requa
Klamath
Del Norte Co
Ah Pah
Johnsons
Orick
Cappell
Martins Ferry
Weitchpec
Hoopa
Humboldt Co.
Siskiyou Co.
Crescent City
Del Norte
Siskiyou
Trinidad
Humboldt
Eureka
Legend
Yurok Reservation Boundary 55,297 Acres
Yurok Tribal Trust 3,127 Acres
Yurok Allotment 3,930 Acres
Hoopa Trust & Allotments 86,390 Acres


Northwest Coast Ancestral Territories
The Hand Book of North American Indians was a reference for the data development of Northwest Coast Ancestral Territories. Some Tribes have provided the Yurok Tribe GIS Division with their ancestral boundary coverages so that accurate boundaries can be displayed. This map is being updated annually based on new coverages provided from other Tribal Agencies.
Smith River
Gasquet Mtn
Tolowa
Crescent City
Elk Valley
Tolowa Nation
Red Mtn
Klamath
Karuk
Nickwitz Peak
Barren Butte
1 inch equals 8.8 miles
Yurok
Onion Mtn
Burrill Peak
Shelton Butte
Salmon Mtn
Schoolhouse Peak
Big Lagoon
Chilula
Trinidad
Hupa
Brannon Mtn
North Fork Whilkut
Arcata
Blue Lake
Whilkut
Sanungwa
Chimariko
Eureka
Mad River Whilkut
Wiyot
Table Bluff
Rohnerville/Bear River
Bear River
Chalk Rock
Nongatl
Mattol
Lonlangkok/Sinkyone
LEGEND
Mountain Peaks
RANCHERIAS
Big Lagoon
Blue Lake
Elk Valley
Resighini
Bear River
Smith River
Table Bluff
Tolowa Nation
Trinidad
County Boundary
Coastal Shoreline
Hydrology
Hoopa Reservation
Yurok Reservation Boundary
Yurok Ancestral Territory
Karuk Ancestral Territory
Ancestral Territories
Chilula
Hupa
Lonlangkok
Mad River Whilkut
Mattole
Nongatl
North Fork Whilkut
Redwood Creek Whilku
Sanungwa
Tolowa
Wiyot