**Electronically Filed September 10, 2008**

IN THE UNITED STATES COURT OF FEDERAL CLAIMS

| | |
|---|---|
| HOOPA VALLEY TRIBE, on its own behalf, and in its capacity as *parens patriae* on behalf of its members; Elton Baldy; Oscar Billings; Benjamin Branham, Jr.; Lila Carpenter; William F. Carpenter, Jr.; Margaret Mattz Dickson; Freedom Jackson; William J. Jarnaghan, Sr.; Joseph LeMieux; Clifford Lyle Marshall; Leonard Masten, Jr.; Danielle Vigil-Masten, Plaintiffs, v. UNITED STATES OF AMERICA, Defendant. | Case No. 08-72-TCW<br>Judge Thomas C. Wheeler<br>**PLAINTIFFS' RESPONSE IN OPPOSITION TO DEFENDANT'S MOTION TO DISMISS, OR IN THE ALTERNATIVE FOR SUMMARY JUDGMENT, AND REPLY IN SUPPORT OF PLAINTIFFS' MOTION FOR PARTIAL SUMMARY JUDGMENT ON QUESTION OF BREACH OF TRUST RESPONSIBILITY** |

**TABLE OF CONTENTS**


INTRODUCTION .......... 1

STANDARDS OF REVIEW .......... 2

I. RCFC 12(b)(1) .......... 2

II. RCFC 56 .......... 2

ARGUMENT .......... 2

I. THE COURT HAS SUBJECT MATTER JURISDICTION OVER PLAINTIFFS' CLAIMS BASED ON THE SETTLEMENT ACT, 25 U.S.C. § 407, THE 1864 ACT, AND THE COURT'S PRIOR ANALYSIS IN *SHORT* .......... 2

A. The Settlement Act Establishes a Specific Fiduciary Duty Breached by the United States .......... 3

B. A Network of Statutes Provides a "Money-Mandating" Source of Law .......... 5

1. "Reasonable Amenability" Based on "Fair Inferences" Test Applies .......... 6

2. *Short III* Has Already Found that 25 U.S.C. § 407 and the 1864 Act Are Money-Mandating Statutes .......... 7

II. PLAINTIFFS' CLAIMS ARE NOT BARRED BY SECTION 14 OF THE SETTLEMENT ACT .......... 10

III. THE HOOPA TRIBE'S WAIVER DOES NOT BAR THIS ACTION .......... 13

A. Individual Hoopa Members Were Not Required to Waive Claims .......... 13

B. The Tribal Claim Waiver Provision Discredits the United States' Contention that the Settlement Fund was "Set Aside" for the Yurok Tribe .......... 14

C. Congress Did Not Require A Waiver of the Instant Claims To Enforce the Statute, and the Hoopa Claim Waiver Preserved Such Claims .......... 16

IV. PLAINTIFFS HAVE STANDING TO PURSUE THE TRUST BREACH CLAIMS .......... 19

A. There Is No Basis To Dismiss the Hoopa Valley Tribe As *Parens Patriae* .......... 19

B. Individual Plaintiffs Have Standing .......... 23

V. INTERIOR VIOLATED ITS FIDUCIARY DUTIES BY ACCEPTING AN ILLUSORY CLAIM WAIVER TO DISBURSE THE SETTLEMENT FUND .......... 26

CONCLUSION .......... 30

CERTIFICATE OF SERVICE ..........

**CONTENTS OF SUPPLEMENTAL APPENDIX OF EXHIBITS**


| **Exhibit No.** | **Document Description** | **Page** |
|---|---|---|
| Exhibit 41 | T. Schlosser Memo to Bernhardt Regarding Can the Yurok Interim Council's Failure to Satisfy 25 U.S.C. § 1300i-1(c)(4) be Cured? (Mar. 23, 2006) | 406 |
| Exhibit 42 | T. Schlosser e-mail to E. Passarelli and C. Alexander Regarding Identity of the Indians for Whom the Funds of the Hoopa-Yurok Settlement Fund were Collected (June 15, 2006) | 413 |
| Exhibit 43 | Chairman Marshall letter to Kempthorne Regarding Department's Policy Decision to Release the Hoopa-Yurok Settlement Fund and Block Hoopa Appeal (May 21, 2007) | 414 |
| Exhibit 44 | Memo of Pretrial Conference held May 17, 1974 - *Short v. U.S.*, No. 102-63 (May 24, 1974) | 416 |
| Exhibit 45 | Hogan & Hartson, LLP Memo to Honorable Sue Ellen Wooldridge Regarding Critical Issues Facing the Yurok Tribe (Oct. 21, 2005) | 424 |
| Exhibit 46 | Iudicello letter to Chairman Marshall Regarding Cason Recusal (Apr. 3, 2007) | 429 |
| Exhibit 47 | Sacramento Area Director letter to T. Schlosser Regarding Hoopa Valley Tribal Council and Enrollment Committee Appeal Upheld (Sept. 17, 1992) | 430 |


**Exhibits 1-40 electronically filed with Appendix on April 2, 2008**

# TABLE OF AUTHORITIES

**Cases**

*Akzo Nobel Salt, Inc. v. Fed. Mine Safety and Health Review Comm'n*,
212 F.3d 1301 (D.C. Cir. 2000) .......... 26

*Alfred L. Snapp & Son, Inc. v. Puerto Rico*,
458 U.S. 592 (1982) .......... 20, 21

*Anderson v. Liberty Lobby, Inc*.,
477 U.S. 242 (1986) .......... 2

*Bond v. United States*,
43 Fed. Cl. 346 (1999) .......... 2

*Bugenig v. Hoopa Valley Tribe*,
266 F.3d 1201 (9th Cir. 2001), *cert. denied*,
535 U.S. 927 (2002) .......... 11

*Caminetti v. United States*,
242 U. S. 470 (1917) .......... 11

*Capoeman v. United States*,
440 F.2d 1002 (1971) .......... 12

*Cheyenne-Arapaho Tribe v. United States*,
512 F.2d 1390 (Ct. Cl. 1975) .......... 3

*Fisher v. United States*,
402 F.3d 1167 (Fed. Cir. 2005) .......... 4, 5, 6

*Georgia v. Pennsylvania Railroad*,
324 U.S. 439 (1945) .......... 22

*Hornback v. United States*,
405 F.3d 999 (Fed. Cir. 2005) .......... 29

*In re Blue Lake Forest Products*,
30 F.3d 1138 (9th Cir. 1994), *cert. denied*,
513 U.S. 1059 (1994) .......... 19

*In re Vitamins Antitrust Class Actions*,
215 F.3d 26 (D.C. Cir. 2000) .......... 24

*Kansas ex. rel. Hayden v. United States*,
748 F. Supp. 797 (D. Kan. 1990) .......... 20

*Karuk Tribe of California v. United States*,
41 Fed. Cl. 468 (1998), *aff'd*,
209 F.3d 1366 (Fed. Cir. 200), *cert. denied*,
532 U.S. 941 (2001) .......... 16

*Kickapoo Tribe v. Lujan*,
728 F. Supp. 791 (D. D.C. 1990) .......... 19

*Lujan v. Defenders of Wildlife*,
504 U.S. 555 (1992)........................................................................................................ 23

*Lujan v. National Wildlife Fed'n*,
497 U.S. 871 (1990)........................................................................................................ 23

*Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*,
475 U.S. 574 (1986).......................................................................................................... 2

*Menominee Tribe v. United States*,
179 Ct. Cl. 496 (1967) ....................................................................................................... 8

*Mountain States Tel. & Tel. v. Santa Ana*,
472 U.S. 237 (1985)........................................................................................................ 28

*Navajo Nation v. Super. Ct. of WA for Yak. Cty*.,
47 F. Supp.2d 1233 (E.D. Wash. 1999) .......................................................................... 21

*Navajo Nation v. United States*,
501 F.3d 1327 (Fed. Cir. 2007) ........................................................................... 4, 5, 6, 7

*Parravano v. Babbitt*,
70 F.3d 539 (9th Cir. 1995), *cert. denied*,
518 U.S. 1016 (1996)...................................................................................................... 12

*Press Mach. Corp. v. Smith R.P.M. Corp.*,
727 F.2d 781 (8th Cir. 1984) .......................................................................................... 17

*Puzz v. United States*,
No. C80-2908 , 1984 WL 23255, (N.D. Cal., Oct. 2, 1984)............................................ 7, 25

*Red Lake Band of Chippewa Indians v. United States*,
861 F. Supp. 841 (D. Minn. 1994)................................................................................... 19

*Reynolds v. Army and Air Force Exch. Serv.*,
846 F.2d 746 (Fed. Cir. 1988) .......................................................................................... 2

*Scheuer v. Rhodes*,
416 U.S. 232 (1974).......................................................................................................... 2

*Short v. United States (I)*,
202 Ct. Cl. 870 (1973), *cert. denied*,
416 U.S. 961 (1974)........................................................................................................ 16

*Short v. United States (II)*,
661 F.2d 150 (1981), *cert. denied*,
455 U.S. 1034 (1982).................................................................................... 14, 22, 24

*Short v. United States (III)*,
719 F.2d 1133 (Fed. Cir. 1983), *cert. denied*,
467 U.S. 1256 (1984)............................................................................................. passim

*Short v. United States (IV)*,
12 Cl. Ct. 36 (1987) ................................................................................................. passim

*Short v. United States (VI),*
28 Fed. Cl. 590 (1993) ........ passim

*Short v. United States (VII),*
50 F.3d 994 (Fed. Cir. 1995) ........ 8, 12, 21

*Sisseton-Wahpeton Sioux Tribe v. United States,*
90 F.3d 351 (9th Cir. 1996) ........ 19

*Stephenson v. Dow Chemical Co.*,
273 F.3d 249 (2d Cir. 2001) ........ 17

*U.S. v. White Mountain Apache Tribe*,
537 U.S. 465 (2003) ........ 6

*United States v. Mitchell,*
463 U.S. 206 (1983) ........ 6, 9, 25

**Statutes**

10 U.S.C. § 1201(a) ........ 4

25 U.S.C. § 117a ........ 4

25 U.S.C. § 162a ........ 3

25 U.S.C. § 407 ........ passim

Act of April 8, 1864, 13 Stat. 39 ........ passim

Hoopa-Yurok Settlement Act, Pub. L. 100-580, *codified in part as amended at* 25 U.S.C. §§ 1300i *et seq* ........ passim

Indian Tucker Act, 28 U.S.C. § 1505 ........ passim

**Other Authorities**

Fraser, C., Note, *Protecting Native Americans: the Tribe as Parens Patriae*, 5 MICH. J. RACE & L. 665 (Spring 2000) ........ 20

S. Rep. 100-564 ........ 17, 19, 26

**INTRODUCTION**

From the Secretary's Section 14(c) Report and the Senate Hearing in 2002, Hoopa Indians of the Reservation expected the federal trustee to treat the Settlement Fund as "administered for the mutual benefit of both Tribes," and to seek authority for "a separate, permanent fund for each Tribe from the remaining balance," App. 332, thereby recognizing that the Settlement Act's settlement offers had expired and that funds (which came almost entirely from timber of the Hoopa Valley Reservation)[1] would be used to rehabilitate the clear-cut hillsides. *See* App. 290-97. Instead, the Interior Department failed to propose legislation and did nothing to advance a bill the Hoopa and Yurok Tribes produced through mediation. App. 348-67. Then, in 2005, counsel for the Yurok Tribe proposed a scheme "to help achieve both the Department's and the [Yurok] Tribe's goals" (Ex. 45, App. 428), under which the Interior Department would accept a new waiver resolution that ignored the Yurok Tribe's litigation (vitiating the Settlement Act), and permit a disbursement for only one Tribe's benefit. Special Trustee Swimmer executed the plan on March 1, 2007, and thereafter made a general distribution to the Yurok Tribe's members only in violation of the Settlement Act and the teachings of the *Short* case. App. 372-405. *See* Marshall Declaration.

As explained below, partial summary judgment on the purely legal question of the United States' breach of trust responsibility is appropriate. Defendant has not demonstrated a material factual dispute. The Court should deny Defendant's Motion because it depends on mischaracterizing Plaintiffs' claims, ignores the express "trust" language of the Settlement Act, eviscerates the waiver requirement, and presumes the correctness of the United States' action in order to minimize Plaintiffs' harm. The Court has subject matter jurisdiction over Plaintiffs'

[1] It is undisputed that all but 1.26% of the Escrow Funds included in the Settlement Fund came from the Hoopa Reservation. Def. Resp. to Pl. Facts ¶ 25.

claims arising out of the specific statutory fiduciary duties, breached by Defendant, for damages pursuant to money-mandating statutes; Plaintiffs have standing to pursue their claims in their own right and as *parens patriae* on behalf of Hoopa Indians of the Reservation; and, Plaintiffs' claims are neither barred by the waiver nor the statute of limitations provisions of the Settlement Act.

## STANDARDS OF REVIEW

### I. RCFC 12(b)(1)

Evaluating Defendant's motion to dismiss for lack of subject matter jurisdiction, the Court must construe the facts in the Amended Complaint in the light most favorable to Plaintiffs, *Scheuer v. Rhodes,* 416 U.S. 232, 236 (1974), and accept Plaintiffs' undisputed factual allegations as true. *Reynolds v. Army and Air Force Exch. Serv.*, 846 F.2d 746, 747-48 (Fed. Cir. 1988); *see also Bond v. United States*, 43 Fed. Cl. 346, 348 (1999).

### II. RCFC 56

Summary judgment is appropriate when evidentiary materials reveal that "there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." RCFC 56(c); *Anderson v. Liberty Lobby, Inc*., 477 U.S. 242, 247-48 (1986). If no rational trier of fact could find for the non-moving party, summary judgment is appropriate. *Matsushita Elec. Indus. Co. v. Zenith Radio Corp*., 475 U.S. 574, 587 (1986).

## ARGUMENT

### I. THE COURT HAS SUBJECT MATTER JURISDICTION OVER PLAINTIFFS' CLAIMS BASED ON THE SETTLEMENT ACT, 25 U.S.C. § 407, THE 1864 ACT, AND THE COURT'S PRIOR ANALYSIS IN *SHORT*

The United States contends that Plaintiffs have not established either a source of law establishing a fiduciary duty or the existence of a money-mandating law source. U.S. Br. at 18-24. Defendant is correct that the Indian Tucker Act alone does not create a substantive cause

of action (it simply provides a waiver of the United States' immunity from certain damages actions). *Id.* at 19. However, Plaintiffs properly invoke the Court's jurisdiction here.

To be entitled to the requested judgment concerning the breach of trust claim, the Hoopa Plaintiffs need show (1) the existence of the trust duty (25 U.S.C. § 1300i-3(b)); (2) the elements of the trust (*id*. §§ 1300i-3(a), 1300i(b)(1)); and (3) the action that breaches that trust (*id*. §§ 1300i-1(c)(4)(D)). *Short IV*, 12 Cl. Ct. at 41-42, 44-45. Plaintiffs satisfy these three elements. Pls.' Mot. Summ. J. at 25-37; App. 392-405; Pls. Facts ¶¶ 63-69. The Settlement Act specifies a trust duty breached by Defendant. 25 U.S.C. § 1300i-3(b). 25 U.S.C. § 407 and the 1864 Act, authoritatively construed in *Short*, are statutory authorities that are reasonably amenable to a fair inference that they establish a money-mandating source for the Hoopa Plaintiffs' claims against the United States for failure to adhere to its fiduciary duty by apportioning the Settlement Fund as a discriminatory per capita payment to only Yurok Indians of the Reservation.

### A. The Settlement Act Establishes a Specific Fiduciary Duty Breached by the United States

The Settlement Act unambiguously defines the trust as follows:

> The Secretary <u>shall make distribution from the Settlement Fund as provided in this subchapter and</u>, pending payments . . . , <u>shall invest and administer such fund as Indian trust funds pursuant to section 162a of this title</u>.[2]

25 U.S.C. § 1300i-3(b) (emphasis added). Even though Defendant refuses to discuss this section of the Settlement Act, the United States admits that it acted as a "trustee" with respect to these

[2] 25 U.S.C. § 162a provides for the holding of "community funds of any Indian tribe which are, or may hereafter be, <u>held in trust by the United States</u> . . ." and makes plain that the "trust responsibilities of the United States" in managing such funds include, *inter alia*, "providing adequate controls over . . . disbursements." 25 U.S.C. § 162a(a), (d)(2) (emphasis added). Congress' intent to create a trust duty is buttressed by the Settlement Act's reference to 25 U.S.C. § 162a. *See Cheyenne-Arapaho Tribe v. United States*, 512 F.2d 1390 (Ct. Cl. 1975) (applying statute to Hoopa trust funds).

"certain funds." U.S. Br. at 7. There is no material factual dispute that a specific trust relationship exists with respect to the Settlement Fund.

The Settlement Act states that the Settlement Fund is to be managed by the Secretary as "Indian trust funds." Use of the term "trust" is significant. *Navajo Nation v. United States*, 501 F.3d 1327, 1341 (Fed. Cir. 2007) (noting that "explicit trust language" is "necessary but not sufficient for an Indian Tucker Act breach of trust claim" and proceeding to review network of statutes that created actionable trust duties). The language of the Settlement Act is more explicit in its trust duties than the statutes construed in two recent Tucker Act cases, *Fisher v. United States*, 402 F.3d 1167, 1175-75 (Fed. Cir. 2005) (portion of opinion en banc) (requiring Secretary to make military pay determinations and payments pursuant to 10 U.S.C. § 1201(a)), and *Navajo*, 501 F.3d at 1337 ("tribe lawfully placed under the exclusive jurisdiction and protection of the . . . United States" and series of statutes confirming that lands to be "held in trust" for Navajo under Treaty of 1849), that were found to establish a trust relationship.

Defendant's contention that the Settlement Act "explicitly established a new funding distribution scheme" that ended any trust relationship distorts the statute and runs counter to the ruling in *Short VI*, which Defendant acknowledges with no more than a footnote string citation. U.S. Br. at 21, 3 n.1. Defendant would do well to heed the conclusion of *Short VI*, one of the few cases concerning the monies of the Settlement Fund, which rejects Defendant's argument by clarifying that the Settlement Act did not end trust duties but merely added to the Secretary's discretion to make payments. In *Short VI*, plaintiffs challenged the per capita distribution to Hoopa tribal members authorized by Section 7 of the Settlement Act. The Court ruled:

> The only reasonable construction of section 7 is that it changes the nature of the government's discretion to make per capita distributions <u>from the escrow fund</u>. Under the law of this case, it is within the Secretary of Interior's discretion to make per capita distributions. *Short IV*, 12 Cl. Ct. at 44. The

> Secretary's discretion is constrained by statutes including 25 U.S.C. §§ 117a and 407, and by the fiduciary relationship between the Secretary and the Indians. *Short III*, 719 F.2d at 1135–37. The Settlement Act is simply another statute that constrains the Secretary's discretion in new ways.

*Short VI*, 28 Fed. Cl. 590, 595 (1993) (emphasis added). Where, as here, the Settlement Act does not expressly allow a payment from the Settlement Fund, the United States remains constrained by the fiduciary obligations recognized in *Short*. *See* 25 U.S.C. § 1300i-2.

As a matter of law, the Settlement Act is a "substantive source of law that establishes specific fiduciary or other duties" and the Hoopa Plaintiffs' have sufficiently alleged that the United States "has failed to faithfully perform those duties." *United States v. Navajo Nation*, 537 U.S. 488, 506 (2003); Amend. Compl. ¶¶ 68-105. "[I]f the Secretary decides (as he has) to distribute proceeds under § 407, he must act non-discriminatorily." *Short III*, 719 F.2d at 1137. Where, as here, there is a discriminatory distribution, "the proper beneficiaries can sue under the Tucker Act if those funds illegally leave the Treasury." *Id.*

### B. A Network of Statutes Provides a "Money-Mandating" Source of Law

The statutes that establish specific fiduciary duties also are money-mandating statutes. The Federal Circuit has wrestled with the "money-mandating" statute question in two recent cases, neither of which is cited by the United States. By ignoring *Fisher* and *Navajo*, the United States seeks to apply an overly strict "fairly be interpreted" standard expressly rejected by *Fisher* and *Navajo.* U.S. Br. at 19. The cases discussed below should guide this Court in its review of 25 U.S.C. § 407, the 1864 Act, and the Settlement Act to determine whether they provide the requisite "money-mandating" source of law for jurisdiction. Applying the "reasonable amenability" based on "fair inferences" test, the Court should find that it has subject matter jurisdiction.

**1. "Reasonable Amenability" Based on "Fair Inferences" Test Applies**

In *Fisher*, the Federal Circuit focused on a core question – what is the test for determining whether a statute is money-mandating for Tucker Act jurisdictional purposes: (1) the "reasonably amenable . . . fair inference" rule from *U.S. v. White Mountain Apache Tribe,* 537 U.S. 465, 472-73 (2003);[3] or (2) the arguably more strict "fairly be interpreted" test from *Navajo Nation*, 537 U.S. 488 (2003). *Fisher*, 402 F.3d at 1173-74. Noting that both cases dealt with whether the United States owed fiduciary duties to Indian tribes, *Fisher* applied both tests to find that plaintiff stated a claim sufficient for jurisdiction. However, *Fisher* suggested a preference for the "reasonably amendable" standard as the "new test [that] clearly lowers the threshold for establishing that a statute or regulation is money-mandating, for it replaces a normal 'fairly interpreted' test with a less demanding test of 'reasonable amenability' based on 'fair inferences.'" *Id.* at 1174.

Last year, in *Navajo*, the Federal Circuit considered what is necessary for a "money-mandating" statute and concluded that the "reasonably amenable" standard should apply, holding that the "network of statutes and regulations" in that case "are reasonably amenable to the reading that they might mandate recovery in damages against the government under the Indian Tucker Act" for breach of fiduciary responsibilities to the Navajo Nation. *Navajo*, 501 F.3d at 1335. As here, the United States in *Navajo* tried to "have it both ways" by assuming "comprehensive control" over the Tribal resource "*and* disclaim[ing] liability for

[3] The United States' obligations in this case are more clear than those in *White Mountain Apache* and *Mitchell II*, where enforceable fiduciary duties were found to exist. *Mitchell II* construed acts that address timber sales – the same acts that created the revenues that went into the Settlement Fund – and concluded that they imposed a fiduciary duty on the government. As the Court noted in *Short III*, the only difference between the situation in *Mitchell II* and the case involving distributions to less than all "Indians of the Reservation" is the alleged injury: failure to properly manage timber versus the discriminatory distribution of the proceeds of timber sales. *Short III*, 719 F.2d at 1135. The same holds true here.

exercising such control." *Id.* at 1336 (emphasis in original). The Federal Circuit correctly rejected the United States' effort to avoid liability in *Navajo* and a similar rejection of the United States dismissal efforts is warranted here.

Applying this most recent controlling analysis from the Federal Circuit, 25 U.S.C. § 407 and the 1864 Act, as buttressed by the Court's rulings in *Short*, create a network of statutory authorities reasonably amenable to a fair inference that they establish a money-mandating source requiring compensation for Defendant's breach of trust in individualizing the Settlement Fund.

#### 2. ***Short III*** **Has Already Found that 25 U.S.C. § 407 and the 1864 Act Are Money-Mandating Statutes**

The government's effort to distance this case from the *Short* litigation is understandable, but not excusable. U.S. Br. at 28-29. The *Short* rulings concerning the same source of funds individualized to some, but not all, Indians of the Reservation, are binding upon the United States in this litigation and Defendant is estopped from attempting to collaterally attack *Short*'s rulings here.[4] As discussed below, *Short* applies because Defendants' action is unauthorized by the Settlement Act, and, as *Short III* has already established, 25 U.S.C. § 407 and the 1864 Act provide a network of statutory authorities reasonably amenable to a fair inference that they establish a money-mandating source for the Hoopa Plaintiffs' trust breach claims.[5] *Short III*, 719 F.2d at 1135.

---

[4] The effect of the adjudicated *Short* claims was litigated in *Puzz v. United States*, No. C80-2908, 1984 WL 23255 *7 (N.D. Cal., Oct. 2, 1984), where the Court opined that certain factual findings of *Short* were entitled to preclusive effect.

[5] The United States correctly admits that the Settlement Act's language "on how to divide, invest, and disburse the Settlement Fund [are] duties [that] are money-mandating." U.S. Br. at 22. Thus, the Settlement Act also serves as a cognizable money-mandating statute for Plaintiffs' claims. The United States' attempt to argue based on a "portion of the Settlement Fund set aside for the Yurok" to avoid this admitted money-mandating function fails. U.S. Br. at 23; *see* Sec. III.B. *infra.* (explaining that, contrary to Defendant's argument, Plaintiffs' challenge is to the "apportionment" of the Settlement Fund without a lawful waiver).

Section 3 of the Settlement Act, ignored by Defendant, expressly preserves the *Short* rulings, stating: "Nothing in this Act shall affect, in any manner, the . . . decisions of the United States Claims Court in the Short cases or any final judgment which may be rendered in those cases." 25 U.S.C § 1300i-2. The Settlement Act did not render *Short* inapplicable or irrelevant. *See Short VI,* 28 Fed. Cl. at 595 (rejecting idea that the Settlement Act is a new mechanism stating that "[t]he Settlement Act is simply another statute that constrains the Secretary's discretion in new ways"). The Settlement Act added additional discretion and duties; it did not replace existing trust duties in the escrow funds created pursuant to Section 407 and the 1864 Act. *Short* plaintiffs were denied damages based on a 1991 per capita distribution from the Settlement Fund only "because it was specifically authorized by the Settlement Act." *Short VII*, 50 F.3d at 997 (emphasis added). *Short* is good law and should guide the Court in its review of the money-mandating statutes at issue here.

The Federal Circuit in *Short III* determined that *Short* plaintiffs who were "Indians of the Reservation" qualify under 25 U.S.C. § 407 and applied the ruling to the Hoopa Valley Reservation as established by the Act of April 8, 1864, an Act to provide for the better Organization of Indian Affairs in California, 13 Stat. 39 ("1864 Act").[6] *Short III*, 719 F.2d at 1136. The money individualized from the Settlement Fund is derived from timber cut from the Hoopa Square in accordance with 25 U.S.C. § 407 which "established a fiduciary

---

[6] Assuming *arguendo* that the United States' is correct that the Settlement Act terminated the trust created by 25 U.S.C. § 407 or the 1864 Act, that result would not avoid the Court's jurisdiction under the Indian Tucker Act. *Menominee Tribe v. United States*, 179 Ct. Cl. 496 (1967) (holding that despite the Menominee Termination Act, which terminated federal supervision over the tribe's property, the Menominee Tribe still could invoke jurisdiction under the Indian Tucker Act, in part because "[t]he tribe continues to hold the beneficial and equitable interest in the property"). Here, there is no intention by Congress to terminate the trust; rather, Congress expressly extended the trust to the Secretary's management of the Settlement Fund for the benefit of all Indians of the Reservation. 25 U.S.C. § 1300i-3(b).

relationship" under which "the Government should be liable in damages for the breach of its fiduciary duties." *Short III*, 719 F.2d at 1135 (internal quotations omitted). With respect to the 1864 Act, *Short III* concluded that the 1864 Act helps "show that the Government had a fiduciary relationship toward qualified plaintiffs with respect to the Hoopa Valley reservation and also to show that the Secretary's action in excluding [certain Indians of the Reservation] from the distribution of the monies was unlawful." *Id.*; *see* Section 2 of the 1864 Act, 13 Stat. at 40. *Short IV* reaffirmed the ruling that the *Short* plaintiffs' claims were for a breach of trust for discriminatory distributions of reservation revenues by the Secretary of the Interior pursuant to 25 U.S.C. § 407. *Short v. United States*, 12 Ct. Cl. 36, 40 (1987) (any distributions "must be made in a non-discriminatory manner."). The Hoopa Plaintiffs have identified money-mandating sources for their breach of trust claim founded on substantive sources of law establishing specific fiduciary duties. Amend. Compl. ¶¶ 5, 26-28, 65-66; *Mitchell II*, 463 U.S. at 216-17, 219.

Defendant quotes from the amended Section 407 (Section 13 of the Act) to argue that the change in language renders the *Short* ruling inapposite and shifted the trust beneficiaries from individual tribal members to the tribes themselves. U.S. Br. at 22. This overlooks the important fact that the version quoted came into effect <u>after</u> the timber sales created the proceeds at issue.[7] The amendment to Section 407 in the Settlement Act is, by its plain language, not retroactive, as Defendant seems to assume. Plaintiffs' entitlement as "Indians of the Reservation" was well-established before passage of the Settlement Act and nothing in the Settlement Act

[7] Even if the amended language were applicable, the governing bodies of the tribes agreed that "[n]o expenditure from the Settlement Fund shall be made prior to" subsequent congressional action, which has not occurred. App. 351, 358. Also, Defendant's contention was rejected in *Short III*. That court construed the "used for the benefit of Indians of the Reservation" language in old Section 407 as unchanged by the "members of the tribe" and concluded that the substitution was "obviously not designed to cut off existing rights." *Short III*, 719 F.2d at 1136.

terminates that entitlement.[8] As *Short VI* determined, "the Settlement Act does not make any distinctions between pre-Act escrow funds and post-Act income" placed in the Settlement Fund which "suggests that Congress intended no distinctions between funds earned prior to the Act or after the Act." 28 Fed. Cl. at 595. Plaintiffs have a direct interest in the revenues in the Settlement Fund accumulated during the joint ownership of the Reservation, and interest thereon.

## II. PLAINTIFFS' CLAIMS ARE NOT BARRED BY SECTION 14 OF THE SETTLEMENT ACT

The United States argues that Plaintiffs' claims are barred by the statute of limitations of Section 14 of the Settlement Act. U.S. Br. at 17-18. That argument fails as it both misconstrues Plaintiffs' claims in an effort to shoehorn the case into a Section 14 claim and re-writes Section 14 to extend the limitation to "distribution of the Settlement Fund" even though no such language appears in Section 14. *Id.* Plaintiffs' claims do not arise under Section 14 of the Settlement Act and, in any event, were filed only one month after the release of funds occurred that triggered the cause of action.

Section 14 is divided into two subparts. The first, Section 14(a), defines the "claims" subject to the limitation and exclusively lists "[a]ny claim challenging partition of the joint reservation pursuant to section 1300i-1 of this title or any other provision of this subchapter as having effected a taking under the fifth amendment of the United States Constitution or as otherwise having provided inadequate compensation." 25 U.S.C. § 1300i-11(a) (emphasis added). As this first subsection makes plain, the "claim" at issue is a takings or compensability claim pertaining to the division of the joint reservation. This takings claim discussed in subsection (a) is made subject to certain limitations in Section 14(b) as follows:

---

[8] The United States does not dispute that it administers timber revenues from the Reservation "as trustee for the Indian beneficiaries." Def. Resp. to Pl. Facts ¶ 10.

> (1) Any such claim by any person or entity, other than the Hoopa Valley Tribe or the Yurok Tribe, shall be forever barred if not brought within the later of 210 days from the date of the partition of the joint reservation as provided in section 1300i–1 of this title or 120 days after the publication in the Federal Register of the option election date as required by section 1300i–5 (a)(4) of this title.
>
> (2) Any such claim by the Hoopa Valley Tribe shall be barred 180 days after October 31, 1988, or such earlier date as may be established by the adoption of a resolution waiving such claims pursuant to section 1300i–1 (a)(2) of this title.

*Id.* § 1300i-11(b)(1), (2) (emphasis added). Taken as a whole, the only possible reading of Section 14(b)'s use of the phrase "Any such claim" is to refer to Section 14(a)'s description of the "claim" as being one asserting that a section of the Act, such as the authorized partition of the joint reservation, constituted a taking. *See* Pl. Facts ¶ 26-28.

The plain language of the Settlement Act forecloses Defendant's reading of the "Any such claim" language to include, for instance, a breach of trust claim arising 20 years later out of noncompliance with the Settlement Act. *Caminetti v. United States*, 242 U. S. 470, 485 (1917) (noting that it is well-established that "when the statute's language is plain, the sole function of the courts—at least where the disposition required by the text is not absurd—is to enforce it according to its terms"). This understanding of Section 14 is confirmed by the Senate Report accompanying the Settlement Act. *See* App. at 107 (discussing limitations on "any claim challenging the constitutionality of this Act as a taking").

Hoopa Plaintiffs are not challenging the partition of the Joint Reservation or any provision of the Act; they seek to enforce the Act. Other courts have not hesitated to enforce rights secured by the Settlement Act. *E.g.*, *Bugenig v. Hoopa Valley Tribe*, 266 F.3d 1201, 1212-14 (9th Cir. 2001), *cert. denied*, 535 U.S. 927 (2002) (enforcing Section 8) ; *Parravano v. Babbitt*, 70 F.3d 539, 546 (9th Cir. 1995), *cert. denied*, 518 U.S. 1016 (1996) (enforcing Section

2) . The instant breach of trust claims against the United States are not foreclosed, by any stretch of the imagination, by Section 14. Plaintiffs' claims are not "any such claim" for takings.

The United States' briefly stated companion argument that the Hoopa Plaintiffs waited "seventeen years" to file breach of trust action is factually erroneous.[9] U.S. Br. at 18. The Complaint was filed barely two weeks after the trust funds were distributed in an underinclusive per capita distribution to some entitled Indians of the former Hoopa Valley Reservation. Amend. Compl. ¶ 65. The United States should be well aware that it is the individualized per capita distribution that occurred in January 2008, App. 405, not the United States' purported release of funds to the Yurok Tribe, that triggers the United States' liability in this suit. *Short IV*, 12 Cl. Ct. 36, 41, 44 (1987) ("It is also without consequence that the monies were first distributed by the Secretary to the Hoopa Valley Tribe for subsequent distribution to the Tribe's individual members, . . . [plaintiffs are injured when] these monies are individualized or otherwise handled contrary to law"); *Short VII*, 50 F.3d 994, 1000 (Fed. Cir. 1995) ("[T]he Secretary's actions in making per capita payments only to Hoopa Valley Tribe members were unauthorized.").

The Hoopa Plaintiffs' claims are timely and were filed well within the Indian Tucker Act's six year statue of limitations. *Capoeman v. United States*, 440 F.2d 1002, 1008 (1971) (Tucker Act's six year statute of limitations, 28 U.S.C. § 1491, applies to Indians under 28 U.S.C. § 1505). The Settlement Act statute of limitations is inapplicable to the instant claims.

---

[9] Defendant suggests a third possible bar in that "ten years have lapsed from the division of the funds made pursuant to the Act" making the Yurok per capita permissible. U.S. Br. at 29. This is not true. The injurious distribution was made in January 2008. Amend. Compl. ¶¶ 64-65. At Congress' direction, the apportionment of the Settlement Fund could not occur until receipt of the required claim waiver. 25 U.S.C. §§ 1300i-1(c)(4) and -5(c)(4). A Yurok Tribe claim waiver was accepted by the United States on March 21, 2007. Amend. Compl. ¶ 57. Sixteen months, not 10 years, have passed since the funds were purportedly divided pursuant to that illusory claim waiver. The per capita is, therefore, not in accordance with the Settlement Act.

## III. THE HOOPA TRIBE'S WAIVER DOES NOT BAR THIS ACTION

The Settlement Act forecloses the United States' argument that the Hoopa Valley Tribe's waiver of certain then-existing claims under Settlement Act Section 2(a)(2)(A), 25 U.S.C. § 1300i-1(a)(2)(A), somehow bars the Hoopa Plaintiffs from pursuing the new breach of trust claims here. U.S. Br. at 16. The history of the Settlement Act and the language of the waiver provision make clear that the Tribe only waived whatever claims it had in 1988; Congress preserved the Tribe's rights to enforce the Settlement Act in the future. Defendant's argument that individual members' rights were cut off, *id*. at 13, is also fatally flawed because the Tribe's waiver does not affect the claims of the individual Hoopa Plaintiffs. Hoopa members were not required to waive claims pursuant to the Settlement Act.

### A. Individual Hoopa Members Were Not Required to Waive Claims

Resolution of the *Short* litigation and its progeny hinged on the partition of the former Joint Reservation into separate reservations for the Hoopa Valley Tribe and the Yurok Tribe. 25 U.S.C. § 1300i-1(a)(1). However, Congress was concerned that such partition might be a "taking" because none of the litigation had "squarely address[ed] the central question of whether any Indians or tribes have any vested rights in the Hoopa Valley Reservation or its resources." App. 90, 107; Pl. Facts ¶ 27; App. 35, 55. Congress addressed the potential takings claims arising out of the partition of the former Joint Reservation and the authorized distribution of the escrow funds derived from the Hoopa Square by establishing a waiver mechanism.

With respect to non-member individual Indians of the former Joint Reservation, Congress directed a Settlement Roll by which certain individuals would receive a settlement payment and elect Hoopa or Yurok tribal membership, or opt out of tribal membership and waive further claims. 25 U.S.C. §§ 1300i-4, 1300i-5. Hoopa tribal members were <u>not</u> required to waive any claims because they were not on the Settlement Roll and did not elect a Settlement Roll option.

*Id.*, *see also* Pl. Facts ¶ 26. Indians of the Joint Reservation whose names were placed on the Settlement Roll signed claim waivers, but Hoopa tribal members did not. *Id.*

Inexplicably, Defendant does not deny the factual allegation that Hoopa members were not required to sign claim waivers, *compare* Pl. Facts ¶ 26 *with* Def. Resp. to Facts ¶ 26, but nevertheless argues that 25 U.S.C. § 1300i-5(b)(4), which restricts rights of persons who elected Hoopa membership under the Settlement Act, cuts off the rights of the individual Plaintiffs in this case. U.S. Br. at 2, 13 (concerning standing). The flaw in Defendant's reasoning is that this section is inapplicable. Hoopa Plaintiffs were not on the Settlement Roll and did not elect Hoopa Membership. Section 5(a)(1)(C), 25 U.S.C. § 1300i-4(a)(1)(C), prohibits inclusion on the Settlement Roll of those persons who were already enrolled members of the Hoopa Valley Tribe on August 8, 1988. The individual Hoopa Plaintiffs were ineligible for the Settlement Roll because they were already enrolled as members of the Tribe as of that date. Declaration of Ollie Mae Davis (discussing Hoopa plaintiffs and four individuals who attempted to elect Hoopa membership under Section 6(b), 25 U.S.C. § 1300-i5(b)). 25 U.S.C. § 1300i-5(b)(4) does not apply at all -- either to deny standing to the Hoopa Plaintiffs or to limit these individual Hoopa members' claims.[10] 25 U.S.C. § 1300i-1(a)(2)(A); App. 133-34.

### B. The Tribal Claim Waiver Provision Discredits the United States' Contention that the Settlement Fund was "Set Aside" for the Yurok Tribe

The provisions relating to the Settlement Roll provided a mechanism for resolving existing individual takings claims, but Congress also had to address the possibility of tribal

[10] The Hoopa Tribe's waiver, App. 133-34, does not purport to make a waiver of claims its individually enrolled tribal members may have had, and Congress did not require as much. As a matter of law, any claims that the Hoopa Tribe "may have" had in 1988 with respect to partition of the Joint Reservation and its resources (claims that were waived) are fundamentally different from claims of Indians of the Reservation arising from later individualized payments. *Compare, e.g., Short II*, 661 F.2d 150 (1981) (upholding claim of individuals) *with Short IV*, 12 Cl. Ct. at 40 (no ruling on Yurok Tribe claim).

takings claims. Congress required that the Hoopa and Yurok Tribes each enact a takings claim waiver, and provided incentives to both tribes to do so. 25 U.S.C. § 1300i-1(a)(2)(A) (Hoopa); § 1300i-1(c)(4)(D) (Yurok). In particular, for Yurok, "apportionment of funds to the Yurok Tribe as provided in sections 1300i-3 and 1300i-6 . . . shall not be effective unless and until the Interim Council of the Yurok Tribe has adopted a resolution waiving any claim such tribe may have against the United States arising out of the provisions of this Act." 25 U.S.C. § 1300i-1(c)(4) (emphasis added); Pl. Facts ¶ 29. The language of 25 U.S.C. § 1300i-1(c)(4) discredits the United States' untenable contention that the Settlement Fund was somehow "set aside for the Yurok Tribe" in the absence of a waiver. U.S. Br. at 1, 12, 27.

Defendant relies solely on Sections 4 and 7 of the Act to the exclusion of Section 2(c) for its disingenuous "Yurok set aside" theory. *Id.* at 12-13. This is erroneous for two reasons. First, Plaintiffs' claims do not seek to reach the "remainder" monies under Section 7(a); rather, this case is about damages resulting from the unauthorized "apportionment" and disbursement of the Settlement Fund under Section 2, 25 U.S.C. § 1300i-1(c)(4)(A), that was made after the United States accepted the illusory Yurok claim waiver. *Compare* U.S. Br. at 12, 28 *with* Pls. Mot. Summ. J at 36. Second, Sections 4 and 7 are preceded by and conditioned upon Section 2(c) which makes plain that "apportionment of funds to the Yurok Tribe as provided in sections 1300i-3 [Section 4] and 1300i-6 [Section 7] . . . shall not be effective unless and until the Interim Council of the Yurok Tribe" enacted its waiver. Amend. Compl. ¶¶ 27-39. As the United States admits, the waiver acted as a "condition precedent" to a Yurok share of the Settlement Fund. U.S. Br. at 7. If there was a "condition precedent," it strains credulity to believe that the Settlement Fund was unconditionally "set aside" for the Yurok Tribe. *Id.* at 1, 14. Rather, the Settlement Fund was offered as a means to settle claims, which the Yurok Tribe rejected when it

opted to litigate its takings claims. Amend. Compl. ¶¶ 32, 38, 92. Plaintiffs' point is that the 2008 individualization of "funds remaining" in the Settlement Fund was unlawful and unauthorized by the Act because there was no valid apportionment pursuant to Section 2(c).

Defendant's "set aside" theory has also been rejected by this Court. Twice previously, this Court has ruled that none of the plaintiff tribes or groups had an ownership interest in the Joint Reservation or a vested compensable expectancy in the monies derived from it that became the Settlement Fund. *Karuk Tribe of California, et al. v. United States, et al.*, 41 Fed. Cl. 468, 474-76 (1998); *see also Short I*, 202 Ct. Cl. at 884 ("[n]o vested Indian rights in the Square existed."). Despite the lack of a vested compensable expectancy, Defendant's expenditures were subject to enforceable trust duties, as *Short* made clear.

### C. Congress Did Not Require A Waiver of the Instant Claims To Enforce the Statute, and the Hoopa Claim Waiver Preserved Such Claims

The United States speciously distorts Congress', Interior's, and the Hoopa Valley Tribe's language with respect to the Hoopa waiver required for the partition of the former Joint Reservation and the ratification of the Hoopa Tribe's governing documents to be effective. 25 U.S.C. § 1300i-1(a)(2)(A). The United States rewrites the Settlement Act to have Hoopa broadly waive "<u>any claim challenging</u>" administrative action linked to the Act, in an effort to expand after the fact the scope of the claims the Hoopa Tribe released in the waiver. U.S. Br. at 16 (emphasis added). Defendant's arguments are refuted by the plain language of the Settlement Act which states the waiver more narrowly, using the present perfect tense ("have"), which is used to refer to an action or state of being that began in the past and continues into the present time:

> [W]ithin 60 days after October 31, 1988, [Hoopa] shall adopt, and transmit to the Secretary, a tribal resolution:

> (i) waiving any claim such tribe may have against the United States arising out of the provisions of this subchapter, and
>
> (ii) affirming tribal consent to the contribution of Hoopa Escrow monies to the Settlement Fund, and for their use as payments to the Yurok Tribe, and to individual Yuroks, as provided in this subchapter.

25 U.S.C. § 1300i-1(a)(2)(A) (emphasis added). Future claims are excluded by the tense choice. *See also* S. Rep. at 17, App. 94.

With respect to Subsection (i), Congress' choice of words, limiting the waiver to claims the Tribe "may have" in 1988 is purposeful and should not be ignored. Congress was not recognizing claims that did not exist. *See* App. 90, 92, 107. It is axiomatic under contract law principles that a waiver or release of future unknown and unaccrued claims is disfavored in law and public policy. *E.g., Stephenson v. Dow Chemical Co*., 273 F.3d 249, 259-61 (2d Cir. 2001) (settlement violated class members' right to due process by purporting to relinquish unaccrued future claims). Moreover, if Congress had intended to require the tribes to release claims they did not yet know about or have in 1988, Congress could have said so by referring to claims which "may arise hereafter," or employing such phrases as "now have or under any circumstances could or might have" that have been held to constitute a waiver of all present and future claims. *See, e.g., Press Mach. Corp. v. Smith R.P.M. Corp.*, 727 F.2d 781, 785-86 (8th Cir. 1984). Congress did not do so and instead sought only a qualified waiver of claims the tribes "may have" had in 1988. Congress was only concerned with resolving claims that arose when the Settlement Act was passed.

Likewise, with respect to Subsection (ii), there is no persuasive argument that the Hoopa Tribe's waiver of claims it "may have" had in 1988 with respect to the former Joint Reservation somehow bars this action brought by and on behalf of individual Hoopa Indians of the Reservation who were illegally excluded from the United States' individuation and distribution

of trust revenues 20 years later in 2008. This would be evident had Defendant read all of Section 2(a)(2)(A)(ii) which provides that Hoopa affirmed its consent to "contribution of Hoopa escrow monies to the Settlement Fund and for their use as payments to the Yurok Tribe . . . as provided in this subchapter." *Compare* 25 U.S.C. § 1300i-1(a)(2)(A)(ii) *with* U.S. Br. at 5 (stopping quotation without ellipses before the limiting "as provided" language). The "as provided in this subchapter" provides an important limitation on the claim waiver that acts to preserve the Hoopa enforcement rights here. The Settlement Fund was apportioned in contravention of the Settlement Act. Pl. Facts ¶ 19. Therefore, the waiver authorizing use of the Settlement Fund "as provided" does not apply because the Settlement Act did not "provide" for the discriminatory individualization of the Settlement Fund that occurred earlier this year after acceptance of the illusory Yurok waiver. *See Short IV*, 12 Cl. Ct. at 38, 44.

Moreover, the Hoopa waiver—by its own terms—does not extend to actions like this brought to enforce rights and obligations created by the Settlement Act. As contemplated by the Settlement Act, the Hoopa Valley Business Council enacted Resolution No. 88-115, *reprinted in full at* 53 Fed. Reg. 49361 (Dec. 7, 1988), App. 133-34, which reads in pertinent part:

> BE IT FURTHER RESOLVED: That this resolution is not intended, and shall not be construed, so as to prevent the Hoopa Valley Tribe from enforcing rights and obligations created by the Hoopa-Yurok Settlement Act, *see* S. Rep. 100-564 at 17; and
>
> BE IT FURTHER RESOLVED: That the Hoopa Valley Tribe hereby waives any claim the Hoopa Valley Tribe may have against the United State arising out of the provisions of the Hoopa-Yurok Settlement Act;
>
> . . .

In the same notice, the Bureau of Indian Affairs determined that the Hoopa Tribe "has adopted a valid resolution which meets the requirements of section 2(a)(2)(A) of the Act." *Id.* The limited scope of the waiver respects the intent of Congress, as reflected by the Senate Select Committee's notation that "The Committee also does not intend that the waivers of the tribes, if

given, shall present [sic] the tribes from enforcing rights or obligations created by this Act." S. Rep. 100-564, App. at 94; Pl. Facts ¶ 33. Without question, one of the "rights or obligations created by this Act" includes the trust restrictions created by 25 U.S.C. § 1300i-3(b). The United States' argument to the contrary, U.S. Br. at 16, does not square with the trust functions of the Settlement Act. It would be strange indeed for Congress to have used the Settlement Act to establish specific fiduciary obligation on one hand (through 25 U.S.C. § 1300i-3(b)) and require the Hoopa Tribe and Yurok Interim Council to waive prospectively all their future rights and the rights of their members to enforce those rights created on the other. If this were the case (contrary to what the legislative history says), as the United States wants this Court to believe, the trust would have been illusory.

The plain language of the Settlement Act and the Tribe's waiver do not support Defendant's argument that the Hoopa tribal waiver bars all claims for all time to enforce rights and obligations arising from a violation of the Settlement Act, 25 U.S.C. § 407, and the 1864 Act, such as the 2008 discriminatory distribution following an unauthorized release of funds to the Yurok Tribe at issue here. The 1988 waiver was of the Tribe's then-existing takings claims.

## IV. PLAINTIFFS HAVE STANDING TO PURSUE THE TRUST BREACH CLAIMS

### A. There Is No Basis To Dismiss the Hoopa Valley Tribe As *Parens Patriae*

A sovereign may bring a suit on behalf of its citizens as *parens patriae* if it "articulate[s] an interest apart from the interests of particular private parties," "expresse[s] a quasi-sovereign interest," and alleges "injury to a sufficiently substantial segment of its population."[11] *Alfred L.*

---

[11] Courts recognize the authority of Indian tribes to sue the United States in a *parens patriae* capacity. *E.g., Sisseton-Wahpeton Sioux Tribe v. United States,* 90 F.3d 351 (9th Cir. 1996); *In re Blue Lake Forest Prod.,* 30 F.3d 1138 (9th Cir. 1994) (Hoopa Valley Tribe) ; *Kickapoo Tribe v. Lujan*, 728 F. Supp. 791 (D. D.C. 1990); *Red Lake Band of Chippewa Indians v. United States*, 861 F. Supp. 841, 842 (D. Minn. 1994); *see generally* Fraser, C., Note,

*Snapp & Son, Inc. v. Puerto Rico,* 458 U.S. 592, 607 (1982); *see also Quechan Indian Tribe v. United States*, 535 F. Supp.2d 1072 (S.D. Cal. 2008). The United States requests that the Court dismiss the Hoopa Valley Tribe in its *parens patriae* capacity because the Tribe already received its share of the Settlement Fund and does not have a financial interest apart from its members.[12] U.S. Br. at 14-15. As explained below, the Tribe meets all three elements of the *parens patriae* test elucidated in *Alfred L. Snapp & Son.*

First the Tribe "articulate[s] an interest apart from the interests of particular private parties." *Alfred L. Snapp & Son,* 458 U.S. at 607. The Hoopa Valley Tribe, as a party to the Settlement Act, a named beneficiary thereof, and as a tribal sovereign, has been injured by the United States' actions. The Tribe has an interest in the settlement framework enacted by Congress, and was reserved the right to enforce the statute. *See, e.g.*, App. at 94; 133. This right is different from that of its members who are the Indians of the Reservation for whom the Settlement Fund was held. The Tribe and its members are legally separate entities; the Tribe has the right to represent its interests separate from that of its members. *Hopland Band of Pomo Indians v. United States*, 855 F.2d 1573, 1576 (Fed. Cir. 1988) (stating "Indian tribes can be viewed as specific governmental and legal entities distinct from their members"). Further, there is no bar to *parens patriae* in suits filed against the United States when "seeking to enforce the provisions" of a federal statute, such as the Settlement Act. *See, e.g., Kansas ex. rel. Hayden v. United States*, 748 F. Supp. 797, 802 (D. Kan. 1990).

---

*Protecting Native Americans: the Tribe as Parens Patriae*, 5 MICH. J. RACE & L. 665 (Spring 2000).

[12] Defendant makes too much of this argument. Just because the Tribe cannot demand a share of the Settlement Fund does not make it ineligible to pursue damages for an unlawful distribution of an Indian trust account to which its members are a beneficiary. In *Short IV*, the court held that plaintiffs were entitled to damages from the United States government, not to the escrow fund itself. 12 Cl. Ct. at 44.

Second, the Tribe "expresse[s] a quasi-sovereign interest." *Alfred L. Snapp & Son,* 458 U.S. at 607. A "quasi-sovereign interest" has been described as a government's "interest in the health and well-being – both physical and economic – of its residents in general," and the interest "in not being discriminatorily denied its rightful status within the federal system." *Id.* at 607, 602. The Tribe has a quasi-sovereign interest in ensuring that these Indian trust responsibilities are adhered to by the United States, and in ensuring that Hoopa Indians of the Reservation are not discriminatorily denied benefits of the federal system.

Third, the Tribe alleges "injury to a sufficiently substantial segment of its population." *Alfred L. Snapp & Son,* 458 U.S. at 607. Here, the Hoopa Valley Tribe is asserting a claim on behalf of qualifying Hoopa "Indians of the Reservation" which includes a substantial portion—if not all—of the Tribe's members, all of whom were injured when the United States excluded them from a per capita distribution of trust monies derived primarily from timber harvested from the Hoopa Square. *Short IV*, 12 Cl. Ct. 36, 45 (1987) (income from 25 U.S.C. § 407 shall be used for the benefit of the Indians who are members of the tribes concerned), *aff'd*, 50 F.3d 994 (Fed. Cir. 1995). The government's breach of trust does not affect the rights of only a set of parents or an isolated group of tribal members. *Cf. Navajo Nation v. Super. Ct. of WA for Yak. Cty*., 47 F. Supp.2d 1233, 1240 (E.D. Wash. 1999). The rights of the Hoopa Valley Tribe *qua* tribe, as well as rights of its members are implicated and adversely affected by the United States' discriminatory apportionment of the Settlement Fund, a violation of the Settlement Act that the Tribe, as a sovereign government, has a right to contest.

Defendant's argument against *parens patriae* confuses the question of whether the Tribe should be "substituted" as a plaintiff in lieu of its members, with the question of whether the Tribe has a sovereign interest that permits it to participate as a party in a "representative"

capacity of its members. U.S. Br. at 15 (citing *Short II*). First, Plaintiffs find it ironic that the United States goes to great pains to argue that Hoopa's reliance on *Short* "lacks merit," yet the United States seeks to reject the Tribe's standing "[i]n accordance with *Short II*." *Compare* U.S. Br. at 2, 28 *with id.* at 15. Defendant tries to have it both ways. Second, and more importantly, *Short II*'s "substitution" ruling is inapplicable and actually supports the Tribe's argument. Whereas "substitution" replaces one party for another, *parens patriae* provides standing in a representative capacity. *Georgia v. Pennsylvania R.R*, 324 U.S. 439, 451 (1945) (defining interests of *parens patriae* as "an interest apart from that of particular individuals who may be affected."). At issue in *Short II*, in part, was the United States' motion to "<u>substitute</u> the Yurok Tribe for the 3,800 individual plaintiffs" on the theory that "the Reservation and its resources are tribal property rather than the common property of the individual Indians and that only a tribe composed of non-Hoopa Indians and not any individual Indian has a right to recover the proceeds of the timber sales." *Short II,* 661 F.2d at 154-55 (emphasis added). At that time, the Yurok had "no existing organizational or functional tribal entity." *Id*. at 155. The Court rejected the United States' argument for two reasons: (1) "individuals whom the Secretary arbitrarily excluded from per capita distributions have the right to recover" (*id.* at 154); and (2) the absence of functioning Yurok entity would not further resolution of the litigation (*id.* at 155).[13] Here, the Tribe's *parens patriae* standing is established. *Short II*'s consideration of replacing the individuals with the incipient Tribe is inapposite to *parens patriae*.

---

[13] In 1966, during the development of the *Short* case, the United States "insist[ed] that all the individual claimants be identified and made parties rather than permitting the suit to proceed in a representative capacity" – creating a situation the *Short II* court referred to as "chaotic." *Id.* at 155. The United States seems to want chaos over that representative capacity yet again.

**B. Individual Plaintiffs Have Standing**

The United States contends only that Plaintiffs collectively lack standing because they cannot establish the "injury in fact" prong of the standing inquiry. U.S. Br. at 11. Because the United States concedes that Plaintiffs have alleged facts in the Complaint sufficient to establish the causation and redressability elements, Plaintiffs focus solely on the "injury in fact" question below and demonstrate standing. *Lujan v. Defenders of Wildlife*, 504 U.S. 555, 560 (1992).

The Court's inquiry must begin with the Complaint. *Lujan v. Nat'l Wildlife Fed'n*, 497 U.S. 871, 889 (1990) (stating that "on a motion to dismiss we 'presum[e] that general allegations embrace those specific facts that are necessary to support the claim.'")). The United States never mentions the allegations in the Complaint, focusing instead on the alleged effect of the Settlement Act on Plaintiffs' claims. *Id* at 11-13. This circular reasoning is misguided. Plaintiffs' allegations in the Complaint more than satisfy the injury in fact element of standing and nothing in the Settlement Act cuts off Plaintiffs' rights and interests at issue here.

"Injury in fact" is an invasion of a legally protected interest which is concrete and particularized, as well as actual or imminent. *Lujan*, 504 U.S. at 560. Plaintiffs allege they have suffered a concrete and actual injury by virtue of the fact that the members of the Hoopa Valley Tribe are Indians of the Reservation, and they have suffered damages as a result of the United States' unauthorized and discriminatory per capita distribution to members of the Yurok Indian Tribe from an account that was held in trust for them as well. Amend. Compl. ¶¶ 23, 66-67, 80, 101; App. 4. While Yurok members each received $15,652.89, Hoopa members got nothing. *See* Schlosser Decl. ¶ 3 (Apr. 2, 2008). Under the law of the *Short* case, if the Secretary chose to make additional payments from resources of the Joint Reservation, all Indians of the Reservation must be benefited by those payments. *Short IV*, 12 Cl. Ct. at 41-42. The language stating that the Secretary must "administer such fund as Indian trust funds" makes clear the existence of the

"trust" that runs to the Hoopa "Indians of the Reservation" as a trust beneficiary. 25 U.S.C. § 1300i(b)(5). Such "Indians of the Reservation" are "entitled to equal rights in the division of timber profits (and other income) from the unallotted trust land of the [joint] reservation." *Short III*, 719 F.2d at 1133. Nothing in the Settlement Act cuts off the beneficial interests of the Hoopa Indians of the Reservation in the escrow funds that became the Settlement Fund remainder. *See* 25 U.S.C. § 1300i-2; *see also* App. at 49 (explaining that "Indians of the Reservation" "has two meanings, one applicable generally with respect to the Hoopa Valley Reservation and one applicable to the Short plaintiffs"). Hoopa members are within the "zone of interest" of this Act. *See In re Vitamins Antitrust Class Actions*, 215 F.3d 26, 29 (D.C. Cir. 2000). Thus, Hoopa Plaintiffs are beneficiaries of the Settlement Fund and must have standing to pursue damages for a discriminatory release of such funds. *E.g., Short II*, 661 F.2d at 155 ("individuals whom the Secretary arbitrarily excluded from per capita distributions have the right to recover"); *Short III*, 719 F.2d at 1137 (plaintiffs who are proper beneficiaries "have a right to sue for the parts of those funds improperly distributed to others or illegally withheld from those claimants"); *Short IV*, 12 Cl. Ct. at 38 ("All 'Indians of the Reservation' were held entitled to receive payments, and the discriminatory distributions of the proceeds of the timber sales (and other Reservation income) constituted a breach of the government's fiduciary duties with respect to the qualified plaintiffs").

Defendant's standing theory seems premised on the idea that it could have spent the Settlement Fund anywhere and in any manner without facing legal recourse from the trust beneficiaries. Defendant also confuses individual Hoopa tribal member rights with those of the Tribe in arguing that "They received their full entitlement of the Settlement Fund," and further confuses the right to force a distribution by the United States, which the Hoopa Plaintiffs do not

have and is not asserted, with the right to damages for improper distributions, which the Plaintiffs do have and this case is about. U.S. Br. at 13.[14] The rights of the Tribe and those of individual members are different. *Puzz,* 1984 WL 23255 *5-6 (recognizing that organized tribal body and unorganized individuals simply are not similarly situated). As the Court made plain in *Short IV*:

> It is also without consequence that the monies were first distributed by the Secretary to the Hoopa Valley Tribe for subsequent distribution to the Tribe's individual members. Where the Secretary's action or failure to act permits a violation of his fiduciary obligations to occur, the United States is liable for the damages sustained. *United States v. Mitchell*, 463 U.S. 206, 226-28 . . . . The Secretary cannot avoid established trust obligations to qualified plaintiffs by making discriminatory distributions to individual Hoopas through the Hoopa Valley Tribe, when such distributions were otherwise prohibited by the law of this case. . . .
>
> . . .
>
> The violation of these duties under the statute would give rise to an action for money damages. . . .

*Short IV*, 12 Ct. Cl. at 41, 45 (emphasis added). Defendant falsely assumes that Plaintiffs lack standing if they could not force a further distribution of the Settlement Fund to them. U.S. Br. at 11-12. The fallacy of that reasoning is illustrated by the *Short* case where the court repeatedly held that plaintiffs were not entitled to the trust funds but yet were entitled to damages if those monies were individualized or otherwise handled contrary to the law. *E.g., Short IV*, 12 Cl. Ct. at 44-45. Congress intended that the tribes continue to have the ability to enforce the "rights or

[14] Defendant would have this Court believe that the money individualized in January 2008 were the only funds the Yurok have ever received from the Settlement Fund. U.S. Br. at 5, 8, 12. This overlooks the fact that the Yurok Transition Team (a predecessor to tribal organization) received funds authorized by Section 4(a)(3) and individual Indians who elected Yurok membership received approximately $15 million, authorized by Section 6(c). *See* App. at 333. Successful Short plaintiffs, most of whom are Yurok Tribe members, also recovered about $25,000 each. App. 275.

obligations created by this Act." App. at 94 (S. Rep. 100-564 at 17). Plaintiffs have established standing and none of Defendant's arguments warrant dismissal or judgment in its favor.

## V. INTERIOR VIOLATED ITS FIDUCIARY DUTIES BY ACCEPTING AN ILLUSORY CLAIM WAIVER TO DISBURSE THE SETTLEMENT FUND

Plaintiffs prevail if the Court agrees that the Special Trustee's abrupt course change in accepting a new waiver of already litigated claims from a different legal entity than Congress directed violates the Settlement Act. Defendant's three-page response is unavailing, as it *a priori* assumes the validity of the challenged proposition. *Compare* U.S. Br. at 25-27 *with* Pls. Facts ¶¶ 41-50 (prior positions against waiver) *and Akzo Nobel Salt, Inc. v. Fed. Mine Safety and Health Review Comm'n*, 212 F.3d 1301, 1304-05 (D.C. Cir. 2000) (concluding "flip-flops here mark the Secretary's position as the sort of 'post hoc rationalizations' to which courts will not defer") (internal quotation omitted). Defendant's erroneous assumptions about the merits fail.

First, the United States argues that, despite Congress' language to the contrary, the Yurok waiver can be made by any latter day Yurok entity at any time. *Id.* at 25. The United States plays fast and loose with important terminology from the Settlement Act. For example, Defendant states that the Settlement Act required "the Yurok to waive claims."[15] U.S. Br. at 6. This is inaccurate. Congress chose the terms "Yurok Tribe" and "Yurok Interim Council" with specific meanings and purposes in mind, including granting only the "Interim Council" the "full authority to adopt a resolution— (i) waiving any claim the Yurok Tribe may have against the United States arising out of the provision of this subchapter." *Id.* § 1300i-8(d)(2); *see also id.* § 1300i-1(c)(4)(D); Pls.' Mot. Partial Summ. J. at 29-31. By contrast, "Yurok Tribe" means the

---

[15] In contrast, the United States was specific when it brought the Yurok Tribe into this suit. In its RCFC 14 summons, the United States acknowledges that the "Act required the Yurok Interim Council . . . to waive claims." Def's RCFC 14 Mot. at 4.

Tribe "authorized to be organized pursuant to section 9." 25 U.S.C. § 1300i(b)(16). The "Interim Council" did not enact the waiver before it ceased to exist; no later in time entity can satisfy Congress' direction.[16] Congress was well aware that the Interim Council would exist for only two years and that this placed a time limit on the waiver decision. *See* Section 9(d)(5) and App. 159-63 (Solicitor's opinion). Section 9(a)(1) refers to the Interim Council waiver resolution as "required by subsection (d)(2)." Similarly, subsection (d)(2) preserves the Yurok Tribe's right to reopen legal obligations incurred by the Interim Council that would bind the Yurok Tribe for a multi-year period, but excepts the waiver resolution from that reservation of rights.

The Settlement Act's language notwithstanding, the United States is also plain wrong that the Yurok Tribal Council "possesses the inherent power to provide a waiver of claims." U.S. Br. at 25. The Yurok Tribal Constitution, adopted before the Interim Council ceased to exist, prohibits the Yurok Tribal Council from unilaterally acting on the waiver of claims as it did. YUROK CONST., art. IV, § 5(a) ([powers delegated to the Yurok Tribal Council]: "provided however, that laws that affect the fundamental rights of Tribal members, such as . . .the Waiver of claims issue shall not be effective until approved in a referendum among the Tribal Voting Membership pursuant to Article XI of this Constitution.").[17] The Yurok Tribal Council, acting unilaterally, could not lawfully enact the new waiver that the United States accepted in violation of the Settlement Act. App. 376. The United States admits as much in its Response to Plaintiffs' Facts where it avers that, not the Tribal Council, but the "Yurok General Council [has the] ability

---

[16] It is undisputed that the Yurok Interim Council understood that "We either have to waive our rights to any damages claim against the United States or file suit." Pl. Facts ¶ 41; *see* Def. Resp. to Pl. Facts ¶ 41.

[17] http://yuroktribe.org/government/councilsupport/documents/Constitution.pdf.

to waive claims." Def. Resp. to Pl. Facts ¶ 30. Furthermore, the United States' reliance on a letter of March 14, 1995, App. 188, U.S. Br. at 26, violates Fed. R. Evid. 408 by using a statement it offered in compromise negotiations to settle the Yurok Tribe's takings claim.

Interestingly, the United States continues to admit that the 1993 Yurok Waiver was invalid to effect an apportionment of the Settlement Fund to Yurok "because the Yurok litigated its takings claims rather than waiving them." U.S. Br. at 7; *see also* Amend. Compl. ¶¶ 37-46; Def. Resp. to Pl. Facts ¶¶ 48-49, 53. If the 1993 waiver was inadequate because of the litigated takings claims, it stands to reason that the 2007 claim waiver – also submitted after the Yurok 1992-2001 takings litigation – would be invalid and inadequate to apportion the Settlement Fund for the same reason. The United States' admission undercuts its theory that it did nothing wrong when it invited the new waiver from the wrong Yurok tribal entity in Mach 2007. Amend. Compl. ¶¶ 53-105.

Defendant's second argument, that the absence of affirmative statements to the contrary allows the Department to change its mind and accept a Yurok Tribal Council waiver two decades later, fares no better. U.S. Br. at 26-27. If Congress had intended to allow a cure after the fact by a different governing body of the Yurok Tribe, it is "difficult to understand why it did not say so in simple language." *Mountain States Tel. & Tel. v. Santa Ana*, 472 U.S. 237, 251 (1985). The United States' speculation that because "providing a new, unconditional waiver was simply not discussed before" justifies the challenged action is unavailing. U.S. Br. at 27. The silence likely means that no one thought a waiver 20 years later was a legal possibility because it presumed that Congress's choice of words failed to prevent the very takings litigation that was sought to be avoided by the waiver requirement. Under the United States' new view, the waiver requirement

only required Yurok to postpone its waiver until it had already litigated all of the claims required to be waived. That reading renders the waiver provision of the Settlement Act a nullity.

Similarly, the United States' speculation concerning the absence of a discussion in the Settlement Act or its legislative history as to the effect of taking claims on the ability to provide a later waiver ignores the fact that the silence may support Plaintiffs. *Id.* Congress would have recognized that, if litigated, res judicata would have the effect of extinguishing the takings claim that was to be waived, making it unnecessary to provide for a waiver later. After 20 years, the consideration for a waiver no longer existed. *Hornback v. United States*, 405 F.3d 999, 1001 (Fed. Cir. 2005) (holding that claim preclusion "extinguishes all rights of the plaintiff . . . with respect to all or any part of the transaction, or series of connected transactions, out of which the action arose"). Yurok's litigation extinguished the claim to be waived, making a waiver impossible.

The United States, as trustee, must represent the interest of all Indians. Here, the United States has chosen the interests of one beneficiary (Yurok Indians of the Reservation) over the interests of another beneficiary (Hoopa Indians of the Reservation). In this situation, the United States' ability to faithfully exercise its trust duties is compromised. *Wichita and Affiliated Tribes of Oklahoma v. Hodel*, 788 F.2d 765, 775 (D.C. Cir. 1986) (finding United States' representation' inadequate where the United States' allegiance was "necessarily split among three competing tribes"). The Hoopa Plaintiffs do not seek to compel the United States to distribute the Settlement Fund to them; rather, the Hoopa Plaintiffs seek to hold the United States to the trust duties provided in the Settlement Act that require the United States "to invest and administer such fund as Indian trust funds" and forbids the discriminatory distribution that occurred upon acceptance of the illusory Yurok Tribal Council waiver.

The United States fails to justify the Special Trustee's actions through word play. The Special Trustee, acting for the Secretary of the Interior, pretermitted Congress' right to reapportion the Settlement Fund remainder, and breached the United States trust duties as defined in the Settlement Act to the Hoopa Plaintiffs as Indians of the Reservation, by ignoring law as to how the Settlement Fund should be held and could be apportioned, and by making a discriminatory per capita payment from the Settlement Fund to only the Yurok Tribe Indians of the Reservation. App. 392-405; Pls. Facts ¶¶ 63-69. This is an actionable breach of the United States' fiduciary obligations for which damages are appropriate.

**CONCLUSION**

For the foregoing reasons, the Court should hear oral argument and enter partial summary judgment as to liability for breach of trust and fiduciary duties in favor of the Hoopa Plaintiffs, and deny Defendant's Motion to Dismiss, or in the Alternative for Summary Judgment.

Respectfully submitted this 10th day of September, 2008.

*s/ Thomas P. Schlosser*_____________________
Thomas P. Schlosser, *Attorney of Record*
MORISSET, SCHLOSSER, JOZWIAK & McGAW
801 Second Avenue, Suite 1115
Seattle, WA 98104-1509
Tel: (206) 386-5200
Fax: (206) 386-7322
t.schlosser@msaj.com

*Of Counsel:*
Rob Roy Smith, Attorney
ATER WYNNE, LLP
601 Union Street, Suite 1501
Seattle, WA 98101-3981
Tel: (206) 623-4711
Fax: (206) 467-8406
rrs@aterwynne.com
*Attorneys for the Plaintiff Hoopa Valley Tribe, et al.*

## CERTIFICATE OF SERVICE

I hereby certify that on September 10, 2008, a copy of the Plaintiffs' Response in Opposition To Defendant's Motion To Dismiss, or in the Alternative For Summary Judgment, and Reply in Support of Plaintiffs' Motion For Partial Summary Judgment on Question of Breach of Trust Responsibility was electronically sent via the CM/ECF system by the United States Court of Federal Claims to the following party:

Devon Lehman McCune
Email: devon.mccune@usdoj.gov

Sara E. Costello
Email: Sara.costello@usdoj.gov

*s/ Thomas P. Schlosser*____________________

Thomas P. Schlosser, Attorney of Record
MORISSET, SCHLOSSER, JOZWIAK & McGAW
801 Second Avenue, Suite 1115
Seattle, WA 98104-1509
Tel: (206) 386-5200
Fax: (206) 386-7322
t.schlosser@msaj.com

T:\WPDOCS\0020\09561\Pleadings\Hoopa Response_ Reply07.DOC
nmc:9/10/08